## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 15-10338-FDS** |
| | ) | |
| **RAFAEL LEONER-AGUIRRE,** | ) | |
| Defendant. | ) | |


## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

### I.    INTRODUCTION

The defendant, Rafael Leoner-Aguirre, has moved to suppress statements made to officers

of the Chelsea Police Department on April 16, 2014 after he received his Miranda rights in

Spanish *four times* -- twice verbally and twice in writing, and after he signed two waiver of rights

forms on which he requested to speak with officers.  To try to justify his motion, Leoner-Aguirre

claims: "When I spoke to the police I did not understand what my rights were."  Defendant's

Affidavit in support of his Motion to Suppress, document #1266-5.  The affidavit lacks any degree

of credibility since at the trial of the related state case, Commonwealth v. Rafael Leoner-Aguirre,

the defendant *testified to completely the opposite*.  See attached Exhibit 1, Trial Transcript at p.

146-7.  Specifically after agreeing with his attorney that he received his rights, Leoner-Aguirre

testified:

| | |
|---|---|
| Napolitano: | *You understood the rights as they were given to you?* |
| Leoner-Aguirre: | *I had a bit of a problem to understand them but yes, I did.* |
| Napolitano: | What you did is that even though you were read your rights, did you decide to give them a statement? |
| Leoner-Aguirre: | Yes. |

Id.[1] (Emphasis added).

The defendant knowingly, intelligently and voluntarily waived his Miranda rights before admitting to the shooting, and he testified to just that previously.   Moreover, he did not invoke his right to counsel at anytime.

## II.    BACKGROUND[2]

On April 16, 2014, at approximately 7:00 p.m., Chelsea Police officers responded to the intersection of Cary Avenue and Broadway in Chelsea, where a victim had been shot in the hip. Within minutes of the shooting, Chelsea Police dispatch received a 911 call from a witness who was following a blue Honda that had fled the scene of the shooting.  Officer Roger Digaetano caught up to the Honda and saw a man dressed in white carrying a blue backpack get out of the back seat of the car at Eastern Avenue and Central Avenue.  He radioed for assistance while he continued to follow the Honda.  Officer Digaetano was able to stop the Honda on Willow Street. Inside the Honda was Josue Morales, Kevin Ayala-Majano, Vicky Chacon-Martinez and Kenia Rivas.  A green hooded sweatshirt was seized from the car.

Office Thomas Riley responded to Officer Digaetano's radio call and saw a Hispanic male – later identified as the defendant – dressed in white with a blue backpack on Eastern Avenue.  He turned his marked cruiser around, got out, identified himself, and (now joined by Detective Stephen Garcia) ordered Leoner-Aguirre to the ground with his service weapon drawn.  As he was placed in custody, Officer Riley felt the backpack and immediately felt a hard object which he believed to be firearm.  He opened the backpack and recovered a black .380 caliber semi-automatic

---

[1]       Neither the defendant nor his counsel can claim surprise over this prior testimony that undermines any basis for the motion to suppress since counsel cited to the closing argument of this very transcript in another motion that he filed in this matter. See document #1267.

[2]       This summary consists of the expected testimony of witnesses at the hearing on the motion.

handgun that was warm to the touch.  There were no rounds left in the clip, though the officers recovered one unspent .380 caliber round from the sidewalk near where the defendant was placed in handcuffs.

Leoner-Aguirre was brought to the Chelsea Police Station following his arrest and booked per department policy.  The incident was reported at 7:08 p.m., the arrest was made at 7:40 p.m., and Leoner-Aguirre's booking began at 7:52 p.m.  <u>See</u> attached Exhibit 3, the booking sheets.

<u>Miranda</u> rights and the right to use a telephone were provided by Officer James Farden, according to his usual practice.  <u>Id.</u>  It is Chelsea Police Department policy to allow those arrested to make multiple telephone calls, without limitation to local calls.[3]  Moreover, there is a phone in the cell that allows detainees to make collect telephone calls from their cell.

