## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**22. RAFAEL LEONER AGUIRRE**<br>   **a/k/a "TREMENDO,"**<br><br>**Defendant.** | **Criminal No. 15-10338-FDS** |

## GOVERNMENT'S TRIAL BRIEF

The United States submits this trial brief to provide a high-level overview of the evidence it intends to introduce at trial, and to preview certain issues that may arise at trial.[1]

## I.    Overview of the Alleged Charge and Legal Elements

Defendant Rafael Leoner Aguirre a/k/a "Tremendo," is charged in Count Two of the Fifth Superseding Indictment with conspiracy to conduct enterprise affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).   As alleged in the Indictment, "the pattern of racketeering activity" consisted of:

   a)   multiple acts involving murder, in violation of Massachusetts General Laws, Chapter 265, Section 1 (murder), Section 15 (assault with intent to murder), Section 16 (attempt to murder), and Section 18 (armed assault with intent to murder), and in violation of Massachusetts General Laws, Chapter 274, Section 7 (conspiracy to commit murder);

---

[1]   This brief attempts to avoid rehashing issues that are or have been the subject of motions in limine or other pretrial litigation.

b)   multiple acts involving robbery, in violation of Massachusetts General Laws, Chapter 265, Section 17 (armed robbery), Section 18 (armed assault with intent to rob), and in violation of Massachusetts General Laws, Chapter 274, Section 6 (attempted robbery) and Section 7 (conspiracy to rob); and

c)   multiple offenses involving trafficking in narcotics, including cocaine, cocaine base, heroin, and marijuana, in violation of 21 U.S.C.§§ 846 and 841(a)(1).

To sustain its burden, the government generally has to prove: (1) the existence of an enterprise, (2) that the enterprise affected or would affect interstate or foreign commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that a conspirator did or would participate in, either directly or indirectly, the conduct of the affairs of the enterprise; and (5) that a conspirator did or would knowingly participate in the conduct of the enterprise through a pattern of racketeering activity.  *See* Seventh Circuit Pattern Jury Instructions (1999 ed.); Eleventh Circuit Pattern Jury Instructions § 71.1 (2003 ed.); *United States v. Nascimento*, 491 F.3d 25, 48 (1st Cir. 2007); *United States v. Cianci*, 378 F.3d 71, 90 (1st Cir. 2004).  *See also Laverty v. Massad*, No. 08-40126-FDS, 2009 WL 1873646, at *6 (D. Mass. Mar. 10, 2009) (Saylor, J.) ("A RICO conspiracy count must allege (1) that an enterprise affecting interstate commerce existed, (2) that the defendant knowingly joined the conspiracy, and (3) that the defendant intended to further an endeavor which, if completed, would have satisfied the pattern requirement of RICO.").

Importantly, "a RICO conspiracy charge need not specify the predicate or racketeering acts that the defendants agreed would be committed." *United States v.*

*Applins*, 637 F.3d 59, 80-82 (2d Cir. 2011); *see also Laverty*, 2009 WL at 1873646

(Saylor, J.) (citing *Salinas* and holding in a civil RICO case that there is "no[ ] need

to allege that each conspirator agreed to commit (or actually committed) two or

more predicate acts," "no overt act is required," and "a defendant may be part of a

RICO conspiracy even if he has not committed a substantive RICO violation").

Accordingly, the government does not need to prove any overt or racketeering

acts by the defendant. *See, e.g.*, *Salinas v. United States*, 522 U.S. 52, 63 (1997)

("There is no requirement of some overt act or specific act in the statute"); *United

States v. Randall*, 661 F.3d 1291, 1297 (10th Cir. 2011) ("Based on *Salinas*, a few of

our sister circuits have concluded that it is not necessary to prove the specific

predicate acts that supported a RICO conspiracy charge in order to prove a

defendant's participation in a RICO conspiracy.  We agree with that conclusion.");

*United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991) (rejecting argument that

the government must specify individual predicate acts of racketeering and the

government's proof at trial must be limited to such predicate acts).

## II.   <u>Overview of the Government's Case</u>

Following a multi-year investigation, the government charged 61 leaders,

members, or associates of La Mara Salvatrucha (MS-13) with various violations of

federal law, including RICO conspiracy.  The 61 co-defendants in this case belonged

to at least ten different MS-13 cliques operating in Massachusetts.  The underlying

investigation involved the gathering of tens of thousands of pages of documents,

thousands of recordings, and countless pieces of physical evidence.  The examples of

the means and methods of the RICO conspiracy included specific references to six different murders and approximately twenty attempted murders, as well as multiple specified examples of drug trafficking.

