1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2


3
   UNITED STATES OF AMERICA            )
4                                      )
   vs.                                 )   Criminal Action
5                                      )
   RAFAEL LEONER-AGUIRRE,              )   No. 15-10338-FDS
6          Defendant                   )
                                       )
7                                      )
                                       )
8


9

   BEFORE:   THE HONORABLE F. DENNIS SAYLOR, IV
10


11
                        JURY TRIAL DAY 4
12


13
                         TESTIMONY ONLY
14


15       John Joseph Moakley United States Courthouse
                       Courtroom No. 2
16                    1 Courthouse Way
                     Boston, MA 02210
17
                     November 9, 2017
18                       9:29 a.m.

19


20


21


22


23                    Valerie A. O'Hara
                    Official Court Reporter
24       John Joseph Moakley United States Courthouse
                  1 Courthouse Way, Room 3204
25                   Boston, MA 02210
                  E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3         United States Attorney's Office, by GLENN A. MacKINLAY,
     ASSISTANT UNITED STATES ATTORNEY, and KUNAL PASRICHA,
4    ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
     Boston, Massachusetts 02110;
5
     For the Defendant:
6
          KEITH S. HALPERN, ESQ., 572 Washington Street, Suite 19,
7    Wellesley, Massachusetts 02482.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS                        DIRECT   CROSS  REDIRECT  RECROSS

3    VICKY MARTINEZ CHACON
       By Mr. MacKinlay                 4
4      By Mr. Halpern                           31

5    IRWIN MARTINEZ
       By Mr. Pasricha                 62
6
     SEAN CONNOLLY
7      By Mr. Pasricha                 74

8    BRIAN ESTEVEZ
       By Mr. Pasricha:                89
9


10
     EXHIBITS                              FOR I.D.   IN EVIDENCE
11
       124, 125 and 126                                   72
12     26, 27, and 28                                     83
       16                                                 94
13     17                                    11           92
       18                                                 95
14     19                                                 96
       21                                                 85
15     22.1, 22.2 and 22.3                                84
       23                                                 79
16     24                                                 80
       25                                                 81
17     29                                                 82
       119                                   16
18     121.1 through 121.5                                65
       122                                                70
19     149                                   11
       281                                                45

20

21

22

23

24

25

```
 1                        TESTIMONY ONLY
 2              THE CLERK:  All rise for the jury.
 3              (JURORS ENTERED THE COURTROOM.)
 4              THE CLERK:  Thank you.  You may be seated.  Court is
 5    back in session.
 6              THE COURT:  Ladies and gentlemen, welcome back.  I
 7    understand one of you had a traffic issue this morning.  That
 8    does happen, and we'll just do the best we can.  Let's see how
 9    the day goes.  I may see if we can't go at least a few minutes
10    maybe past one depending where we are in the evidence and just
11    to try to gain a little bit back.  In the meantime, we'll get
12    going.
13              We have a new protocol for adverse weather conditions
14    if we have a blizzard or something, and I want to make sure
15    what that is, but next week I'll tell you what to do so you'll
16    know what to do if the schools are closed.
17              All right.  Let's get going.  Ms. Martinez, you
18    understand that you are still under oath?
19              THE WITNESS:  Yes.
20              THE COURT:  All right.  Mr. MacKinlay.
21              VICKY EULLALIA MARTINEZ CHACON, RESUMED
22                  CROSS-EXAMINATION, CONTINUED
23    (Through the Interpreter)
24    BY MR. MACKINLAY:
25    Q.   Where we left off yesterday, you had described to the jury
```

1    that that Tremendo was the first word of the Enfermos clique in

2    Chelsea?

3    A.    Yes.

4    Q.    Can you turn that microphone a little bit more towards

5    you.   Thank you.   And you've described at some point what a

6    homeboy was.   Was Tremendo a homeboy?

7    A.    Yes, yes.

8    Q.    Do you also, does he use another name besides Tremendo?

9    A.    Yes.

09:31AM 10    Q.    What name is that?

11    A.    Carlos.

12    Q.    Also, when we left off yesterday, we were talking about

13    when you were in Michigan, and you were discussing with the

14    members of the jury about a conversation Tremendo told you

15    about that he had with Cilindro.   Do you remember that?

16    A.    Yes.

17    Q.    What did Tremendo tell you Cilindro told him while you

18    were in Michigan?

19    A.    To come here because there were many people to recruit

09:32AM 20    here and there were also many chavalas.

21    Q.    By the way, back then did you have a telephone number that

22    you were using to communicate?

23    A.    Yes.

24    Q.    If I suggested a number of 248-818-8779, is that the

25    number you were using back then?

```
 1   A.   Yes.

 2   Q.   In discussing Cilindro as well with Tremendo, do you know

 3   anything about Cilindro's source of income?

 4   A.   Yes.

 5   Q.   Describe what you know of Cilindro's income.

 6   A.   .he sold drugs.

 7   Q.   Do you know what kind of drugs?

 8   A.   Yes.

 9   Q.   What kind?

09:33AM 10   A.   Marijuana.

11   Q.   Do you know what he did with the money he made from

12   selling marijuana?

13   A.   Yes.

14   Q.   What did he do?

15   A.   He would give it to Tremendo.

16   Q.   And do you know what Tremendo did with the money he

17   receives from Cilindro from the marijuana business?

18   A.   Yes.

19   Q.   What did he do with it?

09:33AM 20   A.   With part of it, he would send it to El Salvador, and the

21   other part he would use to buy weapons.

22   Q.   And how do you know all that?

23   A.   Because he said it.

24   Q.   Who said it?

25   A.   Tremendo.
```

1    Q.   Yesterday you discussed meetings, clique meetings that

2    were conducted in Cilindro's room.  Do you remember that?

3    A.   Yes.

4    Q.   You also discussed meetings that were on a speaker phone

5    or that were on a conference, that were held in your apartment?

6    A.   Yes.

7    Q.   I believe you mentioned the word "activate" was a word

8    that you heard.  Describe what you heard and the context of it.

9    A.   Yes.  The people in El Salvador were telling the people

09:35AM 10   here not to activate yet.

11   Q.   Did you hear further conversation about what "activate"

12   meant?

13   A.   Yes.

14   Q.   What did you hear?

15   A.   Activate is like to do things like steal or kill chavalas.

16   Q.   Did you hear Tremendo speaking at that time?

17   A.   Yes.

18   Q.   What did you hear him saying?

19   A.   He said that, yeah, the people in El Salvador said that,

09:36AM 20   but he is the one that is here and he is the one that is going

21   to give the orders.

22   Q.   And did he give the orders to activate to his clique?

23   A.   Yes.

24   Q.   How do you know that?

25   A.   Because they went to rob.

1   Q.   Did you -- were there other cliques that were involved

2   with Enfermos around that time?

3   A.   Yes.

4   Q.   Do you know which cliques they were, Boston cliques?

5   A.   It was the Everett Locos.

6   Q.   How do you know that?

7   A.   Because they would say it.

8   Q.   Who would say it?

9   A.   Tremendo was the one that said it.

09:37AM 10   Q.   What did you hear Tremendo say about the Everett clique?

11   A.   That they wanted to unite with them.

12   Q.   Were there meetings with the Everett clique?

13   A.   No.

14   Q.   You mentioned recruitment in high schools yesterday.  Do

15   you know which high schools recruitment for Enfermos were

16   targeting?

17   A.   Yes.

18   Q.   Which high schools?

19   A.   Chelsea.

09:38AM 20   Q.   And who from the clique was designated as a recruiter at

21   Chelsea High School?

22   A.   Cilindro, Roca and Cuervo.

23   Q.   How do you know that?

24   A.   Because Tremendo told them that they had to go and recruit

25   people.

1    Q.    And were you present when he told them that?

2    A.    Yes.

3    Q.    You described some YouTube videos yesterday, and we played

4    one that you recognized the voice and would know that Tremendo

5    made in your basement in Michigan.  Do you remember that?

6    A.    Yes.

7          MR. MACKINLAY:  Your Honor, at this time I'd like to

8    request to play Exhibit Number 75 and also ask the members of

9    the jury turn to tab next 76 in the transcript binder that they

09:39AM 10    have before them.

11          THE COURT:  All right.

12          (Video played)

13    Q.    Ms. Martinez, just to be clear, none of the images on the

14    video are Tremendo?

15    A.    No.

16    Q.    But you do recognize his voice?

17    A.    Yes.

18    Q.    At the end, did you hear the part about sending out a

19    greeting?

09:43AM 20    A.    Yes.

21    Q.    Did you know any of those people?

22    A.    I only heard that he mentioned them.

23    Q.    Do you know the name Bunker?

24    A.    Yes.

25    Q.    How do you know the name Bunker?

1  A.   Because Tremendo used to speak with him.

2  Q.   And where according to your understanding was Bunker when

3  Tremendo spoke to him?

4  A.   He was in jail in El Salvador.

5  Q.   Do you know the name Violento?

6  A.   Yes.

7  Q.   And how do you know that name?

8  A.   Because Tremendo also spoke about him.

9       MR. MACKINLAY:  Your Honor, we completed using the

09:44AM 10  transcript binders for the time being.

11       THE COURT:  Okay.  If you want to set those aside,

12  ladies and gentlemen.

13  Q.   Did Tremendo have weapons that he used?

14  A.   Yes.

15  Q.   What weapons?

16  A.   He had a machete and a gun.

17       MR. MACKINLAY:  May I approach, please, your Honor?

18       THE COURT:  Yes.

19  Q.   I'm showing you what we marked Exhibit 17.  Do you

09:45AM 20  recognize that?

21  A.   Yes, it's very similar to the one he had.

22  Q.   He, meaning Tremendo?

23  A.   Yes.

24       MR. MACKINLAY:  Your Honor, I would offer it into

25  evidence.

```
 1              MR. HALPERN:  Objection.

 2              THE COURT:  Sustained.

 3              MR. MACKINLAY:  Mark it for purposes of identification

 4    then at this time, your Honor?

 5              THE COURT:  It's marked as Exhibit 17.

 6              (Exhibit 17 was marked for identification.)

 7    Q.   You mentioned a firearm or a gun; is that right?

 8    A.   Yes.

 9              MR. MACKINLAY:  May I approach again?

09:46AM 10              THE COURT:  Yes.

11    Q.   I'm showing you an item to be marked as Exhibit 149.  Do

12    you recognize this?

13    A.   Yes.

14    Q.   What do you recognize this as?

15    A.   It's a gun.  It looks like the gun Tremendo had.

16              MR. MACKINLAY:  Again, your Honor, I'd mark it for

17    identification at this time.

18              THE COURT:  It's 149, yes.

19              (Exhibit 149 was marked for identification.)

09:46AM 20    Q.   Now, Ms. Martinez, I direct your attention to the machete.

21    Were you present at any time when Tremendo possessed the

22    machete?

23              THE INTERPRETER:  I'm sorry, could you repeat the

24    question for the interpreter?

25              MR. MacKINLAY:  Certainly.
```

1    Q.    Were you present at any time that Tremendo was in

2    possession of the machete?

3    A.    Yes.

4    Q.    When was that in relation to when he was arrested for the

5    subsequent charge?

6    A.    It was a week before.

7    Q.    Were you with Tremendo?

8    A.    Yes.

9    Q.    What happened that evening?

09:47AM 10    A.    We were on our way to go have -- to eat at the corner from

11   where we lived.

12   Q.    Did anything occur when you were going to eat with

13   Tremendo?

14   A.    Yes.

15   Q.    By the way, was he armed at that point with the machete?

16   A.    Yes.

17   Q.    How did he --

18           THE COURT:  I'm sorry, I don't understand what

19   evening.  Is this before he was arrested, when he was arrested,

09:48AM 20   what are we talking about here?  I don't understand.

21           MR. MACKINLAY:  I'll clarify it then.

22   Q.    Was it approximately a week before he was arrested on

23   state charges there was an incident?

24   A.    Yes, it was about a week and a half before.

25   Q.    And do you know that he was arrested on April 16th, 2014?

```
 1   A.   Yes.

 2   Q.   You were there on that occasion as well; is that correct?

 3   A.   Yes.

 4   Q.   Going back to the incident with the going out to eat,

 5   where did that occur?

 6   A.   In Chelsea.

 7   Q.   Was Tremendo armed with a machete that day?

 8   A.   Yes.

 9   Q.   How did he carry it?

10   A.   He had it in the back.

11   Q.   What do you mean in the back?

12   A.   Put into his pants back here.

13   Q.   What occurred that day, that evening when you were going

14   to get something to eat with Tremendo?

15   A.   Two guys were coming, and Tremendo recognized them as

16   being from the 18s, and he started saying things to them.

17   Q.   Who recognized him as being with the 18th?

18   A.   Tremendo.

19   Q.   Did he -- do you know how he knew him to be with 18th

20   Street?

21   A.   Yes.

22   Q.   How do you know that Tremendo knew it was 18th Street?

23   A.   Because Cilindro had already shown him photos of them.

24   Q.   How were the photos displayed?

25   A.   He had shown them from Facebook because they had photos in
```

1    Facebook.

2    Q.    Photos of whom did they have in Facebook and who had them?

3    A.    They were 18s in the photos, and Cilindro had the photos.

4    Q.    Did you know the name at the time of the person that you

5    came to meet on the street?

6    A.    I'm sorry, could you rephrase that?

7    Q.    Yes.  Do you know the name of the person from 18th Street

8    who you met on the street?

9    A.    Yes.

09:51AM 10    Q.    What is it?

11    A.    Christian.

12    Q.    When you mentioned a moment ago that they started talking,

13    who started talking?

14    A.    Tremendo.

15    Q.    What did you hear him say?

16    A.    He said, What's up, girl?  I'm the Tremendo from the

17    Enfermos Criminales.

18    Q.    Was there just one person from 18th Street or more than

19    one?

09:52AM 20    A.    There were two.

21    Q.    Do you know the name of the other person?

22    A.    No.

23    Q.    After Tremendo announced his name and his clique and his

24    gang, what happened next?

25    A.    He pulled out his machete and the other guy took out a

1    knife.

2    Q.   Did the other guy say anything back and forth at that

3    time?

4    A.   No.

5    Q.   Describe the knife that you said that the other guy --

6    referring to Christian, was it?

7    A.   It was a small knife.

8    Q.   Did Christian have it or the other guy whose name you

9    don't know had it?

09:53AM 10    A.   Christian.

11    Q.   Did you see what happened next?

12    A.   They started fighting, Tremendo with the machete and the

13    other guy with the knife, and then Tremendo had hit him in the

14    head with the machete and wounded him.

15    Q.   Did you see what Christian did when he got hit on the head

16    with the machete?

17    A.   He fell sitting in the middle of the street.

18    Q.   Was he bleeding?

19    A.   Yes.

09:54AM 20    Q.   Where?

21    A.   From the head.

22    Q.   Did you see what the second person did?

23    A.   He took him walking, and they went to the hospital.

24        MR. MACKINLAY:  May I approach, your Honor?

25    Q.   I'm showing you an item that we marked as

1    Exhibit Number 119.  Do you recognize that at all?

2    A.   Yes, it looks like the one that Christian had.

3         MR. MACKINLAY:  Could we mark it for identification,

4    please, at this time, your Honor, Exhibit 119?

