1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3
    UNITED STATES OF AMERICA,        )
4                                    )
                    Plaintiff        )   Criminal Action
5                                    )
    vs.                              )   No. 15-10338-FDS
6                                    )
    RAFAEL LEONER-AGUIRRE,           )
7                                    )
                    Defendant        )
8

9
    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11
                       JURY TRIAL DAY NINE
12

13

14

15        John Joseph Moakley United States Courthouse
                      Courtroom No. 2
16                    1 Courthouse Way
                      Boston, MA 02210
17
                      November 17, 2017
18                       9:58 a.m.

19

20

21

22

23                     Lee A. Marzilli
                   Official Court Reporter
24       John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                   E-mail: leemarz@aol.com

1    APPEARANCES:

2    For The United States:

3         United States Attorney's Office, by GLENN A. MacKINLAY,
     ASSISTANT UNITED STATES ATTORNEY, and KUNAL PASRICHA,
4    ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
     Boston, Massachusetts 02110;
5
     For the Defendant:
6
          KEITH S. HALPERN, ESQ., 572 Washington Street, Suite 19,
7    Wellesley, Massachusetts 02482.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

3    CHRISTOPHER DOUGHERTY
          By Mr. MacKinlay:    8
4
     MATHEU KELSCH
5         By Mr. MacKinlay:   15

6    MICHAEL NOONE
          By Mr. MacKinlay:   26
7         By Mr. Halpern:             35

8    CRISTIAN CARILLO
          By Mr. MacKinlay:   37
9         By Mr. Halpern:             48

10   JOSEPH DEPENA
          By Mr. MacKinlay:   50
11
     ADAM HARTLEY
12        By Mr. Halpern:     69
          By Mr. MacKinlay:           80
13        By Mr. Halpern:                        90
          By Mr. MacKinlay:                               92
14


15
     EXHIBITS           RECEIVED IN EVIDENCE
16
     287                      71
17
     288                      73
18
     289                      74
19
     290                      76
20
     291                      93
21

22

23

24

25

1                    P R O C E E D I N G S

2          MR. HALPERN:  Your Honor, there's an evidentiary

3     issue, if you've got a minute.  I mean, we can wait.

4          THE CLERK:  All rise for the jury.

5          THE COURT:  Hold on.  We have to wait for the

6     defendant.

7          MR. HALPERN:  No, that's okay.  So can we do this?

8          THE COURT:  We can talk about it now.

9     SIDEBAR CONFERENCE:

10         MR. HALPERN:  There was a machete that was recovered

11    at one of the houses.

12         THE COURT:  Okay.

13         MR. HALPERN:  It's in evidence because it was

14    recovered at one of the houses.

15         THE COURT:  Yes.

16         MR. HALPERN:  There's no witness who has identified

17    that machete or any machete as belonging to the defendant or

18    being involved in the incident on April 6.  So I would object

19    to this witness being shown or any witness being shown the

20    machete and asked, "Is that the machete from this incident?"

21    There's no tie-in.

22         MR. MacKINLAY:  Two things:  One, the witness Vicky

23    Martinez said that particular exhibit looked like the machete

24    that was the one that he possessed, which is a sufficient

25    connection.  The rest of it goes to weight.

1          THE COURT:  That's not a sufficient connection.  No,

2     it's not sufficient to say that the machete was his.

3          MR. MacKINLAY:  No, but it is sufficient for purposes

4     of connecting it to the defendant.

5          THE COURT:  No, it's not.  There's evidence that he

6     has a machete and it looks like that, but that's all we've got,

7     or, you know, and then the machete is an MS-13 machete.

8          MR. MacKINLAY:  That's not the point.  The point is,

9     this witness was shown the machete a month ago in a pretrial

10    meeting.  That information was disclosed to counsel, who said

11    that looks like -- "I believe that's a machete," or words to

12    that effect already.  It's an inanimate object.

13         THE COURT:  It's not enough to say -- yes, an

14    inanimate object is harder to authenticate, not easier to

15    authenticate than a document or photograph, which is why you

16    need chain of custody and why you need all the things to get a

17    knife or a gun or whatever into evidence.  He can say it looked

18    like that machete, but he's not going to say that it's the

19    machete, not without the chain-of-custody information.

20         MR. MacKINLAY:  Well, but there were distinct features

21    of it, your Honor, that he was able to identify.

22         THE COURT:  Well, you know, like a serial number,

23    fine, but I doubt you're going to be able to get there.

24         MR. MacKINLAY:  And I'm not suggesting he's going to

25    say that's the machete.

1          THE COURT:  Well, I'm not going to permit him to say
2     that without a proper foundation.
3          MR. HALPERN:  I object to him being shown a machete
4     just so he can say, "Yeah, that looks like --"  I think he had
5     other things on his mind than trying to remember what the
6     machete looked like.
7          MR. MacKINLAY:  Well, and that's the weight.  That's
8     the weight issue.  That's not the admissibility issue.  The
9     admissibility is --
10          MR. HALPERN:  There's no evidence --
11          MR. MacKINLAY:  It's been provided.  It's an inanimate
12     object, not subject to suggesting procedure.  He can testify
13     to --
14          THE COURT:  No, an inanimate object, like, if it were
15     a gun, you can't say that looks like the gun.  That's why you
16     write down serial numbers, or you put it in the evidence bag or
17     you put in the evidence locker.  No, and in fact I think I may
18     agree with Mr. Halpern.  You know, he can't identify it as the
19     machete.  He can just say it was a machete.  You know what a
20     machete looks like?  You know, it was big and it was long.  And
21     I think that unless you lay a real foundation that that is
22     literally the machete, or even, you know, maybe if he says it's
23     the same brand and length of the machete or, you know,
24     something like that could come in; but the machete looked like
25     that, you don't need it and it's unnecessary.  And if you're

1   trying to get the jury to draw the inference that that is the

2   machete, you can't do that.  There's not enough evidence, so --

3           MR. MacKINLAY:  Thank you.

4           (End of sidebar conference.)

5           THE CLERK:  All rise for the jury.

6           (Jury enters the courtroom.)

7           MR. HALPERN:

8           THE CLERK:  Thank you.  You may be seated.  Court is

9   now back in session.

10          THE COURT:  All right, ladies and gentlemen, good

11  morning.  This delay of an hour comes under the heading of "the

12  magic and wonder of computers."  We have a stenographer, two

13  stenographers actually, who need to create a record, and it has

14  to be both written and a recording made, and we couldn't get

15  everything to work.  But I think we're all set an hour later,

16  so we're ready to start.  The good news is, at least before the

17  delay, we thought we would complete the evidence today, so if

18  we don't have that much more to go with the evidence and if it

19  isn't completed today, we'll get it done on Monday.  But let's

20  see how far we go.  Mr. MacKinlay?

21          Oh, one other thing.  Mr. Pasricha is not here.  He

22  had a family emergency, so he's not able to be here today.

23          MR. MacKINLAY:  Thank you, your Honor.  The government

24  calls Christopher Doherty.

25

```
 1                      CHRISTOPHER DOHERTY
 2   having been first duly sworn, was examined and testified as
 3   follows:
 4   DIRECT EXAMINATION BY MR. MacKINLAY:
 5   Q.   Good morning, sir.  Can you tell us your name.
 6   A.   Good morning.  Christopher Doherty.
 7   Q.   And, again, where do you work?
 8   A.   Massachusetts State Police.
 9   Q.   Have you appeared before this jury a few days ago relative
10   to a different incident and examination of a firearm that you
11   conducted?
12   A.   Yes.
13   Q.   And at that time, did you discuss your background and your
14   qualifications relative to the testing and examination of
15   firearms and ballistics evidence?
16   A.   I did.
17   Q.   I want to turn your attention to the date of April 16,
18   2014, in Case No. 14-0933.  Were you involved in working that
19   day, and were you assigned that case?
20   A.   Yes, I was.
21   Q.   What did you do?
22   A.   I was called by the duty office to respond to 690 Broadway
23   Street in Chelsea for a reported non-fatal shooting
24   investigation.
25   Q.   And did you go to that location?
```

1    A.    I did.

2    Q.    What did you do?

3    A.    I worked along with Crime Scene and the Detective Unit,

4    and I collected, documented, and preserved evidence related to

5    that shooting.

6    Q.    What did you collect at the scene, sir?

7    A.    I collected two discharged cartridge casings, meaning they

8    were fired by a firearm, on the sidewalk in front of

9    690 Broadway Street in Chelsea.  After that, I responded to the

10   Chelsea Police Department, and from a detective from the

11   Chelsea Police Department, Detective Coen, I collected a

12   firearm, a .380 -- excuse me -- a .9 millimeter short caliber

13   Beretta firearm and a magazine.

14   Q.    At some point did you later receive additional ballistics

15   evidence from Detective Coen from the police department in

16   Chelsea?

17   A.    Yes.  At approximately one week later, Detective Coen

18   submitted a spent projectile, which means it was fired out of a

19   weapon, that was recovered from the victim at the hospital.

20   Q.    And that victim was Javier Servellon?

21   A.    Yes.

22   Q.    With this evidence, did you conduct an examination at the

23   laboratory in Danvers?

24   A.    Yes.  I conducted test firings for the weapon to make sure

25   it met the standards of the laws in Massachusetts that it was a

1    firearm.  I also did test fires so I could use them for

2    comparison purposes on the microscope that I explained on

3    Monday to see if the discharged cartridge casings on the

4    sidewalk were fired by that weapon and the projectile.

5    Q.   What type of weapon was provided to you by Detective Coen

6    at the station?

7    A.   It was a Beretta, a .9 millimeter short caliber Beretta,

8    Model 1934, semi-automatic pistol.

9    Q.   How just briefly does a semi-automatic weapon fire and

10   discharge --

11             MR. HALPERN:  Objection.

12             THE COURT:  He can describe the operation of it.

13   A.   The type of weapon is a semi-automatic pistol.  It ejects

14   the cartridges after each fire, but I explained on Monday that

15   you'll put the magazine in the weapon, and for every round

16   that's in the magazine, each pull of the trigger will expel a

17   bullet down the barrel and extract a live -- excuse me -- a

18   discharged cartridge out of the weapon.

19   Q.   And where would the discharged cartridge leave the weapon?

20   A.   In general, they usually discharge to the right or above,

21   and usually they go about 5 to 8 feet away from where the

22   person fired the weapon, in general.  I mean, they could do a

23   lot of different things but normally in that area, 5 to 8 feet.

24   Q.   And how does a discharge of a shell casing from a

25   semi-automatic differ from a revolver that you talked about in

1    your prior testimony?

2    A.    A revolver is a repeating firearm that the cartridge stays

3    in the weapon.   There's a cylinder with chambers, and it

4    revolves around a single barrel.   With each pull of the

5    trigger, however, the cartridges stay in the chambers.

6    Q.    I'm showing you several items, including Exhibit No. 148,

7    and ask you to take a moment and look at the items.

8                    (Witness examining items.)

9    A.    Okay.

10   Q.    Do you recognize what I've handed you?

11   A.    Yes.

12   Q.    What is it?

13   A.    This is the box that I used to hold the weapon and the

14   evidence.   Inside included is the firearm that I recovered from

15   Detective Coen at Chelsea Police Department on the morning of

16   April 17.   Again with that is the two discharged cartridge

17   cases that I collected from the scene and a projectile that was

18   also submitted approximately a week later that Detective Coen

19   had recovered from the victim at the hospital.

20   Q.    You mentioned that you were going to conduct a test fire.

21   Did you conduct a test fire with respect to this Exhibit

22   No. 148?

23   A.    I did.

24   Q.    What did you do?

25   A.    I took live cartridges, which is a live round from section

1    inventory, and I put them in the magazine and entered it into

2    the weapon.

3    Q.   What do you mean you used cartridges from inventory or

4    section inventory?

5    A.   To fire the firearm, we have a stock of ammunition that we

6    use for test fires so we can compare it to the evidence

7    recovered from the scene.

8    Q.   Did you use this stock ammunition to assist you in your

9    examination of the weapon?

10   A.   Yes.

11   Q.   What did you do?

12   A.   I took it out.  I gave it its own item number, which is

13   5-4.2.  I took two cartridges and I fired them into cotton at

14   the State Police lab in Danvers.

15   Q.   And after conducting the test fire, do you have an

16   opinion, based on your training and experience, as to whether

17   or not the firearm is operable?

18   A.   Yes.  It's a functioning firearm, and I certified that

19   with a report.

20   Q.   The projectile that was fired into the cotton you

21   described in the machine, or the snail, I believe you called it

22   the other day?

23   A.   Yes, the snail, I would lose -- if I shot it into the

24   snail, I would not have a projectile.  In this case I needed

25   the projectile so I could do some comparison testing against

1   the discharged round that Detective Coen got from the victim.

2   So I shot it into cotton because it stays in the cotton, and we

3   can use it for comparison purposes.

4   Q.   And how about the discharged shell casings from the test

5   fire of the weapon, what did you do with that?

6   A.   There's a little netting there that we collect the

7   discharged cartridge casings, and we also do comparisons of the

8   cartridge casings against the collected evidence at the scene.

9   Q.   Starting with the projectile, Trooper, can you describe,

10  did you conduct a microscopic examination of the projectile

11  received from the detective from the hospital to the one you

12  recovered from the cotton?

13  A.   Yes.

14  Q.   Can you describe the procedure that you used and your

15  results of that.

16  A.   So after I fired it into the cotton, I retrieved the

17  bullet from the cotton, the spent projectile, as we call it.  I

18  put it on a microscope, a comparison microscope, basically two

19  compound microscopes with an optical bridge.  I'm able to look

20  at them side by side.  I did a comparison test, and I was

21  unable to say conclusively that that firearm fired that

22  particular projectile because it did not mark well.