According to his usual practice, Detective Stephen Garcia assisted in providing the defendant his rights by reading the <u>Miranda</u> rights in Spanish, while the defendant followed along reading the rights also in Spanish on form provided to him.  Leoner-Aguirre signed the written waiver of rights in Spanish at the booking desk.  <u>See</u> Exhibit 3, <u>Miranda</u> Rights form.  Officers Farden and Garcia signed it as well.  <u>Id.</u>

Leoner-Aguirre agreed to speak with Detective Myles Coen and Detective Emilio Ramirez and indicated this in writing by checking "<u>Si</u>' on the <u>Miranda</u> Rights form when it stated:

> 6.) Having these Rights in mind do you wish to make a knowing, voluntary and intelligent waiver of these rights and answer any questions or make any statements at this time?"

<u>Id.</u>

---

[3]     The defendant alleges in his signed affidavit and in his motion that "when he told Detective Ramirez that he wanted to call his lawyer, Detective Ramirez denied the request, telling Leoner-Aguirre that the only call he could make was to a family member, and only then if the person was in Massachusetts."  In fact, this conversation was with Detective Stephen Garcia, and not Detective Ramirez.  Detective Garcia is expected to deny this allegation.

The defendant thereby requested to go upstairs to the interview room to speak with the detectives.  He was escorted by Detective Garcia.  Before the interview began, he was again advised of his <u>Miranda</u> rights.  <u>See</u> Exhibit 1 to the Defendant's Motion, the videotaped interview. This entire interview was video recorded the transcript is attached to the defendant's Motion as Exhibit 2 ("hereinafter Transcript, p.___").  The interview began at 9:44 p.m., and Detective Ramirez explained that he speaks Spanish and will conduct the interview in Spanish.  Transcript, p. 1.  Leoner-Aguirre responded "No problem."  He was told another time that the Detectives will talk to him, and he replied: "That's fine, no problem."

Detective Ramirez gave the defendant a written copy of his <u>Miranda</u> rights in Spanish, and told him to "read your rights."  This marked the third time that Leonor-Aguirre received his rights on April 14, 2016.  Again, the defendant waived his rights in writing and again requested to continued to speak with the Detectives, who had asked some background questions.  <u>Id.</u>  After speaking with him about his name, his birthday, and where he lives, Detective Ramirez paused to read his rights to him out loud, in Spanish.  This marked the fourth time that <u>Miranda</u> rights were administered.  <u>See</u> Transcript, p. 7.

Leoner-Aguirre responded affirmatively when he understood each right, and when he said that  he did not understand the right to have an attorney present for questioning, Detective Ramirez stopped and said "I will explain it to you."  Transcript, p. 8.  Detective Ramirez explained the rights to have counsel present during questioning again and Leoner-Aguirre agreed that he understood them replying; "Ok, ok" and signed the Spanish language waiver form, marking "Si" agreeing that he comprehended his rights, and signed and dated the form.  <u>See</u> attached at Exhibit 4, blank <u>Miranda</u> forms in Spanish and English.[4]  Leoner-Aguirre then continued to speak with the

---

[4]      While it is clear from the videotaped interview that Leoner-Aguirre read from, and signed a <u>Miranda</u> form, the government has not located a copy of this form.  The blank forms are the type that were used during the interview.

detectives, saying "I want to tell you that I am not going to lie to you." Transcript, p. 8. He then continued to speak with the detectives about the events of that evening, eventually admitting to shooting the victim. Id. During the interview, Leoner-Aguirre appears relaxed, smiling, and at ease with the detectives. See Exhibit 1 to the Defendant's Motion. At no point does the defendant stop speaking, invoke his right to an attorney, or express that he is uncomfortable, confused or unwilling to continue the interview. Id.

## III.   ARGUMENT

Leoner-Aguirre's motion to suppress his statements should be denied as he previously testified that he voluntarily decided to provide a statement claiming self-defense, after he understood the Miranda rights that were provided to him repeatedly and after he signed two Miranda waiver forms requesting to provide a statement.

### A. Background

The Fifth Amendment guarantees that no "person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Pursuant to that guarantee, a suspect must be advised of his Miranda rights prior to a custodial interrogation. Dickerson v. United States, 530 U.S. 428, 438 (2000); Miranda v. Arizona, 384 U.S. 436, 444 (1966). "[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Thus, apart from interrogation in the formal sense, Miranda warnings are necessary whenever the police employ "words or actions ... (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301 (footnote omitted). An incriminating response is one that the prosecution may seek to use at trial. Id., n. 5.