Although the law allows the government to introduce evidence of all those acts (and even uncharged racketeering acts by alleged co-conspirators or unindicted co-conspirators), the government's presentation will be far more limited and focused at trial.  Specifically, the government's presentation will focus on (1) evidence that establishes the broader MS-13 criminal enterprise, and (2) evidence that establishes defendant's association with the enterprise and participation in the conspiracy, primarily through the testimony of cooperating witnesses and co-conspirator statements buttressed by a limited amount of corroborating evidence of racketeering activity by the defendant and other members of his clique.

### A.    Evidence of the Violent, Criminal Enterprise Known as MS-13

MS-13 is one of the largest criminal organizations in the United States, with members operating in Chelsea, East Boston, Somerville, Everett, Revere, and other parts of Massachusetts.  Members of MS-13 engage in criminal activity including murder, attempted murder, robbery, drug trafficking, illegal possession of firearms, and obstructing justice in the form of threatening and intimidating witnesses who they believe are cooperating with law enforcement.  Participation in criminal activity, particularly violent acts directed at rival gangs or as directed by MS-13 leadership, increases the level of respect accorded a member and his position within MS-13.  MS-13 members recruit members—often juveniles inside high schools—

from communities such as Chelsea, which have a large number of immigrants from

El Salvador, Honduras, and Guatemala.  At trial, cooperating witnesses will provide

evidence of these facts, including evidence of the defendant recruiting young

members in Chelsea.

As a whole, MS-13 is run by leaders in El Salvador who establish policies and

procedures that govern the criminal organization, and who communicate orders to

members of MS-13 in the United States.  MS-13 is organized in the form of so-called

"cliques," that is, smaller groups, with a leadership structure, acting under the

larger mantle of MS-13.  To coordinate hundreds of cliques in numerous disparate

locations, MS-13 is divided into "programs."  MS-13 generally organizes its

programs either by name or by geography, such as the Hollywood Program or the

East Coast Program.  Grouping cliques into these programs creates a hierarchy that

expedites the process of getting orders from leadership in El Salvador to the street.

If a clique does not fall under a particular program, that clique nevertheless falls

under the umbrella of MS-13 and reports to leaders in El Salvador.  MS-13 cliques

work both independently and cooperatively to engage in criminal activity and assist

one another in avoiding detection by law enforcement.  At trial, the government will

present testimony from an MS-13 gang expert to help the jury understand the gang.

Leaders from El Salvador often communicate with leaders in the United

States through cell phone conference calls.  During these calls, Salvadorian leaders

communicate the goals and objectives of MS-13 to the U.S.-based leadership.  The

leaders then pass on these directives to clique members during clique meetings.  At

trial, the government will play a recording of one such meeting of the "East Coast Program," where a leader from El Salvador calls in to provide guidance to MS-13 leaders from across the East Coast, including Massachusetts.

Prospective members of MS-13 are generally required to complete an initiation process: from "paro," to "observation," to "chequeo," to "homeboy."  To become a homeboy, prospective members typically have to participate in a murder or other very serious violent crime for which they are rewarded by being "jumped-in" or "beat-in" to the gang, although in rare instances members can be "blessed-in." A "beat-in" involves an initiation process where the new homeboy is beaten in by the other homeboys while a leader counts to 13.  At trial, the government will play a recording of one of these beat-in initiations.

MS-13 members wear certain distinctive colors and clothes, and use certain distinctive weapons such as machetes or bladed weapons.  At trial, the government will introduce some of the MS-13 paraphernalia and weapons seized during this investigation.

### B.   Evidence of the Defendant's Role in MS-13 and the Enfermos

In Massachusetts, some of these cliques are identified by names such as East Boston Loco Salvatrucha ("EBLS"); Eastside Loco Salvatrucha ("ESLS"); Everett Loco Salvatrucha ("ELS"); and Enfermos Criminales Salvatrucha ("ECS").  At trial, the government will establish that defendant Leoner-Aguirre was the leader of the Enfermos or ECS clique.  The evidence will also show that the Enfermos were a fledgling group comprised of junior MS-13 members (generally "paros" and

"chequeos" who had not gained full membership as "homeboys") leading up to 2014, when defendant Leoner-Aguirre a/k/a Tremendo arrived in Chelsea and took over the leadership of the Enfermos.  Once Tremendo arrived, he organized and led this more inexperienced group of MS-13 members, which included David Lopez a/k/a Cilindro or Villano, Hector Ramries a/k/a Cuervo, Bryan Galicia-Barillas a/k/a Chucky, Daniel Menjivar a/k/a Roca, and CW-2 and CW-12.