5         THE COURT:  Yes.

6         (Exhibit 119 was marked for identification.)

7    Q.   Just so that we're clear about this, the machete, did

8    Tremendo have a machete like this machete at the time of the

9    attack?

09:55AM 10   A.   Yes.

11   Q.   And did Christian have a knife that looked like this knife

12   at the time of the attack?

13   A.   Yes.

14   Q.   What happened after you saw Tremendo strike Christian with

15   the machete and he went to the sitting position?

16   A.   We went to the apartment.

17   Q.   Your apartment that you shared with him?

18   A.   Yes.

19   Q.   What happened there?

09:56AM 20   A.   He went to the bathroom to wash the machete.

21   Q.   Wash it from what?

22   A.   Of the blood that was on it.

23   Q.   Did you speak to Tremendo at your apartment about the

24   attack that occurred moments before?

25   A.   Yes.

1    Q.   What did he tell you?

2         THE INTERPRETER:  I'm sorry, I need to ask for

3    repetition.

4    A.   He had wounded him on the head and he didn't know what had

5    happened to him.

6    Q.   Are you familiar around this time period of robberies that

7    were conducted by Tremendo?

8    A.   Yes.

9    Q.   How do you know about the robberies, any robbery that was

09:58AM 10   committed by Tremendo during that time period?

11   A.   Because when he'd go to rob, I would also go in the car.

12   Q.   Would there be someone who would drive the car?

13   A.   Yes.

14   Q.   Who would be the driver typically on robberies around that

15   time period?

16   A.   It was Blanquito.

17   Q.   Did Blanquito participate in any robberies?

18   A.   No, he would stay with me.

19   Q.   And just to be clear, this is the end of March until

09:58AM 20   April 16th of 2014?

21   A.   Yes.

22   Q.   Do you have a specific memory of certain incidents

23   occurring?

24   A.   Yes.

25   Q.   Tell the jury about any robbery that you recall

1    specifically occurring during that time period.

2    A.    One time he stole in Chelsea.  He robbed a chain from a

3    man.  That same night, we went to Everett, but he wasn't able

4    to steal anything, then we went to Revere, and in Revere he

5    took the backpack from a guy.  The guy tried to oppose the

6    robbery, and he said that he had wounded him and left him lying

7    on the ground.

8          And in Chelsea from a woman, he tried to rob her

9    phone, and the woman said no, that she didn't want to, and so

10:00AM 10    he hit her with the flat part of the machete.

11   Q.    How do you know about these incidents?

12   A.    Because he came to the car telling the others.

13   Q.    After the incident occurred?

14   A.    Yes.

15   Q.    Did those incidents occur the same night or different

16   nights?

17   A.    Those were one night.

18   Q.    Were there other robberies that occurred during that time

19   period that you're aware of based on being present?

10:01AM 20    A.    Yes.

21   Q.    How many?

22   A.    About three or four more.

23   Q.    Did Tremendo use a weapon in the robberies?

24   A.    Yes.

25   Q.    What weapon?

1   A.   The machete and the gun.

2   Q.   On that night that there were multiple robberies that you

3   described in multiple towns, cities, what happened after?

4   A.   They were going to go and split it up at the apartment

5   where we lived.

6   Q.   And were you present later that evening after the

7   robberies?

8   A.   No, they would meet in Cilindro's room.

9   Q.   Do you know what the money from the robberies was used

10:02AM 10   for?

11   A.   Yes.

12   Q.   What was it used for?

13   A.   They were gathering money to buy weapons and to send to

14   El Salvador.

15   Q.   We talked about the day that Tremendo was arrested.  Prior

16   to that, do you recall an incident of Cuervo being injured?

17   A.   Yes.

18   Q.   How do you know about the incident of Cuervo being

19   injured?

10:03AM 20   A.   Because Tremendo received a phone call saying that Cuervo

21   had been wounded.

22   Q.   Did Tremendo tell you anything about what he knew about

23   the circumstances of him being wounded?

24   A.   No.

25   Q.   Can you describe Tremendo's reaction to the phone call

1    that he received with that information?

2    A.    He became angry.

3    Q.    Did he say anything at the time you saw him being angry?

4    A.    No.

5    Q.    I turn your attention to the day of the arrest,

6    April 16th, 2014.  What were you doing earlier in the day?

7    A.    I was looking for an apartment with a girlfriend.

8    Q.    Where were you looking for an apartment?

9    A.    We were looking around Foyo Compado, and then she told me

10:05AM 10   about a laundromat where they put up announcements.

11   Q.    Is that in Chelsea?

12   A.    Yes.

13   Q.    Did you go to the laundromat with your friend?

14   A.    We were on our way over there.

15   Q.    Did anything occur on your way there?

16   A.    Yes.

17   Q.    What happened?

18   A.    There were two guys behind us, and allegedly they were

19   from the 18s, and they knew her because supposedly she got

10:06AM 20   along or had gotten along with the 18s.

21   Q.    Hold on.  Let's go back over that.  Where did you

22   encounter these people?

23   A.    I'm sorry.

24   Q.    Where did you encounter these people?

25   A.    Around Foyo Compado.

1    Q.    Did you recognize them?

2    A.    No, I did not know them.

3    Q.    Did the girlfriend you were with recognize them?

4    A.    Yes, she did.

5    Q.    Did she say anything about recognizing them?

6    A.    Yes, she said they were 18s and that we had to walk

7    quickly.

8    Q.    Did you walk quickly?

9    A.    Yes.

10:06AM 10    Q.    Where did you go?

11    A.    We were heading towards the laundry, and she said this is

12    where Cuervo lives, let's go there instead.

13    Q.    Was she friends with Cuervo, your girlfriend?

14    A.    Yes.

15    Q.    Did you see what the other two people from 18th Street

16    were doing?

17    A.    They were just behind us.

18    Q.    Following you?

19    A.    Well, at first they were following us, but then we didn't

10:07AM 20    see them any longer when we got to Cuervo's house.

21    Q.    When you got to Cuervo's house, did your girlfriend have a

22    conversation with Cuervo?

23    A.    Yes, she told him that they had been following us.

24    Q.    Did she provide the name of the person?

25    A.    Yes, she said Papelito.

1    Q.    Did you see Cuervo at that time?

2    A.    Yes.

3    Q.    Did you observe the injuries that he had sustained

4    previously?

5    A.    Yes, he was lying in bed.

6    Q.    Could you see his injuries as he was laying in bed?

7    A.    No, I don't recall exactly.

8    Q.    Did you notice any bandages anyplace on his body?

9    A.    Yes.

10:08AM 10    Q.    Where were the bandages?

11    A.    I believe it was on his arm.

12    Q.    Did your girlfriend tell Cuervo what had just happened?

13    A.    Yes.

14    Q.    Describe Cuervo's reaction.

15    A.    He didn't do anything.  He remained silent.

16    Q.    Was Tremendo present?

17    A.    No, I sent him a message that I was there.

18    Q.    Did you talk to him or send him a message about what had

19    happened?

10:09AM 20    A.    Yes.

21    Q.    What did you tell him?

22    A.    I told him that we had been followed, and he said okay,

23    stay where you are, I'm going to go get you.

24    Q.    And did he come and get you?

25    A.    Yes, he came.

1    Q.   Did he come in a car or on foot?

2    A.   In a car.

3    Q.   Was there someone else driving?

4    A.   Yes.

5    Q.   Who was driving?

6    A.   Blanquito.

7    Q.   Was there anyone else in the car?

8    A.   Yes.

9    Q.   Who else?

10:10AM 10    A.   Gallito.

11    Q.   What happened once Tremendo arrived with Blanquito and

12   Gallito?

13    A.   We got down, we went down from where we had been, and we

14   were walking, and then he saw the two guys.

15    Q.   How do you know he saw the two guys?

16    A.   Because he said, oh, look they're coming, we don't have to

17   go looking for them because they're already coming.

18    Q.   What did you do?

19    A.   He told me go to the car, and he sent Rosemary and myself

10:11AM 20   to the car.

21    Q.   Rosemary, is that the girlfriend you were with earlier?

22    A.   Yes.

23    Q.   Was Tremendo armed at this time?

24    A.   Yes.

25    Q.   What was he armed with?

1    A.    He had the gun.

2    Q.    Did you follow his instructions when he told you he saw

3    the two people?

4    A.    Yes.

5    Q.    What did you do?

6    A.    I got in the car, and I stayed there with Rosemary.

7    Q.    Did you see what Tremendo did?

8    A.    He went out to look for the guys with Blanquito and

9    Gallito.

10:12AM 10    Q.    Were you able to see what happened from where you were in

11    the car?

12    A.    Yes, I was in the back.

13    Q.    And where was the car stopped or parked?

14    A.    At a corner, and they were behind the car.

15    Q.    Who is they?

16    A.    Tremendo, Blanquito Gallito, and the other two that were

17    fighting.

18    Q.    Were you watching them as they were fighting?

19    A.    Yes, they were fighting.

10:13AM 20    Q.    But were you looking in the direction of where they were

21    fighting?

22    A.    Yes.

23    Q.    What did you see?

24    A.    I just saw that they were fighting, and then I heard a

25    shot, and then Tremendo, Gallito and Blanquito ran to the car.

```
 1   Q.   Did you just hear one shot or more than one shot?

 2   A.   I only heard one.

 3   Q.   And how long after the shot did you see them run back to

 4   the car?

 5   A.   Immediately after the shot, they took off running.

 6   Q.   How far away from where you were in the car was Tremendo

 7   and Gallito and Blanquito?

 8   A.   Like from here to the door.

 9   Q.   You mean the door of the courtroom, ma'am?

10   A.   Yeah, a little bit further.

11   Q.   I estimate 40, 50 feet; is that about right?

12   A.   Perhaps.

13   Q.   Did they come back and get into the car?

14   A.   Yes.

15   Q.   What positions or where in the car did each one of them

16   come and sit?

17   A.   Blanquito was driving, and Tremendo was in the back with

18   me and with Rosemary.

19   Q.   What happened when they all got into the car?

20   A.   Tremendo said, "I shot him and I don't know if he died."

21   Q.   What was he wearing at the time, do you remember?

22   A.   He was wearing white pants.  I don't remember the shirt.

23   Q.   After Tremendo said, "I shot him and I don't know if he

24   died or not," what happened next?

25   A.   Further down he said to stop and that he was going to go
```

1    and get rid of the gun and change his clothes.

2    Q.    I mean further down, what do you mean?

3    A.    He was already driving, and about two or three minutes

4    down the road, he stopped.

5    Q.    While you're driving down the road, did you see any

6    police?

7    A.    Yes.

8    Q.    Where did you see the police?

9    A.    We saw them further down where they stopped us.

10:16AM 10    Q.    How long after the shooting were you stopped in the car by

11    the police?

12    A.    About four minutes later.

13    Q.    Was there a police car following you or anyone following

14    you?

15    A.    No.

16    Q.    Was Tremendo in the car the whole time?

17    A.    No, he got out before.

18    Q.    When the car was stopped by the police, what happened?

19    A.    They stopped us, they handcuffed us, and they asked us

10:17AM 20    where was the person that had fired the shot.

21    Q.    And did you tell them at that point?

22    A.    No.

23    Q.    Did they take everybody back to the station?

24    A.    Yes.

25    Q.    And placed under arrest and taken back to the station?

1    A.   Yes.

2    Q.   Back at the police station, were you interviewed by the

3    police?

4    A.   Yes.

5    Q.   Did you tell them the truth about what happened?

6    A.   No.

7    Q.   Why not?

8    A.   Because I was scared, because Gallito had said when we

9    were on our way that we knew what was going to happen if we

10:18AM 10   talked.

11   Q.   When did Gallito tell you that?

12   A.   When the police was taking us out.

13   Q.   Taking you out of the car that they had stopped?

14   A.   From the police car.

15   Q.   What did you understand what Gallito said to mean?

16         MR. HALPERN:  Objection.

17         THE COURT:  I'm sorry.

18         MR. HALPERN:  I think the name is wrong unless I

19   misunderstood it.

10:18AM 20         THE COURT:  I thought she said Gallito.

21         MR. HALPERN:  I thought there was a confusion between

22   Blanquito and Gallito.  I may have misunderstood.

23         THE COURT:  Why don't we clarify.

24   Q.   Who told you, "You know what will happen if you talk?"

25   A.   Gallito.

1    Q.   And when did Gallito tell you that?

2    A.   As we were getting out of the police car.

3    Q.   And what did you understand what he said to mean?

4    A.   That they would kill us.

5    Q.   Now, eventually what happened to the case against you

6    where you were taken back to the station on that particular

7    night?

8    A.   I was arrested, and the next day the charges were dropped,

9    and I was able to leave.

10:20AM 10    Q.   Now, did Tremendo have a backpack that night?

11    A.   Yes.

12    Q.   When he got back into the vehicle, did you see the

13    backpack?

14    A.   Yes.

15    Q.   Did he have it with him?

16    A.   Yes.

17    Q.   When he got out of the car, did you see what he did with

18    the backpack?

19    A.   I'm sorry.

10:20AM 20    Q.   When he got out of the vehicle before the police stopped

21    you, did you see what Tremendo did with the backpack?

22    A.   Yes, he had it.

23    Q.   Since the date of Tremendo being placed under arrest,

24    which was that same day, correct --

25    A.   Yes.

1    Q.    -- had you had the chance to speak to him in person?

2    A.    Yes, I went to visit him.

3    Q.    How many times did you go to visit him?

4    A.    Many times.

5    Q.    And where did you visit him?

6    A.    At Nashua.

7    Q.    Nashua Street Jail?

8    A.    Yes.

9    Q.    Where he was detained on the arrest that night?

10:21AM 10    A.    Yes.

11    Q.    Did you also speak to him by telephone?

12    A.    Yes.

13    Q.    Did you bring him money?

14    A.    Yes, I put money in his canteen.

15    Q.    And canteen is, what, an account he can access?

16    A.    Yes, to buy food.

17    Q.    In addition to your visits and phone calls, did you also

18    receive anything in the mail from him?

19    A.    Yes, letters.

10:22AM 20    Q.    How many letters did you receive?

21    A.    Several.

22    Q.    Did you talk to Tremendo in one of your meetings or phone

23    calls about the letters that he was sending?

24    A.    No.

25    Q.    Do you know if they were being monitored?

1    A.   He said that the ones that were outgoing were not

2    monitored.

3    Q.   By monitored, meaning what?  What did he describe that to

4    mean?

5    A.   That they wouldn't be read but that the ones that were

6    sent to him that they would read.

7    Q.   Sent into the institution?

8    A.   Yes.

9    Q.   Did Tremendo talk to you about other conversations that he

10:23AM 10   had about Enfermos?

11   A.   No.

12   Q.   Did he talk to you about conversations with his mother?

13   A.   Yes.

14   Q.   What did he tell you about those conversations?

15   A.   He would talk to her on the phone, and sometimes he would

16   ask her how the other people from his gang were down there.