23  Q.   What do you mean, it didn't mark well?

24  A.   As I explained, we go to firearm manufacturers to see how

25  firearms are made, and they leave particular marks.  In this

1    case, this weapon was manufactured in 1933, '34, and weapons

2    get old.  It just did not mark the projectile that came out of

3    the barrel that well.

4    Q.   Were there other characteristics of the projectiles that

5    were consistent?

6    A.   Yes.  I was able to say based on the size, the weight, and

7    general configuration that it is .38 caliber class ammunition,

8    and the weapon that I recovered was .38 caliber class handgun.

9    Q.   Did you conduct a second microscopic examination relative

10   to the shell casings, the two that you found at the scene and

11   the shell casings used in the test fire at the lab?

12   A.   I did.

13   Q.   What did you do?

14   A.   I also put those on the comparison microscope.  I took the

15   test fire and I -- I took a test fire and I took one of the

16   discharged cartridges from the scene.  Previous to that, I had

17   identified both those cartridges as being fired by the same

18   firearm previous to that, so both the cartridges on the

19   sidewalk I recovered I knew were fired by the same firearm.  I

20   took one of those and compared it against the test fire that I

21   fired, and I was able to say to a ballistic certainty that that

22   firearm that I recovered from Detective Coen fired those

23   discharged cartridges on the sidewalk in Chelsea.

24   Q.   And how is it that you're able to arrive at that

25   conclusion?  Are there distinct characteristics that each

1  firearm leaves on a shell casing?

2  A.   Yes.  In this case, I identified it through breach face

3  marks.  So when you fire a firearm, a small explosion happens.

4  The base of that cartridge slams against the back, the breach

5  face of the firearm.  It slams against that.  And the breach

6  face of this weapon is manufactured.  It leaves distinct

7  individual markings.  I was able to say to a ballistic

8  certainty that because of that, those individual markings, that

9  those two discharged cartridges were fired by this weapon.

10 Q.   Did you prepare a report that summarized the conclusions

11 that you reached relative to the physical examination test fire

12 as well the ballistics comparisons that you described?

13 A.   Yes.

14         (Discussion off the record.)

15         MR. MacKINLAY:  No further questions of this witness,

16 your Honor.

17         MR. HALPERN:  Nothing for the defendant.

18         THE COURT:  Thank you.  You may step down.

19         (Witness excused.)

20         MR. MacKINLAY:  The government calls Matheu Kelsch.

21                     MATHEU KELSCH

22 having been first duly sworn, was examined and testified as

23 follows:

24 DIRECT EXAMINATION BY MR. MacKINLAY:

25 Q.   Good morning, sir.  Can you tell us your name.

1   A.   Good morning.  It's Matheu Kelsch, and I'll spell it for

2   you.  It's a little bit different.  It's M-a-t-h-e-u, and

3   Kelsch is K-e-l-s-c-h.

4   Q.   Where do you work?

5   A.   I'm employed as a special agent with the Bureau of

6   Alcohol, Tobacco, Firearms and Explosives, or more commonly

7   ATF.

8   Q.   How long have you worked with the ATF?

9   A.   I've been working with ATF for approximately 16 years.

10  Q.   And what is your present assignment?

11  A.   I'm presently assigned to our Boston group, and we call it

12  our Crime Gun Intelligence Center.  This particular group

13  focuses on firearms trafficking in the Boston area mainly.

14  Q.   And prior to that, what position did you hold with the

15  ATF?

16  A.   Prior to that, I have worked in our Boston group that

17  worked on regular firearms enforcement, so dealing with violent

18  crime by possession of firearms, and I also work a couple of

19  collateral duties at ATF as well.

20  Q.   Do you have a particular training that you have received

21  from the ATF regarding interstate commerce?

22  A.   Yes, I do.

23  Q.   Describe what is meant by interstate commerce and the

24  training you received.

25  A.   Sure.  So to make interstate commerce simple, if we're

1    talking about interstate commerce or interstate nexus, as I may

2    call it, it's basically taking a firearm or ammunition and

3    determining where that particular item was produced or

4    manufactured.  ATF agents that are interested in being able to

5    testify in that type of field are sent to a one-week course.

6    You're given course material beforehand that you study.  You

7    take an examination when you arrive there.  Once you pass that

8    examination, we have a week-long course where you spend time in

9    a classroom.  You're taught on the manufacturing process of

10   firearms and ammunition, the markings that need to be placed on

11   firearms and ammunition.  ATF has almost like a library of

12   firearms.  They have over 10,000 firearms exemplars that we

13   spend time looking at to familiarize ourselves with the

14   different types of firearms and how they function.  At the end

15   of that week-long period, there is a written test, and there's

16   some practical examinations in teaching us how to determine

17   nexus.  There's also some advanced courses that agents attend.

18   There's an advanced course where we actually tour different

19   firearms manufacturers.  That's held up here in New England

20   because New England is an area that's rich to firearms

21   manufacturers.  Colt, Springfield, Smith & Wesson, SIG Sauer

22   are all very popular firearms whose manufacturers are in this

23   area, so we actually tour those factories where they'll show us

24   the manufacturing process and how the information is actually

25   placed on the firearms.

1    Q.    And did you conduct tours of some of those plants of

2    manufacturers as a part of that training?

3    A.    Yes, I have.

4    Q.    Okay.  And in particular, do you remember which places,

5    which manufacturing plants that you toured?

6    A.    Yeah, I've been to a number of the ones I mentioned

7    before.  The bigger ones in this area are Colt, Smith & Wesson,

8    SIG Arms, Ruger, and a number of other smaller manufacturers

9    that are located in the area.

10   Q.    Do you have available to you in your capacity as working

11   in developing interstate nexus analyses certain periodicals or

12   materials available?

13   A.    Yes.  So ATF has some electronic databases that I can

14   query when doing my research, and also I have kind of my own

15   little library of volumes of reference material that I use on a

16   regular basis.

17   Q.    And have you conducted examinations of firearms for the

18   purposes of determining the original place of manufacture and

19   therefore interstate nexus?

20   A.    Yes, I have, yes.

21   Q.    How many times have you conducted such examinations, sir?

22   A.    I've done approximately 200 -- I'm sorry -- well over 200

23   examinations.  When I say "examination," that examination could

24   include multiple firearms or multiple rounds of ammunition, but

25   I'd say over 200 examinations at this point.

1   Q.   And have you been qualified to render an opinion

2   concerning your conclusion as to the place of origin and

3   therefore interstate nexus of weapons and ammunition prior to

4   today?

5   A.   Yes, I have.

6   Q.   How many times and in what court, sir?

7   A.   I have testified in U.S. District Court in both

8   Massachusetts and Connecticut, and I'd say approximately

9   fifteen times.

10  Q.   Were you directed to conduct such an examination for the

11  purposes of interstate nexus in this particular matter?

12  A.   Yes, I was.

13  Q.   And when was that request made?

14  A.   The request was made just -- well, I'd say the request was

15  made early September.

16  Q.   Okay.  And was there firearms in particular that you were

17  asked to examine for the purposes of determining their origin?

18  A.   Yes, I did.

19       MR. HALPERN:  Objection.  Well, after that question,

20  what's coming.

21       THE COURT:  Overruled.

22  Q.   Were there three firearms that you were asked to take a

23  look at and examine and determine an interstate nexus?

24  A.   Yes, there were.

25       MR. MacKINLAY:  May I approach the witness, your

1   Honor?

2           THE COURT:  Yes.

3           (Discussion off the record between attorneys.)

4   Q.   I'm handing you what we have marked previously as three

5   separate exhibits.  I'm going to start with the one that's on

6   top and ask you if this is one of the weapons that you were

7   asked to conduct an examination for purposes of interstate

8   nexus on, and it's been marked previously as Exhibit 173.

9   A.   Yes.  I did perform an examination on this particular

10  firearm.

11  Q.   What did you do in your examination of Exhibit 173?

12  A.   So when I conduct any examination, I'm looking for

13  requirements that are marking requirements that have to be

14  placed on a firearm.  So the federal government has mandated

15  that manufacturers put specific markings on each firearm.  So

16  at a minimum, they have to have the manufacturer's name, so

17  whoever made the firearm.  They have to have a serial number

18  for the firearm.  There needs to be the location where the

19  firearm was produced or where the company is headquartered, so

20  the city and state.  Normally they'll ask that the model be

21  placed on there, if there is a model.  The caliber of the

22  firearm is placed on there.  And if the firearm was made

23  outside the United States in a foreign country, they'll ask

24  that the importer's name and the importer's city and state are

25  also on the firearm.  So when I look at firearms, I look for

1   markings.

2   Q.   Did you do that with respect to that exhibit?

3   A.   Yes, I did.

4   Q.   What did you determine?

5   A.   So this particular firearm, which is a .22 caliber

6   revolver, from the markings I was able to determine that the

7   Armscor Company produced this particular revolver.  It's a

8   Model Mark 059, and this would have been produced here in the

9   United States in Nashville, Tennessee.

10  Q.   And the caliber of that weapon is?

11  A.   This would be a .22 caliber long rifle would be the

12  caliber of that.

13  Q.   How were you able to determine that that weapon was

14  manufactured in Tennessee, sir?

15  A.   From my resource materials, I'm able to research the

16  company and where they did their production.  In addition to

17  that, like I mentioned to you before, there are requirements

18  that are placed, and the place of manufacture is one of them;

19  and if I look on the side of the firearm here, I can clearly

20  see it says "Nashville, Tennessee."

21  Q.   So do you have an opinion, based on your training and

22  experience, as to the location of manufacture of that

23  particular weapon?

24  A.   Yes, I do.

25  Q.   And what is it?

1    A.    It would have been in Nashville, Tennessee.

2    Q.    Did you conduct a second examination of a Beretta

3    .380 caliber pistol?

4    A.    Yes, I did.

5          MR. MacKINLAY:  May I approach, your Honor?

6          THE COURT:  Yes.

7    Q.    I'm showing you what we previously marked as Exhibit 148.

8    Do you recognize that?

9    A.    Yes, I do.

10   Q.    What do you recognize that to be, sir?

11   A.    This is a Beretta pistol that I examined previously.

12   Q.    What did you do in your examination of the Beretta pistol?

13   A.    I used the same process that I explained to you before,

14   looking for the certain markings that are required.  This is an

15   older firearm, so all of those markings wouldn't be present on

16   it, but I did go through and identify the markings that were

17   present.

18   Q.    And what did you identify for markings relative to this

19   particular Exhibit No. 148?

20   A.    So this particular firearm is a Beretta Model 1934 pistol

21   that shoots a .380 caliber or .9 millimeter short.  One is

22   metric, one is standard, but they're the same type of

23   ammunition.  There are serial number markings on here as well.

24   Q.    Okay.  And what markings did you notice on the weapon,

25   sir?

1    A.    Aside from that, there are none of the manufacturer

2    markings like I mentioned to you, but from my familiarization

3    with this type of firearm, and from the grip markings that show

4    that it was made by Pietro Beretta, I can tell you this is a

5    Model 1934 firearm.  I mentioned before that the government

6    requires importer markings, so Beretta is located outside the

7    United States.  There would need to be on here -- this firearm

8    is actually before those marking requirements were made, so it

9    doesn't surprise me that I wouldn't see those markings on here.

10   Q.    Do you have an opinion, based upon your examination and

11   your research and your training and experience, as to the place

12   of manufacture of that weapon?

13   A.    Yes.  So this Beretta Model 1934, all of them were

14   produced in Italy, so in a foreign country.

15   Q.    By the way, sir, does that weapon also, based on your

16   training and experience, meet the definition of a firearm under

17   federal law?

18   A.    Oh, yes, it does.

19   Q.    Okay.  And how is it you're able to say that?

20   A.    So a firearm under federal law is any weapon which is

21   designed to or can readily be converted to expel a projectile

22   by the action of explosive.  A subcategory under that is also

23   the frame or receiver of a firearm.  So this particular firearm

24   I can tell from its manufacturer was designed to be a weapon

25   that would expel a projectile.  And in addition to that, the

1    frame of the lower portion of the firearm itself, even if

2    everything else was missing, if the slide was gone, it would

3    still be a firearm under federal law because it's a frame or

4    receiver of that.

5    Q.    I want to just go back and ask you with respect to the

6    firearm, the Armscor 22 that we just discussed, Exhibit 173, do

7    you have an opinion, based on your training and experience, as

8    to whether that weapon met the definition of a firearm under

9    federal law?

10   A.    Yes, that does as well.

11   Q.    Did you conduct a third investigation relative to the

12   request in this case?

13   A.    Yes, I did.

14        MR. MacKINLAY:  May I approach again, your Honor?

15   Q.    Showing you, Special Agent, what we've previously marked

16   as Exhibit No. 26.

17   A.    Yes.

18   Q.    Do you recognize Exhibit 26, sir?

19   A.    Yes, I do.

20   Q.    What is it?

21   A.    This is a pistol made by Sterling Company, and the caliber

22   is .22 long rifle, the same caliber as the revolver we just

23   spoke about.

24   Q.    And did you conduct the similar examination to determine

25   the place of manufacture or origin of this weapon?

1    A.    Yes, I did.

2    Q.    What did you do?

3    A.    So this firearm, like the others, I looked to see whether

4    there were the required markings.  This firearm does have the

5    markings that are required.  When I look on the frame of the

6    firearm, I see that it lists that it was made by Sterling Arms,

7    and the location of that company is Gasport, New York.

8    Q.    And did you do further checking of resources in the way

9    that you have previously described to confirm that that was the

10   place of manufacture?