5

### B. __The Defendant Received Miranda Warnings__

Leoner-Aguirre received his Miranda rights and not just once, but four times in less than two hours.  Leoner-Aguirre received Miranda warnings verbally at the booking at the Chelsea Police Station at 7:52 p.m. by Detective Garcia in Spanish and read the form as they were being explained to him.  See Exhibit 2.  Furthermore, he signed the written waiver that was in Spanish before questioning began at 9:20 p.m., witnessed by Officer Jame Farden, and also signed by Detective Stephen Garcia.  Id.

Once an effective Miranda warning is administered, those warnings remain effective until the passage of time or an intervening event makes the defendant unable to fully consider the effect of a waiver.  United States v. Hinkley, 803 F.3d 85, 92 (1st Cir. 2015).  In United States v. Pujols, the court denied suppression of defendant's statements when the defendant had been Mirandized twice on the day before he made the statements. 608 F. Supp. 2d 125, 127 (D. Mass. 2008); see also United States v. Pruden, 398 F.3d 241, 247 (3d Cir. 2005) (finding twenty hour time lapse between warnings and statements insufficient to render defendant's waiver ineffective); United States v. Nguyen, 608 F.3d 368, 375 (8th Cir. 2010) (concluding that full-day break in questioning did not make Miranda warnings ineffective); Guam v. Dela Pena, 72 F.3d 767, 770 (9th Cir. 1995) (fifteen-hour interval between the Miranda warnings and the questioning did not render defendant's confession inadmissible).

Here, the proper administration of the rights at booking covers that questioning minutes later by the detectives upstairs in the police station by the detectives.  This is certainly not an instance of "two-stage questioning" as alleged by the defendant since the defendant received and

waived his rights before ay trip to the interview room.  The defendant's reliance upon <u>Missouri v.</u> <u>Siebert</u>, 542 U.S. 600 (2004) is misplaced in this case.[5]

Leoner-Aguirre was then was given the written Spanish waiver form to read again at 9:44 p.m. at the commencement of the interview.  <u>Id.</u>  Detectives Ramirez and Coen began to talk with him about his background and education.  <u>Id.</u>

The defendant unsuccessfully attempts to characterize these first few minutes of the interview before the <u>Miranda</u> rights form as improper.  <u>See</u> Defendant's Memorandum at p. 7, document 1266.  For several reasons, these allegations of misconduct have no application here. First, Leoner-Aguirre was provided his <u>Miranda</u> rights at the booking desk both verbally and in writing, discussed above.  The defendant was reminded of this during the interview.  <u>See</u> Exhibit 1, Transcript, p. 7.

Second, the initial questions were merely background questions, much like the booking questions asked moments before.  <u>In Pennsylvania v. Muniz</u>, a four-justice plurality recognized an exception to <u>Miranda</u>, under which officers need not advise suspects of their rights before asking routine booking questions. 496 U.S. 582, 600-02, (1990) (plurality opinion).  The "routine booking" exception has been adopted by the First Circuit, and accordingly the requirements of <u>Miranda</u> do not apply to questions of an administrative nature, such as those seeking a suspect's name, address and related matters.  <u>United States v. Reyes</u>, 225 F.3d 71, 76-77 (1st Cir. 2000) (concluding that questions seeking defendant's name, date of birth, and social security number fell within routine booking exception); <u>see</u> <u>United States v. Doe</u>, 878 F.2d 1546, 1551 (1st Cir. 1989) (assuming without deciding that there existed a routine booking exception to <u>Miranda</u>).

---

[5]     The expected testimony of the officers, consistent with common sense, is that a defendant would not be taken upstairs to an interview room unless he elected to speak to the officers and indicated that in the Miranda waiver form at the booking desk.

Third, the initial questions by Detective Coen and Officer Ramirez's questions did not constitute interrogation warranting prior Miranda warnings.  The defendant claims that when the questioning was directed at gathering gang involvement information.  See Defendant's Memorandum at p. 3, document 1266.  In interpreting Miranda, the Supreme Court has limited "interrogations" to "express questioning or its functional equivalent."  Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  Interrogation means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Innis, 446 U.S. at 301 (conversation between police officers in the presence of the defendant concerning the possibility that a handicapped child might find the murder weapon did not constitute interrogation).