At trial, through witness testimony, the government will provide extensive evidence about defendant's role in the conspiracy and the wave of violence that began once the defendant arrived in Chelsea in Spring 2014, organized the newer members into the local Enfermos clique, and encouraged the Enfermos to commit acts of violence.  The racketeering activity that the government will present evidence about will focus on the violence committed by the Enfermos in the year after the defendant arrived in Chelsea and took over leadership of the Enfermos:

- *Attempted Murder by defendant Tremendo on April 6, 2014:*  Chelsea Police officers were dispatched to the intersection of Central Avenue and Shurtleff Street for a report of a man in the street with a machete. When they arrived, they found blood and a box cutter.  Evidence will show that during the confrontation with the victim, the defendant pulled out a machete and struck the victim in the head.  During this attack, the defendant flashed MS-13 gang signs and referenced La Mara as he struck the victim.

- *Robbery by Cuervo and Tremendo on April 9, 2014*: The victim was sitting on the stairs in front of his home when the two Enfermos members approached him, put guns to his head, asked repeatedly if he was 18th Street, and robbed him.  The incident was captured on video surveillance that will be introduced at trial.  The assailants forced the victim to remove his shirt to look for gang tattoos and took his cell phone and cash.

- *Attempted murder by Tremendo on April 16, 2014*:  Chelsea Police responded to the intersection of Cary Avenue and Broadway in Chelsea, where a victim had been shot.  Witnesses provided information about the assailant fleeing in a car.  Within minutes, police located the vehicle and arrested the defendant as he got out of the car.  They seized a gun from him and arrested him.  Parts of the shooting were caught on surveillance video, and the government will also present testimony from multiple cooperating witnesses who were with Tremendo during the incident.

- *Attempted murder by Roca and Villano on May 29, 2014*:  Just after midnight, the victim was found stabbed on the street.  In recorded conversations that will be introduced at trial, Roca admitted to stabbing the man over 20 times and Villano admitted to shooting the man multiple times after Roca had already stabbed him. The efforts of first responders and emergency surgery saved the victim's life.

- *Attempted murder by Bravo, Chucky, and Little Crazy on September 8, 2014*:  Police responded to Blossom Street for a report of a stabbing where the victim was found bleeding with puncture wounds in his back.  Witness accounts and video surveillance reveal that three MS-13 members attacked the victim.  Chucky and others were recorded talking about this attack, and cooperating witnesses will identify the three MS-13 members running from the scene.

- *Murder of Katerin Gomez by Cuervo and Chucky on October 18, 2014*:  The government will present very limited evidence of this incident, focusing mostly on the efforts of the Enfermos to go out looking for rival gang members to attack on that and other nights.  For example, the government will present limited evidence from Cuervo's phone where he admits to membership in the Enfermos and references shooting rival gang members with his homeboys.  The government does not intend to present photos of the scene or the autopsy, present testimony from any family members, or mention the location or circumstances of where the victim was killed.

- *Multiple robberies committed by Enfermos members*: Evidence will show that Tremendo called Enfermos clique meetings where he told members that they needed to commit more robberies so that they could send back more money to San Vincente, El Salvador.

- *Conspiracy to Kill CW-2*:  Buttressing evidence of these acts will be evidence of the conspiracy to kill CW-2 in March and April 2015.  Testimony will show that CW-2 was targeted because the clique believed he was cooperating with law enforcement.  He was not cooperating at the time, but law enforcement interceded to save his life and CW-2 then began cooperating.  In recording conversations, Roca indicates that Tremendo issued the order to kill CW-2.  Recordings also include members discussing how CW-2 can provide evidence about all the Enfermos, including Tremendo, Cuervo, Chucky, and Villano, and therefore must be killed.  Other recordings will show Chucky and Villano driving around looking to hunt and kill CW-2 on or around April 28, 2015, the same day CW-2 was testifying before a federal grand jury in this case.