17   Q.   Down there, meaning where?

18   A.   In El Salvador.

19   Q.   At some point, did you decide to leave the Boston area and

10:24AM 20   move?

21   A.   Yes.

22   Q.   How long after the evening where you were both arrested

23   did that occur?

24   A.   About a year and some, over a year.

25   Q.   During that time, did you have a child?

1    A.    Yes.

2    Q.    This is a child that you had with Tremendo?

3    A.    Yes.

4    Q.    Why did you decide to leave the Boston area and move your

5    family?

6          THE INTERPRETER:  I'm sorry, I didn't hear the last

7    part of the question?

8    Q.    Sure.  Why did you decide to leave the Boston area and

9    move your family?

10:25AM 10    A.    Because I was afraid that members of his gang would do

11    something to me.

12          MR. MACKINLAY:  Can I have just one moment, please,

13    your Honor.  No further questions of the witness, your Honor.

14          THE COURT:  All right.  Cross-examination.

15          Because we started late, why don't we keep going for a

16    while.

17          MR. HALPERN:  I could use like a minute.  Okay.

18          THE COURT:  We'll break about eleven.

19                         CROSS-EXAMINATION

10:26AM 20    BY MR. HALPERN:

21    Q.    Good morning, Ms. Martinez.

22    A.    Good morning.

23    Q.    Yesterday you were asked about a phone call that you said

24    you overheard between Rafael and Cilindro while you were still

25    in Michigan.  Do you remember that?

1    A.    Yes.

2    Q.    And do you remember that yesterday when you were asked

3    about that phone call, you testified that what you knew about

4    that phone call was that Cilindro told him when you got to

5    Massachusetts, he'd have a room for him, he'd get him a room?

6    A.    Yes.

7    Q.    Yesterday when you were asked what you remembered from

8    that phone call, you didn't say anything about hearing Cilindro

9    talk about coming to Massachusetts because there were more

10:27AM 10    chavalas here.

11    A.    But Cilindro said that to him.

12    Q.    You remembered that today?

13    A.    He said that to him.

14    Q.    Yesterday when you testified, you forgot that part?

15    A.    But it's true, he did say that.

16    Q.    Just do you agree with me that yesterday you left that

17    part out?

18    A.    Yes.

19    Q.    And after you testified yesterday, did someone remind you

10:28AM 20    that you left that part out?

21    A.    No.

22    Q.    It was the first question you were asked today.

23    A.    Yes.

24    Q.    Did someone tell that you they were going to ask that

25    question today because you forgot to say it yesterday?

A.   No.

Q.   So it just happened, and you don't know why that the first question you were asked today was about something you forgot to say yesterday?

A.   Excuse me.

Q.   I'll move on.  Your son was born about eight months after Rafael was arrested?

A.   Yes.

Q.   He'll be about -- he'll be three years old next month, right?

A.   Yes.

Q.   The most important thing in your life?

A.   Yes.

Q.   And it would be hard for you to name anything more important to you than having your son grow up in the United States?

A.   Excuse me.

Q.   It would be very hard for you to think of anything more important to you than having your son grow up in the United States?

A.   I don't understand the question.

Q.   Would you rather have your son grow up here or in El Salvador?

A.   Here.

Q.   You don't want your son to ever have to sit on top of a

1    train for a month in order to find a better life?

2    A.    No.  My three children.

3    Q.    You have three children now?

4    A.    Yes.

5    Q.    How old are they?

6    A.    My daughter is one month old, and my other daughter is

7    nine years old, and all three of them are important to me.

8    Q.    And important that they have the opportunities that would

9    be available to them growing up here compared to El Salvador?

10:32AM 10    A.    Yes.

11   Q.    And you would do whatever you needed to do in order to

12   make sure that your kids have the opportunity to stay here and

13   grow up here?

14   A.    Not anything.

15   Q.    Your life changed in some big ways when Donald Trump was

16   elected president?

17            MR. MACKINLAY:  Objection.

18            THE COURT:  Sustained.

19            MR. HALPERN:  Can I be heard?

10:32AM 20            THE COURT:  No.

21            Ladies and gentlemen, this case should be decided

22   without any regard for politics, regardless of the politics of

23   anyone in the courtroom or out but only on the evidence before

24   you.

25            Go ahead.

1    Q.    You have lived with fear for a number of months that you

2    coo be deported?

3    A.    I'm still in the process.

4    Q.    But when you came to the United States, you were already

5    legally an adult?

6    A.    Yes.

7    Q.    Rafael was a minor, right?

8    A.    No, he was an adult already.

9    Q.    How old was he?

10:33AM 10   A.    He was about 21 years old or 20, but he used different

11   papers when he came.

12   Q.    All right.  But in terms of what his papers showed, he was

13   a minor?

14   A.    Yes, according to the papers.

15   Q.    All right.  And because of that, your immigration

16   situation when you were arrested coming into the country was

17   worse than his because there was more of a chance of

18   deportation because your papers identified you as an adult?

19   A.    Yes.

10:34AM 20   Q.    All right.  And ever since -- you've never obtained legal

21   documentation in this country, have you?

22   A.    Not yet.

23   Q.    All right.  And is it fair to say that you have become

24   more fearful of being deported in the past six months?

25              MR. MACKINLAY:  Objection.

1           THE COURT:  Overruled.

2   A.   No.

3   Q.   Do you have concerns that one day you may be in the wrong

4   place at the wrong time and somebody from immigration may ask

5   you some questions?

6   A.   No.

7   Q.   Do you have any fear about what's going to happen or what

8   could happen when it's time for your oldest child to go to

9   kindergarten?

10:36AM 10   A.   No.

11   Q.   El Salvador is a country with tremendous poverty?

12   A.   Yes.

13   Q.   It's a country where women in particular have very

14   difficult lives?

15   A.   Yes.

16   Q.   Can you explain that to the jury, some of the things that

17   make life so difficult for women there?

18   A.   In El Salvador?

19   Q.   Yes.

10:37AM 20   A.   Like life is difficult?

21   Q.   If you could just explain and give some examples of why

22   for women especially life there is very hard.

23   A.   Because there aren't many jobs for people.

24   Q.   And it's a very violent country?

25   A.   Yes.

1    Q.    Particularly violence against women?

2    A.    Yes.

3    Q.    Which the police do very little about?

4    A.    The police does help but sometimes not enough.

5    Q.    It's a place where young boys have very little choice

6    about joining a gang?

7    A.    Sometimes the gangs force them to become gang members.

8    Q.    And for many young boys, the real choice, the only choice

9    for them is picking which gang they want to belong to but not

10:38AM 10    staying out of it altogether?

11    A.    Sometimes, yes; sometimes, no.  Sometimes they do it for

12    pleasure.

13    Q.    It's not a life you want for your son?

14    A.    No.

15    Q.    Are you employed now?

16    A.    Not right now.

17    Q.    It's difficult for you to find work?

18    A.    Yes.

19    Q.    And one of the reasons it's difficult to find work is

10:39AM 20    because you don't have legal documentation?

21    A.    Yes.

22    Q.    And even if you could find work, you know that people in

23    your situation are underpaid?

24    A.    Yes.

25    Q.    Because of how little choice you have?

```
 1    A.   Yes.
 2    Q.   And being able to work here legally would allow you to
 3    live a better life and would allow you to give your children a
 4    better life?
 5    A.   Yes.
 6    Q.   Now, you were contacted by law enforcement in September,
 7    less than a couple of months ago; is that right?
 8    A.   Which law?
 9    Q.   By police or prosecutors involved in this case?
10    A.   They weren't, I don't recall that.
11    Q.   The first time that you met and were interviewed by a
12    prosecutor in this case was in late September; is that right?
13    A.   I don't remember, but what do you mean by interviewed?
14    Q.   You know this gentleman, Mr. MacKinlay, you've seen him
15    before the trial?
16    A.   Yes.
17    Q.   And was the first time that you met him in late September?
18    A.   No.
19    Q.   When was the first time?
20    A.   It was later than that, but I don't recall.
21    Q.   All right.  So only like a month or two ago?
22    A.   I think one month.
23    Q.   Okay.  And you were interviewed by him and by others?
24    A.   Yes.
25    Q.   Okay.  And is that the first time you met him when there
```

10:40AM (line 10)
10:41AM (line 20)

1      was an interview?

2      A.    What do you mean by interview?

3      Q.    They asked you questions?

4      A.    Yes.

5      Q.    Okay.  And how were you contacted before the interview so

6      that you found out that they were interested in talking to you?

7      A.    Over the phone.

8      Q.    And they told you, what was it, was it Mr. MacKinlay that

9      talked to you on the phone?

10:43AM 10   A.    No.

11     Q.    Who was it?

12     A.    It was somebody else.

13     Q.    A police officer?

14     A.    Yes.

15     Q.    All right.  And they told you that they were interested in

16     talking to you concerning this case?

17     A.    Yes.

18     Q.    And that they would come to wherever you were to meet with

19     you?

10:43AM 20   A.    No, I said I would come.

21     Q.    Okay.  And when you met with them, there was Mr. MacKinlay

22     and a police officer and an interpreter?

23     A.    No, there were only two people.

24     Q.    Was there an interpreter?

25     A.    Yes.

40

1    Q.    And two more people?

2    A.    Yes.

3    Q.    And who were those two people?

4    A.    It was the interpreter, it was him, and it was another

5    policeman.

6    Q.    And one of the troopers also spoke Spanish, right?

7    A.    Yes.

8    Q.    Okay.  And you were told that they wanted your help?

9    A.    No, I offered it.

10:45AM 10   Q.    Did they tell you that they understood the situation you

11   were in?

12   A.    No.  First I said I would help them, and then I didn't

13   want to because I got scared, and then they sent me a paper.

14   Q.    I'm sorry, they said what?

15   A.    A paper, a subpoena to come here.

16   Q.    Okay.  In the meeting, did anyone tell you that they

17   understood the situation you were in and that they would try to

18   help you?

19   A.    They told me they would protect me so that nothing would

10:46AM 20   happen to me.

21   Q.    All right.  And they told you that they already knew

22   everything that had happened, they didn't need you to tell them

23   anything they didn't already knew, did they tell you something

24   like that?

25   A.    No.

1   Q.   Did they tell you that they would know if you lied to them

2   because they already knew everything?

3   A.   No, they didn't say that.

4   Q.   Did they tell you that they knew that Tremendo had come to

5   Chelsea to be a leader of the clique?

6   A.   No.

7   Q.   They didn't say they knew that?

8   A.   No.

9   Q.   Did they tell you that they knew that Tremendo had

10:47AM 10   communicated with gang leaders in El Salvador?

11   A.   No.

12   Q.   Did they tell you that they wanted you to confirm for them

13   things that they knew already?

14   A.   No, I told them what had happened.

15   Q.   Did they tell you that if you told them the truth, they

16   could help you?

17   A.   To help me how?

18   Q.   Did they tell you that they could help make sure that you

19   would not be charged with any crimes?

10:48AM 20   A.   No, I was told that later.

21   Q.   Did they tell you that they could try to help make sure

22   that your children grew up in the United States?

23   A.   No, I did not ask for that.

24   Q.   You mentioned that you received a subpoena to come here?

25   A.   Yes.

1    Q.   But the truth is you would have come here whether you were

2    subpoenaed or not because what you're doing here is very

3    important for you?

4    A.   No, because if I didn't know, I wouldn't have come.

5    Q.   But you did know, you knew there was a trial?

6    A.   I didn't know about his case, I knew that he had been

7    charged, but I didn't think he was still in the case.

8    Q.   But once you found out that there was a trial and that you

9    could be a witness, it was important for you to come here

10:50AM 10   whether you were subpoenaed or not?

11   A.   Yes.

12   Q.   Because by coming here and testifying, you're making it a

13   lot more likely that your children are going to grow up in this

14   country?

15   A.   No, because I didn't realize that they could help me with

16   that.

17   Q.   When you first came into the country, Rafael was put into

18   a foster care home, right?

19   A.   Yes.

10:51AM 20   Q.   And you have a brother in Michigan, correct?

21   A.   Yes.

22   Q.   And your brother's family helped get Rafael out of foster

23   care and move to Michigan?

24   A.   Yes, his mother called him to help.

25   Q.   And when he got to Michigan, he tried to find work?

```
 1    A.    Yes.

 2    Q.    And he found work mostly doing painting?

 3    A.    Yes.

 4    Q.    And, in fact, you mentioned that on April 16th, the day of

 5    the shooting, he was wearing white pants?

 6    A.    Yes.

 7    Q.    And those were painter's pants?

 8    A.    Yes.

 9    Q.    Because he had been working that same day painting?

10    A.    Yes.

11    Q.    In fact, he was working at a job painting when he got a

12    call from you about being chased?

13    A.    He had already gotten off of work.

14    Q.    You did call him and tell him that you had been chased?

15    A.    I told him -- I sent him a message saying that I was there

16    and we had been followed.

17    Q.    Can you read English?

18    A.    No.

19    Q.    I'm going to ask that this be translated for you.

20    A.    Okay.

21          THE COURT:  Is it a 302?

22          MR. HALPERN:  Pardon.

23          THE COURT:  Is it a 302?

24          MR. HALPERN:  It's not a 302, it's a State Police

25    report.
```

1            THE COURT:  Why don't you do it up here at the

2    sidebar.

3            MR. HALPERN:  Can she see the screen?

4            THE COURT:  Why don't you do it mechanically, in other

5    words, without the screen.

6    Q.   So this is a report from the interview:  "They were

7    walking by Polo Com Paro when two 18th Street members, one she

8    knew as Javier began to chase them.  She stated that the

9    18th Street members recognized Rosemary as an MS-13 girl.

10   Rosemary called Cuervo to see where he was located.  She then

11   texted Aguirre, Aguirre told her he would go pick her up."  Is

12   that an accurate statement as to what you told Mr. MacKinlay

13   and the police?

14   A.   Yes.

15   Q.   Rafael had a hard time making decent money doing painting

16   work in Michigan?

17   A.   Yes.

18   Q.   And when you made the decision to move to Chelsea, you

19   understood that he had been promised work as a painter with

20   Cuervo's father who ran a painting business?

21   A.   He got the job here.

22   Q.   Okay.  And one of the reasons that you knew he wanted to

23   come here was because he thought he could make better money

24   working?

25   A.   He was going to earn the same thing because the rent over

1    there was cheaper, so it would all work out the same.

2    Q.    Gallito and Bravo, who came with you, they had family here

3    in the Boston area?

4    A.    Only Gallito, I believe he had an uncle.

5          MR. HALPERN:    I have a document, which is a ticketing

6    record.   This has been by agreement, I'd like to offer this as

7    Exhibit 281.

8          THE COURT:    281.   All right.   It's admitted, 281.

9          (Exhibit No. 281 received into evidence.)

10:57AM 10    Q.    This is a ticketing record from American Airlines, which

11   merged at some point with U.S. Air, and I'm going to ask

12   you -- can we go up on the screen?   This is your full name, is

13   that Vicky Eullalia Martinez Chacon?