11   A.    Yeah.  So this is a Sterling Arms Model 302 pistol.  All

12   the Model 302 pistols were either made or assembled in Gasport,

13   New York.

14   Q.    Okay.  And do you have an opinion, based on your training

15   and experience, as to the location and manufacture of that

16   particular weapon as well?

17   A.    Yes.  It would have been Gasport, New York.

18   Q.    Now, did you also have an opinion, based on your training

19   and experience, as to whether or not that weapon meets the

20   definition under federal law of being a firearm?

21   A.    Yes.  It does meet the definition of being a firearm.

22         MR. MacKINLAY:  I have no further questions, your

23   Honor.

24         MR. HALPERN:  No questions.

25         THE COURT:  All right, thank you.  You may step down.

1            (Witness excused.)

2            MR. MacKINLAY:  The government calls Michael Noone.

3                          MICHAEL NOONE

4    having been first duly sworn, was examined and testified as

5    follows:

6            MR. MacKINLAY:  May I approach, your Honor?

7    DIRECT EXAMINATION BY MR. MacKINLAY:

8    Q.    Good morning, sir.  Tell us your name.

9    A.    It's Michael Noone, N-o-o-n-e.

10   Q.    Where do you work?

11   A.    Chelsea Police Department.

12   Q.    What do you do for the Chelsea Police Department, sir?

13   A.    I'm a detective.

14   Q.    How long have you been a detective in Chelsea?

15   A.    Approximately nine years.

16   Q.    And how long have you been a detective with Chelsea?

17   A.    Approximately nine years.

18   Q.    The entire time?

19   A.    No.  I'm sorry.  I've been with Chelsea approximately

20   fourteen years.

21   Q.    And prior to that, were you on the street, on the road?

22   A.    Yes.

23   Q.    I want to direct your attention to April 6 of 2014.  Were

24   you working as a detective and working that day?

25   A.    Yes.  I was on call that day.

1    Q.   Did you at some point were you dispatched to a certain

2    location?

3    A.   Yes, I was.

4    Q.   Where were you dispatched to?

5    A.   Central and Shurtleff Street.

6    Q.   What was the report that was sending you to that location?

7    A.   For a victim of a machete attack.

8            MR. MacKINLAY:  Can I have Exhibit 112.1, please.

9    Q.   I'm showing you what we've previously marked as

10   Exhibit 112.1.  Do you recognize that?

11   A.   Yes.

12   Q.   What do you recognize that to be?

13   A.   Basically that's a map of the area in which it occurred.

14   Q.   And describe the streets that are relevant to the location

15   that you responded that day to the radio dispatch.

16   A.   Basically Central Ave. and right at Shurtleff Street,

17   right in that general area.

18   Q.   If you touch the screen, sir, you'll be able to mark where

19   that location is for the jury.

20           (Witness complies.)

21   Q.   When you arrived at the scene, was there a victim there?

22   A.   No.

23   Q.   Did you at some point learn that there was a 911 call

24   directing the police to that location?

25   A.   Yes.

1    Q.    Have you listened to it?

2    A.    Yes.

3    Q.    Have you had an opportunity to review a transcript that

4    corresponds with it?

5    A.    Yes, I did.

6              MR. MacKINLAY:  Your Honor, I'd ask to play

7    Exhibit 113-T, which is the corresponding 911 transmission,

8    together with the transcript.

9              THE COURT:  I'm sorry.  113 or 114?

10             MR. MacKINLAY:  I'm sorry, your Honor.  It's 113-T,

11   which is the merger.

12             (Audio played.)

13   Q.    Detective, were there other officers that went to the

14   scene in addition to yourself?

15   A.    Yes.

16   Q.    Were some of them tasked with taking photographs to

17   document the scene?

18   A.    Yes, they were.

19   Q.    I'm going to show you what we previously marked as 115.8

20   and ask you if you recognize that.

21   A.    Yes.

22   Q.    What's depicted in 115.8?

23   A.    That would be the corner of Shurtleff and Central, and I

24   believe that would be bloodstains in the street.

25   Q.    When you say bloodstains in the street, are you referring

1   to the cones that are marked 13 and 14?

2   A.   Yes, that's correct.

3   Q.   Did you put those cones out or someone else?

4   A.   No.  Somebody else.

5   Q.   And where in relation to where you first responded to is

6   this photograph to show?

7   A.   It's quite accurate to the same area, probably right

8   across the street.

9   Q.   I put up before you Exhibit No. 115.6 and ask you if you

10  recognize that.

11  A.   Yes.  Again, that's the corner of Shurtleff and Central,

12  just facing the opposite direction.

13  Q.   I also want to show you what we previously marked as

14  115.3.  Do you recognize that?

15  A.   Yes.  It's a box cutter.

16  Q.   What is that?

17  A.   That was a box cutter found in the street.

18  Q.   And where in relation to the blood drops that you

19  described earlier was this located?

20  A.   In the general area.

21  Q.   I'm going to direct your attention to what we previously

22  marked as 115.12.  Again, what's depicted in that photograph?

23  A.   Again, that's the corner of Shurtleff and Central, and

24  again there's a cone with the blood droppings.

25             MR. MacKINLAY:  May I approach the witness, your

1    Honor?

2            THE COURT:  Yes.

3    Q.   The photograph of the box cutter that you described, was

4    it found in the area?

5    A.   Yes.

6    Q.   Was that item also recovered?

7    A.   Yes, it was.

8    Q.   I'm showing you what we previously marked as Exhibit 119

9    and ask you if you recognize that.

10   A.   Yes.  That's the box cutter.

11   Q.   What do you recognize that to be?

12   A.   That was the box cutter that was recovered from the

13   incident that day.

14   Q.   Was it secured in evidence back at the station?

15   A.   Yes, it was.

16   Q.   In addition to collecting evidence and having the scene

17   documented through photographs, were there efforts to locate

18   surveillance video or camera footage in the area?

19   A.   Yes, there were.

20   Q.   What did you do?

21   A.   First, we tried to look at the city cameras, the cameras

22   that are owned by Chelsea.  They didn't get any of the footage,

23   as well as when the incident happened, somebody actually moved

24   it to a different location, I'm assuming looking for the

25   suspect fleeing the scene.

1    Q.    Did you take a look at the available footage from the

2    city's surveillance camera?

3    A.    Yes.

4    Q.    Did you see anything relevant to the investigation?

5    A.    No.

6    Q.    Where is the city surveillance camera in relation to the

7    photographs and corners we just looked at?

8    A.    At least a block away on Hawthorne Street.

9    Q.    Were there any other potential video surveillance cameras

10   closer to the scene?

11   A.    No.

12   Q.    At some point did you secure from the scene and go

13   anywhere?

14   A.    Yes.

15   Q.    Where did you go?

16   A.    To the MGH, Mass. General Hospital in Boston.

17   Q.    And what was the purpose?

18   A.    To speak to the victim.

19   Q.    And did you identify the victim, or did the victim

20   identify himself?

21   A.    Yes, he did.

22   Q.    Who was the victim?

23   A.    Cristian Carillo.

24   Q.    Now, did you observe any injuries at the time that you

25   were at Mass. General Hospital to Cristian Carillo?

1    A.    Yes, I did.

2    Q.    What did you observe for injuries?

3    A.    A severe laceration on the top of his head as well as a

4    broken and a sliced left elbow area.  I believe it was his ulna

5    was broken.

6    Q.    I'm going to show you what we previously marked as

7    Exhibits 116.1.  Do you recognize what's depicted in 116.1?

8    A.    Yes, I do.

9    Q.    What is it?

10   A.    That would be his left elbow area.

11   Q.    Is it a photograph of the victim, Cristian Carillo --

12   A.    Yes, it is.

13   Q.    -- as it appeared to you at the time that you visited him

14   in the hospital?

15   A.    Yes.

16   Q.    I'm going to show you what we previously marked as 116.2.

17   Again, do you recognize what's depicted in 116.2?

18   A.    Yes, I do.

19   Q.    What is it?

20   A.    Again, that's the head injury to Mr. Carillo.

21   Q.    And, again, is that consistent with the injury that you

22   observed when you saw him being treated at Mass. General

23   Hospital?

24   A.    Yes, it is.

25              MR. MacKINLAY:  May I approach the witness again, your

1    Honor?

2    Q.    I'm showing you what we previously marked as Exhibit 117.

3    Do you recognize the documents that are there in Exhibit

4    No. 117?

5    A.    Yes.

6    Q.    Are they the medical records for the treatment of Cristian

7    Carillo on that particular day that you went and saw him in the

8    hospital?

9    A.    Yes, they are.

10   Q.    Do you know if Cristian Carillo had any gang affiliation?

11   A.    I asked him.  He said "no."  He did say he hung out with

12   some 18th Street gang members or associates.

13   Q.    Did your investigation determine that during the incident

14   that occurred earlier, Cristian Carillo was with anyone?

15   A.    Yes, he was.

16   Q.    Who did you determine he was with?

17   A.    Kevin Morales.

18   Q.    Do you know Kevin Morales?

19   A.    Yes, I do.

20   Q.    And do you know his gang affiliation?

21   A.    I would say Kevin was an associate of the 18th Street

22   gang.

23   Q.    The 18th Street?

24   A.    Yes.

25   Q.    Now, did you continue to identify additional witnesses

1    that were at the scene at the time of the incident involving

2    Mr. Carillo?

3    A.   Yes.

4    Q.   Did you take a description of an individual who was with

5    the alleged suspect?

6              MR. HALPERN:  Objection.

7              THE COURT:  He can answer that "yes" or "no."

8    A.   Yes, I did.

9    Q.   What description?

10             MR. HALPERN:  Objection.

11             THE COURT:  Let me see counsel.

12   SIDEBAR CONFERENCE:

13             MR. HALPERN:  It's hearsay.

14             MR. MacKINLAY:  It's just offered for the purpose of

15   identification, your Honor.  It's not offered for the truth.

16   As an offer of proof, he would be saying that a female was

17   there, and her physical description was as follows.

18             THE COURT:  But why is it not hearsay?

19             MR. HALPERN:  It's obviously offered for the truth.

20             MR. MacKINLAY:  It's offered for the purpose of the

21   identification who was with --

22             THE COURT:  Which is for the truth.  Sustained.

23             (End of sidebar conference.)

24             THE COURT:  All right, the objection is sustained.

25   BY MR. MacKINLAY:

1    Q.   Did you continue to identify other witnesses to the

2    incident?

3    A.   Yes.

4    Q.   Did you draft a report documenting the efforts you made in

5    the investigation?

6    A.   Yes.

7              MR. MacKINLAY:  No further questions, your Honor.

8              THE COURT:  Cross-examination?

9    CROSS-EXAMINATION BY MR. HALPERN:

10   Q.   Good afternoon, Detective.

11   A.   Good afternoon.

12   Q.   You also after this incident became involved in

13   investigating a crime on April 16 involving Mr. Aguirre, a

14   shooting.  Do you remember that?

15   A.   Yes.

16   Q.   And in that instance, you made another trip to a hospital,

17   and you interviewed the young man that was shot, Carillo; is

18   that right?

19   A.   No.

20   Q.   Oh, I'm sorry.  Javier Servellon?

21   A.   Yes.

22   Q.   Okay.  When you interviewed him, you obviously asked him

23   to describe what had happened?

24   A.   Yes.  I had another -- a trooper with me, I believe.

25   Q.   And he told you that before the fight occurred, the young

1    man with the gun had taken the gun out and pointed it at him,

2    correct?

3    A.   I would have to look back at that report, sir.  I'm not

4    aware.

5            MR. HALPERN:  I pulled the wrong report.  I'm sorry.

6            (Pause.)

7    Q.   You remember meeting Servellon in the hospital?

8    A.   Yes.

9    Q.   You've seen the video of that incident, right?

10   A.   I may have, yes.

11   Q.   And two guys turn around and follow right behind Servellon

12   and the guy he's with?

13   A.   I believe so.  I wasn't the primary detective on that.

14   Q.   I want to give you a copy of your report and ask if it

15   refreshes your recollection.

16           (Witness examining document.)

17   Q.   Does this refresh your recollection that Servellon told

18   you that before the fight happened, one of these guys took out

19   a small black automatic from his waistband and pointed it at

20   him?

21   A.   Yes.

22   Q.   And did he also tell you when you were at the hospital

23   that when he saw these guys and got nervous about them, he took

24   a chain off from around his neck to use as a weapon?

25           (Witness examining document.)

1  A.   Yes.

2          MR. HALPERN:  That's all I have.  Thank you.

3          THE COURT:  Redirect?

4          MR. MacKINLAY:  No, your Honor.

5          THE COURT:  All right, thank you.  You may step down.

6          (Witness excused.)

7          MR. MacKINLAY:  The government calls Cristian Carillo.

8                       CRISTIAN CARILLO

9  having been first duly sworn, was examined through the

10 Interpreter and testified as follows:

11         THE COURT:  Madam Interpreter, you acknowledge you're

12 still under oath.

13         THE INTERPRETER:  Yes.

14         THE COURT:  All right, Mr. MacKinlay.

15 DIRECT EXAMINATION BY MR. MacKINLAY:

16 Q.   Good morning.  Tell us your name.

17 A.   My name is Cristian Omar Carillo.

18 Q.   Mr. Carillo, do you live in the area?

19 A.   Yes, in Chelsea.

20 Q.   In the Boston area, right?

21 A.   Yes.

22 Q.   Do you work?

23 A.   Yes.

24 Q.   What do you do for work?

25 A.   Right now I'm doing drywall construction.

1    Q.    Is that full time?

2    A.    Yes.  It is now.

3    Q.    Do you have a family?

4    A.    Yes.

5    Q.    Tell us about your family.

6    A.    Do you mean my family here or in my country?

7    Q.    Family here.

8    A.    Here, I only have one uncle and one brother.  We only

9    speak when we need each other.