Leoner-Aguirre's claim also fails because the officer's inquiry was aimed at gathering background information only, and after reminding the defendant of the prior Miranda rights. Moreover, although they were not required to do so, the officers carefully re-Mirandized Leoner-Aguirre insuring that that he was again aware of his rights before moving into taking the statement that the defendant requested to provide while he was at the booking desk.  See Exhibit 4.  This background questioning did not amount to interrogation under the functional equivalency test.  See Commonwealth v. Lark, 505 Pa. 126, 133 (1984) (informing defendant of the charges against him were actions "normally attendant to arrest and custody" and did not constitute interrogation); United States v. Crisco, 725 F.2d 1228, 1232 (9th Cir. 1984) (finding agent's remarks to be "normally attendant to arrest and custody" when agent intended to inform defendant of the circumstances so that defendant would exercise his judgment as to what course of action to take).

The defendant then received his rights a *fourth* time and signed a second valid waiver, in his native language.  See Exhibit 4.  The questions he asked were thoroughly answered, and he

said "Ok, ok" and continued to answer questions after he received his rights the fourth time and signed a written waiver for for the second time.  There was no "pre-warning interrogation" compromising a valid waiver in this instance.  The conduct of Detective Ramirez was proper and was in no way "designed to impair the voluntariness of a waiver".  <u>See</u> Defendant's Memorandum at p. 7, document 1266.

### C.   <u>The Defendant Waived His Rights</u>

After receiving his rights in Spanish multiple times, in multiple forms – verbal and in writing, the defendant validly waived his rights and asked to tell his story.  For the waiver to be knowing and intelligent, the defendant must make the waiver "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>See</u> <u>United States v. Bezanson-Perkins,</u> 390 F.3d 34, 39 (1st Cir. 2004).  This requires the court to examine the totality of the circumstances.  <u>Id.</u> at 39–40.  A defendant may waive his Fifth Amendment rights so long as the waiver is given voluntarily and intelligently.  <u>See Miranda v. Arizona,</u> 384 U.S. 436, 475 (1966).  Voluntariness determinations are based on a totality of the circumstances test.  <u>See, e.g.,</u> <u>United States v.  Jackson,</u> 918 F.2d 236, 241 (1st Cir. 1990).  Truly voluntary statements must have been: i) "a product of a free and deliberate choice rather than intimidation, coercion, or deception;" and ii) "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>Colorado v. Spring</u>, 479 U.S. 564, 573 (1987) (quoting <u>Moran v. Burbine,</u> 475 U.S. 412, 421 (1986)).

Relevant factors include the particular manner in which the interview was conducted (i.e., the duration, location, and manner of the questioning), the defendant's experience with law enforcement, and his age, education and intelligence. <u>See</u> <u>United States v. Barnett,</u> 989 F.2d 546, 555 (1st Cir. 1993) (discussing voluntariness factors).  A defendant's mental and physical

condition at the time may also be considered.  See, e.g., United States v. Rosario Peralta, 199 F.3d

552, 564 (1st Cir. 1999).

Leoner-Aguirre's prior testimony establishes the waiver.  Indeed, the examination of the

voluntariness of the statement needs to look no further than Leoner-Aguirre's *own words* under

oath prove that he knew he was voluntarily waiving his rights.  In Commonwealth of

Massachusetts v. Rafael Leoner-Aguirre, the defendant testified about his experience at the

Chelsea Police Station following his arrest.  Exhibit 1, Trial Transcript, p. 146-7.  Under

questioning from his own attorney, he stated:

| | |
|---|---|
| Question:<br>(Attorney Napolitano) | The police treated you pretty well, didn't they? |
| Answer:<br>(Defendant) | In some parts, yes. |
| Question: | By that I mean you were given your rights, weren't you? |
| Answer: | Yes. |
| Question: | *You understood the rights as they were given to you?* |
| Answer: | *I had a bit of a problem to understand them but yes, I did.* |
| Question: | What you did is that even though you were read your rights, did you decide to give them a statement? |
| Answer: | Yes. |

The defendant went on to testify that his post-Miranda statement to the police was

consistent with his trial testimony.  Id.  He knowingly, intelligently and voluntarily waived his

Miranda rights and did not invoke his right to counsel at anytime before confessing to the

shooting in self-defense.  Succinctly stated, Leoner-Aguirre cannot be credibly heard to claim that his rights were abridged after he testified that they were not.[6]