While not required, all the acts above were generally listed in the Indictment.  As may be expected, the testimony of cooperating witnesses who are describing in detail the inner workings of the MS-13 enterprise and the Enfermos clique led by Tremendo will necessarily involve mentions of other racketeering activity that was intrinsic and inextricably interwoven with the conspiracy.  This testimony might include mention of uncharged acts or other enterprise evidence, all of which courts routinely find admissible in RICO cases.  *See, e.g.*, *United States v. Ramirez-Rivera*, 800 F.3d 1, 44 (1st Cir. 2015) (permitting the government to introduce evidence of uncharged gang criminal activity to prove elements of the charged RICO offense, specifically the existence and nature of the criminal enterprise and conspiracy); *see also United States v. DeCologero*, 530 F.3d 36, 54 (1st Cir. 2008); *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (admitted evidence that members of the Latin Kings Street gang committed uncharged crimes of violence "to prove the existence, organization and nature of the RICO enterprise, and a pattern of racketeering"); *United States v. Richardson*, 167 F.3d 621, 625-26 (D.C. Cir. 1999) (continuity may be established by the totality of all the co-defendants' unlawful conduct); *United*

*States v. Keltner*, 147 F.3d 662, 667-68 (8th Cir. 1998) (uncharged criminal conduct by coconspirator admissible to prove the enterprise); *United States v. Gonzalez*, 921 F.2d 1530, 1545-47 (11th Cir. 1991) (uncharged crimes by defendant and other conspirators admissible to prove the enterprise and continuity) (collecting cases).

Uncharged acts and evidence that may be introduced through the testimony of cooperating witnesses might include the following:

- CW-2 is expected to testify about how he and other MS-13 members beat up rival gang members and robbed them.  He will also describe a MS-13 robbery and stabbing that occurred in July or August 2014 where Enfermos member Bravo explained how and another MS-13 member robbed and stabbed an 18th Street rival.  Further, CW-2 will explain how Enfermos member Chucky was involved in another shooting of an 18th street member in the months or weeks before the Katerin Gomez shooting.

- Both CW-12 and CW-2 will testify regarding other robberies sanctioned by the Enfermos clique that they did in Chelsea and the surrounding areas, including robbing people on the street with knives and robbing food deliverymen.

- CW-2 and CW-12 will describe how Chucky and Cuervo painted MS-13 graffiti at Chelsea High School, and how they were disciplined by Tremendo with a 13 second beating for doing so.

- CW-12 will explain how beatings by 18th Street gang members became the impetus for CW-12's recruitment into MS-13 and how he became a part of the Enfermos clique.  CW-12 may also describe how Enfermos member Roca threatened his father after he was arrested and CW-12 understood this to be a threat to CW-12 and his family if he cooperated with law enforcement.

- CW-15 will describe Tremendo's historical involvement with MS-13 dating back to his days in El Salvador.

- CW-15 will also testify to the illegal border crossing undertaken by Temendo, and the trip to Massachusetts that Tremendo took with CW-15, Gallito, and Bravo as he made his way to Chelsea to become the leader of the Enfermos clique.

Other uncharged acts and evidence intrinsic to the conspiracy is likely to be mentioned in co-conspirator statements detailed in a supplemental filing. *See* Dkt. No. 1531.

## III. <u>Anticipated Legal Issues</u>

### A. Acts Intrinsic to the Conspiracy are Not Subject to Rule 404(b)

The evidence concerning the alleged enterprise and racketeering conspiracy, including evidence of prior MS-13 acts and activities by the defendant and coconspirators, is not subject to Fed. R. Evid. 404(b) because it is intrinsic to the crime charged. *See, e.g.*, *United States v. Manning*, 79 F.3d 212, 217 (1st Cir. 1996) ("Evidence intrinsic to the crime for which the defendant is on trial, accordingly, is not governed by Rule 404(b)"); *United States v. Tutiven*, 40 F.3d 1, 4 (1st Cir. 1994) (evidence "intrinsic" to the crime for which the defendant is on trial is simply not governed by Rule 404(b)); *United States v. Henley*, 766 F.3d 893, 914-15 (8th Cir. 2014) (holding that "evidence of uncharged crimes was admissible in a RICO prosecution as 'proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy'") (citations omitted); *United States v. Guerrero*, 768 F.3d 351, 365 (5th Cir. 2014) (holding that "evidence of an uncharged offense arising out of the same transactions as the offense charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b)" and finding evidence of uncharged murder, drug trafficking, and extortion admissible in RICO and VICAR prosecution) (citations omitted).