14   A.    Yes.

15   Q.    And the flight, tell me if this is consistent with your

16   memory of when you came here, that you flew from Detroit on

17   March 24th, 2014?

18   A.    Yes.

19   Q.    And the names, the real names of the others that came were

10:59AM 20   Pineda and Ayala?

21   A.    Yes.

22   Q.    And you were picked up at the airport at Logan by Cuervo,

23   Hector Ramires?

24   A.    Yes.

25   Q.    And he's the one whose father owned the painting business?

1    A.   Yes.

2    Q.   The rap songs that Rafael made in Michigan, when you

3    arrived in Massachusetts, did he try to take those down off of

4    YouTube?

5    A.   Yes.

6    Q.   He told you he couldn't figure out how to do it, right?

7    A.   He wanted to take them down because he had been scolded by

8    the gang in El Salvador.

9    Q.   And did he tell you that he couldn't figure out how to get

11:00AM 10   them down?

11   A.   Yes.

12   Q.   Did he ask you to try to help figure out how to get them

13   off YouTube?

14   A.   No, I couldn't do it.

15   Q.   This was right after you got here?

16        THE COURT:  Whenever you're ready to pause.

17   A.   Yes, after.

18        MR. HALPERN:  It's a good time.

19        THE COURT:  Okay.  We'll take a break.

11:01AM 20        THE CLERK:  All rise.

21        (JURORS EXITED THE COURTROOM.)

22        MR. MacKINLAY:  I understand she's on

23   cross-examination.  I would like permission to inquire

24   concerning a nursing issue we had discussed, whether it

25   required --

1          THE COURT:  Fine.  She's got a one-month old.

2          MR. HALPERN:  I'm fine with whatever they want to do.

3          MR. PASRICHA:  If a break is needed, we also have

4  another witness we can use.

5          MR. MACKINLAY:  She doesn't need a break, your Honor.

6          THE COURT:  What I'd like to do when we come back, I'm

7  going to ask if we can go straight through just to try to gain

8  some of that time back.

9          THE CLERK:  All rise.

11:19AM 10          (A recess was taken.)

11          THE CLERK:  All rise for the jury.

12          (JURORS ENTERED THE COURTROOM.)

13          THE CLERK:  Thank you.  You may be seated.  Court is

14  back in session.

15          THE COURT:  Ladies and gentlemen, what I would like to

16  do is go straight through until one to try to make up the time,

17  if we can.  If anyone can't go that long, raise your hand.

18          Go ahead.

19  Q.   I want to ask you about the incident with the machete on

11:20AM 20  April 6th, 2014.  Mr. MacKinlay asked you several questions in

21  which he referred to this event happening in the evening.  You

22  remember those questions?

23  A.   It was in the afternoon.

24  Q.   Right.  You were actually going for lunch, right?

25  A.   Yes.

1   Q.   To a restaurant that both of you liked, Sabor Centro

2   Americano?

3         THE INTERPRETER:  I'm sorry?

4   Q.   Sabor Centro Americano.

5   A.   Central American.

6   Q.   And to walk there from your home, you went through a park?

7   A.   Yes.

8   Q.   Now, you did not go out for walks with Rafael around

9   Chelsea hoping to find 18th Street kids to get into fights

11:21AM 10   with?

11   A.   No.

12   Q.   Your plan that day was to go somewhere to get something to

13   eat?

14   A.   Yes.

15   Q.   And you saw two guys walking in your direction as you were

16   going through the park?

17   A.   Yes.  They were walking.

18   Q.   And Rafael told you as they were coming in your direction

19   to be careful and come closer to him?

11:22AM 20   A.   No, he just started saying things to him when he saw him.

21   Q.   They were wearing shoes that had red on them?

22   A.   Yes.

23   Q.   And they had some red clothing?

24   A.   I don't recall.

25   Q.   But based just on the way they looked, it was clear that

1    Rafael thought that they might be 18th Street?

2    A.    He recognized them because he had seen photos.

3    Q.    Well, did he tell you that like he turned to you and said

4    I recognize those guys because I've seen photos?

5    A.    No, he just directly started talking to them.

6    Q.    And at that point, you only had been here in Chelsea, this

7    is on the 6th, you flew in on the 22nd?

8          THE COURT:  I thought it was the 24th.

9    Q.    24th, I'm sorry.  You had been here for about 11 days?

11:24AM 10   A.    Yes.

11   Q.    You weren't hanging around with 18th Street kids during

12   that 11 days --

13         THE INTERPRETER:  I'm sorry, could you repeat the

14   question?

15   Q.    You personally were not hanging around 18th Street kids

16   during those 11 days?

17   A.    No.

18   Q.    No.  And if you saw 18th Street kids, you'd stay away from

19   them?

11:24AM 20   A.    Yes.

21   Q.    And you weren't studying these Facebook pictures to try to

22   memorialize the names of the 18th Street kids?

23   A.    No.

24   Q.    But you see as coming towards you an 18th Street kid named

25   Christian?

1    A.    Yes, because he's the one I saw when he hit him with the

2    machete.

3    Q.    Christian?

4    A.    Yes.

5    Q.    Did the prosecutor or the police tell you that the guy who

6    got hit with the machete was named Christian?

7    A.    No.

8    Q.    You just knew walking towards you 11 days after you got

9    here that the kid walking, one of these kids walking towards

11:25AM 10  you was Christian?

11   A.    Because Tremendo said it.

12   Q.    He knew after 11 days, he recognized this kid as

13   Christian?

14   A.    Yes.

15   Q.    And he said, oh, there's Christian?

16   A.    No, he just said it, and then he said to the guy that he

17   was Christian and what was he called.

18   Q.    And three and a half years later after this incident

19   occurs, you're interviewed by the prosecutor and the police,

11:26AM 20  and you tell them that the guy with the knife who got hit with

21   the machete was named Christian, that's what happened?

22   A.    Yes.

23   Q.    Because the report of this interview, tell me if this is

24   consistent with what you remember, is that you told them that

25   this guy's name was Christian?

1   A.   Yes.

2   Q.   That you remembered three and a half years later?

3   A.   Yes.

4   Q.   Okay.  And as they come closer to you, is it true that one

5   of them says something like, "Look at that piece of shit, he

6   has a good-looking girl with him?"

7   A.   No.

8   Q.   Did one of them make an 18th Street sign with his hand?

9   A.   No.

11:28AM 10   Q.   Did Rafael say to one of them something like, "What did

11   you say to me?  Say it to my face."

12   A.   No, he just said, "What's up, buchona?"

13   Q.   You may have saved his life that day; is that right?

14   A.   No.

15   Q.   One of them pulled out a knife, and you saw it before

16   Rafael did?

17   A.   No, only Christian took out a knife.

18   Q.   You used a nickname often with Rafael, "negro;" is that

19   right?

11:28AM 20   A.   Yes.

21   Q.   And when you saw a kid pull out a knife, you yelled out to

22   him "negro"?

23   A.   No.

24   Q.   Did you push the guy that had the knife?

25   A.   No, I was just to one side.

1    Q.    Did you push one of them?

2    A.    No.

3    Q.    Did you see that both of them had knives?

4    A.    I only saw that one had a knife.

5    Q.    And did you see him lunge at Rafael and cut his shirt?

6    A.    No.

7    Q.    Rafael pulled out a machete after this guy pulled out a

8    knife?

9    A.    No, he pulled it out before that.

11:30AM 10    Q.    They pulled it out at the same time?

11    A.    Yes.

12    Q.    And the kid with the knife doesn't back off, right?

13    A.    No.

14    Q.    And, in fact, he says to Rafael, "You're a pussy and

15    you're not going to use that?"

16    A.    No, he didn't say that.

17    Q.    Did he come at Rafael with the knife?

18    A.    Both of them had a fight.

19    Q.    And once this guy got hit with the machete, he stopped

11:31AM 20    fighting?

21    A.    Yes.

22    Q.    And he went and sat on the ground?

23    A.    Yes.

24    Q.    So, at that point he was helpless?

25    A.    No.

1    Q.   He wasn't helpless?

2         THE INTERPRETER:  Sorry for the translation.  Could

3    you repeat the question?

4    Q.   Yes.  At the point he's sitting on the ground, he could

5    not defend himself, correct?

6    A.   No.

7    Q.   You're agreeing with me that he couldn't defend himself?

8    A.   Who?

9    Q.   The kid that's on the ground after he gets hit with the

11:31AM 10   machete, do you agree with me that at that point he couldn't

11   defend himself?

12   A.   Yes.

13   Q.   And at that point Rafael walks away?

14   A.   Yes.

15   Q.   Okay.  And the two of you go back to the house?

16   A.   Yes.

17   Q.   After that day in the park, did you see these two guys

18   again?

19   A.   After Tremendo was in jail, I saw him again.

11:32AM 20   Q.   Did they try to attack you?

21   A.   No.

22   Q.   The shooting incident was a week later?

23   A.   Yes, about a week or before, something like that.

24   Q.   All right.  And in the interview that you had with

25   Mr. MacKinlay and the trooper, you told them, at least

1    according to the report, that the name of one of the 18th

2    Street guys, the guy that got shot was Javier.  Did you say

3    that during the interview?

4    A.    Yes.

5    Q.    So you remembered that, too, three and a half years later,

6    you remembered the name of an 18th Street that got shot that

7    day?

8          THE INTERPRETER:  I'm sorry, could I just add that I

9    didn't translate the part that she had said the name was

11:34AM 10    Javier.

11    A.    Yes.

12    Q.    All right.  So three and a half years later when you were

13    interviewed, you remembered that the name of the kid that got

14    shot was Javier?

15    A.    Yes, and he was called Papelito.

16    Q.    And were you, in fact, chased?

17    A.    Supposedly they were following us.

18    Q.    So what did you think they were going to do to you if they

19    had caught you?

11:35AM 20    A.    I don't know.

21    Q.    Were you afraid?

22    A.    Yes.

23    Q.    And that's why you called Rafael?

24    A.    I told him I was there.

25    Q.    After Rafael was arrested, you continued to live in the

1    same apartment?

2    A.   Yes.

3    Q.   For how long?

4    A.   I don't remember, but it was several months.

5    Q.   And were there days when you would look outside your

6    window and see 18th Street kids hanging around?

7    A.   No.

8    Q.   Did you ever walking around the streets feel like you were

9    in danger from 18th Street kids who knew that you were his

11:36AM 10    girlfriend?

11    A.   Yes.

12    Q.   You went to see Rafael in jail pretty much every week for

13    a long time, didn't you?

14    A.   Yes.

15    Q.   And sometimes more than once a week?

16    A.   Sometimes.

17    Q.   And right away after his arrest, he told you to tell the

18    guys in the Chelsea gang that the gang was over and that they

19    should end it?

11:36AM 20          MR. MACKINLAY:  Objection.

21          THE COURT:  Let me see counsel.

22          (THE FOLLOWING OCCURRED AT SIDEBAR:)

23          THE COURT:  Why does this come in?

24          MR. HALPERN:  That he's withdrawing, he doesn't learn

25    anything more about the gang, he tells her to tell David Lopez

1    that he's out, he doesn't want any more involvement, and he

2    tells her.

3           THE COURT:  Okay.  Why is it not hearsay?  Give me an

4    evidentiary explanation as to why it comes in.  In other words,

5    it's his own private statement that you're eliciting, so why

6    does it come in?

7           MR. HALPERN:  Well, I think the circumstances are

8    credible, and she acted on it.  She goes to Lopez and tells

9    Lopez that he wants out.

11:37AM 10          THE COURT:  Well, you've got to fit me within a rule

11   here.  Is it his then existing intent, mental; is that --

12          MR. HALPERN:  I don't know how you would withdraw from

13   a conspiracy absent evidence that you communicated its

14   withdrawal, so he communicated it through her, he tells her --

15          THE COURT:  Well, this isn't close to withdrawal, but

16   anyway, it's a legal matter.  I need to fit this in an

17   evidentiary pigeonhole for it to come in.  Give me the

18   pigeonhole.

19          MR. HALPERN:  Okay.  Let me just think for a minute.

11:38AM 20   It's obviously being admitted for the truth of the matter

21   asserted.  I think I've just got to go sort of the fallback on

22   general credibility as a hearsay exception.

23          THE COURT:  I'm not going to admit it on, you know,

24   sort of a hearsay exception.  I don't think it has the indices

25   of credibility that it might otherwise have, but you say that

1    she relied on it and she did X.  What is X that she did?

2         MR. HALPERN:  She went to David Lopez and told him

3    that Rafael wanted out and that he wanted the gang to disband

4    and that he did not want to be involved anymore, and she

5    communicated that to Lopez.

6         THE COURT:  And did Lopez give a response?

7         MR. HALPERN:  Lopez told her to tell Rafael, okay.

8         MR. MACKINLAY:  Your Honor --

9         THE COURT:  Yes, go ahead.

11:39AM 10    MR. MACKINLAY:  -- I don't think we even have to

11   entertain this outside the presence of the jury because I think

12   the witness is going to deny all that.

13        MR. HALPERN:  She may.

14        THE COURT:  The first question is whether there's a

15   good faith basis for the question.  I'm going to assume the

16   answer is yes for these purposes, but could it not be a

17   statement of his intent, this is my then existing state of

18   mind, my intent, and offered for that purpose only.

19        MR. HALPERN:  Yes, thank you.

11:40AM 20    THE COURT:  All right.  I'm going to allow the

21   question on that basis, and if she says yes, I'm going to give

22   the jury a limiting instruction as to what they can consider it

23   for.

24             (SIDEBAR CONFERENCE WAS CONCLUDED)

25        THE COURT:  Why don't you put the question to the

58

1    witness again.

2          MR. HALPERN:  Thank you.

3    Q.   After Rafael's arrest, did he ask you to tell guys in

4    Chelsea and in particular David Lopez that he wanted out and

5    that they should end the gang?

6    A.   No.

7    Q.   Did you deliver for Rafael a message to David Lopez about

8    what Rafael wanted?

9          MR. MACKINLAY:  Objection.

11:41AM 10          THE COURT:  Overruled.

11    A.   No.  Perhaps he sent him letters.

12    Q.   Did you talk to David Lopez about whether or not Rafael

13    wanted any involvement in the gang -- after his arrest, after

14    Rafael was arrested -- David Lopez is Cilindro, you know that,

15    right?

16    A.   Yes.

17    Q.   Okay.  And after Rafael was arrested, did Cilindro become

18    the leader?

19    A.   Yes.

11:42AM 20    Q.   All right.  And you saw that.  You saw that yourself when

21    you observed these kids that after Rafael was arrested, his

22    position as leader was taken over by Cilindro?

23    A.   Cilindro said that, but I didn't see it.

24    Q.   And did the other kids treat him like he was the leader?

25    A.   I don't know because I didn't live there afterwards.

1    Q.   All right.  And you didn't see Rafael do anything after

2    his arrest to indicate that he was still a leader?

3    A.   No.

4    Q.   Okay.  So, I want to go back to the question I asked

5    before.  Did you ever have a conversation with David Lopez,

6    with Cilindro, about Rafael wanting out of the group?

7    A.   It was only that they heard rumors, that Cilindro heard

8    rumors that he didn't want that.