10   Q.    Okay.  And your country you refer to, is that El Salvador?

11   A.    Oh, yes.

12   Q.    Mr. Carillo, has the government made some promises to you

13   before your testimony today?

14   A.    I'm not sure what you're asking.

15   Q.    What is your understanding of what we are doing to help

16   you?

17   A.    Well, I do know that you're going to help me with my

18   safety.

19   Q.    Okay.  And in addition to your safety, what else have we

20   promised to help you with?

21   A.    Do I need to say what you have promised me?

22   Q.    Yes.  Immigration issues, correct?

23   A.    Yes.

24   Q.    And was there also a letter provided to you that you would

25   not be prosecuted for the incident that occurred here?

1    A.    Exactly, yes.

2    Q.    And what is your understanding of your obligation under

3    that agreement?

4    A.    To tell the complete truth.

5    Q.    Mr. Carillo, I want to turn your attention back to

6    April 6, 2014.  At around lunchtime, 1:00 o'clock in the

7    afternoon, where were you?

8    A.    Yes, it was around 12:00 noon that I had gotten off of

9    work, and I don't remember exactly the name of where the bus

10   stop was, but it's near La Princesita.

11   Q.    Where did you work at that time?

12   A.    I was working at McDonald's.

13   Q.    What did you do there?

14   A.    I did maintenance, cleaning the bathrooms and everything.

15   Q.    Did your work at McDonald's require you to open cartons or

16   boxes?

17   A.    Yes, always.

18   Q.    Did you have any tools to assist you in that work?

19   A.    Yes, precisely.  I had something for opening them.

20   Q.    What did you have?

21   A.    It's called Open Boxes.  It's a knife to open boxes.

22   Q.    I'm showing you what we marked as Exhibit 119.  Do you

23   recognize that?

24   A.    Yes.

25   Q.    What is it?

1    A.    It's a knife that I dropped after that happened.

2    Q.    And is this the knife that you described that you used at

3    work at McDonald's?

4    A.    Yes.

5    Q.    When you left work, where did you go?

6    A.    Directly to catch the bus, and I was on my way to soccer

7    at Highland Park.

8    Q.    Did you meet anybody?

9    A.    Yes.

10   Q.    Who did you meet?

11   A.    An acquaintance.

12   Q.    Any friend of yours did you meet on the way?

13   A.    Yes.  I ran into a friend, and he asked me where I was

14   going, and I said to play ball.

15   Q.    Who was the friend?

16   A.    His name is Kevin Morales.

17   Q.    Was Kevin Morales associated with the 18th Street gang at

18   the time?

19   A.    I can't tell you that exactly because I only knew him.

20   Q.    In the time that you knew him, did you see him hanging

21   around with people that you knew to be 18th Street gang

22   members?

23   A.    Yeah, I realized that, but I wasn't involved in any of

24   that.

25   Q.    Where did you meet Kevin Morales after work that day?

1   A.   He was above Pollo Campero in Chelsea.

2   Q.   And did you see him in that location?

3   A.   Yes.  That's where he asked me where I was going and that

4   I told him I was going to play ball.

5   Q.   And what did you do next?

6   A.   So then he asked me if I wanted him to accompany me, and I

7   said, "Yeah, sure.  Let's go."  So as we were going by

8   La Princesita, that's when I ran into the other young men.

9   Shall I continue?

10  Q.   Where did you see the other person that you described as a

11  young man first?

12  A.   Well, actually, it was as I was entering Central Street.

13  It was by the gas station that's on the corner by the store, on

14  side the store, that's in front of the store.

15  Q.   And was that person with anyone?

16  A.   The person that I ran into?  Yes, that person was with

17  someone.

18  Q.   Describe what the other person looked like.

19  A.   You mean the person that was with the person that attacked

20  me?

21  Q.   Yes.

22  A.   I'm a little bit confused.

23  Q.   When you first saw the person that you later say attacked

24  you, was there someone else there?

25  A.   Yes.  The person that was with him was a girl.

1    Q.    What did the girl look like?

2    A.    Well, like I told you before, I don't remember that girl

3    very well from that time because the guy attacked me right

4    away.

5    Q.    Before we get to that, I want to show you what we marked

6    as Exhibit 115.8 on the screen in front of you.  Do you

7    recognize that picture?

8    A.    Yes.

9    Q.    What is it?

10   A.    It's Shurtleff Street and Central Avenue.

11   Q.    Is that the location where you saw these people?

12   A.    No.  The people, those persons were further back.

13   Q.    Let me show you what we marked as 115.6.  Do you recognize

14   that?

15   A.    Yes.  That's where I fell.

16   Q.    Now, you described that there was a woman and a man that

17   you encountered.  What happened next?

18   A.    As we were walking by where there was a car between, as I

19   was over here, he pulled out the machete.  That's what

20   happened.  And he started attacking me, and I defended myself.

21   Q.    Was there anything said by the person prior to pulling the

22   machete out?

23   A.    Yes.

24   Q.    What did you hear him say?

25   A.    He said, "What's up?"

1   Q.   Did you answer him?

2   A.   And I said, "What's up with what?  What happened?"

3   Q.   Did he say anything back to you?

4   A.   No.  He immediately -- it was quick -- when I responded,

5   he pulled out the machete.

6   Q.   Do you recall him saying "La Mara"?

7           MR. HALPERN:  Objection.

8           THE COURT:  I'll allow it.  Overruled.

9   A.   Yes.

10   Q.   When did he say "La Mara"?

11   A.   He said that after he had hit me over here.

12   Q.   Okay, let's walk through this then.  You testified that

13   you saw this person remove a machete.  Where did he remove the

14   machete from?

15   A.   From this part here.

16           (Witness indicating.)

17   Q.   And you're indicating he held it up in a manner over his

18   head?

19   A.   He pulled it out, took this out, and hit me, and I

20   defended myself.

21   Q.   And you're indicating you put your left arm up; is that

22   right?

23   A.   Yes.

24   Q.   Did the machete strike your left arm?

25   A.   Yes.

1    Q.    How did you respond?

2    A.    I had that box opener, Open Boxes, here in my belt.

3    Q.    And what did you do?

4          (Witness indicating.)

5    A.    So when he hit me here, I did this, and then I did that.

6    Q.    Meaning you waved the box cutter at him?  Is that what

7    your motion is with your right hand?

8          (Witness indicating.)

9    A.    I defended myself, and I tried to attack him.

10   Q.    When you waved the box cutter in your right hand in the

11   way you described, did it strike the person?

12   A.    I don't remember that because he continued hitting me.

13   Q.    What do you mean, he continued hitting you?

14   A.    He kept following me with a machete.  I was moving back

15   towards the -- you know, moving backwards, and that's when he

16   said "La Mara Salvatrucha," and I told him, "Go to hell, you

17   fucking idiot."

18   Q.    What did he do once you said that back to him?

19         THE INTERPRETER:  I'm sorry.  Could you repeat the

20   question.

21   Q.    What did he do next after you said that to him?

22   A.    That's when he struck me again with a machete on the head,

23   and that's when I fell on the middle of Central Avenue and

24   Shurtleff Street, and that's where I dropped the Open Boxes.

25   Q.    When you fell, how did you fall down?

A.   Well, I fell forward like this.  (Witness indicating.)
And I got up and I touched myself here, and I dropped the
knife.

Q.   Were you bleeding from the head and arm?

A.   I didn't realize I was bleeding from my arm, but from my
head, yes.

Q.   What do you remember happened next?

A.   I remember that we were asking for help there, but
everything was very difficult.  And Kevin kept asking me, "Who
should I call?  Who should I call?"  And then some young women
started asking if we needed a ride.

Q.   Hold on.  Did you get an opportunity to see what the
machete looked like that struck your arm and your head?

A.   Yes.

Q.   Can you describe it?

A.   Yes.

Q.   What did it look like?

A.   First of all, when he pulled it out, it's black, but it
was covered with a sheath.  We call it "vaina," sheath.  And so
the handle is black, and the rest is silver.

Q.   And what about the sheath?  Do you remember the color of
the sheath?

A.   Yes.

Q.   What color?

A.   Black.

1    Q.    During this incident, how long were you in the presence of

2    this person that had the machete?  How long did it occur?

3    A.    I don't think it was more than one minute.

4    Q.    Was your attention focused on the individual and the

5    machete?

6    A.    Yes.  I couldn't look in any other direction, just at the

7    person that was attacking me.

8    Q.    Would you recognize the item, the machete, if you saw it

9    again?

10            MR. HALPERN:  Objection.

11            THE COURT:  I'll let him answer that question.

12   A.    Yes.

13            MR. MacKINLAY:  Your Honor, may we approach?

14            THE COURT:  Yes.

15   SIDEBAR CONFERENCE:

16            MR. MacKINLAY:  I've laid a sufficient foundation.

17            THE COURT:  There's nothing that he said was unique

18   about it, some unique marking or whatever.  A silver machete

19   with a black handle is not enough.  Sustained.

20            I assume you object?

21            MR. HALPERN:  Yes.

22            THE COURT:  Sustained.

23            (End of sidebar conference.)

24   BY MR. MacKINLAY:

25   Q.    How long were you on the sidewalk after you'd been struck

1    twice before you were helped to the hospital?

2    A.    I was able to get up.

3    Q.    Okay.  And did you get to the hospital?

4    A.    Yes, thanks to those young women that took me.

5    Q.    What hospital did you go to?

6    A.    The Chelsea Mass. General, and from there to Mass. General

7    in Boston.

8    Q.    Mr. Carillo, do you see the person in the courtroom here

9    today that attacked you with a machete?

10              (Witness pausing.)

11   A.    Can I stand up?

12   Q.    Please.

13   A.    Yes.

14   Q.    Can you point that person out, please.

15              (Witness indicating.)

16   Q.    Can you indicate an article of clothing the person is

17   wearing?

18   A.    A white shirt and a tie that looks black.

19   Q.    You may sit down, sir.

20              MR. MacKINLAY:  No further questions.  May the record

21   reflect that Mr. Aguirre has been identified by the witness,

22   your Honor?

23              THE COURT:  Yes.

24              MR. MacKINLAY:  No further questions of the witness.

25              THE COURT:  Cross-examination?

CROSS-EXAMINATION BY MR. HALPERN:

Q.   Good morning.  In addition to working at McDonald's, you were making some money selling drugs at that time?

A.   No.

Q.   Had you set up a Facebook profile with the name Omar Weed?

A.   No.

Q.   The shoes you were wearing that day were red Nike Cortez?

A.   Yes.

Q.   Did you know back then that wearing red Nike Cortez in Chelsea was like wearing a sign that you were part of 18th Street?

A.   No, I didn't know that because it wasn't explained to me when I went to buy the shoes at the store.

Q.   Well, you have friends that were involved with 18th Street, right?

A.   Could you repeat the question.

Q.   You had friends that were involved with 18th Street?

A.   Of course.  I said it before I had friends, but I wasn't involved in those things.

Q.   And didn't you know that wearing clothes that were identified with a gang could get you into trouble with the gang -- let me back up.  You weren't part of 18th Street at all, and you're wearing red Nike Cortez.  You knew you could get in trouble with kids from 18th Street because they wouldn't like it that you were wearing their stuff, right?  You knew

1    that, didn't you?

2    A.   Well, what I can tell you is that I buy my clothes

3    according to my tastes, just like you buy clothes according to

4    your tastes.

5    Q.   And you just like red Nike Cortez?

6    A.   Yes.  I had purple ones, blue ones, white ones, and black

7    ones.

8    Q.   Were you also wearing a red hat that day?

9    A.   That I don't remember.

10   Q.   Once you found Kevin, the two of you were walking

11   together?

12   A.   Yes.

13   Q.   So he was standing right next to you as you were walking?

14   A.   Yes.  He was walking with me.

15   Q.   And the other guy was walking next to a girl?

16   A.   Yes.  We were going, and he was coming with someone who

17   supposedly was his girlfriend.  I didn't know him.  I didn't

18   know who he was.

19          MR. HALPERN:  That's all.  Thank you.

20          THE COURT:  Redirect?

21          MR. MacKINLAY:  No, your Honor.

22          THE COURT:  All right, ladies and gentlemen, why don't

23   we take a break.

24          THE CLERK:  All rise.

25          (Jury excused.)

1               (A recess was taken, 10:28 a.m.)

2               (Resumed, 11:41 a.m.)

3               THE COURT:  Mr. MacKinlay.

4               MR. MacKINLAY:  The government calls Jose Depena.

5                          JOSE DEPENA

6      having been first duly sworn, was examined and testified as

7      follows:

8      DIRECT EXAMINATION BY MR. MacKINLAY:

9      Q.   Good morning, sir.  Can you tell us your name.

10     A.   Good morning.  Jose Depena.

11     Q.   And you testified before this jury previously concerning

12     this investigation?

13     A.   Yes, I have.

14     Q.   I want to direct your attention to a particular exhibit

15     that we previously marked as Exhibit 58-01.  I would like to

16     play a segment of that and have you describe what is occurring

17     on the screen at the time.  It corresponds with the April 28,

18     2015 transcript as well, correct?

19     A.   Yes.

20               (Video played.)

21               THE COURT:  Can you pause it.  Thank you.  Is there a

22     transcript we're supposed to be looking at?

23               MR. MacKINLAY:  I'm going to have the transcript in

24     one moment, your Honor.

25               THE COURT:  Okay, all right.

1    Q.   Trooper Depena, what's occurring at that particular time

2    on April 28 in the vehicle of Cooperating Witness No. 1?