### D.  Written Waiver Forms Were Signed

Courts can consider whether a defendant signed a written waiver, which amounts to "strong proof of the validity of the waiver."  North Carolina v. Butler, 441 U.S. 369, 373 (1979).  Here, Leoner-Aguirre signed two Spanish language standard waiver forms advising him of his rights.  See Exhibits 3 and 4.  Leoner-Aguirre acknowledged his rights both times by marking "Si" for "Yes" both under the "Statement of Rights" section and acknowledging that he was waiving them under the "Waiver" section and then signing and dating the document.  Id.  The detectives also signed the forms as witnesses.  Id.

Written waivers, like Leoner-Aguirre's, are solid proof of the soundness of the waiver due to the explicitness of the warning provided.  Butler, 441 U.S. at 373.  Moreover, the fact that the waivers were executed both at booking and immediately before the substantive interview support their effectiveness.  See also United States v. Hack, 782 F.2d 862, 866 (10th Cir. 1986) (finding express waiver is "usually strong proof of the validity of that waiver"); Patton v. Thieret, 791 F.2d 543 (1st Cir. 1986) (upholding waiver when given shortly before questioning).

### E.  The Recording of the Post-Arrest Interview Establishes that the Waiver Was Proper

The audio and video recording of Leoner-Aguirre's post-arrest interview, Exhibit 1 to Defendant's Memorandum, demonstrates that he properly waived his rights.  A defendant's

---

[6]     Leoner-Aguirre's own conduct is also not to the contrary.  It demonstrates that his waiver was knowing and intelligent.  It is clear from the waiver form that he chose to accompany the detectives upstairs to the interview room after receiving and waiving his rights at booking and checking the box indicating his desire to provide a statement.  See Exhibit 3.

condition at the time of the statement is a factor in the analysis.  See LeBeau v. Roden, 806 F.

Supp. 2d 384, 401 (D. Mass. 2011) (where a defendant "was both physically and mentally in

command of himself at the time of his arrest and throughout the police station interview," waiver

held to be valid).

The recording of the interview provides patent evidence supporting the validity of Leoner-

Aguirre's waiver.  Exhibit 1 to Defendant's Memorandum.  It clearly depicts the defendant's

normal demeanor and speech as well as the Officer Ramirez explaining his rights while the

defendant followed along.  Frankly, one can see for themselves that Leoner-Aguirre is far from

confused by the process.

First, Leoner-Aguirre answers the questions and continues to be interviewed.  This is solid

evidence of the validity of the waiver.  See United States v. Mejia, 600 F.3d 12, 18 (1st Cir.

2010)("He received *Miranda* warnings three times in his native language, twice orally and once in

writing; he also attested that he understood his rights by initialing and signing the *Miranda*

warning form. According to the district court's factual findings, he then began responding to

questions willingly and even offered to become an informant. The totality of the circumstances

indicate that this was a voluntary conversation that Mejia undertook after having been fully

advised of his rights."); see also Bui v. DiPaolo, 170 F.3d 232, 240 (1st Cir. 1999).

Second, his promise at the outset of the statement also supports the soundness of the

waiver.  Leoner-Aguirre said to the detectives, "I want to tell you that I am not going to lie to you."

Transcript, p. 8.

Third, the video shows that Leoner-Aguirre was obviously mentally in command of

himself.  He followed along with the conversation and was able to focus on the person speaking

and responded appropriately.  His speech was clear and cogent, factors that weighed recently in

favor of a voluntariness finding in <u>United States v. McForbes</u>, No. CRIM. A. 15-40014-TSH, 2015 WL 3884235, at *3 (D. Mass. June 24, 2015).  Further, during the interview, Leoner-Aguirre carefully read the waiver form and asked a question from it.

There is simply no evidence that Leoner-Aguirre was "very confused" as he now complains.  <u>See</u> Affidavit of the Defendant, document 1266-6.  Accordingly, there is no basis for relief from his waivers of rights.