**B. Co-Conspirators and Co-Conspirator Statements.**

The government alleges that the defendant is a member of MS-13 and a leader of the Enfermos clique.  The evidence produced in discovery indicates that the defendant was working in concert with other individuals in connection with his association with the MS-13 enterprise and the racketeering activities of the enterprise.  Evidence further indicates that MS-13 is a cohesive organization that has as one of its institutional objectives the promotion and protection of the organization's power and influence, and as a member of MS-13, the defendant was aware of these policies and was involved in their implementation in concert with other leaders and members of MS-13.

Information concerning unindicted co-conspirators can be found in the reports previously produced in this matter, as well as in the consensual recordings listed on the government's exhibit list.  While the government has not identified every voice on the recordings listed on its exhibit list, it is clear from the content of the recordings that every participant on the recording is a member of MS-13 who ascribes to the organization's goals and purpose.

For the avoidance of doubt, it is the government's position that its cooperating witnesses, all MS-13 members recorded or mentioned on the recordings and transcripts the government seeks to introduce, and MS-13 members referenced in Jencks and other materials who are not named defendants in this case are all unindicted co-conspirators.

### C. Prohibition Against Improper Impeachment.

The government intends to present the testimony of several witnesses in its case-in-chief who have been arrested in the past; some of these witnesses have felony convictions, or at the very least, felony arrests, on their criminal records. The government seeks an order from this Court preventing defense counsel from attempting to impeach witnesses through arrests and crimes for which they were not convicted, pending cases, or non-qualifying convictions under Fed. R. Evid. 609.

Under Fed. R. Evid. 609(a)(1), "for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant," and under Fed. R. Evid. 609(a)(2), "for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving — or the witness's admitting — a dishonest act or false statement." However, allegations are not convictions. Arrests are not convictions. Dismissed charges are not convictions. Pending, unresolved cases are not convictions, and acquittals are not convictions.

Importantly, "Rule 403 protects government witnesses . . . against the danger of 'unfair prejudice.'" *United States v. Tse*, 375 F.3d 148, 163 (1st Cir. 2004). "[T]he prior convictions of government witnesses are more likely to cause 'unfair prejudice to the government's interest in a fair trial and unnecessary embarrassment to [the] witness,'" *id.* at 164, and thus should be excluded, *see United States v. Orlando-*

*Figueroa*, 229 F.3d 33, 46 (1st Cir. 2000) (affirming district court's decision to exclude prior crime of government witness involving dishonesty).

Unless there is prior Court approval for attempting to impeach a witness about prior arrests, dismissed charges, pending unresolved charges, acquittals, non-qualifying convictions, or underlying factual basis, no witness should be cross-examined in any manner about such subjects.

### D. Potential Need for Leading Questions During Direct Examination.

The government anticipates calling witnesses who either (i) identify with the defendant and the MS-13 criminal enterprise, or (ii) are otherwise hostile towards the government, such as rival gang members, or those who believe that the government is putting their safety and security at risk by calling them as witnesses. The government may use leading questions in developing testimony from such witnesses, and in proper circumstances, may request that one of its own witnessed be declared hostile.

By way of example, the government will call several witnesses who have expressed their frustration, anger, and fear about having subpoenaed to testify in trial.   Other witnesses have had personal relationships with the defendant or co-conspirators.   Yet other witnesses were willing to give interviews in the past but are incredibly fearful for their safety if they testify in open court.  Still other witnesses are believed to be associated with the 18th Street or East Side gangs.