9    Q.   That Rafael didn't --

11:44AM 10       THE COURT:  Hold on.

11       MR. MACKINLAY:  Objection.  Strike the answer.

12       THE COURT:  I'm going to strike the answer, and the

13    jury will disregard it.

14    Q.   You talked to Cilindro about rumors that Cilindro had

15    heard?

16    A.   Yes.

17    Q.   Okay.  And the rumors that Cilindro asked you about were

18    that Rafael wanted out of the group?

19       MR. MACKINLAY:  Objection.

11:44AM 20       THE COURT:  I'll allow this, but let me explain

21    something to the jury.  Sometimes there's a legal concept

22    called hearsay, and it's a statement out of court made for its

23    truth, and let me give you an example.

24       If someone came in the back of the courtroom and said

25    you have to evacuate, the building is on fire and everyone

1    evacuated, that's not really evidence that the building is on

2    fire, but if somebody asked you to evacuate, it's because

3    somebody told me this, all right.  You don't know whether the

4    building is on fire, you were told something, and you reacted,

5    so it's not proof that the building is on fire, but it matters

6    because something happened as a result.

7          So this question is assuming the existence of rumors

8    or possibly passing on rumors.  That's not evidence that

9    whatever this rumor is is true, it's evidence of a

10   conversation.  Go ahead.

11   Q.   So the question I wanted to ask you is whether Cilindro

12   spoke to you about rumors that he had heard that Rafael wanted

13   out?

14   A.   Yes, but Tremendo said that that was his family, that he

15   would never leave.

16   Q.   After he was arrested, some of the members of the group

17   did stop involvement?

18   A.   Yes.

19   Q.   Bravo stopped being involved, and he was hanging out in

20   Everett?

21   A.   I don't know about that.  All I found out, all I heard was

22   that they had been arrested, and I don't know if they got out

23   or not.

24   Q.   Smiley or Chucky, you know who he is, Bryan Barillas

25   Galicia?

```
 1    A.   Yes.

 2    Q.   Okay.  He moved away, he moved out of Chelsea altogether,

 3    he went to Texas?

 4    A.   Yes.

 5    Q.   The group from the time that you arrived in Chelsea until

 6    the time the group ended, the size of the group never changed,

 7    it was the same kids from the time you came until the time you

 8    left?

 9    A.   No.

10    Q.   No.

11         MR. HALPERN:  Do we have the chart?

12    Q.   Yesterday you were shown a blow-up of this.  All of these

13    guys were part of the group from the time you arrived, Bravo

14    and Gallito came with you, the others were already part of the

15    group, and then in addition, there was Clacker and Blanquito,

16    and they were all part of it?

17         THE COURT:  Let me ask you, for the benefit of the

18    translator, can you break that up?  You're asking very long

19    questions.

20         MR. HALPERN:  I'm sorry.

21    Q.   All of the people pictured here were part of the group

22    from when you arrived?

23    A.   Yes.

24    Q.   And, in addition, Blanquito, Josue Morales, and Clacker,

25    Christian Henriquez also were part of the group when you
```

1    arrived?

2    A.    Yes.

3    Q.    And these were the same people who were involved in the

4    group when Rafael went to jail?

5    A.    Yes.

6    Q.    The gang didn't grow while he was in Chelsea?

7    A.    Yes.

8    Q.    He didn't recruit anybody?

9    A.    No.  He didn't have enough time.

11:50AM 10          MR. HALPERN:  Thank you.  That's all I have.

11          THE COURT:  Redirect.

12          MR. MACKINLAY:  No questions, your Honor.

13          THE COURT:  All right.  Thank you, you may step down.

14          MR. PASRICHA:  The United States calls Martinez.

15          IRWIN MARTINEZ, having been duly sworn by the Clerk,

16   testified as follows through the interpreter:

17                     DIRECT EXAMINATION

18   BY MR. PASRICHA:

19   Q.    Good morning, sir.

11:52AM 20   A.    Good morning.

21   Q.    Can you please introduce yourself to the jury and spell

22   your last name for the record.

23   A.    Irwin Martinez, E-r-n-i --

24   Q.    Irwin, is the English spelling I-r-w-i-n?

25   A.    Yes.

```
 1    Q.    How old are you, Mr. Martinez?

 2    A.    Twenty-eight.

 3    Q.    What city do you live in?

 4    A.    Chelsea.

 5    Q.    And how long have you lived in Chelsea?

 6    A.    Seven years.

 7    Q.    Do you work?

 8    A.    Yes.

 9    Q.    What kind of work do you do?

10    A.    Construction.

11    Q.    What kind of hours do you keep when you work your

12    construction job?

13    A.    6 a.m. to 4 p.m.

14    Q.    You do that every day?

15    A.    Every day.

16    Q.    I want to remind you about -- I want to take you back to

17    April 9th, 2014.  Where were you living at that time?

18    A.    At 33 Spencer.

19    Q.    And what city is 33 Spencer in?

20    A.    Chelsea.

21    Q.    Showing you a map --

22          MR. PASRICHA:  Your Honor, it's marked 121.1 for

23    identification.  Your Honor, I'm just marking it as a chalk, so

24    I don't know if the jury can see that as well.

25          THE COURT:  Yes, they can see it.
```

11:53AM 10

11:54AM 20

1          MR. PASRICHA:  Thank you.

2    Q.   Is that a general area of where you lived at that time at

3    33 Spencer Ave.?

4    A.   Yes.

5    Q.   And do you recognize this area as the intersection where

6    you live?

7    A.   Yes.

8          THE COURT:  That's 121.3, you just showed them?

9          MR. PASRICHA:  Yes.  Thank you, your Honor.

11:55AM 10   Q.   I'm showing you what's been marked as 121.4.  Do you

11   recognize that?

12         THE COURT:  Hold it.  This is not in evidence,

13   correct?

14         MR. PASRICHA:  Correct.

15         THE COURT:  So the jury can't see it.  Are you going

16   to show a series of photographs?

17         MR. PASRICHA:  Two more.

18         MR. HALPERN:  I have no objection.

19         MR. PASRICHA:  I can move them, if needed.

11:55AM 20        THE COURT:  121.4.

21         MR. PASRICHA:  I'll move in for the record 121.1

22   through 121.5.

23         THE COURT:  Is there any objection?

24         MR. HALPERN:  No.

25         THE COURT:  They're all admitted, 121.1 through 121.5.

```
 1              (Exhibit Nos. 121.1 through 121.5 received into

 2    evidence.)

 3    Q.   Do you recognize that?

 4    A.   Yes.

 5    Q.   And what is that house we're looking at?

 6    A.   It is my sister's house.

 7    Q.   And is that the house you were living at in April, 2014?

 8    A.   Yes.

 9    Q.   Who else were you living with at that time in that house?

10    A.   With my mother, my two nephews, and my two sisters.

11    Q.   Did you go to work that day?

12    A.   Yes.

13    Q.   What kind of work did you go do that day?

14    A.   Construction.

15    Q.   And approximately what time did you come home from work

16    that day?

17    A.   It was a little bit dark already.

18    Q.   So in the evening?

19    A.   Around the evening.

20    Q.   And when you came home, tell the jury what happened once

21    you walked towards your house.

22    A.   I got out of work, I was on my way home, my sister told me

23    to check on my nephew, so I went and sat down on the steps.  I

24    checked my phone.

25    Q.   Thank you.  That's helpful.  I asked a poor question, so
```

11:56AM appears at lines 10 and 20.

 1  let me break that up.  This is the sister you lived with; is

 2  that correct?

 3  A.   Yes.

 4  Q.   And so when you came home while you were still outside,

 5  did she tell you to wait for your nephew?

 6  A.   Yes.

 7  Q.   And where was your nephew that you were waiting for?

 8  A.   He had gone to pick up homework from school.

 9  Q.   I believe you started to say that you decided to sit down

11:58AM 10  to wait for him.  Where did you sit?

11  A.   On the steps.

12  Q.   I'm putting back up what was introduced as Exhibit 121.4.

13  Are those the steps that you were sitting on?

14  A.   Yes.

15  Q.   And what were you doing when you decided to sit on the

16  steps?

17  A.   Checking my phone.

18  Q.   What kind of phone was it?

19  A.   A Samsung.

11:58AM 20  Q.   And what were you doing with the phone?

21  A.   Playing.

22  Q.   Like playing a game or something?

23  A.   Yes.

24  Q.   And what happened next?  What do you remember happening

25  next?

1   A.   Suddenly, as I was sitting on the stairs, I saw two

2   subjects come near me and pointed two guns at me.

3   Q.   Did you see them as they were walking up to you?

4   A.   No.

5   Q.   You were looking down at your phone; is that correct?

6   A.   Yes.

7   Q.   And so when was the first time you noticed the two people

8   with the guns?

9   A.   When they were pointed at me.

12:00PM 10   Q.   What happened after you looked up from your phone and saw

11   people pointing guns at you?

12   A.   I asked what was going on.

13   Q.   And how did they respond?

14   A.   They just were pointing at me, and I was nervous.

15   Q.   Did they -- did you recognize either of the two people who

16   pointed guns at you?

17   A.   Since I was nervous, I don't remember.

18   Q.   Well, do you recognize -- did you recognize one of the

19   people from the neighborhood?

12:01PM 20   A.   Not very well.

21   Q.   Did you hear the two people talking to each other?

22   A.   Yes.

23   Q.   And what did you hear them saying?

24   A.   One was saying to the other that I was going to die here.

25   Q.   After you heard them say that, did they ask you any

1    questions?

2    A.    They took my shirt off.

3    Q.    Did they tell you why they took your shirt off?

4    A.    To see if I had tattoos.

5    Q.    Did they ask you if you were in a gang?

6    A.    Yes.

7    Q.    What did you say?

8    A.    That I was not a gang member.

9    Q.    Are you in a gang, sir?

12:02PM 10    A.    No.

11    Q.    Have you ever been in a gang?

12    A.    No.

13    Q.    What country were you born in?

14    A.    In El Salvador.

15    Q.    In El Salvador, were you ever in a gang?

16    A.    No.

17    Q.    When you told them you weren't in a gang, did they believe

18    you?

19    A.    No.

12:02PM 20    Q.    So was it after that, after you told them that you weren't

21    a gang member, is that when they asked you to lift your shirt

22    to show whether you had tattoos or not?

23    A.    Yes.

24    Q.    Is there anything else you remember them saying to each

25    other while they were checking you for tattoos?

1    A.   Only that one was saying to the other we're going to kill

2    him here.

3    Q.   After they saw that you didn't have a tattoo or tattoos

4    and after you told them that you weren't a gang member, what

5    did they do?

6    A.   They took my phone.

7    Q.   What else?

8    A.   And my wallet.

9    Q.   Did they take the money from your wallet?

12:04PM 10    A.   Yes.

11    Q.   And what happened next?

12    A.   Afterwards, they left.

13    Q.   Is the house you were living at, did that have any

14    surveillance cameras?

15    A.   There are four cameras.

16    Q.   And is one of the cameras pointed right at the area where

17    you were sitting?

18    A.   Yes.

19    Q.   I'm going to show you what was 121.5.  Is that one of the

12:05PM 20    cameras on the top left above near the door?

21    A.   Yes.

22    Q.   Was anyone inside the house at the time that you were

23    being robbed?

24    A.   My sister was inside.

25    Q.   Did your sister happen to be watching the cameras as you

1   were being robbed?

2   A.   Yes.

3   Q.   Did she call the police while you were being robbed?

4   A.   Yes.

5   Q.   After you were robbed, did you go back into the house?

6   A.   Yes.

7   Q.   By the time you went into the house, had your sister

8   already called and was she already on the phone with 9-1-1?

9   A.   Yes.

12:06PM 10         MR. PASRICHA:  Your Honor, I'd seek to move 912, it's

11   the 9-1-1 call to the Chelsea Police.

12         MR. HALPERN:  No objection.

13         THE COURT:  It's admitted, 122.

14         (Exhibit No. 122 received into evidence.)

15         MR. PASRICHA:  There is a transcript in the transcript

16   binder for the jury, but if we can play 122T, I believe it will

17   play both the tape and the scrolling text, if it helps.

18         THE COURT:  I don't think there's a transcript, at

19   least not in my binder.

12:07PM 20         MR. PASRICHA:  122 is the call, 123 is the transcript.

21         THE COURT:  And is the transcript a chalk?  Are you

22   offering it?

23         MR. PASRICHA:  We can offer it in unless there are

24   objections.

25         THE COURT:  Are you offering 123?

1           MR. PASRICHA:  We'll offer it into evidence.

2           MR. HALPERN:  We don't object.

3           THE COURT:  123.

4           MR. PASRICHA:  If I may publish for the jury what

5    we'll call 122T, which is the scrolling transcript over the

6    audio of the 9-1-1 call.

7           THE COURT:  All right.

8           (Video played.)

9    Q.   Was that your sister whose voice we heard first?

12:11PM 10   A.   Yes.

11   Q.   And towards the end, we hear a male voice in the

12   background clarifying that the men were Hispanic.  Was that

13   your voice?

14   A.   That's me.

15   Q.   And is that generally how -- is that -- is what's

16   described on the tape generally how that incident occurred as

17   you remember it?

18   A.   Yes.

19   Q.   Except that the men didn't come into the house, there was

12:12PM 20   a translation issue, right, they were just outside, robbed you

21   and went away?

22   A.   Yes.

23   Q.   Have you seen since the incident the surveillance video

24   from your house that captures the incident?

25   A.   No.

1    Q.   Well, remember the video we saw, I guess I'm talking about

2    the video we talked about over the weekend, do you remember

3    seeing the video of yourself sitting outside the house showing

4    the robbery?

5    A.   Yes.

6         MR. PASRICHA:  Your Honor, I'd move into evidence

7    Exhibits 124, 125 and 126.  124 is the surveillance video, 125

8    is an excerpt from that video, and 126 are some still photos

9    from that video.

12:13PM 10         THE COURT:  Any objection?

11         MR. HALPERN:  No objection.

12         THE COURT:  They're admitted, 124, 125 and 126.

13         (Exhibit Nos. 124, 125 and 126 received into

14    evidence.)

15         MR. PASRICHA:  Your Honor, may we publish for the jury

16    125?  That's an excerpt of the video.

17         THE COURT:  Yes.

18         "Publish" is a lawyer word, ladies and gentlemen.  It

19    means "show."

12:13PM 20   Q.   I'm going to pause it while I talk to you about that.  Is

21    that you, sir, sitting on the bottom right playing on your

22    phone?

23    A.   Yes.

24    Q.   There were two men in here, one on the left and one on the

25    right, and only one is on the screen where I froze it on the

1    left.  There's a person on the right who's also pointing a gun

2    at you; is that correct?

3    A.   Yes.

4    Q.   Which of the two men was asking permission or saying,

5    "Should we kill him"?

6    A.   The one on the stairs.

7    Q.   So the one we see right now or the one we don't see right

8    now?

9    A.   The one that's on the screen right now.

12:16PM 10    Q.   So the one that's on the screen, and just to clear it up,

11   I'll move it back up a little bit.  The one that's on the

12   screen?