3    A.   It's a conversation between CW-1, Chucky, and Villano

4    regarding a machete.

5    Q.   And is there a section of the April 28 transcript that

6    corresponds with the translation into English of what's

7    occurring in the vehicle at that time?

8    A.   Yes.

9    Q.   And which part of that transcript which we marked

10   previously as Exhibit 59 corresponds?

11   A.   It's on Page 4.

12           MR. MacKINLAY:  May the members of the jury be

13   directed, please, to pick up their exhibit binders,

14   Exhibit Tab 59, please.

15   Q.   Trooper Depena, I want to play just about a one-minute

16   segment of the recording, and then we'll go back and read the

17   transcript in English, okay?

18   A.   Okay.

19           (Video played.)

20   Q.   Trooper Depena, do you recognize who it is in the backseat

21   of the vehicle wearing the blue hat?

22   A.   Yes, I do.

23   Q.   Who is that?

24   A.   Chucky.

25   Q.   And do you recognize what he's doing at that particular

1    time in the recording?

2    A.    He's putting pants on.

3    Q.    Okay.  And at some point, what happens next?

4    A.    He grabs a machete and conceals the machete inside his

5    pants.

6              MR. MacKINLAY:  Continue to play the recording,

7    please.

8              (Video played.)

9    Q.    Trooper Depena, I want to turn you to Page 4 that you

10   described of the Exhibit 59.  Do you have a copy of that in

11   front of you?

12   A.    Yes, I do.

13   Q.    I want you to start at the top where it says "Chucky,"

14   actually the third entry down from the top, and again

15   consistent with our prior routine, I will read CW-1 and you

16   read the other individuals by announcing their name before

17   reading it.  Okay?

18   A.    Okay.  Chucky says, "No, man.  I'm going to put on this

19   pair of pants, dude.  If my brother sees me with machete in

20   hand, dude, forget it!  He'll say, 'Where are you going?  And

21   where are you coming from?'"

22   Q.    "So how did that work for you?"

23   A.    Villano says, "Yes!  Those sons of bitches are culeros.

24   Did a thing to this guy, so that he would serve me.  He said,

25   "No, couldn't activate the other one," but she didn't feel like

1    it.  See, it works."

2    Q.   "You have to go to a different metro."

3    A.   Villano says, "Yes, but it's too late right now, homie.  I

4    don't want to."

5    Q.   "Don't cut yourself, doggie."

6    A.   Chucky says, "No, dude.  I know how to put this fucker

7    back."

8    Q.   "You're going to cut your balls off.  You're going to cut

9    your balls."

10   A.   Villano says, "Like that, like that, like that.  Put it on

11   properly, man.  You need more practice, brother."

12   Q.   I want to turn your attention, please, to Page 17 at the

13   bottom starting with the second entry from the bottom, which

14   reads "Villano."  Can you start from that point, and that's

15   Page 17 at the bottom.

16   A.   Villano says, "That song you were listening to today over

17   there, it's awesome, doggie."

18        Muerto says "Yes."

19        Villano says, "It was just sent to me by some homies from

20   down below.  Uh-huh, from the clique."

21        Muerto says, "That song was recorded by some dudes from

22   the Lioneses."

23        Villano says, "By a dude from Usulutan del Camino, right?"

24        Muerto says, "Uh-huh.  Because the dude, my cousin that

25   was killed that day, that dude had the word for the Lioneses

1   outside."

2   Q.   "No way!"

3   A.   Muerto says, "Yes.  That dude had been in for ten, he'd

4   spent ten Aprils inside.  He had only been out for five

5   months."

6   Q.   "Less."

7   A.   Muerto says, "Yes, less."

8        Villano says, "From Barrios?"

9        Muerto says, "Yes.  Because when I sent him the Cortezes,

10  when the dude asked me to send him a pair of Cortezes, it had

11  been like two months since I had sent them."

12  Q.   "Uh-huh.  It was after December, right?"

13  A.   Muerto says, "Uh-huh."

14       Villano says, "Was the dude called Mago?"

15  Q.   "He was called Mago."

16  A.   Villano says, "But, dude, those guys have really made such

17  a fucking mess with all the homies down there from Barrios."

18  Q.   "And, dude, all the moving around, dude.  What's up with

19  all that shit?"

20  A.   Villano says, "We have lost such a great communication

21  with the homeboys, dude.  Sometimes the Ranfleros, for example,

22  the Ranflero that -- that homeboy has lost communication with

23  us, for that same reason."

24  Q.   "Because of the phones?"

25  A.   Villano says "Uh-huh."

1  Q.   "They confiscated almost all of their phones, man."

2  A.   Villano says, "But there was one phone there in Barrios,

3  but, dude, one is not enough.  One is fucking shit."

4       Muerto says, "No, it's not enough, dude.  Imagine that

5  each time to talk with that dude, Demente, I have to fucking

6  watch him to see that he's connected through a thing there, and

7  fuck, sometimes I call him, and fuck, he doesn't answer me

8  until three days later or so, man."

9       Villano says, "Uh-huh; it's a fucking mess.  At first, the

10 homeboys, fuck, the homeboys of the clique there even had

11 several phones there."

12      Muerto says, "Yes, because Mago, when he was in jail

13 there, the dude will call me right away and tell me, 'Call me

14 on this phone, this is the one that I have inside.'  I will

15 call him right away, dude, and if not the brother, 'Hey, that

16 call started, dude.'  Right away.  Not now, dude."

17      Villano says, "Now, maybe one per clique, or one for

18 several clicks, you know?  Because they role them there, you

19 have to go see the Ranfleros so that you can connect with the

20 clique."

21 Q.   "Whoever has his own, takes his own, takes care of it."

22 A.   Villano says, "Yeah, they have to take care of those

23 phones, dude.  The chips, sometimes the chips are what must not

24 get lost, because sometimes with the chips...  Let's say,

25 sometimes several phones are confiscated, but as long as one is

1    safe in the clique, they can recuperate."

2    Q.   And can you continue to read the next three entries as

3    well, Trooper.

4    A.   Muerto says, "That dude has the video of that thing.  That

5    dude, Rebelde, has it.  I haven't called that guy back."

6         Villano says, "A video of what, dude?"

7         Muerto says, "When they buried that homeboy, that dude of

8    the Lioness, he was killed, he was just killed recently."

9    Q.   If you could turn to Page 26, please, and at the top after

10   "Several conversations at once," Page 26, I start with CW-1:

11        "They haven't found any evidence against him, right?"

12   A.   Muerto says, "No, they haven't found anything.  His wife

13   told me that they wanted to get him because they had found some

14   ammunition at his house."

15        Villano says, "But for that ammunition they can do

16   anything for him for ammunitions.  One can be condoned.  It's

17   like in El Salvador, one cannot be condoned for a gun if

18   there's no crime.  Just a gun alone is not condemnable."

19        Muerto says, "If the guys know you're in the Mara, the

20   first thing is Immigration.  They deport you."

21        Villano says, "Down there?"

22        Muerto says, "Yes, down there."

23        Villano says, that's why that dude Sitiko, I told that dog

24   that since he has an electric bracelet, dude, he'd better think

25   about it and not fuck around, dude!  Because if he gets out,

1  the minute he messes up he will be deported, dude."

2  Q.   "So then why the fuck is he waiting?"

3  A.   Villano says, "The only thing is that I am all screwed

4  with Immigration, and with that other thing, dude.  I think

5  that they didn't find my fingerprints because I think that they

6  would have already made fucking trouble for me."

7  Q.   "Yes, they would have already.  Don't you think that if

8  they found this guy's fingerprints on the gun, don't you think

9  that they would already have given orders to search him?"

10  A.   Muerto says "Who?"

11  Q.   "This dude here."

12  A.   Muerto says, "What do you mean, if they found

13  fingerprints?"

14      Villano says, "Well, listen dude, we went over to do a

15  thing there, dude, and --"

16  Q.   "This one, this one knows about that problem with you."

17  A.   Villano says, "And I lost the gun, dude."

18      Muerto says, "Uh-huh."

19      Villano says, "And the police are saying that they found

20  it."

21  Q.   "Do you remember the one they did around the house?"

22  A.   Muerto says "No, no."

23  Q.   "That day when I told you I saw them running?"

24  A.   Muerto says "Yes."

25  Q.   "Well, this one here was one of the ones that was over

1   there."

2   A.   Muerto says, "But, no, that's why, man, but I know of

3   the -- and who did they grab for this thing?  Was anyone

4   caught?"

5        Villano says, "Yes, of course, they grabbed that dude,

6   Roca."

7   Q.   "Roca?"

8   A.   Muerto says "Oh."

9   Q.   "The big one who was there, the biggest one?"

10  A.   Muerto says "Oh."

11       Villano says, "They grabbed that dude, man, and they put

12  an electronic bracelet on him.  But they have already paid

13  $9,000 for him, dude."

14       Muerto says, "Oh, yeah?"

15       Villano says, "Uh-huh.  But they have not found any proof

16  against him, dude.  They have not found any proof against him."

17       Muerto says, "That's why, if they have not found any proof

18  against him, why the fuck."

19       Villano says, "It's just the word of culero, dude, with

20  him."

21  Q.   Stop at that point, Trooper, and pick up on Page 29 in the

22  middle of the page, please.  CW-1 I'll start, and then sort of

23  the bottom third:  "They released him because they didn't find

24  any evidence against him."

25  A.   Muerto says "Exactly."

Q.    "The other one, Bravito, pretended to be mad."

A.    Villano says, "But my name appears in a book there.  But
why is my name in a fucking book?  Because that guy, since he
paid for an attorney, you know, supposedly they gave him a book
where supposedly all that shit is found, and there's a record
that Tremendo from the clique is there, and the Enfermos
Criminales are mentioned."

      Muerto says "Oh, yeah?"

      Villano says, "Uh-huh.  Because those kids smeared shit on
the dude, you know, so that's how the police found out about a
lot of fucking things, and so they have Tremendo there, and
they have two pictures.  They have one of the girl, Sapa, and
they have another one of the kid, of the girl, Papela.  Those
two attempts on the dude on top.  And there they have everyone,
dude, everyone!"

Q.    "Uh-huh."

A.    Muerto says, "That's the problem, dude, that's why because
that fucking problem always happens because there's always guys
who talk."

      Villano says, "Uh-huh, and someone tells."

Q.    "On the streets?"

A.    Muerto says, "Those dudes, always flashing MS, but they're
there because girls are there hanging out.  That's the problem,
man.  That's why I'm not.  I'm going to tell this dude.  We
took them there by Maverick Station, and there was Sonya!

1    Rather than be around those kind of people, I would rather be

2    alone because whenever one gets arrested, dude, you know, you

3    are told, 'Look, dude, we're going to give you one option.  You

4    either tell us what's going on, or we'll deport you.'  Fuck,

5    man, I would rather deported than fucking snitch."

6    Q.    "Exactly."

7    A.    Muerto says, "After Barrio knows, where does that leave

8    you?  You'll be full of lead.  You won't be able to walk."

9    Q.    I'm going to turn ahead, please, to Page 32, and I'm going

10    to start with two-thirds of the way down, Villano.

11    A.    Villano says, "The doggie I trusted, dude, was Terrible.

12    Because he was the one -- the only one that was always trying

13    to do something.""

14         Muerto says, "Terrible?"

15         Villano says, "Uh-huh."

16         Muerto says "Yes."

17         Villano says, "Uh-huh.  He was the only one who had done

18    something there with everyone.  The homeboys down below knew

19    him.  Because all the dudes hardly had any communication with

20    the homeboys down below.  Supposedly he has homeboys down

21    there, in jail and all that."

22         Muerto says, "Yes.  The thing is that the Everetts are the

23    clique that has the most homeboys down below.  That's the

24    thing, man.  And the thing is...hey, man, I was in Sibar three

25    years.  Two years, almost three years, I was down there.  I was

1   killing culeros down there too, and the dudes know what
2   happened.  Uh-huh, I was there with Silva dudes, man.  So what
3   would the dudes down below do to me?  When we'll get arrested,
4   where would I go?  Go to the program, man?  But before it
5   wasn't like that now."
6        Villano says, "Which program?"
7        Muerto says "East Coast."
8        Villano says, "But the East Coast weren't down there."
9        Villano says, "Oh, yeah, because it's the 13s."
10       Muerto says "Exactly."
11       Villano says, "It's the 13s on the East Coast as well?"
12       Muerto says, "Yes, but that's what's happening now is that
13   the dudes don't care if we're doing stuff up here or how.  The
14   only thing they care about having us send money down there.
15   That's the thing, one has to keep sending money constantly,
16   it's like a rule they're making, but we are MS, and we don't
17   have to keep sending rent to the dudes down there.  You know
18   that.  Here, down below, we can increase.  So, like I told this
19   dude, Grille, that son of a bitch said to me, 'Hey, you guys
20   owe us money.'  'For what?'  'For Bravo.'  'What do you mean?
21   We send money to the dudes, and what do the dudes do with the
22   money?'  We're giving money to the program, and what's the
23   program doing with the money?"
24       Villano says, "I heard that the East Coast is the program.
25   I heard East Coast already is the program, but in the program

1    there are the 13s, Everetts, and you guys."

2        Muerto says, "Yes.  Uh-huh.  And there are some dudes from

3    East Boston, and where have you seen dudes from East Boston

4    here?  There are no East Bostons in the street.

5        "And the dudes from East Boston down there have nothing.

6    There was a big problem there with Flaco from East Boston.

7    That dude is a big snitch.  Even the cops, the detectives will

8    see him talking.  Uh-huh.  So what's going on?"