### F.   Leoner-Aguirre's Statements were Voluntary

Defendant's next complains that his post-arrest statements should be suppressed because they were not voluntary.  This challenge also misses the mark.  The voluntariness of a statement depends on "whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act." <u>Bryant v. Vose</u>, 785 F.2d 364, 367–68 (1st Cir. 1986), citing <u>Procunier v. Atchley</u>, 400 U.S. 446, 453 (1971).  A defendant challenging admission of statements made subsequent to <u>Miranda</u> warnings must point to evidence tending to show that his statements made after waiving his rights were "coerced, compelled or involuntary."  <u>United States v.  Duarte</u>, 160 F.3d 80, 81 (1st Cir. 1998) (quoting <u>United States v. Lawrence</u>, 889 F.2d 1187, 1189 (1st Cir. 1989)).

The government has the burden of proving by the preponderance of the evidence that such statements were given voluntarily and without coercion. <u>See United States v. Palmer</u>, 203 F.3d 55, 60 (1st Cir. 2000).  As in the waiver analysis discussed above, this requires a totality of the circumstances inquiry. <u>United States v. Hufstetler</u>, 782 F.3d 19, 22 (1st Cir. 2015) <u>cert.  denied</u>, (U.S. Oct. 5, 2015).

### G.  Leoner-Aguirre's Will Was Not Overborne

There is no evidence that Leoner-Aguirre's will was overborne by the actions of the officers.  Rather, the videotaped interview reveals that the defendant was calculating with both his questions and his responses.  See United States v. Clark, 746 F. Supp. 2d 176, 187 (D. Me. 2010) (statements held voluntary where defendant "made strategic, voluntary, and knowing choices concerning what he revealed to the police, and when. [The agents] at no point endeavored to deceive the defendant, and the defendant was not in fact deceived, by [their] promises.")

Leoner-Aguirre's post-arrest interview revealed that he told what are best described as an attempt at explaining away his flight from the scene of the shooting, carrying a backpack with the gun used in the shooting.  Leoner-Aguirre's conduct demonstrated his cognizance of what he was doing (minimizing his accountability), and contradicts his complaint of police coercion overtaking his self-control.

Moreover, it bears repeating with regularity bordering on redundancy that Leoner-Aguirre stated in the two written waiver forms that "Having these Rights in mind do you wish to make a knowing, voluntary and intelligent waiver of these rights and answer any questions or make any statements at this time?"  See Exhibit 4.  Taken at his word, this ends the inquiry into his present lack of voluntariness claim.

Lastly, perhaps the best indication that Leoner-Aguirre's statement was not a coerced confession is that he *denied responsibility for the crime claiming self-defense.* Transcript, p. 7.  There is no basis to suppress Leoner-Aguirre's statement and his motion should be denied.

### H.  Defendant Did Not Invoke His Right To Counsel

The defendant contends that he invoked his right to have counsel present during the interview by mentioning that he had an immigration lawyer in Michigan.  This claim also is meritless.  The invocation of the right to counsel must be clear and unequivocal.  Davis v. United

States, 512 U.S. 452 (1994).  This is an objective inquiry.  Id.  "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning."  Davis v. United States, 512 U.S. 452, 459 (1994).  "Rather, the suspect must unambiguously request counsel.  As we have observed, a statement either is such an assertion of the right to counsel or it is not." Id.  (internal quotations omitted).

The Second Circuit dealt with facts substantially similar to this case in United States v. Oehne, 698 F.3d 119 (2d Cir. 2012).  In Oehne, the defendant was handcuffed and detained in a parked cruiser.  Id.  The officers read him his rights, and he told the officers that he had a lawyer. Id.  The officers confirmed that he meant that he had a lawyer for separate pending charges in another state.  Id.  The court recognized that Oehne had a right to counsel for the unrelated matter, but that the right is offense specific, and "'its effect of invalidating subsequent waivers in police-initiated interviews is [also] offense specific.' With respect to the instant offense, Oehne never requested a lawyer, even tentatively—he merely informed the officers that he had a lawyer for an unrelated charge."  Id. at 123, citing McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); see also Delap v. Dugger, 890 F.2d 285, 294 (11th Cir. 1989) ("On these facts we conclude that the mere indication that Delap was represented by counsel in an unrelated matter does not constitute even an equivocal request for counsel.").

Here, Leoner-Aguirre's statement was: "the problem is that what you say 'waive your right to an attorney'….I have my attorney."  Transcript, p. 7.   Defendant claims that this declaration regarding a Michigan lawyer was a tantamount to invoking his right to counsel to be present during the questioning is far less compelling than Oehne's contentions that were ruled

ineffective.  698 F.3d 119, 123 (2d Cir. 2012) (There was no clear invocation when the defendant "never requested a lawyer, even tentatively—he merely informed the officers that he had a lawyer for an unrelated charge.")