The government will request permission, as needed, to use leading questions to develop the testimony of witnesses who are fearful, reluctant, hostile to the

government, or aligned with the defendant or co-conspirators. Rule 611(c) permits the use of leading questions in direct examination to "develop the witness's testimony," or in dealing with hostile witnesses or witnesses identified with the other party. *See United States v. Bowie*, 618 F.3d 802, 815 (8th Cir. 2010). The term "identified with an adverse" has been construed broadly to include family, friends, employees, or agents of an adverse party. *See, e.g., United States v. Brown*, 603 F.2d 1022, 1026 (1st Cir. 1979) (allowing prosecutor to lead witness who was close friend of defendant and a participant in crime); *United States v. Perez,* 106 Fed. Appx. 597, 598 (9th Cir. 2004) (no error in allowing the government to ask leading questions of the defendant's mother who was either reluctance or suffering from significant memory loss or both); *United States v. Hicks*, 748 F.2d 854, 859 (4th Cir. 1984) (allowing leading questions of defendant's girlfriend); <u>Stahl v. Sun Microsystems, Inc.</u>, 775 F. Supp. 1397, 1398 (D. Colo. 1991) (allowing leading questions of defendant's former secretary).

Moreover, courts have generally allowed the government to ask leading questions of a witness who appear to be feigning memory loss in order to avoid testifying. *See, e.g.*, *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 758 (5th Cir. 2008). The government will seek permission to treat witnesses as hostile when they qualify as a reluctant party or one aligned with the defendant in some way.

### E. Spanish Language Issues.

The government anticipates calling multiple witnesses whose primary language is Spanish, and who will need the services of an interpreter. Given the

mandate of Rule 611(c), the government may use a few more leading questions than the norm to "develop the witness's testimony" if language barriers make it difficult for a witness to follow the traditional mode of questioning or if it appears that jurors might benefit from some leading questions to develop the witness's testimony.

In addition, most of the recordings the government will seek to introduce into evidence are in Spanish, and the government will seek to introduce the English translations of such recordings as well. The government anticipates reading in parts of those transcripts into the record so that the jury can understand the contents of the recordings.

The government anticipates that significant time will be spent during trial translating the testimony of witnesses into English or reading the English translations of recordings into evidence. The government has done its best to account for such time in the estimate of time it provided the Court for the presentation of its case-in-chief.

### F.  911 Communications and Related Statements

The government will offer into evidence several 911 emergency telephone communications. These communications qualify as exceptions to the hearsay rules under both Fed. R. Evid 803(1) and (2).

The fundamental premise behind the present sense impression exception under Fed. R. Evid. 803(1) "is that the substantial contemporaneity of the statement and the event described or explained offsets the likelihood of deliberate or conscious misrepresentation." *United States v. Ferber*, 966 F. Supp. 90, 97 (D.

Mass. 1997); *citing Makuc v. Am. Honda Motor Co.*, 835 F.2d 389, 391 (1st Cir. 1987).  *See also Chambers v. Mississippi*, 410 U.S. 284, 298-99 (1973) (hearsay exceptions are premised on the idea that the particular circumstances surrounding the making of certain utterances guarantee their reliability).

The requirements for admissibility under Fed. R. Evid. 803(1) are: (i) "the declaration must be limited to describing or explaining the event in question," (ii) "the statement must be made contemporaneously or immediately after the event described," and (iii) "the declarant must have been describing something that she actually perceived herself, though her participation in the event is not required." *Ferber*, 966 F. Supp. at 97.

The "contemporaneous" element is not applied in a draconian manner.  "[I]n many, if not most, instances[,] precise contemporaneity is not possible and hence a slight [time] lapse is allowable."  *United States v. Shoup*, 476 F.3d 38, 42 (1st Cir. 2007).  *See also United States v. Taveras*, 380 F.3d 532, 537 (1st Cir. 2004) (noting that permissible delay may in fact be even "a few minutes" or more).

Based on the reasoning above, courts have routinely allowed the admission of 911 calls or reports to the police made soon after an incident.  *See, e.g.*, *United States v. Shoup*, 476 F.3d at 42 (finding no error in the admission of a 911 call made minutes after the defendant confronted the witness with a gun); *United States v. Davis*, 577 F.3d 660, 668 (6th Cir. 2009) (allowing statement made to 911 dispatcher and stating "it does not matter whether the call was made thirty seconds or five minutes" after witness observed defendant's conduct); *United States v. Danford*, 435

17

F.3d 682, 687 (7th Cir. 2006) (statement made "less than 60 seconds" after witnessing robbery qualified as present-sense impression); *United States v. Jackson*, 124 F.3d 607, 618 (4th Cir. 1997) (statement by witness to police upon their arrival at scene that defendant was threatening to kill her family was admissible as "description of ongoing events").