13            THE COURT:  You can move the screen forward.

14   Q.   So this is the start of the video, and is this the point

15   before they ask to see your tattoos where he asks, "Should we

16   kill him"?

17            THE INTERPRETER:  I'm sorry, can you repeat the

18   question?

19   Q.   Sure.  Is this the point before they ask to see your

12:16PM 20   tattoos where this person on the left asks his partner or the

21   other person whether they should kill you?

22   A.   Yes.

23   Q.   Did that other person give permission or how did he

24   respond to that question?

25   A.   No, he didn't answer.  He kept quiet, he just said,

1      "You're going to die here."

2      Q.   That's what the other person told you?

3      A.   Yes.

4      Q.   And is that when you told them that you were not a gang

5      member?

6      A.   Yes.

7      Q.   And as shown in the video, is it after that that they

8      asked you to prove it by showing whether you had gang tattoos

9      or not?

12:17PM 10    A.   Yes.

11     Q.   Based on what they were saying and how they were acting,

12     did you think they would have killed you if you had gang

13     tattoos?

14     A.   Yes.

15          MR. PASRICHA:  Nothing further, your Honor.

16          THE COURT:  Cross.

17          MR. HALPERN:  No questions.

18          THE COURT:  All right.  Thank you, you may step down.

19          MR. PASRICHA:  The government calls Sean Connolly.

12:18PM 20         SEAN CONNOLLY, having been duly sworn by the Clerk,

21     testified as follows:

22                      DIRECT EXAMINATION

23     BY MR. PASRICHA:

24     Q.   Good morning, sir.  What's your name?

25     A.   My name is Sean Connolly.

1    Q.    Where do you work?

2    A.    I work for Homeland Security Investigations in Boston.

3    Q.    What's your title with Homeland Security Investigations in

4    Boston?

5    A.    I'm a special agent.

6    Q.    And Homeland Security Investigations also goes by his

7    shorthand?

8    A.    Yes, it does.

9    Q.    How long have you worked for his?

12:19PM 10    A.    Over six years, sir.

11    Q.    Do you have any prior law enforcement background as well?

12    A.    Yes, I do.

13    Q.    Could you just summarize that for the jury?

14    A.    Prior to working with Homeland Security Investigations, I

15    worked for the Transit Police in Boston for six and a half

16    years.

17    Q.    Can you summarize for the jury the duties and

18    responsibilities of a special agent with his?

19    A.    Our job is to enforce the criminal statutes, criminal and

12:20PM 20    civil statutes of the United States Customs and Immigration

21    laws, statutes.

22    Q.    And that's part of what you do as well?

23    A.    Yes, it is.

24    Q.    In connection with that work, do you also coordinate with

25    other law enforcement agencies to investigate criminal

1    activity?

2    A.   Yes, I do.

3    Q.   And what are some of the partner agencies that you work

4    with as part of your work?

5    A.   I work with Boston Police Department, Massachusetts State

6    Police, Federal Bureau of Investigation, Alcohol, Tobacco, and

7    Firearms, Drug Enforcement Administration, Chelsea Police

8    Department, Everett Police Department, pretty much everybody in

9    the area.

12:21PM 10    Q.   Are you familiar with the gang known as La Mara

11    Salvatrucha or MS-13?

12    A.   Yes, I am.

13    Q.   How are you familiar with them?

14    A.   For the last three years, I've been working exclusively

15    targeting MS-13 and 18th Street transnational gangs.

16    Q.   And what kinds of work do you do as part of your efforts

17    to target that gang?

18    A.   Working on criminal investigations of those gangs.

19    Q.   Through your training and experience and work targeting

12:21PM 20    that gang, have you become familiar with some of the

21    identifying characteristics of that gang?

22    A.   Yes, I have.

23    Q.   Just at the high level, can you tell the jury what are

24    some of the characteristics you look for when investigating

25    MS-13?

1   A.   We want to look for the specific types of clothing they

2   wear, the gang apparel.  You want to look for the type of

3   paraphernalia they might wear or carry with them to the

4   different types of clothing to jewelry or something like that

5   that they would carry on them, the type of weapons, the way the

6   weapons are carried on them.  You want to look for if you have

7   the ability, again, gang hand signs, pretty much any indicator

8   for those gangs.

9   Q.   I want to turn your attention to July, 2015.  Were you

12:22PM 10   working on an investigation into the MS-13 gang at that time?

11   A.   Yes, I was.

12   Q.   Is that the same investigation that led to the indictment

13   in this case?

14   A.   Yes, it did.

15   Q.   And on July 8th, 2015, in particular, were you working on

16   that date?

17   A.   Yes, I was.

18   Q.   Part of the work on that date, did your work take you to

19   124 Broadway in Somerville, Massachusetts?

12:23PM 20   A.   Yes, it did.

21   Q.   What was the purpose of his and your partner agencies

22   going to that address that day?

23   A.   We went to that address because it is a known MS-13

24   address or house, and we went there in search of several

25   different MS-13 gang members.

1    Q.   When you arrived, were you voluntarily let into the house?

2    A.   Yes, I was.

3    Q.   And then based on that consent and the developing

4    situation, did you end up searching that house?

5    A.   Yes, we did.

6    Q.   Did you search for items that you believed were relevant

7    to the ongoing MS-13 investigation?

8    A.   Yes, we did.

9    Q.   Did you seize a number of items that day that you believed

12:24PM 10   were relevant to MS-13?

11   A.   Yes, we did.

12        MR. PASRICHA:  With the Court's permission, your

13   Honor, may I approach the witness?

14        THE COURT:  Yes.

15   Q.   I'm showing you what's marked as Exhibit 23.  Do you

16   recognize that, sir?

17   A.   Yes, I do.

18   Q.   And what is Exhibit 23?

19   A.   Blue rosary beads and white rosary beads.  Those are

12:24PM 20   commonly carried by MS-13 gang members to identify themselves.

21        THE COURT:  Hold on.  The question is what is it?

22        Go ahead.

23        THE WITNESS:  Sorry, your Honor.

24   Q.   Blue and white rosary beads?

25   A.   Yes.

1    Q.   Based on your training and experience, does that have any

2    significance relative to MS-13?

3    A.   Yes, those are commonly carried by MS-13 gang members to

4    identify themselves.

5    Q.   Did you seize these from 142 Broadway on that day?

6    A.   Yes, we did.

7         THE COURT:  Didn't you say 124 Broadway?

8         MR. PASRICHA:  I hope I said 142, if not, I meant 142.

9         THE COURT:  142, all right.

12:25PM 10    Q.   To be clear, 142 Broadway that day, correct?

11    A.   Yes.

12         MR. PASRICHA:  Your Honor, I'd move Exhibit 23 into

13    evidence.

14         MR. HALPERN:  Just a continuing objection on the time

15    frame for all of this.

16         THE COURT:  All right.  Overruled.  It's admitted,

17    Exhibit 23.

18         (Exhibit No. 23 received into evidence.)

19         MR. PASRICHA:  May I just briefly showing it to the

12:25PM 20    jury?

21         THE COURT:  I'll give you a standing objection on that

22    basis.  Go ahead.

23         MR. PASRICHA:  I don't know if the Court has a

24    preference.  I can hold it up or the witness can hold it up,

25    but Exhibit 23.

1    Q.    Did you also seize items of clothing from that address?

2    A.    Yes, we did.

3    Q.    With the Court's permission, I'm showing you what has been

4    marked as Exhibit 24.  Do you recognize that item, sir?

5    A.    Yes, I do.

6    Q.    What is Exhibit 24?

7    A.    It is a Chicago Bull's hat.

8    Q.    What color is the hat?

9    A.    Blue.

12:26PM 10    Q.    Does this item have any significance relative to MS-13?

11    A.    Yes, it does.

12    Q.    And what is that?

13    A.    MS-13 gang members will wear a Bull's hat to identify

14    themselves.  The Bull's symbol is a symbol used by MS-13, and

15    it looks similar to their devil horn's hand sign.

16    Q.    And is the devil horn sign one of the MS-13 insignias or

17    logos?

18    A.    It's their main logo, their main insignia.

19           MR. PASRICHA:  Your Honor, I'd move Exhibit 24 into

12:26PM 20    evidence.

21           THE COURT:  It's admitted, Exhibit 24.

22           (Exhibit No. 24 received into evidence.)

23    Q.    With the Court's permission, I'm showing you Exhibit 25.

24    Do you recognize Exhibit 25?

25    A.    Yes, I do.

81

```
 1   Q.   Can you describe Exhibit 25, please.

 2   A.   It is a blue and white hat.  It has the numbers "503" on

 3   it.

 4        MR. PASRICHA:  Your Honor, I'd move --

 5   Q.   Was this item also seized from 142 Broadway that day?

 6   A.   Yes, it was.

 7        MR. PASRICHA:  Your Honor, I'd move Exhibit 25 into

 8   evidence.

 9        THE COURT:  It's admitted, 25.

10        (Exhibit No. 25 received into evidence.)

11   Q.   Do the colors blue and white have any significance to you?

12   A.   Yes.

13   Q.   What is the significance of the blue and white colors?

14   A.   Blue and white is the main colors for the MS-13 gang.

15   Q.   Does the number "503" have any significance to you?

16   A.   Yes it does.

17   Q.   What is the significance of 503?

18   A.   503.  Is the country code for El Salvador.

19   Q.   With the Court's permission, I'm showing you what is

20   marked Exhibit 29.  Do you recognize that?

21   A.   Yes, I do.

22   Q.   What is Exhibit 29?

23   A.   Blue and white bandanas.

24   Q.   Did you seize that day as well?

25   A.   Yes, we did.
```

1     MR. PASRICHA:  Your Honor, I'd move Exhibit 29 into

2  evidence.

3     THE COURT:  It's admitted, 29.

4     (Exhibit No. 29 received into evidence.)

5  Q.   What is the significance of the blue and white bandanas?

6  A.   Those are also common apparel among MS-13 gang members.

7  It's the primary actual apparel to identify themselves as gang

8  members.

9  Q.   With the Court's permission, I'm showing you a box

12:28PM 10  containing three separate items.  We'll take them in turn.  I'm

11  showing you what is Exhibit 26, what is Exhibit 26?

12  A.   It's a Sterling firearm.

13  Q.   What is Exhibit 27?

14  A.   It is a magazine that goes to this firearm.

15  Q.   What is Exhibit 28?

16  A.   It is bullets that go to this firearm.

17  Q.   And are Exhibits -- I want to make sure I've got the

18  numbers right.  Is the firearm seized in Exhibit 26, the

19  magazine that's 27, and the bullets that are 28, were they all

12:29PM 20  seized from 142 Broadway that day?

21  A.   Yes, they were.

22     MR. PASRICHA:  Your Honor, I'd move 26, 27 and 28 into

23  evidence.

24     THE COURT:  All right.  No objection.  They're

25  admitted, 26, 27, 28.

1          (Exhibit Nos. 26, 27, and 28 received into evidence.)

2     Q.    Did you seize any other weapons from that address that

3     day?

4     A.    Yes, we did.

5     Q.    What else did you seize that day?

6     A.    We seized large knives.

7     Q.    Based on your experience investigating MS-13, do large

8     knives have any significance to you?

9     A.    Yes, they do.

12:29PM 10  Q.    What is the significance of the large knives?

11    A.    MS-13 gang members commonly carry large kitchen-like

12    knives to be used in violent assaults.

13    Q.    With the Court's permission, I am showing you what is

14    collectively Exhibit 22, but it's marked three separate items

15    as 22.1, 22.2 and 22.3.  Do you recognize these items, sir?

16    A.    Yes, I do.

17    Q.    And what are these items?

18    A.    Three large kitchen-like knives.

19    Q.    Were those three knives also seized by his that day from

12:30PM 20  that address?

21    A.    Yes, with his and the Somerville Police, yes.

22          MR. PASRICHA:  Your Honor, I'd move 22, Exhibit 22,

23    the three items 22.1, 22.2 and 22.3 into evidence.

24          MR. HALPERN:  No objection.

25          THE COURT:  All right.  They are admitted, 22.1, 22.2

1    and 22.3.

2           (Exhibit No. 22.1, 22.2 and 22.3 received into

3    evidence.)

4           MR. PASRICHA:  I'd ask that the witness show each of

5    those three items in turn to the jury.

6           THE COURT:  All right.

7           (Items displayed to the jury)

8    Q.    Now, Agent, this third knife has a covering of some sort.

9    How would you describe that covering?

12:31PM 10    A.    That is a homemade sheath.

11   Q.    And is that something you have learned about and seen as

12   part of your experience investigating MS-13?

13   A.    Yes, it is.

14   Q.    Just for the record, your Honor, I don't believe I showed

15   the jury Exhibit 26, but that is the firearm that you seized

16   that day; is that correct?

17   A.    Yes.  Yes, it is.

18   Q.    Finally, I'm showing you with the Court's permission, I'll

19   show approach and show you what's been marked Exhibit 21.  Do

12:32PM 20   you recognize those pictures?

21   A.    Yes, I do.

22   Q.    What is Exhibit 21?

23   A.    It is pictures of two MS-13 gang members doing MS-13 gang

24   hand signs.

25   Q.    And are these pictures that were also seized from the

1    address where these MS-13 members were living?

2    A.   Yes, they were.

3         MR. PASRICHA:  Your Honor, I'd move Exhibit 21 into

4    evidence.

5         MR. HALPERN:  No objection.

6         THE COURT:  It's admitted, 21.

7         (Exhibit No. 21 received into evidence.)

8         MR. PASRICHA:  Madam Clerk, may I have the Elmo,

9    please.

12:32PM 10   Q.   Are those the gang signs that you're familiar with for

11   MS-13?

12   A.   Yes, they are.

13   Q.   And you previously talked about the Chicago Bull's hat

14   having some relevance because the horns seem similar to the

15   sign.  Is that the sign you were referencing?

16   A.   That's the sign I'm referencing, yes, sir.

17   Q.   You indicated that you were there as part of an

18   investigation into various what you described as known as MS-13

19   members.  Do you remember that?

12:33PM 20   A.   Yes.

21   Q.   Do you remember some of the names of some of the

22   individuals you encountered that day?

23   A.   Yes.

24   Q.   At that residence, where you seized these MS-13 related

25   items, did you encounter an individual named Jose' Miguel

1   Hernandez?

2   A.   Yes, we did.

3   Q.   Do you know the country of citizenship or place of birth

4   of Mr. Miguel Hernandez?

5   A.   El Salvador, I believe.

6   Q.   Is that Jose' Miguel Hernandez the same Jose' Miguel

7   Hernandez that was indicted in connection with this

8   investigation?

9   A.   Yes, it was.

12:33PM 10   Q.   Was Oscar Recines-Garcia also an individual you met with

11   that day?

12           MR. HALPERN:  Objection.

13           THE COURT:  Let me see counsel.

14           (THE FOLLOWING OCCURRED AT SIDEBAR:)

15           MR. HALPERN:  My concern is that if they just list off

16   people who were indicted as part of the investigation, there's

17   an implication that they've all pled guilty except for the

18   defendant.