9        Villano says, "That's what I told you."

10       Muerto says, "Why were the dudes saying, 'Hey, dude, let's

11   get together?'  Let's talk about this issue, dude, with all the

12   dudes of the clique, the first and second.  But as soon as

13   someone would say Flaco is going, not a single dude from our

14   clique would go.  And why?  Fuck, those dudes want to go there,

15   and what the guy wants to do is go and ruin things there, man.

16   While the dudes from East Boston are really poor down below."

17       Villano says, "Do you know why?  Because down there in

18   Chalate was Furioso, and he talked with some dudes from East

19   Boston, and what I heard was that the dude was running things

20   for them, and those dudes weren't in the program there, because

21   East Boston are supposedly the ones that have to report how

22   things are going with the Virginia cliques."

23       Muerto says, "But there's no clique of that guy here."

24       Villano says, "I don't think they have the ability to

25   reach Virginia."

1       Muerto says, "The thing is that everyone in Virginia runs

2   with the same thing.  It is the program."

3       Villano says "Right."

4       Muerto says, "But since this guy was running things and

5   the guy's clique isn't up here, then what they did was this.

6   Everetts said that the Everett was going to run things because

7   they had the most dudes down there.  And the clique here is

8   more there."

9       Villano says "More established?"

10      Muerto says "Uh-huh.  So they took the thing away.  One of

11  the Everetts, Sugar, from the Everetts, still is in charge of

12  things."

13      Villano says, "Sugar from the Everetts still has that

14  thing?"

15      Muerto says "Uh-huh."

16      Villano says, "No man, we are in the program up here.

17  It's fine.  Fuck, there have been a shit load of problems."

18  Q.   I want to skip ahead, if we could --

19          MR. HALPERN:  Can we approach?

20  SIDEBAR CONFERENCE:

21          MR. HALPERN:  I am just getting concerned that we're

22  going to run out of time for --

23          MR. MacKINLAY:  I have another five minutes.

24          THE COURT:  Okay.

25          (End of sidebar conference.)

BY MR. MacKINLAY:

Q.   I just have two more sections to read, Trooper.

A.   Okay.

Q.   Can we skip ahead to Page 46, in the middle of the page

starting with Villano.  46 in the middle of the page.

A.   Villano says, "Yes, a different story.  One day I will go

visit and go have fun."

     Villano says, "So this kid that arrived recently from

El Salvador was activated?"

Q.   "Yes, supposedly he did a hit.  Chucky was there.  And I

was there."

A.   Villano says, "Chucky has done stuff, but the clique down

hasn't activate him."

Q.   "That's what pisses me off with Chucky, man.  Fuck."

A.   Villano says, "You have to see how things work with the

clique down.  I understand.  For instance, I have done a lot of

shit too, and it's counted for me.  Whereas those dudes, as

long as they don't do something like that, dude, as long as

they don't.  They're going to advance them, they're going to go

up, they're going to.  Suddenly the clique is like that, the

rules are like that for us down below."

Q.   "So I heard the kid IO got the letters."

A.   Villano says, "I heard about earning the letters.  The

kid, I'm not sure about earning the letters, but I heard that

he has, but the kid hasn't killed."

1  Q.   "The Guanaco has the letters of the side?"

2  A.   Muerto says "UI."

3       Villano says, "Hey, doggie, and what about the dude

4  Humilde from 13?  Do you guys hang out with him, dudes?"

5  Q.   "No."

6  A.   Villano says, "I once asked some dudes about the murder he

7  did, and the dudes said.  Also, he wasn't activated."

8  Q.   "What did the dude do?"

9  A.   Villano says, "He's in for a murder in 2011, they say.  I

10 don't know how many years later he was activated."

11 Q.   "Unintelligible."

12 A.   "And Tremendo was with that guy, Humilde."

13 Q.   "Who, Tremendo?"

14 A.   Villano says, "Tremendo from our clique.  We were lost,

15 going over to see you guys, when Tremendo went by and said,

16 'Fuck, follow those culeros, man.'"

17 Q.   "Oh!"

18 A.   "He was pissed off.  Now you see why they don't give it

19 quickly?  We were on our way to talk to you guys about giving

20 us a turf, how the fuck were we going to arrive fighting?  But

21 he was mad, and he was right, doggie.  How could a culero a

22 homeboy?  And he was a chavala...  From the time I was little,

23 I was selling weed.  It was my business.  That's how I

24 supported myself, selling drugs."

25 Q.   "Well (Unintelligible) to sell (Unintelligible)."

1          And the final passage would be on Page 42, please,

2     starting at the top, Villano.  42, please, at the top starting

3     with Villano.

4     A.   Villano says, "Once I was with Trigueno, and there was a

5     kid over there on Exeter/Essex.  Trigueno had a gun.  I told

6     Triigueno, 'Hey, give me the gun.'  I told him, 'I'm taking it

7     for a thousand.'  Because I wanted to shoot son of a bitch,

8     right in the head.  And the money.  Trigueno.  And I knew that

9     kid up here to be a culero, and I wasn't giving him a break,

10    break, but I knew that he had never messed with chavalas.  So

11    we attacked him, and Trigueno told him:  'Hey, lift up your

12    shirt,' Trigueno said to him.  And I thought we were going to

13    beat him, but that dude just told him to lift up his shirt.  I

14    was saying to him, 'Shoot him!'  And since that dude was not

15    shooting him, the son of a bitch was crying out, 'Oh, no!'  I

16    was shouting at him, 'Take his wallet,' and I was hitting the

17    guy on the head.  And that dude was just standing there at a

18    distance."

19    Q.   "Uh-huh."

20    A.   Villano says, "So I got closer to him, and can you

21    imagine, he didn't have a single dollar on him, doggy, not even

22    a fucking dollar in his wallet, doggy.  And I checked it all

23    inside out, and I told him, 'You poor son of a bitch.'  I threw

24    it right at his head.  And I told him, 'Give me your phone.'

25    And he said, 'I don't have one.  That's why I'm waiting for my

1  friend.'  No phone, no money.  I told him, 'You're a fucking

2  son of a bitch.'  I told him we will kill him, dude, but the

3  dude didn't shoot him.  He told me that he was nothing, and for

4  what?  What I really wanted to, dude, to shoot that guy right

5  there.  But that dude said that he was nothing, but I should

6  have grabbed the gun because it was awesome there.  I lived

7  right around the corner.  I know that there weren't any

8  cameras.  I had checked it out really well.  We would have left

9  that culero lying right there.  He was wearing a black rosary.

10 I said to take it off and to step on it.  'You fucking son of a

11 bitch, MS rules here!'  And I was saying to him, 'Son of a

12 bitch, I better never see you here again!'  And that dude was

13 really nervous."

14 Q.   "That's the bad part; the young guys get all nervous."

15 A.   Villano said, "The only thing I fear here is the law,

16 dude.  I feel that those sons of bitches here turn you into

17 shit; they don't beat you as they do in Salvador but..."

18 Q.   "But they do it psychologically."

19 A.   Villano says, "I feel fucked here since this is not our

20 country, dude, and we don't want to go back to Salvador.  So,

21 we are here to stay, we stay here for a while, but what the

22 fuck, what the hell are we going to do here?  That's what I

23 feel, dude."

24 Q.   "In the last two months, Chelsea has gotten hot."

25 A.   Villano says, "Really hot!  Fucking, fucking hot!  There

1    are like four guns!  But Tremendo lost one, and he was

2    arrested.  Then we lost another one that belonged to the

3    Everetts.  Very quickly, I told the dudes, 'Doggie, let's chill

4    right now.  Things are hot,' I would tell him.  'Yes, you'll

5    see soon,' he told me.  That's what happened in the

6    neighborhood there in El Salvador.  When I went to hang out

7    with the clique, there were only a few homeboys.  In the course

8    of a year, dude, there were about 40 homies, dude.  Homies that

9    had committed two killings so that they could get jumped in,

10   and about 60 chequeos.  Fuck, all at once."

11       Muerto says, "From which area?"

12       Villano says, "San Vicente.  Yes, we're in San Vicente

13   again.  Now, since we don't all fit in San Vicente, we've

14   spread out to the outskirts, Molineros.  Other places like San

15   Pedro, dude.  All over."

16   Q.   Trooper, that's fine right there.

17            MR. MacKINLAY:  I have no further questions of the

18   witness.  Is there cross?

19            MR. HALPERN:  No cross.

20            THE COURT:  Ladies and gentlemen, just let me remind

21   you, the transcript itself was the evidence.  There were

22   occasional minor reading errors, and, again, the transcript

23   controls, not the reading.

24            All right, thank you.  You may step down.

25            (Witness excused.)

1          THE COURT:  Anything further?

2          MR. MacKINLAY:  Your Honor, the government rests.

3          THE COURT:  Okay, let me see counsel at sidebar.

4     SIDEBAR CONFERENCE:

5          MR. HALPERN:  I move for a judgment in favor of the

6     defendant.

7          THE COURT:  The motion is overruled, denied.

8          (End of sidebar conference.)

9          THE COURT:  Mr. Halpern?

10         MR. HALPERN:  I'd like to call Adam heartland.

11                    ADAM HARTLEY

12    having been first duly sworn, was examined and testified as

13    follows:

14    DIRECT EXAMINATION BY MR. HALPERN:

15    Q.   Good afternoon, Mr. Hartley.  Would you just state and

16    spell your name for the record?

17    A.   Adam Hartley, H-a-r-t-l-e-y.

18    Q.   And what type of work do you do?

19    A.   I am a forensic analyst.

20    Q.   What type of forensic analyst?

21    A.   Firearms examiner.

22    Q.   How long have you been involved in forensic work?

23    A.   I've been doing forensic case work for about three years.

24    Q.   And can you talk about more specifically the nature of the

25    type of work you do.

A.   I work for an independent firearms examination company

based in Massachusetts, and we specialize in firearms

examination, function testing, crime scene reconstruction.

Q.   Can you review your education and training relating to the

forensic work that you do.

A.   Yes.  I have a bachelor's of science from Rochester

Institute of Technology in technical and scientific imaging.  I

have a master's degree from the University of New Haven

majoring in forensic science.  I have taken several short

courses on different subjects.  I've given technical talks at

national meetings for forensic firearms examination, as well as

been an instructor for those meetings as well.

Q.   And have you been involved in other type of forensic work

in addition to ballistics?

A.   Primarily I focus on ballistics and firearms examination,

but I also do toolmarks, crime scene reconstruction, and

multimedia.

Q.   Now, you were asked to conduct some analysis relating to

this case?

A.   Correct.

Q.   And what was it that you were asked to do?

A.   Specifically were asked to examine the evidence that was

presented to us and determine the origin or location of a

shooter.

Q.   And with respect to what shooting was this?  This was the

1    Katarin Gomez shooting?

2    A.    Correct, yes.

3    Q.    And let's start out with, what evidence was of

4    significance to you when you began this work?

5    A.    We were presented with a spent projectile, a bottle, and a

6    screen from a window.

7    Q.    And what was the significance of the bottle?

8    A.    The bottle had an entry and exit hole from the projectile

9    that came through the window.

10   Q.    I'm going to show an image just to you.  Is it up?  So

11   before we show this to the jury, I just want you to explain

12   what exactly this image shows and what the significance of it

13   is with respect to the work that you did.

14   A.    This is a crime scene photo from the actual incident

15   showing the window blinds and the bottle on the windowsill.

16              MR. HALPERN:  Can we publish this to the jury?

17              MR. MacKINLAY:  No objection.

18              THE COURT:  Yes.

19              MR. HALPERN:  I'd like to offer it as the next

20   exhibit.

21              THE COURT:  Exhibit 287, it's admitted.

22              MR. HALPERN:  Thank you.

23              (Exhibit 287 received in evidence.)

24   Q.    Now, can you explain what the significance of this is.

25   A.    For doing a reconstruction, specifically for finding a

1  trajectory of a projectile, we need to have some objects that

2  it passed through.  In this case, it had passed through a

3  screen in the window, the blinds in the window, and this

4  bottle, and that's pretty much the only thing that it passed

5  through.  The screen is not significant to get a trajectory

6  from.  The blinds were shattered, so the actual perforation

7  wasn't distinct, and the bottle is pretty much what we have to

8  go on.

9  Q.   And just to be clear, this is not a photo that you took?

10 A.   No.  This is from the crime scene, from the police.

11 Q.   Then what was the next step in the process of your

12 evaluation once you had this information?

13 A.   From this, I would take measurements and do some

14 experiments on the bottle to find the angle at which the

15 projectile passed through it.

16 Q.   How do you do that?

17 A.   Do we have the figure?

18      MR. HALPERN:  Just for the witness, yes.

19 A.   Basically what I would do is, I would take the two holes,

20 find the distance between them and the difference in height;

21 and by using those measurements and using some basic

22 trigonometry, you can find the angle at which the projectile

23 passed through the bottle.

24 Q.   All right, and does this image that you're looking at

25 illustrate the measurement that you just explained?

1    A.    Yes, it does.  This contains photos that I took as well as

2    the illustrations that I have annotated it with.

3              MR. HALPERN:  I'd like to offer that as 288.

4              MR. MacKINLAY:  No objection.

5              THE COURT:  All right, it's admitted, 288.

6              (Exhibit 288 received in evidence.)

7    Q.    All right, so now the jury can see it.  Can you explain in

8    a little more detail exactly what is going on here, what the

9    significance of this is.

10   A.    Sure.  By examining the holes, we could see that on one

11   side there is an exit where the bullet left, and on the other

12   side is the entrance hole.  And using some math and some

13   measurements to find out how much higher is the exit from the

14   entrance -- in this case it's 6.36 millimeters -- and how far

15   apart they are -- in this case 47.7 millimeters -- we can

16   extrapolate that the angle through the bottle was about 7.6

17   degrees.