The mere reference to an attorney in an unrelated case doesn't even approach the requirement of an unequivocal demand for a lawyer.  Id.[7]

The defendant further asserts in his affidavit that he was denied the opportunity to call his Michigan attorney.  See Defendant's Affidavit, paragraph 8, document #1266-6.   This statement lacks any appearance of credibility.  First, the booking sheet, Exhibit 3, designates that the defendant was advised of his rights under state law to use a telephone by the booking officer, James Farden.

Second, this same affidavit is contradicted by the defendant's trial testimony regarding his understanding of his rights, discussed earlier.  It follows that the affidavit is likewise untrustworthy pertaining to other assertions in it.[8]  Third, Detective Garcia will testify that he has never denied anyone the opportunity to use the telephone.  Moreover, the procedure employed by the department involves routinely permitting multiple telephone calls and places no limits on whether

---

[7]    Counsel appears to combined two issues here: Leoner-Aguirre's right to have counsel represent him in court in Michigan at his unrelated immigration matter; and Leoner-Aguirre's right to have counsel present during questioning by the officers.  However, Leoner-Aguirre clearly understood.  After asking about it, Detective Ramirez stopped and said "I will explain it to you."  Transcript, p. 8.   The defendant then declared "Ok, ok" and signed the Spanish language waiver form, marking "Si" agreeing that he comprehended his rights, and signed the form.  See attached at Exhibit 4.

[8]    It is well-settled in this District that the affidavit also does not constitute evidence at the hearing, unless the defendant testifies and is subject to cross-examination.  The First Circuit has recently stated, "Like the defendant in Baskin, Phillipos sought to establish the requisite factual predicate for his motion solely on the basis of his own affidavit, which he would not allow the government to test through cross-examination. …In light of Baskin, we see no basis for concluding that the District Court abused its discretion in finding that the affidavit, on its own, failed to establish the sufficient threshold showing of a factual dispute that Phillipos was required to make." United States v. Phillipos, 849 F.3d 464, 469 (1st Cir. 2017), as clarified on denial of reh'g. No. 15-1716, 2017 WL 3307482 (1st Cir. Aug. 3, 2017) citing United States v. Baskin, 424 F.3d 1 (1st Cir. 2005).

the telephone calls made are local or long distance.  In addition, there is a telephone available to make collect calls in each jail cell where detainees are held after booking and before they are interviewed by detectives.

Finally, the defense claims that prophylactic rule established in Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), that once a defendant clearly invokes a right to counsel all questioning must cease unless the defendant himself reinitiates is applicable in this case.  In Edwards, the defendant was questioned, clearly invoked his right to an attorney, saying "I want an attorney before making a deal" and then the following day, officers resumed questioning Edwards, which the court found to be a violation of his constitutional rights.  Id. at 479.

The facts of Edwards bear no resemblance to the instant case.  Leoner-Aguirre did not exercise a right to counsel.  His questions were answered and he did not ever invoke a right to counsel.  Rather, he agreed, multiple times, to answer questions and continued to answer questions and confess to the crimes.  In United States v. Bezanson-Perkins, 390 F.3d 34, 39 (1st Cir. 2004), the First Circuit held that asking "so if I requested a lawyer, there would be one that would come right now?" did not invalidate a previous knowing, intelligent and voluntary waiver of Miranda rights and serve as a clear invocation of counsel.

Leoner-Aguirre's question was less definite than in Bezanson-Perkins, and plainly does not meet the standard for invocation.

## IV.   CONCLUSION

Based on the foregoing, the United States respectfully requests that this court deny Rafael

Leoner-Aguirre's Motion to Suppress.


Respectfully submitted,

WILLIAM D. WEINREB
Acting United States Attorney


By:   Glenn A. MacKinlay
      GLENN A. MACKINLAY
      KUNAL PASRICHA
      Assistant U.S. Attorneys

## **CERTIFICATE OF SERVICE**

The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

By:   s/ Glenn A. MacKinlay
      GLENN A. MACKINLAY
      Assistant U.S. Attorney