The three requirements of the exception for excited utterances under Fed. R. Evid. 803(s) are: (i) the occurrence of a startling event or condition; (ii) the statement must have been made while the declarant was under the stress of excitement caused by the event or condition; and (iii) the statement must relate to the startling event or condition. *See United States v. Luciano*, 414 F.3d 174, 180 (1st Cir. 2005).

Fed. R. Evid. 803(2) does not require that, in order to be admissible, the statement be contemporaneous with the startling event, but rather only with the excitement caused by the event. "An impermissible amount of time is one in which the declarant has had time 'long enough to allow [him or her] to reflect on the alleged events . . . and possibly fabricate or alter the story." *Taylor v. Erna*, 2009 WL 2146675 (D. Mass. July 14, 2009) (quoting *United States v. Taveras*, 380 F.3d 532, 537 (1st Cir. 2004)). The time lapse in most excited utterance cases is usually a few seconds, *see, e.g., United States v. Vazquez*, 857 F.2d 857, 864 (1st Cir. 1988), or a few minutes, *see, e.g., United States v. Bailey*, 834 F.2d 218, 228 (1st Cir. 1987), although in extreme cases, courts have even accepted a delay of a few hours, *see, e.g., United States v. Cruz*, 156 F.3d 22, 30 (1st Cir. 1998) (accepting testimony from

a woman four hours after the shocking incident based on the assumption that she was still suffering trauma after she was beaten by the defendant).  Under similar principles, the government may also introduce non-911 excited utterances made by witnesses immediately after an incident occurred.

Finally, although *Crawford v. Washington*, 541 U.S. 36 (2004), bars the introduction of "testimonial" hearsay, statements are not testimonial when police question the witness under "circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."  *Davis v. Washington*, 547 U.S. 813, 822 (2006) (holding that 911 call for assistance was admissible even though the declarant did not testify at trial).  *See also United States v. Brito*, 427 F.3d 53, 62 (1st Cir. 2005) (911 call made while caller could still view assailant qualified as admissible excited utterance); *Luciano*, 414 F.3d at 179-80 (witness's initial statements to police officer seeking assistance for victim immediately following assault did not constitute testimonial hearsay but qualified as an admissible excited utterance).

### G. Prior Grand Jury Testimony

The government may offer prior grand jury testimony as substantive evidence if a witness is evasive, non-compliant, or not forthcoming.  This may be a more heightened concern in this case than the typical trial given the concerns some witnesses have openly shared about testifying in court about MS-13 activities.

There is, of course, a preference for in court testimony over prior testimony, but "where instead the witness contradicts the prior testimony or purports no longer

to remember it—possibly because of friendship or intimidation—the prior testimony is no longer redundant; the witness can still be questioned in court about its accuracy; and the balance favors its admission." *United States v. Butterworth*, 511 F.3d 71, 74 (1st Cir. 2007).  *See also California v. Green*, 399 U.S. 149, 158 (1970) ("It is, of course, true that the out-of-court statement may have been made under circumstances subject to none of these protections.  But if the declarant is present and testifying at trial, the out-of-court statement for all practical purposes regains most of the lost protections."); *United States v. Distler*, 671 F.2d 954, 959 (6th Cir. 1981) ("We think it clear that the admission, as substantive evidence, of grand jury testimony that meets the requirements of Rule 801(d)(1)(A) does not run afoul of the Constitution.  The Rule was expressly formulated to allow admission of grand jury testimony, and this court and others have held that grand jury testimony admitted under the Rule may properly be considered as substantive evidence of guilt.").

## IV.   **Special Requests**

Given the length of the trial, the government may be unable to have the same support person or case agent available to assist every day.  Accordingly, to the extent required, the government seeks permission to have paralegal Terry Fahey, paralegal Hannah Beller, and IT specialist Michael Caminiti available to assist at counsel table on a rotating basis.  For similar reasons, the government seeks to designate FBI Special Agent Brad Gullicksrud, State Police Sgt. Mario Millett, and Chelsea Police Det. Scott Conley as case agents who may rotate in to assist with witnesses and trial as needed.

Respectfully submitted,

WILLIAM D. WEINREB
Acting United States Attorney

By:   s/ Kunal Pasricha

GLENN A. MACKINLAY
KUNAL PASRICHA
Assistant United States Attorneys

Date:  November 2, 2017

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic

Filing.


By:     /s/ Kunal Pasricha

KUNAL PASRICHA
Assistant United States Attorney

Date: November 2, 2017