19           THE COURT:  I agree.  Why is any of this admissible?

12:34PM 20           MR. PASRICHA:  Well, I would say that this morning we

21   probably talked about it because our concern was if the

22   standing objection is relevance, the relevance is that their

23   co-conspirators seized from co-conspirators houses --

24           THE COURT:  There's nothing tieing this into -- you

25   know, these are just names, and the fact that they're indicted

1    is not relevant.  I mean, the indictment in this context is a

2    suggestion of guilt somehow.  I don't see how --

3         MR. PASRICHA:  That's fine, your Honor.  Part of -- I

4    literally asked the same question, I wrote down and phrased and

5    checked with Mr. Halpern about it this morning.  I'm not

6    suggesting that there's --

7         MR. HALPERN:  My point was the indictment.  What I

8    said is that if you wanted to identify their names as people

9    who he knew as MS-13, I don't really care about that.  I don't

12:35PM 10   think it's relevant.

11        THE COURT:  Let's keep the indictment out, then you

12   can go through the list of names.

13        MR. PASRICHA:  Yes.

14        (SIDEBAR CONFERENCE WAS CONCLUDED)

15        THE COURT:  All right.  Ladies and gentlemen, I'm

16   going to strike the reference to the indictment and ask you to

17   disregard it, but let's put a question to the witness,

18   Mr. Pasricha.

19        MR. PASRICHA:  Thank you, your Honor.

12:35PM 20   Q.   Was Jose' Miguel Hernandez one of the individuals in the

21   house that day?

22   A.   Yes, he was.

23   Q.   Is he a known MS-13 member in Massachusetts?

24   A.   Yes, he is.

25   Q.   Is Oscar Recines-Garcia an individual who was there at the

1   address that day?

2   A.   Yes, he was.

3   Q.   What do you know about his membership?

4   A.   He's an MS-13 gang member.

5   Q.   What about Manuel Diaz-Granados, do you know about him?

6   A.   Yes, I do.

7   Q.   What do you know about his gang membership?

8   A.   He's an MS-13 gang member.

9   Q.   An individual named a Josue Alexis De Paz, do you

12:36PM 10   recognize that name?

11   A.   Yes, I do.

12   Q.   How do you recognize that name?

13   A.   He's a MS-13 gang member.

14   Q.   And was he at the house where you seized these items?

15   A.   Yes, he was.

16   Q.   And, finally, Julio Esau Avalos-Alvarado?

17   A.   Yes, I do.

18   Q.   How do you recognize that name?

19   A.   He's a MS-13 gang member.

12:36PM 20        MR. PASRICHA:  Nothing further, your Honor.

21        THE COURT:  Cross.

22        MR. HALPERN:  No questions.

23        THE COURT:  You may step down.

24        MR. PASRICHA:  The United States called Brian Estevez.

25        BRIAN ESTEVEZ, having been duly sworn by the Clerk,

1    testified as follows:

2                        DIRECT EXAMINATION

3    BY MR. PASRICHA:

4    Q.   Good afternoon, sir.  What's your name?

5    A.   Brian Estevez.

6    Q.   Where do you work, Mr. Estevez?

7    A.   I currently work for the Massachusetts State Police.

8    Q.   What is your title with the Massachusetts State Police?

9    A.   Massachusetts State Police trooper.

12:38PM 10    Q.   How long have you been a trooper with the Massachusetts

11    State Police?

12    A.   Approximately six years.

13    Q.   Do you have any prior law enforcement background?

14    A.   I do.  Prior to joining the Massachusetts State Police, I

15    worked for the Massachusetts Department of Corrections as a

16    corrections officer.

17    Q.   What are some of your current duties and responsibilities

18    as a trooper with the Mass. State Police?

19    A.   I'm currently assigned to the Massachusetts State Police

12:38PM 20    gang unit and also assigned to the FBI North Shore Gang Task

21    Force as part of the gang unit, I'm a trooper that patrols in

22    the evenings.  Our area of patrol is the City of Chelsea,

23    Revere, Everett, East Boston, in that particular area, and as

24    part of the North Shore Gang Task Force, we're more focused

25    other agencies to conduct long-term investigations with the FBI

1   and other local and federal agencies.

2   Q.   What are some of the other agencies involved in the

3   North Shore Gang Task Force?

4   A.   The FBI, Massachusetts State Police, Homeland Security,

5   the Lynn Police Department, Revere Police Department, Chelsea

6   Police Department.

7   Q.   And are there -- as part of your role on the gang task

8   force, have you been involved in the investigation of the gang

9   known as La Mara Salvatrucha or MS-13?

12:39PM 10   A.   Yes.

11   Q.   Can you describe for the jury what are some of the duties

12   and responsibilities you've had during the course of that

13   investigation?

14   A.   Yes.  I've been involved with the investigation for about

15   four years.  I've been involved in surveillance, reviewing

16   video surveillance.  I'm a Spanish speaker, one of two, and

17   have been involved with the case, so I have had a lot of

18   responsibility on reviewing surveillance recordings, audiotapes

19   and different activities of that nature, speaking to witnesses

12:40PM 20   and victims.

21   Q.   You said you speak Spanish.  Are you a fluent Spanish

22   speaker?

23   A.   Yes.

24   Q.   Fair to say you are one of the few fluent Spanish speakers

25   on the case team?

1    A.   Yes.

2    Q.   And as a result of that, have you been involved in

3    reviewing items that are in Spanish to try and understand and

4    translate some of them?

5    A.   Correct.

6    Q.   And to be clear, you're not formally translating, but

7    you've reviewed items and then highlighted for formal linguists

8    items that they should formally translate for the Court; is

9    that correct?

12:41PM 10    A.   That is right.

11    Q.   How long have you personally been involved in the MS-13

12    investigation that led to the charges against this defendant?

13    A.   Approximately four years.

14    Q.   And during the course of this investigation, have you also

15    when wearing your hat as a state law enforcement officer sought

16    search warrants and done investigative work to obtain evidence

17    from the state side that was used in this investigation?

18    A.   Yes.

19    Q.   And as an example of that, did you assist in writing a

12:41PM 20    search warrant for the house in Revere?

21    A.   Yes.

22         MR. PASRICHA:  Excuse me one moment, your Honor.

23    Q.   This is the house at 70 Graves Street in Revere?

24    A.   Yes.

25    Q.   Did you also assist in executing the warrant at 70 Graves

1    Street in Revere, Graves Road in Revere?

2    A.   Yes.

3    Q.   And this was February 24th of 2015?

4    A.   Correct.

5    Q.   Did you seize a number of items from Graves Road in Revere

6    when executing the warrant?

7    A.   We did.

8    Q.   I'm showing you what's been marked as, previously marked

9    for identification as Exhibit 17.  Do you recognize this item,

12:43PM 10    sir?

11    A.   I do.

12    Q.   And, for the record, what is this item?

13    A.   It's a machete with a black handle and a black sheath.

14    Q.   And is this one of the items you seized from

15    70 Graves Road in Revere?

16    A.   Yes.

17         MR. PASRICHA:  Your Honor, I'd move Exhibit 17 into

18    evidence.

19         MR. HALPERN:  I have a continuing objection on the

12:43PM 20    time frame.

21         THE COURT:  All right.  That's overruled, and it's

22    admitted, Exhibit 17.

23         (Exhibit No. 17 received into evidence.)

24    Q.   With the Court's permission, I am also showing you

25    Exhibit 16.  Do you recognize this item, sir?

1    A.    Yes, I do.

2    Q.    And what is Exhibit 16?

3    A.    It is a black Starter revolver.

4    Q.    Is this also -- is this revolver also an item you seized

5    from Graves Road in Revere?

6    A.    Yes.

7            MR. PASRICHA:  Your Honor, I'd move Exhibit 16 into

8    evidence.

9            MR. HALPERN:  I'm going to add an additional objection

12:44PM 10    that it's cumulative at this point.

11           THE COURT:  It also hasn't been tied to MS-13, it's

12    just seized from a house in Revere, so sustained.

13           MR. PASRICHA:  Your Honor, may we approach sidebar?

14           THE COURT:  Yes.

15           (THE FOLLOWING OCCURRED AT SIDEBAR:)

16           MR. PASRICHA:  Your Honor, Exhibit 17 is already in.

17           THE COURT:  If it was objected only on the time frame,

18    I would have sustained an objection.

19           MR. PASRICHA:  Fair.  In that case, we'd ask that you

12:45PM 20    admit it de bene so that witnesses can later come in and talk

21    about how 70 Graves Road is an MS-13 hangout, including by

22    members from this defendant's clique went.

23           THE COURT:  I won't admit it de bene, I'll admit it if

24    that evidence comes.  In the meantime, it's just he can

25    identify it so this is where it's seized, and it doesn't come

1    in until it's tied to this case somehow, but I'll give you a

2    continuing objection on the time frame.

3              MR. HALPERN:  Why don't you just ask him to explain

4    what the house was relating to.

5              MR. PASRICHA:  We're also trying to minimize all the

6    other stuff that you didn't want.  We can shorten it.

7              (SIDEBAR CONFERENCE WAS CONCLUDED)

8    Q.   Is the search warrant you sought related to the MS-13

9    investigation?

10   A.   Yes.

11   Q.   Did your search warrant affidavit lay out facts suggesting

12   probable cause that items seized there are connected to MS-13?

13   A.   Yes.

14             MR. PASRICHA:  Your Honor, I would now move Exhibit 16

15   into evidence.

16             MR. HALPERN:  So my objection at this point is not to

17   the foundation, it's to the time frame and that it's

18   cumulative.

19             THE COURT:  Okay.  I'll overrule those objections.

20   I'm sorry, you've offered 16 now?

21             MR. PASRICHA:  Yes, your Honor.

22             THE COURT:  All right.  It's admitted.

23             (Exhibit No. 16 received into evidence.)

24   Q.   Were there other bladed weapons you seized from that

25   address that day?

1    A.    Yes, sir.

2    Q.    With the Court's permission, I am showing you what's been

3    marked as Exhibit 18.  Do you recognize that item?

4    A.    I do.

5    Q.    Is that another item you seized from that residence that

6    you tied to MS-13?

7    A.    Yes.

8          MR. PASRICHA:  Your Honor, I'd move Exhibit 18 into

9    evidence.

12:46PM 10         THE COURT:  All right.  It's admitted.  Exhibit 18.

11          (Exhibit No. 18 received into evidence.)

12          MR. PASRICHA:  Permission to show Exhibit 18 to the

13    jury, your Honor?

14          THE COURT:  Yes.

15          Just to be clear, Mr. Halpern, I'm giving you a

16    continuing objection on time frame and cumulative --

17          MR. HALPERN:  Thanks.

18          THE COURT:  -- as to the items from this location.

19    Q.    Finally, I am showing you Exhibit 19 marked for

12:47PM 20    identification.  Do you recognize this item, sir?

21    A.    I do.

22    Q.    What is this item?  Can you describe it for the record?

23    A.    It's a machete-type knife with a black handle and a brown

24    sheath.

25    Q.    Did you seize this from that MS-13 house as well?

1    A.    Yes.

2          MR. PASRICHA:  Your Honor, I'd move Exhibit 19 into

3    evidence.

4          THE COURT:  All right.  It's admitted, 19.

5          (Exhibit No. 19 received into evidence.)

6    Q.    Can you tell the jury is there a marking on the brown

7    sheath that you can read?

8    A.    Yes, there is.

9    Q.    What does the marking on the sheath of the machete say?

12:47PM 10   A.    It states, "Made in El Salvador."

11         MR. PASRICHA:  Permission to show Exhibit 19 to the

12   jury, your Honor.

13         THE COURT:  Yes, go ahead.

14         (Exhibit 19 was displayed to the jury)

15   Q.    In explaining your experience or describing your

16   experience, you also talked about your prior career with the

17   Department of Corrections; is that correct?

18   A.    Yes.

19   Q.    What kind of work did you do for them?

12:48PM 20   A.    Initially, I started as a correction officer working in

21   the cell blocks, then I became an investigator, inner permit

22   security at the prison in Concord, and then a few years after

23   that, I was also moved up to the Central Intelligence, Central

24   Intelligence Gang Unit in order to gather intelligence on gang

25   members within the prison system.

1    Q.   What kinds of things would you look at in trying to obtain

2    intelligence about gang members when you were in prison?

3    A.   We had different tactics.  We would monitor inmates'

4    telephone calls, we'd also inmates' mail, develop informants

5    within the institution and attempt to gather as much

6    intelligence on gang-related matters within the institution and

7    to try to prevent violence inside the institution and violence

8    on the streets.

9    Q.   And have you continued using some of those skills in your

12:49PM 10   current job?

11   A.   Yes.

12   Q.   Explain to the jury how the -- well, let me lay the

13   foundation.  As a gang intel. officer in the prison system,

14   were you familiar generally with how the phone systems in

15   Massachusetts facilities work?

16   A.   Within the Massachusetts Department of Corrections, yes.

17   Q.   And explain to the jury as a general matter how do phones

18   work in a jail.

19   A.   Well, each individual inmate has an individual pin that

12:50PM 20   they use.  That pin is linked to their name.  That pin will

21   also contain whatever amount of money they have in that, so

22   think of it like a calling card, and you might have -- you can

23   reup it as many times as like, and that pin also has a pin list

24   of numbers that they're allowed to call that has been approved,

25   and there's probably several phones within the tier or the cell

1    block in the institution.  They can pick up any of those

2    phones, put in their PIN number, and it gives them access to

3    call anyone on their phone list.

4    Q.   When people pick up the phone to make a call, are they

5    told that the calls are being monitored or the calls are being

6    recorded and may be monitored?

7    A.   Yes.

8    Q.   Does that warning impact your ability to find evidence

9    against gang members in jail?

12:51PM 10   A.   Yes.  Most inmates will attempt to not speak over their

11   phone, their pin assigned to them in order to, you know, so

12   because if they know that we're monitoring their phone or they

13   believe that we are, they're not going to talk over that

14   particular line because they've already been warned during

15   every call that they make.

16   Q.   So what is a technique you have seen people use in jail to

17   circumvent that process?

18   A.   They use a few things during my time working as an

19   investigator, visits were the first ones, visits in state

12:52PM 20   prison are unrecorded, so it's face-to-face, and none of that

21   information is being recorded or overheard, so anything that is

22   said during visits, we wouldn't be able to review.

23        Also, another common technique is using three-way

24   phone calls where --

25   Q.   Can you describe -- and let me just pause there.  Describe

1    three-way phone calls for the jury.

2    A.    So they would ask another inmate to use their pin so

3    Inmate X would ask Inmate Y to call one of their family members

4    or one of their approved persons on their pin.  Then once that

5    call goes through, that second person who they called would

6    then call another person on a three-way and then connect both

7    lines, then Inmate Y would pass Inmate X the phone so he can

8    talk to whoever he intended to call on Inmate Y's phone.

9    Q.    So using that example, if you were trying to obtain

12:53PM 10    evidence against Inmate X, the general step would be to try to

11    look at Inmate X's phone calls, correct?