18   Q.    Are the methods that you're describing procedures that are

19   accepted within the field of forensics?

20   A.    Yes.  They are extensively used in crime scene

21   reconstruction, both of firearms and of blood spatter.

22   Q.    Are these issues that you've read many publications

23   regarding?

24   A.    Correct.

25   Q.    So, now, what's the next step?

1    A.   The next step is, I like to verify the measurements and

2    the results that I have, if possible through experimental

3    methods.   In this case, what I did was to shine a laser pointer

4    through the two holes; and by measuring the angle that the

5    laser pointer was able to cleanly go through both holes, we can

6    extrapolate the angle for that as well.

7    Q.   Let me show this just to the witness.   And can you explain

8    what this image deals with?

9    A.   Yes.   At this point we were presented with the evidence at

10   a location where we had set up a tripod and angle meter and a

11   laser pointer.   We then pointed it through the two holes in the

12   bottle, and the angle finder would show us the angle at which

13   the light was shining through it.

14            MR. HALPERN:   Can we introduce this as the next

15   exhibit, which would be 289.

16            MR. MacKINLAY:   No objection.

17            THE COURT:   It's admitted, 289.

18            (Exhibit 289 received in evidence.)

19   Q.   So now that the jury can see this, can you explain in a

20   little more detail what the three photos here represent.

21   A.   Okay, the first one on the top left is just an image of

22   the laser going through the holes, showing that it's not

23   hitting the bottle in any way.   The top right is the angle

24   finder that we used showing that it's between 7 and 8 degrees.

25   And then the bottom one is just of the whole setup on the table

1    with the tripod.  So between the two methods that I used, both

2    mathematical and practical, I derived the same angle.

3    Q.   And what was that?

4    A.   It was between 7 and 8 degrees, 7.6 through the math, and

5    the angle finder and the practical method is analog, so there

6    is some interpretation, but it's definitely between 7 and 8

7    degrees.

8    Q.   And what was the next step in your work?

9    A.   The next step is to find where, using that angle, outside

10   the building the shooter would have had to be in order to

11   achieve that angle in that location of the window.  So using

12   that angle, we used a tripod and another angle finder, went

13   down the street that intersects with Shawmut, Cottage Street,

14   and we found the point on that street at which 7.6 degrees hits

15   the spot on the screen where the bullet had penetrated, and

16   then we measured the distance from the building to where that

17   point is.

18   Q.   Do you recall approximately what that was?

19   A.   91 feet from the building.

20   Q.   I want to show an image just to the witness.  Does this

21   image illustrate the step that you just described?

22   A.   Yes.  Yes, it does.

23             MR. HALPERN:  Can we introduce this as 290.

24             THE COURT:  Yes.  It's admitted, 290.

25             MR. HALPERN:  Thank you.

1          (Exhibit 290 received in evidence.)

2     Q.   All right, so explain what exactly this represents.

3     A.   This represents where the origin of the shooter most

4     likely was using the data that I've derived previously, taking

5     into account the rise in the street because it is a street that

6     goes uphill, the distance where the street is at the bottom of

7     the hill, and locations of possible individuals at the bottom

8     of the hill.

9     Q.   When you say the street goes uphill, it shows a 2.5-degree

10    lift?

11    A.   Yes.

12    Q.   And it's going uphill from the house towards the shooter?

13    A.   The street is level.  It starts going up after the

14    sidewalk across the street.  Obviously the streets aren't

15    straight lines, but it's an average of to where it was, about

16    2.5 degrees.

17    Q.   All right.  And so the location of the individuals that he

18    was shooting towards were below level from the shooter?

19    A.   Correct.

20    Q.   So the images at the very bottom, the strip images, the

21    five of them, what's the significance of that?

22    A.   Those are still frames from the surveillance video on

23    Shawmut Street.

24    Q.   And how is that related to the work that you did?

25    A.   It shows that, although it doesn't show much of the

1    street, it does show the entirety going across Cottage Street,

2    so that we could see during the event that two individuals went

3    up the street, presumably who the shooters were, and the people

4    who were following the group that was following them did not

5    enter Cottage Street.  They were at the bottom of the hill, and

6    they did not go past the crosswalk.

7    Q.   And how did that assist you in your analysis?

8    A.   Because I knew there was no one closer than that to where

9    the shooter would be.  The closest person would be the one that

10   was in view at the bottom on the corner.

11   Q.   All right.  So, in summary, that enabled you to determine

12   a location for the people he was shooting towards?

13   A.   Correct.

14   Q.   All right.  And there are four images there of people.

15   What do those four different silhouettes represent?

16   A.   Although it's hard to depict video with a still frame,

17   without movement, it shows that although they're not in view,

18   there were other people within that intersection of Shawmut and

19   Cottage.  During the video, if you saw it, would show that

20   there was feet, you could see feet or people running out of

21   there.  There was a bicycle wheel.  So there were several

22   people present in that intersection, although none of them went

23   past the crosswalk onto Cottage Street.

24   Q.   And based on all of this, based on the process that you've

25   described and your education and training, were you able to

1    reach conclusions about the trajectory of the bullet, the

2    height of the bullet in comparison to where individuals would

3    have been standing?

4    A.    Yes.  From my calculations and analysis, anyone standing

5    in the street on Shawmut Street, the projectile would have gone

6    between 6 and 10 feet above their head to hit the window on the

7    second floor.

8    Q.    So from the silhouette that's the furthest to the right,

9    that individual, based on your assessment, was the closest --

10   A.    Correct.

11   Q.    -- that any of these individuals could have been?

12   A.    Correct.

13   Q.    And at that point the bullet would have been approximately

14   6 feet over that person's head?

15   A.    That is correct.

16   Q.    And then the figure at the furthest left is, based on your

17   assessment, the furthest toward the house any of those

18   individuals would have been?

19   A.    The best we can guess, yes.

20   Q.    And how far would the bullet have been over a person's

21   head at that point?

22   A.    Probably about 10 feet.  I don't know the exact heights of

23   the individuals that were in the street.  In this illustration,

24   assuming a 6-foot person, as the average person is less than

25   6 feet tall.

1    Q.   Were there other conclusions that you made in the course

2    of this analysis that I haven't asked you about?

3    A.   To achieve the impact from the shot, the shooter would

4    have had to have been pointing upwards at a 7.6-degree angle,

5    which, as previously stated, would be 6 to 10 feet above any

6    persons in the street at the bottom of the street's head.  And

7    to add, if the person were shooting straight at a 0-degree

8    angle, it still would have gone over their heads.  Unsure by

9    how much, but it would most likely have gone over their heads

10   as well because of the elevation of the street.

11   Q.   It's fair to say, you've spent a lot of time in shooting

12   ranges?

13   A.   Yes, conducting research and -- yes.

14   Q.   So can you, to help kind of create a context here, can you

15   describe this event as though there was a roof and this was

16   indoors?

17   A.   Sure.  A typical inside shooting range would probably be

18   about 50 to 100 feet in length, you know, just because it's

19   inside of a building; ceilings, probably around 10 feet tall.

20   And having been in shooting ranges quite a bit with varied

21   ranges of people with expertise from, you know, beginners to

22   experts, I've never seen anyone hit the ceiling of a shooting

23   range.  I have occasionally seen someone hit the floor by

24   shooting downwards accidentally, but for the most part, if

25   someone is shooting at a target from, you know, 25 feet to

1    50 feet, they're hitting pretty, you know, averagely, you know,

2    an 18-by-18-inch sheet of paper without much problem, even

3    beginners.

4    Q.   Regardless of where these individuals were, if this had

5    been in a building with a roof that was roughly 10, 12 feet

6    high, the shot would have been through the roof.  Is that fair

7    to say?

8    A.   Oh, yes.  It would probably hit the roof, and they would

9    be escorted out of the shooting range.

10            MR. HALPERN:  I have no other questions.

11            THE COURT:  Cross?

12   CROSS-EXAMINATION BY MR. MacKINLAY:

13   Q.   Mr. Hartley, one of your first questions you were asked by

14   counsel, you didn't give the complete answer to that, did you?

15   A.   Uhm, I'm unsure what question that was.

16   Q.   Let me ask you a different way.  You were asked what you

17   do for work, and you mentioned that you work as a forensic

18   scientist, correct?

19   A.   That is correct.

20   Q.   But is that a part-time job, sir?

21   A.   It is.

22   Q.   In fact, you actually work for Walt Disney; isn't that

23   right?

24   A.   That's true.

25   Q.   Is that your full-time job at Walt Disney?

1    A.    It is.

2    Q.    Does that have anything to do with forensic sciences?

3    A.    No.

4    Q.    What, videographer?

5    A.    No.  I'm a technical engineer.

6    Q.    Okay.  And prior to your experience, it was as a

7    videographer, correct?

8    A.    I did part-time work as a videographer for courts.

9    Q.    Did you explain that when you were asked by counsel what

10   you did for work?

11   A.    I believe I was asked what I did in relevance to this

12   case.

13   Q.    You provided some information relative to this case to

14   take a look at to make the determination that you made,

15   correct?

16   A.    Excuse me?

17   Q.    You were given some materials to look at to base your

18   testimony upon, correct?

19   A.    That is correct, yes.

20   Q.    What did you look at?

21   A.    I looked at a screen, a fired projectile.  There was a set

22   of blinds and a bottle.

23   Q.    You can see yourself to be detail-oriented, Mr. Hartley?

24   A.    Yes, I would.

25   Q.    In fact in your resume` it's the first two words under

1    qualifications, "Detail-oriented," isn't that right?

2    A.    Correct.

3    Q.    Would the fact that you're a detail-oriented person also

4    assist in your work as a forensic scientist in the way that you

5    described?

6    A.    I believe so.

7    Q.    In other words, you'd want to get all the information you

8    could so you could make an accurate assessment and diagram like

9    the one you just provided, correct?

10   A.    I like to use all the information available, yes.

11   Q.    So nothing was withheld from you in terms of information

12   to assist in your analysis, though, right?

13   A.    Uhm, if it was withheld from me, I would not be aware of

14   it.

15   Q.    Well, that's true.  Were you told that anything was

16   withheld from you?

17   A.    No.  I mean, I wasn't able to visit the inside of the

18   building, but --

19   Q.    So you didn't get into the building?

20   A.    I was never inside the building, no.

21   Q.    You used photographs of the scene?

22   A.    Photographs inside the building for reference only from

23   the --

24   Q.    Let's start here at the location inside the building.  You

25   talked a lot about and were shown some photographs of the entry

1    of the bullet projectile through the window, through the

2    screen, I should say, through the blinds through the bottle.

3    Did you also consider the trajectory of the projectile through

4    the person of Katarin Gomez?

5    A.    No, because that would be irrelevant, as we don't know

6    what angle she was at at the time she was hit.  If she was

7    leaning back, that would affect the angle, so the angle through

8    the body was fairly irrelevant to me.

9    Q.    But wouldn't the direction of the person who the bullet

10   struck also be an important factor for you to consider in your

11   examination?

12   A.    No.

13   Q.    You wouldn't care at all where the bullet went once it

14   went through the window?

15   A.    It went through the window -- I mean, the actual window

16   was open.  It went through a screen.  It went through the

17   blinds and through the bottle.  As far as where it struck the

18   victim, I cannot postulate on because if someone had their head

19   looking forward and there is an angle like this, if their head

20   was like this, that would make a big difference.  So since it's

21   a mobile object --

22   Q.    So you didn't look at the autopsy report to see the

23   trajectory, the angle of the bullet through the person of

24   Katarin Gomez?

25   A.    It didn't make a difference to me.

1    Q.    You didn't think it was significant to do that, even

2    though you're detail-oriented?

3    A.    Because I don't use information that would not help in my

4    analysis.  As I mentioned previously, we don't know the angle

5    of the person.  So although you may have a distinct angle in

6    the person, we don't know at what angle the person was at.

7    Q.    Okay.  Did you look at the crime scene video?

8    A.    Yes.

9    Q.    Did you look at the other documents, including the height

10   of the potential shooter?

11   A.    Yes.

12   Q.    Did you look at whether the shooter was right-handed or

13   left-handed?

14   A.    That is irrelevant to me.

15   Q.    Well, would it be relevant if the shooter held the gun up

16   over their head and fired?

17   A.    As opposed to?

18   Q.    Held it in a position lower, more towards the center of

19   their body or their waist?

20   A.    It would make a slight difference.

21   Q.    It would make a significant difference in the trajectory

22   based upon the location of where the firearm was on that other

23   end of your line, correct?

24   A.    I wouldn't say a significant difference.  It would make a

25   slight difference.

```
 1   Q.    Did you also consider other reports of what occurred at
 2   the scene in terms of witness statements?
 3   A.    Witness statements were not important to me.
 4   Q.    So you did not get the opportunity to hear from eye
 5   witnesses to the shooting and what direction that the eye
 6   witnesses said the gun was pointed at the time it was
 7   discharged?
 8   A.    I felt witness statements would bias my analysis.
 9   Q.    How about what the defendant said about where he was
10   shooting the gun, would that be an important aspect in your
11   evaluation of the crime scene?
12   A.    Not to my analysis, no.
13   Q.    So if the defendant said he was shooting it up in the air,
14   you wouldn't take that into consideration?
15   A.    That is not mine to make.
16   Q.    And if the defendant said he was shooting it down at the
17   ground, you wouldn't take that as an important aspect of your
18   evaluation as well?
19   A.    I can only make an analysis on the evidence that is
20   presented to me.
21   Q.    Would it be important?  Yes or no.
22   A.    If the witness stated that they were firing at the ground?
23   Q.    The person who fired the gun, would it be an important
24   aspect of a detail-oriented person such as yourself to know
25   what they said about where the gun was fired?
```

1    A.   It wouldn't be important to my analysis, as people are

2    prone to exaggerate, misremember.  Solid evidence, physical

3    evidence does not change its mind.