12    A.    Correct.

13    Q.    But in that example you used, if Inmate X just borrowed

14    Inmate Y or Inmate Z's pin number and made calls using that,

15    those numbers would never show up on Inmate X's phone records?

16    A.    Right.  That call wouldn't show up, and if you're

17    monitoring Inmate X's phone, that call wouldn't come up as a

18    call that you'd be able to monitor.

19    Q.    Turning your attention back to some of the transcripts and

12:53PM 20    recordings, I had asked you before if based on your Spanish

21    fluency, you had reviewed recordings in this case, have you

22    reviewed various recordings during the course of this

23    investigation?

24    A.    Yes.

25    Q.    And these are videotaped or audiotaped recordings made by

```
 1    Cooperating Witness 1.  Are you familiar with those?

 2    A.   Yes.

 3    Q.   Did you then also review the accompanying transcripts of

 4    those calls or at least excerpts of those calls?

 5    A.   Yes.

 6    Q.   Did you review a recording of a December 13th, 2015

 7    meeting in Virginia that was an MS-13 leadership meeting?

 8    A.   Yes.

 9         MR. PASRICHA:  Your Honor, at this time I think it

10    would be helpful to read the transcript of that.  We admitted

11    that into evidence yesterday as Exhibits 1 and 3.  1 is the

12    recording.  3 is the transcript that is in the jury's

13    transcript binders.

14         THE COURT:  All right.  So am I correct that this was

15    a meeting that was in Spanish, and we're reading an English

16    translation?

17         MR. PASRICHA:  That is correct.

18         THE COURT:  Any objection, Mr. Halpern?

19         MR. HALPERN:  No.

20    Q.   Do you have a binder, sir, with you?

21    A.   No.

22         MR. HALPERN:  Your Honor, other than the continuing

23    objection to the time.

24         THE COURT:  All right.

25         MR. PASRICHA:  Your Honor, may I approach the witness?
```

1          THE COURT:  Yes.

2          MR. PASRICHA:  Your Honor, I think there are parts

3     that I'd like to highlight for the jury and maybe read into the

4     record, and I know the jury can follow along, but I think it

5     would be helpful to read some parts together, and that's what I

6     intend to do with the witness.

7          THE COURT:  All right.

8     Q.   If you can turn to -- before we circle back, is it correct

9     that at some point during this call, various members and

12:55PM 10    leaders identified themselves by name?

11    A.   Yes.

12    Q.   And turning your attention to page 10, is that one of the

13    parts where leaders describe who they are and what clique they

14    are from?

15    A.   Yes.

16         MR. PASRICHA:  And it's tab 3 for the jury.  It's page

17    10, tab 3.

18    Q.   For the record, the bottom of the page number should be

19    stamped 64160.  Can you read what Chucky VA says at the start

12:56PM 20    of that session?

21         THE COURT:  Can I say this is Chucky from Virginia

22    who's not the Chucky we've been hearing about; is that the

23    idea?

24         MR. PASRICHA:  Correct.

25    Q.   Let me clarify.  Are you familiar with the Chucky who is

1    on this call who identifies himself as the leader of the East

2    Coast program during this call?

3    A.   Yes.

4         MR. PASRICHA:  Yes, your Honor, it's a separate

5    Chucky.

6         THE COURT:  All right.

7    Q.   What does Chucky from Virginia say, can you just read that

8    into the record, please.

9    A.   "We are almost finished here but we wanted to talk to you

12:57PM 10   a little -- we wanted to talk a little while so that you could

11   talk to them.  13 cliques came, but not all of them came.

12   Buddy, all right.  Wait.  I'm going to put them on one at a

13   time, all right."

14   Q.   And do they then get on one at a time and describe what

15   cliques they are from on page 10 and page 11; do you see that?

16   A.   I do, yes.

17   Q.   Turning to page 11 about 20 minutes later, why don't we

18   read in some of the parts just through the end of the page, and

19   I'll read Di mente, you read Chucky VA.

12:58PM 20        "I want to bring up something before we close, Bro."

21   A.   "Okay."

22   Q.   "Concerning a territory, you know what I mean, it's

23   Chelsea, man, it belongs to the Chelsea Lacotes but the Chelsea

24   Locotes' brother."

25   A.   "They don't want anything?"

1    Q.    "They're not there, they're not there right now."

2    A.    "No one is there?"

3    Q.    And what's the next thing Chucky says after that?

4    A.    "So we need to put in work because you want to be well

5    organized."

6    Q.    Drawing your attention to the bottom of the page, the part

7    from Sugar.  Am I correct that during this call Sugar

8    self-identifies himself as Sugar?

9    A.    Yes.

12:58PM 10    Q.    And he further identifies himself as the leader of the

11    program from El Salvador?

12    A.    Correct.

13    Q.    I'd like you to read into the record the paragraph where

14    Sugar says, "The reason that this meeting was held."

15    A.    "The reason that this meeting was held over there,

16    unintelligible, as you know, certain points were discussed.  I

17    am the runner for down here from El Salvador, from the program.

18    Not many know me over there.  I am Sugar from the Everett

19    Locals, you know, we are here as representatives of the

12:59PM 20    program, out here in the street in C Bar, you understand."

21           "One of the points that was discussed there, I

22    believe, was unity and brotherhood that we all must share,

23    everyone together when the time comes to carry out some action

24    because the result is that many of the cliques up there are

25    very independent and stupidly insist that this is their side.

1    Others are somewhere else with their side, and in the

2    meanwhile, the enemy are filling up the turfs around us, you

3    know."

4    Q.   The group responds, "That's right, sir."  What does Sugar

5    say next?

6    A.   "So what we're asking is total cooperation.  Let us work

7    as Mara Salvatrucha, MS-13, that we are, do you understand?

8    Let us not, unintelligible.  Well, yes, that we swore this,

9    that it was that, that no one can do it that way and so on.

01:00PM 10   No, let's carry out the work of Mara Salvatrucha, you know."

11   Q.   And when the group agrees and says, "Yes, yes," how does

12   Sugar continue?

13   A.   "Let's all work together, united, you know, everyone

14   relaxed, watching out for each other.  If someone has an issue

15   or has a problem with another clique, you should approach the

16   program, unintelligible.  In order to carry out the modest

17   work, you know, in the end, nowadays we are losing the culture,

18   know, dudes going around saying, This is my turf, and the enemy

19   is filling up our turfs, you know, so let us focus on the work

01:01PM 20   we must do as MS-13, you know, because here we all represent

21   the Mara Salvatrucha."

22          "The only thing that divides us is our last name, each

23   member of each clique, you know, those are last names, but we

24   always represent the two letters, you know."

25   Q.   Based on this experience with the investigation, is the

1    two letters MS?

2    A.   Yes.

3         THE COURT:   Ladies and gentlemen, can I steal 5 or 10

4    minutes of your time to make up ground, is that okay?

5         MR. PASRICHA:   Thank you, your Honor.   We'll finish

6    this transcript.

7    Q.   What direction does Sugar give next?

8    A.   "Exactly.   In other words --"

9    Q.   Sorry, let me interrupt.   I thing you skipped.   Can I

01:02PM 10  please have you read, "The issue at hand as well."

11   A.   The issue at hand is that we should lend each other a

12   hand, see how things work there, listen to what the homeboys

13   are telling you, and we are here to help all of you homeboys up

14   there and see how it's going to work, see what you have and put

15   the work out, like I tell you, to put it this way, the cliques

16   keep growing, you know, the cliques are there, the Mara, you

17   know around here, unintelligible, chavales over there.

18   Q.   Do you know what "chavales" means?

19   A.   Yes, "chavales" is a word that MS-13 uses to identify

01:02PM 20  members of the 18th Street gang, enemies.

21   Q.   And an unidentified male, and for the jury, the

22   transcribers note on the first page, but "UM" means

23   unidentified male.   Unidentified male says, "Like I tell the

24   dudes, we have to carefully choose the people that are going to

25   be with us, unintelligible.   We don't know.   We have to select

1       the people we are going to work with or end it with them,

2       Doggy."  What does Sugar say next?

3       A.    "Exactly.  In other words, that, over there, I think your

4       cliques have chosen you guys as the runners because you know

5       what time it is with you guys, and at any time that you decide,

6       you grab a kid.  Remember that here in El Salvador, it's

7       different.  Over there, there are some dudes that

8       unintelligible.  In El Salvador, it's different from up there.

9       Up there, the kids say, I have done this and this and this.

01:03PM 10      When the time comes to kill the son of a bitch that came your

11      way or something, they'll do it, but days later, they are

12      terrified, you know, it's different."

13             "Over here, we have to be intelligent.  You guys as

14      the clique runners over there have to analyze people, observe

15      them, you know, and if so, yes, because here there are three

16      steps that chequeos must take.  They make it first to paro,

17      then to observation, then to chequeo until they make it to

18      homeboy, you know.  You have to, unintelligible, properly and

19      consider carefully whom you're going to take so that later, you

01:04PM 20      know, all of you won't have to suffer the consequences, you

21      know."

22      Q.    And is it your understanding that "suffer the

23      consequences" relates to letting in chequeos and paros and

24      younger members who can't be trusted and who may rat out

25      members of the gang?

1    A.    That is right.

2          MR. HALPERN:   Objection.

3          THE COURT:   Sustained.   The answer will be struck.

4    Q.    What does Sugar say next?

5    A.    "And those sons of bitch, and those sons of bitch that

6    don't unfortunately understand that because you guys know how

7    hot things are, Brother, you know, and be very careful.   All of

8    you that are there, Brother, be careful, you know.   With the

9    culeros that are ratting, so think about it carefully because

01:05PM 10   in the end, unintelligible, and I think this homeboy

11   specifically got the, unintelligible.   Because sooner or later,

12   the son of a bitch, unintelligible, sooner or later, he always

13   falls into the claws of the beast."

14         "We wake him up, whether it's up there or down here,

15   we are going to cry for him because, you know, I'm going to

16   speak very clearly.   You must be very careful about who you

17   bring in and talk to, you know, because the fucking pieces of

18   shit up there, Brother, have it worked out.   They give them a

19   car, they give them, unintelligible, and some days later they

01:06PM 20   want to grab them for something, they say FBI, and the sons of

21   bitches are there, you know, because the FBI gives them a car,

22   gives them money, gives them everything, and when they give

23   them all that, they loosen their tongues."

24         "You know, it's the outcome of what they're bringing

25   in that they're going to kill, and then they are two-faced.

1    You have to know all the information, analyze to whom you're

2    going to talk, and if, yes, unintelligible, be very careful

3    because in the end, a son of a bitch that has, unintelligible,

4    up there because in the end, we are going to put him on the

5    black list, you know."

6    Q.    And an unidentified male says, "That's right, we're

7    carrying a fork, like I tell the dudes here just what you're

8    saying, that they must be clearly the people because the son of

9    a bitch that betrays someone, we're not going to forgive him

10   here, homeboy."  What does Sugar say next?

11   A.    "Unintelligible, I'm going to say it clearly over here,

12   the Mara makes him, the Mara removes him."

13   Q.    And what does Sugar say after someone says the other

14   thing?

15   A.    "Unintelligible, just as the Mara makes him, the Mara also

16   removes him, if, unintelligible, catches him, son of a bitch

17   doesn't understand, they get dirty because they want to,

18   Brother.  Life is rosy.  You know, one must live it properly

19   and stick to the thing that one hears and sees, unintelligible,

20   so be very careful with all the chequeos.  Any kid that you

21   have and that you might say something in their presence, you

22   know, that's what I want to talk about to you guys, be

23   careful."

24   Q.    And an unidentified male says, "Okay, homeboy, I also want

25   to mention the subject of the outfits, going out with a lot of

1    dudes in the street to get some action, moving, also with the

2    shoes, Niki Cortez, Bro."  How does Sugar respond is to that?

3    A.    In other words, that thing about the color, I'm going to

4    tell you something, unintelligible, a different system of shoes

5    and all that, but I'm going to tell you something, over there

6    you have the color of the United States, which is what the gang

7    members want respect, unintelligible.  Dressed like that, the

8    enemy can see you, the police can arrest you, and, boom, to

9    El Salvador, so each one has to look at that, and that issue is

01:08PM 10  great because I'm going to tell you something.  We, as Everett

11   locals, founded in Boston, unintelligible, we're already

12   cutting out all that bullshit from the homeboys of my clique,

13   you know, dressing like that because, unintelligible, in a more

14   terminology way, you know, because to live a great life there,

15   one must be humble, you know, to avoid being detected because

16   what's the use of going around like that if within days all

17   this, unintelligible, and one is sent back here,

18   unintelligible.

19   Q.   Let's move ahead to the next paragraph where Sugar says,

01:09PM 20  "Well, that's awesome," can you read that paragraph?

21   A.    "Well, that's awesome, it's awesome that you guys start

22   working like this, the cliques over there because in the end

23   everyone from the side from Boston, New York, everyone,

24   unintelligible, gang members, but if you guys dress with your

25   sport shoes, unintelligible, the police are going to stop you

1    because over there, unintelligible, like in El Salvador."

2    Q.   And let me take 30 seconds to just flip back to page 2

3    towards the middle of the page.  Do you see where Chucky VA

4    says, "In our program"?

5    A.   Yes.

6    Q.   Can you read that paragraph, please.

7    A.   "In our program, in our program, all the cliques have to

8    be united, they have to be united, especially because all of

9    the hits that are going to happen.  Deeds have to be

01:10PM 10    coordinated and requested beforehand, and they have to be

11    evaluated to see whether they'll actually happen or not.

12    Homeboy because, look, there are cliques that are doing things

13    here, man, and I hear about it a week later after they did it,

14    and what's up with that?  They end up looking bad, and they

15    make us look bad, too, Bro. "

16    Q.   And, finally, you turn the page, the top of that section

17    on page 3 where Chucky VA says, "But that business, but one but

18    that business."  Could you read that paragraph, please.

19    A.   Sure.  "But one, but that business, man, that business

01:11PM 20    there, this is why I'm telling you they need to plan it well,

21    and all of the sons of bitches that are snitching, you know,

22    that the sons of bitches who are doing stuff, we are going to

23    investigate them, man, and we are going to kill those sons of

24    bitches so they can see what's up, then we'll even go after

25    their family, what the program says, homey."

1          MR. PASRICHA:  Nothing further at this time, your

2     Honor.

3                         - - - -

4

5                      C E R T I F I C A T E

6

7     UNITED STATES DISTRICT COURT )

8     DISTRICT OF MASSACHUSETTS ) ss.

9     CITY OF BOSTON )

10

11         I do hereby certify that the foregoing transcript,

12     Pages 1 through 110 inclusive, was recorded by me

13     stenographically at the time and place aforesaid in Criminal

14     Action No. 15-10338-FDS, UNITED STATES vs. RAFAEL

15     LEONER-AGUIRRE and thereafter by me reduced to typewriting and

16     is a true and accurate record of the proceedings.

17         Dated this 10th day of November, 2017.

18                    s/s Valerie A. O'Hara

19            _____

20                 VALERIE A. O'HARA

21                 OFFICIAL COURT REPORTER

22

23

24

25