4         MR. MacKINLAY:  Move to strike the answer.  I don't

5    believe there was a question there.

6         THE COURT:  Overruled, overruled, overruled.

7    Q.   Go ahead, you can finish.

8         THE COURT:  Now I think he's finished.  Put a question

9    to him.

10   Q.   Have you testified in court before?

11   A.   Once.

12   Q.   Excuse me?

13   A.   I have done once.

14   Q.   And where was that?

15   A.   New Haven Superior Court.

16   Q.   And were you qualified to render an opinion in that case?

17   A.   I was.

18   Q.   And what was the area?

19   A.   The area was actually in photography.  It was not in

20   firearms examination, no.  This is my first time testifying in

21   firearms examination.

22   Q.   The diagram that was just marked a short time ago --

23        MR. MacKINLAY:  May I get the exhibit number on that?

24        THE COURT:  290.

25        MR. MacKINLAY:  290.

1   Q.   You made certain assumptions when you did this; isn't that
2   right?
3   A.   There are certain assumptions that need to be made because
4   not all information is available.
5   Q.   I mean, you watched the video because I see clips of it at
6   the bottom, correct?
7   A.   Correct.
8   Q.   Is your analysis that the shooter stood in this location?
9   Is that what this orange or red dot -- I'm color-blind, but I
10  think it's a red dot there, right?
11  A.   It is a red dot.
12  Q.   All right, well, thank you.  Is that the location where
13  you think based on trajectory the shooter was standing?
14  A.   He was that far from the building.  I don't know what side
15  of the street he was on.
16  Q.   But did you watch the video that puts the individual in
17  the area right at the edge of the sidewalk?
18  A.   There is no sound in the video.  We can only postulate
19  when the firing happened in the video based on when people
20  reacted.
21  Q.   Fair enough.  The person that's on the video that's in the
22  sleeveless shirt that turns and runs away, would that be the
23  fair spot to conclude he is being shot at?
24  A.   I would assume that, yes.
25  Q.   Okay.  And then would it be fair to say that one, two,

1    maybe three seconds at the most later, you can see the person

2    in the white walking around the corner with what appears to be

3    a gun in their hands?

4    A.   I don't know the exact timing, but it was a certain amount

5    of seconds afterwards.

6    Q.   You honestly think that a person --

7         THE COURT:   Don't talk over him, Mr. MacKinlay.  Don't

8    talk over him.  Let him finish, okay?  Calm down.

9         MR. MacKINLAY:   I thought he was done, your Honor.

10   A.   I can't make assumptions on what is not on the video.

11   They had turned the corner.  I don't know if they're walking

12   around.  I don't if they're standing still.  I don't know if

13   they're running, so I can't take that into account.

14   Q.   But you could take into account the video, correct,

15   because you'd used it, and you put still photos at the bottom?

16   A.   But until they appeared around the corner, they were not

17   on the video, so I could not say what they were doing during

18   that time.

19   Q.   Would you agree with me that the distance that you have

20   got the shooter marked on Cottage Street, which I've now marked

21   with a yellow or green spot, is some three, two and a half car

22   lengths from the corner?

23   A.   Probably two car lengths.

24   Q.   And how many feet would you estimate that is?

25   A.   I can say that the corner of the street is at 52 feet away

1   from the building, and the shooter as I postulate is 91 feet,

2   so that's a difference of 40 feet.

3   Q.   So the difference between 91, I'm not that good at math,

4   but I think that's somewhere around 39, does that sound right,

5   40 feet?

6   A.   Yeah, 39, 40 feet.

7   Q.   Okay.  So your observations and your assumptions are that

8   the person in the white who did the shooting covered the

9   distance of 39 feet in the brief time from the time that the

10  person is seen running till they came onto the screen, right?

11  A.   I don't know how fast they were moving.

12  Q.   Now, when you mentioned that that was the most likely

13  location based on the data available, was there other data that

14  would have assisted you that you didn't get a chance to review?

15  A.   Not that I'm aware of.  Unless there was another video

16  camera that showed them shooting, I cannot say.

17  Q.   But, again, your contention is that witness statements and

18  statements of persons who were there about where the gun was

19  pointed was not important to your analysis?

20  A.   As mentioned previously, witness statements to me doing

21  analysis would not factor in.  I can't measure someone's

22  analysis or their statements.  They can have fuzzy memory.  It

23  was dark.  It was late.  They may have bias.  They may have

24  agenda.  I can't rely on witness statements to make an analysis

25  on trajectory.

1    Q.    Would the caliber of the gun count?  The type of weapon,

2    would that be a factor?

3    A.    No, since we do have the -- we have the spent projectile,

4    so we know the caliber of the weapon.

5    Q.    What was the caliber of the weapon?

6    A.    It was a .38 caliber weapon, which could include 380, 38

7    special, 357 magnum, .9 millimeter.

8              MR. MacKINLAY:  No further questions.

9              THE COURT:  Any redirect?

10   REDIRECT EXAMINATION BY MR. HALPERN:

11   Q.    You explained this, but I want to give you an opportunity

12   to explain it again.  The bottle is a stationary object?

13   A.    Correct.

14   Q.    And because it's a stationary object, you can actually do

15   a measurement of the angle?

16   A.    Right.

17   Q.    But a woman's head is not a stationary object?

18   A.    That's correct.

19             MR. MacKINLAY:  Objection at this point, your Honor.

20             THE COURT:  Basis?

21             MR. MacKINLAY:  He's leading, your Honor.  I think the

22   witness can testify on his own.

23             THE COURT:  Well, he is leading him.  All right, ask

24   in a non-leading form.

25   Q.    Can you just explain a little more slowly why the angle of

1    the entry wound in Ms. Gomez's head is completely irrelevant.

2    A.   Because it is a mobile object, not only mobile but very

3    mobile.  I can look at you with my head like this.  I can also

4    look at you with my head like this at a different angle.  I can

5    also look at you like this.  Those are all possible angles that

6    the, for lack of a better term, object was at the time of the

7    shooting.  So although there is a distinct, probably, bullet

8    track in the victim, an entry/exit wound and an angle, we don't

9    know at which angle the object was at when that angle was

10   created.

11   Q.   Now, Mr. MacKinlay has talked to you at some length about,

12   well, the shooter may have been closer, right, to the building

13   on the left?

14   A.   He did make that --

15   Q.   Okay, so let's suppose he's right, okay?

16   A.   Okay.

17   Q.   And the shooter, instead of being here, is over here or

18   over here.  What does that do to the angle that's necessary to

19   get it up to the window where Ms. Gomez is?  Would it increase

20   the angle?

21   A.   Yes.  It would increase the angle dramatically.

22   Q.   Yes.  So if he's closer to the crosswalk, can you explain,

23   like, does that mean he shot it lower, or does it mean he shot

24   it higher?

25   A.   He would have had to have shot it higher.

```
1    Q.   And it would mean that he shot it even further over the

2    heads of whoever was standing between him --

3              MR. MacKINLAY:  Objection.

4              THE COURT:  It is leading.

5    Q.   What would it mean with respect to how high the bullet was

6    over the heads of the people who were between him and the

7    building?

8    A.   The closer a person would be to the intended target, if

9    you're shooting upwards at a high target such as the window,

10   you would have to fire higher.  So instead of, say, pointing

11   straight ahead of you, the closer you got, the more angle you

12   would have to have.

13   Q.   The closer he is to this building, the higher the bullet

14   is going to have to go over the heads of anybody between him

15   and the building.

16             MR. MacKINLAY:  Objection, your Honor.

17             THE COURT:  I think we covered that, yes.

18             MR. HALPERN:  Thank you.

19             THE COURT:  Recross?

20             MR. MacKINLAY:  I do have a few questions, your Honor,

21   based on those questions.  May I have that exhibit, please.

22   RECROSS-EXAMINATION BY MR. MacKINLAY:

23   Q.   If the shooter is standing right there 3 feet away from

24   the intended victim, off the slope of the road, what would the

25   trajectory be at that point, sir?
```

1   A.   I would have to sit down and do an analysis of that.  I

2   can't do that off the top of my head, but I can say that the

3   angle would be much, much greater, possibly 15 degrees or more.

4   Q.   You're relying on the slope of the street, but if the

5   street is not sloped downward, would it affect the trajectory

6   on the other end?

7   A.   No.  The street has no effect on the trajectory of the

8   projectile.

9        MR. HALPERN:  I have nothing else.

10        THE COURT:  All right, thank you.  You may step down.

11        (Witness excused.)

12        THE COURT:  Anything else?

13        MR. HALPERN:  I have a document that I'd like to

14   offer, though I'm not quite sure what number we're up to.

15   These are account records of Mr. Aguirre from Norfolk MCI.

16        THE COURT:  Any objection?

17        MR. MacKINLAY:  No, your Honor.

18        THE COURT:  All right, they're admitted, 291.

19        (Exhibit 291 received in evidence.)

20   SIDEBAR CONFERENCE:

21        MR. HALPERN:  I don't have any witnesses.  There was a

22   stipulation that I was working on.  Do you have it?

23        MR. MacKINLAY:  I don't have it, but we have an

24   agreement on the stipulation, the language --

25        THE COURT:  Why don't I tell the jury the evidence is

1  closed other than we may have a stipulation, which is a factual

2  agreement.

3        MR. MacKINLAY:  Yes, your Honor.

4        THE COURT:  Okay.  And subject to that, do you want to

5  renew your motion?

6        MR. HALPERN:  Yes, I do.

7        THE COURT:  Okay, that motion is denied.

8        All right, I'm going to send them home and tell them

9  that we'll reconvene at 10:00 a.m. on Monday, which hopefully

10  that's enough time to do what we need to do between now and

11  then.

12        MR. MacKINLAY:  Yes, your Honor, and we're back at

13  2:00 o'clock?

14        THE COURT:  I've got a sentencing.  Let me look at the

15  calendar.

16        (End of sidebar conference.)

17        THE COURT:  All right, ladies and gentlemen, the

18  evidence is now closed with one exception, that the parties

19  apparently are talking about a stipulation, which is an

20  agreement as to certain facts or factual matters, and we may

21  have that to be added to the record, but other than that, the

22  evidence is closed.

23        What we're going to do is break for the day.  We're

24  going to come back -- what I'm going to ask you to do on Monday

25  is to come at 10:00 because the good news is, we're way ahead

1    of where we expected to be.  If you remember, we were talking

2    about going well into December when I impaneled you.  But we

3    have some work to do, and I want to make sure this afternoon

4    and Monday morning we get it done before you get the case.  I'm

5    going to ask you to come at 10:00, at which point, if there's a

6    stipulation, that will be offered, and then you'll hear closing

7    arguments of counsel and my instructions.

8         You should be prepared on Monday to be here all day,

9    by which I mean until five o'clock.  I don't know how long the

10   argument and instruction piece of this is going to be, but it's

11   not going to take the whole day, and so you should be prepared

12   to begin your deliberations.  You don't need to worry about

13   bringing lunch.  We'll provide that for you.  And I'll tell you

14   this again, but once you get the case, you are under no

15   obligation to decide it in any particular time frame.  You can

16   take as much time or as little time as you need, but we'll talk

17   about that again on Monday.

18        So thank you for your patience through all of our

19   technical issues this morning, and remember all of my cautions,

20   particularly not to discuss the case among yourselves or with

21   anyone else, or to read or listen or look at anything in the

22   media or on the Internet about this case or anything having to

23   do with it, and I'll see you Monday morning at ten o'clock.

24        THE CLERK:  All rise.

25        (Jury excused.)

1          THE COURT:  All right, I have a motion hearing at 2:00

2     and a sentencing at 3:30.  It's a (c)(1)(C) plea.  The

3     sentencing is not going to be very long.  I think what probably

4     makes sense is for us to try to convene at 2:45, get done what

5     we can get done between 2:45 and 3:30 and then break.  There

6     may be an issue with the van in terms of getting the defendant

7     back.

8          MR. HALPERN:  He's agreed.

9          THE COURT:  Oh, he has agreed to waive his presence at

10    the charge conference?  Okay, this will be the charge

11    conference obviously.  Okay, so he can be taken back?  All

12    right.  And then we are not going to, I think, agree on

13    every -- or at least I won't have ironed out every detail in

14    the charge by this afternoon, and we'll talk about where we go

15    from there, but probably I'll want to convene on Monday morning

16    early to go over whatever has been accomplished over the

17    weekend.  But, again, by the time of your argument, you will

18    have a final written version of the instructions that you can

19    use and refer to, okay?

20          Anything else that we should talk about before 2:45?

21          MR. MacKINLAY:  No, your Honor.

22          MR. HALPERN:  No.

23          THE COURT:  Okay, thank you.

24          THE CLERK:  All rise.

25          (Adjourned, 12:49 p.m.)

1              C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript,

8    Pages 1 through 96 inclusive, was recorded by me

9    stenographically at the time and place aforesaid in Criminal

10   Action No. 15-10338-FDS, UNITED STATES vs. RAFAEL

11   LEONER-AGUIRRE and thereafter by me reduced to typewriting and

12   is a true and accurate record of the proceedings.

13             Dated this 17th day of November, 2017.

14

15

16

17

18                       s/s Lee A. Marzilli

19                       _____

20                       LEE A. MARZILLI

21                       OFFICIAL COURT REPORTER

22

23

24

25