IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA

                                       CRIM. NO. 15-10338-FDS

    v.

RAFAEL LEONER-AGUIRRE

_____

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Rafael Leoner-Aguirre respectfully submits this memorandum to assist the Court in sentencing.  To determine the appropriate sentence in a particular case, "the sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the sentencing factors, 18 U.S.C. § 3553(a)."  *Nelson v. United States*, 555 U.S. 350, 351 (2009).  The defendant urges the Court to impose a sentence of 132 months imprisonment, concurrent with the 7 months remaining on his state sentence, as "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  *United States v. Kimbrough*, 552 U.S. 85 (2007); *United States v. Booker*, 543 U.S. 220 (2005).

**I.      A Beyond a Reasonable Doubt Standard Should be Applied.**

In *United States v. Carrozza*, 4 F.3d 70 (1st Cir. 1993), the Court held that § 1B1.2(d) does not apply to a RICO conspiracy charge, finding that a preponderance standard applies to assess predicate acts establishing a RICO conspiracy offense level.  The argument advanced here is different.  The Court's use of a general verdict makes it impossible to know which predicate offenses were the basis of the verdict.  The defendant believes that if the Court had asked a special question, the jury would have declared that

there was insufficient evidence to support a guilty finding on any attempted murder. Without a special question, the jury may not have even discussed these allegations.  A juror may have quickly asked, "Do we agree that he's guilty of at least two robberies?"  If there was unanimity, the jurors could have concluded that their job was done, and that there was no need to evaluate any other offenses.  The verdict did not specify which offenses were the objects of the conspiracy and "was necessarily ambiguous as to which predicate acts supported the guilty verdicts on the conspiracy count."  *See United States v. Nguyen*, 255 F.3d 1335, 1342 (11th Cir. 2001).  The Court is "therefore required to determine the predicate acts underlying [the] defendant's conspiracy conviction using the reasonable doubt standard."  *Id.*; *accord United States v. Smith*, 267 F.3d 1154, 1162, (D.C. Cir 2001); *United States v. Farese*, 248 F.3d 1056, 1060-61 (11th Cir. 2001).  In *Smith*, the D.C. Circuit approved of *Nguyen* and *Farese*, not for the proposition that a reasonable doubt standard is required to evaluate relevant conduct in a RICO conspiracy, but for the more limited proposition that a reasonable doubt standard applies where the predicate offenses upon which a RICO conspiracy conviction was based were unspecified and indeterminable.

There is a significant difference between a preponderance standard and a reasonable doubt standard.  *Smith*, 267 F.3d at 1161.  The arguments advanced herein do not depend upon this difference.  Even applying a standard that requires "that the fact-finder believe that the existence of a fact is more probable than the non-existence of that fact," none of the alleged attempted murders should be used to determine Aguirre's offense level.  *See id.*

## II.     None of the Alleged Attempted Murders Should be Counted.

At trial, the government sought to establish that Aguirre was involved in three attempted murders.  As to each, there is insufficient evidence to establish a probability of

Aguirre's involvement in an attempted murder.

### A.   The April 6, 2014 Machete Incident

§ 2E1.1, Application Note 2 states: "[i]f the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used."

Provided at Attachment 1 are copies of model instructions for the crimes of assault with intent to murder and assault with intent to kill from the Massachusetts Superior Court Criminal Practice Jury Instructions (MCLE, Inc. 2nd ed. 2013) (hereafter "Instructions").

Under Massachusetts law, the crime of murder may be based on any of three prongs of malice.  First prong malice requires a specific, subjective intent to kill.  Second prong malice requires a specific, subjective intent to cause grievous bodily harm.  Third prong malice requires the commission of an act that creates a plain and strong likelihood that death would follow.  *Commonwealth v. Gaboriault*, 439 Mass 84, 92 (2003); Justice John M. Greaney (Ret.) & James F. Comerford, *The Law of Homicide in Massachusetts* 17-23 (2009).  In contrast, the crime of assault with intent to murder must be based on first prong malice.  Finding that Aguirre intended to cause grievous injury is insufficient.  Finding that he did an act that created a plain likelihood of death is insufficient.  Callous disregard or gross recklessness is insufficient.  The crime requires actual, subjective intent to kill.  But subjective intent to kill is not enough.  Assault with intent to murder is only proven if there is "an absence of justification, excuse or mitigation." Instructions § 3.12.2.

"Mitigation is used to describe situations where the assault with intent to kill is unlawful, but the intention to kill arises from the 'frailty of human nature, as in instances of sudden passion induced by reasonable provocation, sudden combat or excessive force in

self defense.'" Instructions § 3.12.2 (*citing Commonwealth v. Nardone*, 406 Mass. 123, 130-31 (1989)).

The presence of mitigation results in the criminal intent required for conviction of assault with intent to kill being identical to the intent required for conviction of voluntary manslaughter. *Nardone*, 406 Mass. at 131 (*citing Commonwealth v. Henson*, 394 Mass. 584, 591 (1985)). "The crime of assault with intent to murder and the lesser included offense of assault with intent to kill contain the same difference that separates murder in the first and second degrees (where a specific intent to kill is required) from voluntary manslaughter – the existence of mitigating circumstances." *Commonwealth v. Velazquez*, 61 Mass.App.Ct. 667, 674 (2004). "In fact, assault with intent to kill has been referred to in the decisional law as an assault with intent to commit manslaughter." *Id.* (*citing Commonwealth v. Cowie*, 28 Mass.App.Ct.742, 745 (1990) ("…assault with intent to kill is an assault with intent to commit manslaughter.")); *accord Commonwealth v. Hebert*, 373 Mass. 535, 539 (1977) ("… we do not think that recognition of a crime of attempted voluntary manslaughter would serve any useful purpose. We have been unable to hypothesize a case which might constitute attempted voluntary manslaughter which would not also constitute assault with intent to kill.").

Attempted manslaughter is covered under § 2A2.2, the guideline for aggravated assault: "This guideline also covers attempted manslaughter and assault with intent to commit manslaughter." § 2A2.2 Commentary, Background. Assault with intent to kill/attempted manslaughter is not covered under RICO's definition of "racketeering activity." The only crimes that may be used to calculate Aguirre's guideline are those listed in RICO's definition of "racketeering activity" at 18 U.S.C. § 1961(1). *United States*

*v. Hurley*, 374 F.3d 38, 39 (1st Cir. 2004) ("… the term 'underlying racketeering activity' in

§ 2E1.1(a)(2) means simply any act … that qualifies as a RICO predicate act under 18

U.S.C. § 1961(1) and is otherwise relevant conduct under § 1B1.3."); *Carrozza*, 4 F.3d at

77.  The inclusion of crimes that fit under § 1B1.3's definition of relevant conduct, but do

not constitute racketeering activity under § 1961(1), would render the "underlying

racketeering activity" limitation at § 2E1.1(a)(2) meaningless, since the calculation of a

combined offense level would then involve any relevant conduct, regardless of whether it

was a racketeering activity.  18 U.S.C. § 1961(1) does not include manslaughter as a

racketeering activity.  The evidence concerning the April 6th machete assault establishes an

assault with intent to kill, not an assault with intent to murder.

At trial, the government presented two witnesses to the April 6th incident – the

victim, Cristian Carillo, and Aguirre's former girlfriend, CW-15.  CW-15 testified that she

was walking through a park with Aguirre, on their way to get lunch.  Day 4, p. 48.  She did

not go out for walks with Aguirre with the expectation of his getting into fights with 18th

Street members.  *Id*.  Aguirre and Carillo pulled out weapons at the same time and began

fighting. Day 4, p. 14.  After Carillo was struck in the head and sitting helplessly on the

ground, Aguirre walked away.  Day 4, p. 53.

Carillo testified that Aguirre started the fight, and that he pulled out a boxcutter to

defend himself.  There were a number of credibility issues with Carillo's testimony that

warrant crediting CW-12's version of events over his.  Carillo testified that he was carrying

a boxcutter because he was coming from his job at McDonald's, where he often opened

boxes.  Day 9, p. 40.  McDonald's surely supplies boxcutters to their employees as needed,

and does not want employees going home with them.  Carillo denied being affiliated with

18th Street, though he was wearing red Nike Cortez sneakers.  Day 9, p. 40, 48.  Law enforcement witnesses made it plain that any young man from El Salvador living in Chelsea would have known which gang wore red Cortez and which gang wore blue. Carillo testified that he didn't know that red Cortez had any gang connection because "it wasn't explained to me when I went to buy the shoes at the store."  Day 9, p. 48.  Law enforcement witnesses testified that the man Carillo was walking with, Kevin Morales, was a known 18th Street member.  When Mr. MacKinlay asked Carillo whether Morales was associated with 18th Street, Carillo responded, "I can't tell you exactly because I only knew him." Day 9, p. 40.  Mr. MacKinlay pressed the point, asking whether Carillo had seen Morales hanging out with 18th Street members.  Catching the hint, Carillo said, "Yeah, I realized that, but I wasn't involved in any of that." *Id.*

CW-15's description of the fight, in which Carillo and Aguirre pulled out weapons simultaneously, supports a finding of mitigation.  But mitigation comes into play only if there is a finding that Aguirre intended to kill Carillo.  The testimony of both Carillo and CW-15 was not consistent with intent to kill.  Carillo testified that after he was hit in the head with the machete, he dropped his boxcutter and fell to the ground. Day 9, p. 44-45. CW-15 testified that when Carillo was helpless on the ground, Aguirre walked away. Day 4, p. 53.

If Aguirre intended to kill Carillo, he could have.  He did not attempt to slash Carillo's neck.  He did not strike Carillo after Carillo went to the ground.  Carillo's head wound was treated with sutures in the MGH emergency room.  He suffered no intracranial injury, was not admitted to the hospital, and had no follow-up care other than removal of

the sutures.  MGH ER Record, Ex. 117.[1]  Whether the evidence may support a finding of

second or third prong malice is of no consequence.  It does not support a finding that

Aguirre intended to kill Carillo, no matter what standard of proof is applied.  When he

easily could have killed Carillo, he didn't.

### B.  The April 16, 2014 Shooting

The April 16, 2014 shooting of Javier Servellon should be found to be an assault

with intent to kill, not intent to murder, and should not be considered in the offense level

calculation.  There is strong evidence of mitigation and a lack of specific intent to kill.

Aguirre had two easy opportunities to kill.  The incident began when Aguirre and

Blanquito (CW-12) walked past Servellon and Amilcar Portillo, and then turned around,

followed them briefly, and began fighting.  Video shows Aguirre within several feet of

Servellon and Portillo after he began following them.  If he'd wanted to kill someone, he

could have shot either of them in the back of the head.  Instead, he started a fistfight.

Aguirre did not shoot at Servellon until after Servellon hit him with a chain.

---

[1] Asserting that the injury was life threatening, the government points to testimony of CW-2, that Aguirre told him that after being struck in the head, "the guy started screaming for help, that he was going to die…" Day 6, p. 42.  This testimony does not establish a life threatening injury for a couple of reasons.  First, the evidence strongly suggests that this supposed conversation with Aguirre never happened.  CW-2 testified that he just happened to be going to see Aguirre at his home at the very same time that Aguirre and CW-15 were returning home following this incident.  Day 6, p. 41-42; Day 7, p. 45.  CW-2 admitted that his status was "at the bottom" of the group. Day 7, p. 43-44.  The incident happened less than two weeks after Aguirre's arrival in Chelsea, and there was no testimony suggesting that CW-2 had a relationship with Aguirre that would explain his just showing up at his home in the middle of a Sunday afternoon.  At trial, CW-2 testified that he went to Aguirre's home with Bravo/Angel Pineda, but he'd previously testified at the grand jury that the only people present were Aguirre and CW-15.  Day 7, p. 45.  Testifying about the same incident, CW-15 described going back to the apartment and talking to Aguirre, with no mention of CW-2 being there.  Day 4, p. 16-17.  And even if the Court disregarded all of this evidence and credited CW-2's testimony, Cristian Carillo's screaming about dying doesn't change the fact that his head wound involved no intracranial injury and was treated with stitches.

Servellon testified that after he ran back to help Portillo, with his "necklace" in his hand, Aguirre "pulled out a weapon, and I never thought that he had a weapon or anything like that." Day 7, p. 103.  He did not hear a gunshot before running back to help Portillo. Servellon was shot in the buttocks.  He testified that after he was shot and standing helpless in the street, Aguirre could have easily killed him if he'd wanted to. Day 6, p. 116.  As with the April 6th machete assault, Aguirre turned away.

A Suffolk County jury acquitted Aguirre of the attempted murder of Servellon and, based on evidence of mitigation, or lack of specific intent, or both, found him guilty of assault with intent to kill, the equivalent of attempted manslaughter.  This Court may decide to apply a lower standard of proof than the Suffolk jury, but the result should be no different.  The evidence supports a finding that Aguirre shot Portillo because Portillo hit him with a chain.  CW-2, who joined in the fight, testified that, "the rival hit him with a chain and took off running, so Tremendo became angry and fired at him." Day 6, p. 65.  By either standard, the evidence supports a finding that the shooting occurred as an instance of sudden passion induced by reasonable provocation and/or sudden combat.

The evidence may support a finding of second or third prong malice.  It's not enough.  If Aguirre had intended to kill Portillo, he'd be dead.  Absent that specific intent, the shooting cannot be counted to calculate Aguirre's offense level.

### C.  The Attempted Murder of CW-2

There is not a preponderance of evidence establishing Aguirre's involvement in the plot to kill CW-2.  Not only is the evidence insufficient to establish personal involvement, it is insufficient to establish that the plot was within the scope of Aguirre's jointly

undertaken criminal activity, in furtherance of that activity, or reasonably foreseeable in connection with the crimes he agreed to participate in. *See* § 1B1.3(a)(1)(B).

The only trial evidence of Aguirre's involvement with the plan to kill CW-2 came from totem pole hearsay statements of Daniel Menjivar. At the time Menjivar made these statements, he was involved in a ruse, trying to protect CW-2 and simultaneously hiding this from other gang members. CW-2 testified that Menjivar was the first person to tell him about a plan to kill him. Menjivar told him that Crazy/Noe Salvador Perez Vasquez, the leader of the Everett Loco Salvatrucha, had initiated the plan because he believed that CW-2 had provided law enforcement with information about his brother, Little Crazy/Jose Vasquez. Day 6, p. 79. When he first testified about this, CW-2 said nothing about Menjivar telling him that Aguirre was involved. Instead, he testified generally about the way things worked, asserting that Crazy would have sought permission from Aguirre. Day 6, p. 79. Only after the government pressed for more, did CW-2 add that Menjivar told him that Aguirre had greenlighted the plan. Day 6, p. 80.

In a recorded car conversation on April 21, 2015, Menjivar told CW-1 that Aguirre received a letter from El Salvador with instructions to kill CW-2. Ex. 49, p. 3. There was no evidence explaining how Menjivar knew about this letter. There was no evidence of Menjivar, or any gang member, communicating with Aguirre after his arrest. There was no evidence of such a letter, and the likelihood of Aguirre receiving a letter from El Salvador while he was in prison with instructions on murdering someone seems remote. MCI Norfolk would have closely scrutinized any letter sent from El Salvador. Menjivar also told CW-1 that Aguirre spoke to Violento about the plan. Ex. 49, p. 3. How that happened while Aguirre was in prison was left unexplained. Menjivar did not testify. There was no

evidence presented regarding how Menjivar came to believe, (assuming he actually told CW-2 that Aguirre greenlighted him), that Aguirre was involved.

The evidence at trial established that Menjivar was involved in a charade.  The government maintains that Menjivar was trying to trick CW-2, telling him about the murder plan in order to gain his trust and lure him out of hiding.  This theory was first advanced after the government produced the 302 from an April 12, 2015 interview with CW-2, without redacting Menjivar's street name, disclosing that Menjivar had warned CW-2.  The government's claim makes no sense.  The reason that Menjivar went into hiding to begin with was because Menjivar told him there was a plan to kill him:

> Q.    So as a result of what Roca told you, you kind of went into hiding?
> A.    It's possible.  I stayed away.  I wanted to find out if it was true.

Day 7, p. 62

CW-2 testified that Menjivar warned him so that he'd leave town. Day 7, p. 63.

In a recorded conversation on April 19, 2015, Barillas and Violento are driving with CW-1, looking for CW-2.  Barillas complains that it's impossible to find CW-2: "… the son of a bitch, dude, doesn't go out, that's the problem." Ex.44, p. 1.  This was before CW-2 was warned by agents or by CW-1 about the murder plan.  Barillas is unaware that the reason CW-2 can't be found is that Menjivar told him about the plot.  CW-2 testified that after Menjivar warned him, he was warned again by CW-1/Pelon, that this led him to call police, and that he then came to the federal court and met with agents and prosecutors – all on April 21st.  Day 6, p. 81-82.  It was Menjivar that prompted CW-2 to go into hiding, not CW-1 or law enforcement.  In various sentencing memoranda submitted by the government concerning defendants involved in the plot, the government asserts that but for law enforcement's efforts to extract CW-2 from his home, he would have been killed.  Perhaps.

But the reason that CW-2 was hiding in his home was that Menjivar warned him of the plot. Menjivar then pretended to be involved in the plot to conceal the fact that he was the reason that CW-2 was hiding. This is evidenced by another statement of Menjivar on April 21st, in a recorded conversation with CW-1 and Barillas. Menjivar says that CW-2 is in hiding because a cop warned him that there was a plan to kill him. Ex. 49, p. 3. Menjivar says nothing about his telling CW-2 about the plan. Under the government's theory, Menjivar would have had no reason to hide this, since it was part of a gang scheme to get CW-2 to trust him. Moreover, CW-2 would not have told Menjivar that the police had warned him at that time because agents didn't warn CW-2 until April 21st, the very same day as the car recording, when Menjivar, CW-1 and Barillas can't find CW-2. It makes no sense that Menjivar would warn CW-2 of a plan to kill him, which prompted CW-2 to go into hiding, and then conceal this from CW-1 and Barillas, if his intention was to murder him in league with CW-1 and Barillas. Either way, Menjivar was lying to someone, and his statements concerning Aguirre occurred in the context of these lies.

CW-2 did not testify at Aguirre's state trial in August 2015. He did not testify at the state grand jury. CW-12/Blanquito did. So, unlike the situation with CW-2, there was no doubt about whether CW-12 was cooperating. Yet, there is no evidence that Aguirre did anything to further a plot to kill CW-12.

Aside from the uncorroborated hearsay statements of Menjivar concerning CW-2, the government presented no evidence of Aguirre doing anything related to MS-13 after his arrest. There was no evidence of Aguirre having any contact with anyone from MS-13. No letters. No visits. No calls. Undercutting testimony of government witnesses that it was routine for clique leaders to remain in charge after incarceration, and for them to

receive canteen money from the clique, Aguirre offered into evidence a record of canteen payments at MCI Norfolk since December 2015, Ex. 291.  It showed next to nothing being deposited by anyone, and nothing to suggest that he was receiving support from the clique.

Pursuant to § 1B1.3, in order for the Court to consider any specific racketeering activity in the calculation of offense level, the Court must find that Aguirre was personally involved in the commission of the crime, or, if undertaken as part of a joint enterprise, that the offense was within the scope of the jointly undertaken activity, was in furtherance of the activity, and was reasonably foreseeable.  There is insufficient evidence to establish a probability of Aguirre's involvement with the Enfermos at the time the plan to kill CW-2 was developed, a year after Aguirre's arrest.  CW-2 was targeted because Crazy, the leader of the largest Boston clique, believed that CW-2 was cooperating against his brother. There is no evidence of Aguirre entering into any jointly undertaken activity with Crazy. Crazy's initiation of a plan to kill CW-2 was not in furtherance of any joint activity with Aguirre.  And Aguirre could not have reasonably foreseen that Crazy would suspect that CW-2 cooperated against his brother and would plot to kill him.

### III.    The Offense Level Should be Based Upon Multiple Robberies.

The elimination of the alleged attempted murders from the offense level calculation results in an armed robbery becoming the racketeering activity with the highest offense level.  Under Probation's calculations, robberies fall out of the § 3D1.4 calculation.  A proper calculation should include four robberies established by trial evidence.

CW-2 testified that Menjivar told him that he, Aguirre and Bravo robbed a food delivery person.  Day 6, p. 35.  (Group 1 in the chart below).  There was no testimony regarding a weapon.  This is an issue where the difference in standard of proof likely does

change the outcome.  Under a preponderance standard, the defendant would concede that

evidence at trial was sufficient to establish that it was likely that one or more of the

participants in this robbery had a weapon, even though there was no evidence of a weapon

being used or possessed at the time of this robbery.  Under a reasonable doubt standard, the

lack of any evidence of a weapon being used swings the balance in favor of the defendant.

In addition to Aguirre, two others were involved.  A 2 level enhancement pursuant to §

3B1.1(c) is warranted if a separate role adjustment is applied to each predicate racketeering

offense.  If a reasonable doubt standard is applied, and there is no weapon enhancement,

the adjusted offense level is 22.  If a preponderance standard is applied, the addition of a 3

level weapon enhancement results in an adjusted offense level of 25.  The difference is of

no consequence in a § 3D1.4 combined offense level calculation.

CW-15 testified regarding several robberies that occurred one night.  She was

present in a car, but had no role.  Day 4, p. 18.  The only other person involved was

Blanquito/CW-12, who drove the car.  The first robbery CW-15 described involved taking

a chain from a man in Chelsea. (Group 2).  CW-15 testified that Aguirre had a machete in

his possession.  A 3 level enhancement for a weapon is warranted.  A 2 level enhancement

pursuant to § 3B1.1(c) is warranted.  The adjusted offense level should be 25.

CW-15 described a robbery in Revere in which Aguirre took a backpack. (Group 3).

A 3 level enhancement for a weapon is warranted.  A 2 level enhancement pursuant to §

3B1.1(c) is warranted.  CW-15 testified that Aguirre told her that the victim was injured,

warranting a 2 level increase.  The adjusted offense level should be 27.

CW-15 described an attempted robbery, in which Aguirre struck the victim with the flat part of a machete. (Group 4). The battery warrants a 4 level increase. A 2 level increase pursuant to § 3B1.1(c) is warranted. The adjusted offense level should be 26.

Using the robbery offenses detailed above in a § 3D1.4 combined offense level calculation results in a 4 level increase, and a combined adjusted offense level of 31:

| Group | Adjusted Offense Level | Units |
|-------|------------------------|-------|
| #1 | 22 or 25 | ½ or 1 |
| #2 | 25 | 1 |
| #3 | 27 | 1 |
| #4 | 26 | 1 |
| Total Number of Units: | | 3 ½ or 4 |

This yields a guideline range of 108 – 135 months.

In sentencing memoranda submitted concerning other defendants in this case, and in its objections to the draft PSR, the government argues that a leadership role adjustment should be made on the basis of the defendant's overall role in the RICO enterprise. There is logic to this, rather than calculating multiple role adjustments for each predicate offense based on the number of participants that happen to be involved in that particular offense. *See United States v. Ivezaj*, 568 F.3d 88, 99 (2d Cir. 2008) ("… a defendant who served as a leader or manager of an extensive RICO enterprise should not be able to avoid a role enhancement simply because certain predicate acts involved fewer than five participants …"). The counter argument is that it is more appropriate to calculate the offense level based on the actual criminal offenses that occurred, and the defendant's role in those offenses, rather than the defendant's status as a leader, where that status did not result in

the commission of racketeering offenses involving five or more participants.  But at whatever stage in the offense level calculation a role adjustment is applied, the adjustment may not be calculated twice.  It may not be used to calculate the offense level for each predicate offense, and then added again to the § 3D1.4 result.

Relying upon *Ivezaj*, the government has argued that a role enhancement based on the defendant's overall role in the enterprise should be added to each predicate offense involved in the § 3D1.4 calculation.  The argument misreads *Ivezaj*.  In *Ivezaj*, the Second Circuit held that the calculation of an offense level pursuant to § 2E1.1, (and by implication, the application of § 3D1.4 to calculate an offense level under § 2E1.1 where multiple predicate racketeering activities are involved), is only a determination of a base offense level, not an adjusted level that takes a role adjustment into account.  *Id*.  *Ivezaj* holds that a role adjustment should not be applied at all in a § 3D1.4 calculation, which determines only the base offense level under § 2E1.1.  Instead, the role adjustment, based on the defendant's overall role, is to be applied once, to the product of the § 3D1.4 calculation. *Id*. ("… the requirement [of § 2E1.1] to look at each individual act in a RICO offense is only for the purpose of establishing the base offense level, not for applying the Chapter Three adjustments.").  In this case, such a calculation would yield the following:

| Group | Adjusted Offense Level | Units |
|-------|-----------------------|-------|
| #1 | 20 or 23 | ½ or 1 |
| #2 | 23 | 1 |
| #3 | 25 | 1 |
| #4 | 24 | 1 |
| Total Number of Units: | | 3 ½ or 4 |

This results in a § 3D1.4 base offense level of 29.  *Ivezaj* provides that an enhancement based on the defendant's overall role should be applied to this cumulative base offense level.[2]  A 4 level increase pursuant to § 3B1.1 results in an adjusted offense level of 33, and a guideline range of 135 – 168.  The difference in ranges that results from the manner in which a role adjustment is applied, 108 – 135 months vs. 135 – 168 months, does not impact the defendant's position on what constitutes a "sufficient" sentence.

## IV.    Aguirre Should Receive Credit for Time Served Since April 16, 2014, and his Sentence Should Run Concurrent with the Time Remaining on his State Sentence.

Aguirre has been incarcerated since April 16, 2014 on state charges and convictions stemming from the shooting that day.  In August 2015, he was sentenced to 4-5 years for his conviction on assault with intent to kill.  His scheduled wrap date is November 7, 2018.

Aguirre contends that the April 16th aggravated assault should not be used to calculate his offense level.  If the Court disagrees, then it is clear § 5G1.3(b) applies, and the sentence for the instant offense "shall" be adjusted for the period of time that Aguirre has served since April 16, 2014, and "shall" be imposed to run concurrent with the remainder of his current state sentence.

If the Court agrees with the defendant, and does not use the April 16th shooting to calculate the offense level, then the issue of whether § 5G1.3 applies is somewhat less certain.  Should a defendant receive credit for time served on a term of imprisonment from

---

[2] In this case, the government's misapplication of *Ivezaj* does not change the calculation.  The adjusted offense level is 33, whether the 4 level § 3B1.1 increase is added to each predicate robbery offense, or whether it is added to the § 3D1.4 combined base offense level.  In other cases, the error would matter.  For example, a role increase, if added to a predicate offense with an offense level otherwise under 19, could change a § 2E1.1 calculation from subparagraph (a)(1) to (a)(2), and cause the offense to be within 8 levels of the group with the highest offense level in a § 3D1.4 combined offense level calculation.

another offense that is relevant conduct, even if his offense level is not impacted?  The defendant maintains that § 5G1.3(b) still applies, and a credit should be provided.

The reason that the April 16th shooting should not be used to calculate Aguirre's offense level is not because it does not constitute relevant conduct under § 1B1.3.  Rather, it is because § 2E1.1 demands that only certain relevant conduct -- that which constitutes "racketeering activity" -- may be used to determine offense level.  The April 16th shooting fits the definition of relevant conduct, whether it is considered an attempted murder or an aggravated assault/attempted manslaughter.  What changes is whether the offense constitutes a racketeering activity.

§ 5G1.3(b) states that a sentence adjustment should apply in any case where "a term of imprisonment resulted from another offense that is relevant conduct to the instant offense …"  It does not state that this adjustment is limited to cases where the offense level increases as a result of the relevant conduct.  There are many cases where relevant conduct has no impact on offense level.  In Probation's calculation, the single robbery offense used falls out of the combined offense level calculation because it is more than 8 levels below the highest offense level assigned to an attempted murder.  If Aguirre was serving a state sentence on this robbery, § 5G1.3(b) would apply, even though the use of this robbery as relevant conduct, under Probation's calculations, has no impact on offense level.

Relevant conduct that does not constitute racketeering activity could still be considered by a court in the consideration of 18 U.S.C. § 3553(a) factors.  While a sentence increase based on such consideration should not be a requirement for time-served credit, this further illustrates that the significance of relevant conduct, and credit for time-served relating to it, does not hinge on offense level impact.

The critical issue under § 5G1.3(b) is not whether the relevant conduct that underlies the undischarged sentence causes an increase in the guideline range, it is whether the conduct occurred during the commission of the offense of conviction, in preparation for that offense, in the course of avoiding detection, or was part of the same course of conduct or scheme as the offense of conviction.  *See* § 1B1.3.  If the defendant is serving time for a crime that is so related to the instant offense, then he gets credit for the time, regardless of whether that crime impacts his guideline for the instant offense.

The April 16th shooting was part of the instant offense, and that is the case whether it was an attempted murder or an aggravated assault.  Under § 5G1.3(b), that's all that matters.  Even if the Court agrees that the shooting should be treated as an aggravated assault and should not be used to calculate Aguirre's offense level, the sentence should be adjusted and reduced by 4 years for time served, and the sentence should run concurrent with the 7 months remaining on Aguirre's state sentence.

## V.    Personal Background

Among the factors that should be weighed in determining a just sentence is the extent to which a defendant's conduct was voluntary, and the extent to which his choices were shaped by circumstances.  Judges confront these issues day after day, trying to find the proper way to deal with crimes motivated by addiction and poverty.  But the ways in which teenagers in El Salvador are trapped into joining a gang are anomalous.

Aguirre's father was abusive and an alcoholic.  Still, he supported the family. When Aguirre was 7 years old, his father was murdered by 18th Street.  He left school a couple of years later, and went to work assisting a carpenter.  His mother died in 2011, when he was 16.  He attempted suicide.  He then joined MS-13 that same year.

Aguirre became a homeboy.  He encountered so many problems with 18th Street and police that a clique leader paid his way to the United States.  Not as a MS-13 missionary, not with a commitment to be a gang leader, but simply to get away.  CW-15 confirmed this.  She described living with Aguirre in Michigan for a year.  She did not meet other gang members, and did not talk about other members with Aguirre.  Day 3, p. 111.  She did not see him with MS-13 members and he did not try to recruit anyone.  Day 3, p. 115.  Aguirre disputes her testimony, and the government's contention, that he was sent to Chelsea to expand the clique.[3]  At trial, there was no evidence that the clique expanded; not merely during the weeks that Aguirre was in Chelsea, but during the following year.  He made the videos.  He knew that his friends from El Salvador who lived in Chelsea were MS-13.  He knew that when he came to Chelsea, he'd be with them.  CW-

---

[3] The only evidence the Court heard on this issue was from CW-2 and CW-15.  That doesn't mean the evidence satisfied a preponderance standard.  "[I]t is a 'misinterpretation [of the preponderance test] that it calls on the trier of fact merely to perform an abstract weighing of the evidence in order to determine which side has produced the greater quantum, without regard to its effect in convincing his mind of the truth of the proposition asserted.'" *United States v. Restrepo*, 946 F.2d 654, 661 (9th Cir. 1991) (quoting *In re Winship*, 397 U.S. 358, 367-68, 25 L. Ed 2d 368, 90 S. Ct. 1068 (1967)); *United States v. Patriarca*, 912 F.Supp. 596, 610 (D. Mass. 1995).  CW-2 had obvious reasons to tailor his testimony.  As did CW-15.  She testified that she had no fear of deportation. Day 4, p. 35-6.  On January 8, 2018, the Department of Homeland Security ended Temporary Protected Status for Salvadorans; approximately 200,000 Salvadorans face deportation by September 2019.  *See* Miriam Jordan, *Trump Administration Says that Nearly 200,000 Salvadorans Must Leave*, N.Y. Times, Jan. 8, 2018, https://www.nytimes.com/2018/01/08/us/salvadorans-tps-end.html.  Such immigration policy changes were central to Donald Trump's campaign, and were the subject of tremendous concern within Central American immigrant communities.  On November 6, 2017, the Trump Administration terminated Temporary Protected Status for Nicaraguans, triggering fears that similar changes were in store for immigrants from the other Latin American countries covered under this program – El Salvador, Haiti and Honduras.  *See* Ron Nixon, *About 2,500 Nicaraguans to Lose Special Permission to Live in U.S.*, N.Y. Times, Nov. 6, 2017, https://www.nytimes.com/2017/11/06/us/politics/immigrants-temporary-protected-status-central-americans-haitians.html.  CW-15's testimony that she had not feared deportation was not credible.  Like CW-2, she had strong reason to sing the government's tune.

15 initially testified that Aguirre came to Chelsea, "[b]ecause he had some friends here." Day 3, p. 111.  Only when pressed for additional reasons, did she follow the script, and talk about Aguirre's planning to enlarge the clique.  Day 3, p. 111-12.  She testified that upon Aguirre's arrival in Chelsea, he went to work for Hector Ramires's father, who ran a painting business. Day 4, p. 44.  This was the reason he came to Chelsea.  In Michigan, Aguirre hired an immigration lawyer to assist him in gaining citizenship.  He came to Chelsea to earn more money to pay his lawyer.

In Chelsea, he found himself in a small group of MS-13, vastly outnumbered by 18th Street.  CW-2 testified that there were about 100 members of 18th Street in Chelsea. Day 6, p. 91.  His friends were being targeted and beaten up.  Before he arrived in late March 2014, the group was involved in a series of back and forth stabbings with 18th Street. Aguirre assumed a leadership role, not as part of a global expansion scheme, but to help his friends.  He accepts responsibility for what he did.  But at the same time, what he did was exaggerated by the government and cooperating witnesses.  He did not orchestrate murders.

Aguirre was in Chelsea from March 24th to April 16th.  The government has created a narrative in which Aguirre transformed the clique during these weeks and is responsible for violence occurring a year and more later.  It's a story that is inconsistent with the evidence presented at trial, and with the most fundamental aspects of MS-13.  The gang is in a state of permanent hostility with 18th Street.  That is the most basic truth of MS-13.  No one involved in the Chelsea Enfermos needed Aguirre to explain this.  The teens that were part of the clique before Aguirre arrived were fighting with 18th Street all the time.  CW-2 explained what he hoped the strengthening of the clique would accomplish:

> Q.     So by expanding your turf, at that point the main thing you really wanted
>         was to be able to walk around Chelsea without getting beat up?

A.      Yes.

Day 7, p. 11.

Just as the Court should consider the reasons Salvadoran teens join MS-13 and 18th Street, the Court also should recognize the circumstances that impact the decision to go to trial.  Aguirre's opting for trial was not based on an expectation of acquittal, or a refusal to accept responsibility as a leader of the Chelsea clique.[4]  For a homeboy with family in El Salvador, a plea colloquy means something very different than it means for virtually anyone else who has appeared in this court over the years.  In every case, a defendant weighs the benefits of a plea against the alternative.  The counterweight here is sui generis.

## VI.     A Sufficient Sentence

Based on the racketeering activities properly attributable to Mr. Leoner-Aguirre, the Court should calculate a guideline range of 108 – 135 months.  Alternatively, if the Court concludes that a single overall role adjustment should be applied to a cumulative § 3D1.4 base offense level, the guideline range should be 135 – 168 months.  Either way, application of § 5G1.3(b) should result in a downward adjustment of 48 months, and the sentence should run concurrent with the 7 months remaining on Aguirre's state sentence.

The driving force behind the sentence should be the proven racketeering activities, not Aguirre's status in his clique.  However, Aguirre acknowledges that if the Court agrees with Probation's application of role adjustments to each specific predicate offense, rather than basing the adjustment on his overall role, a further upward adjustment is warranted.  If the violence that Aguirre was involved in does not impact his offense level because it did

---

[4] Aguirre does not deny striking Carillo with a machete on April 6, 2014, or shooting Portillo on April 16th.  He denies intending to murder either of them, and denies any involvement in a plot to kill CW-2.  Given that he was not charged with any substantive offenses, these issues would not have precluded a plea.

not constitute racketeering activity, this, too, would warrant a sentence more severe than a guideline based solely upon robberies.

In a number of sentencing memoranda concerning other MS-13 defendants, the government asserts "anything less" than its sentencing recommendation "would be insufficient to comply with the purposes of 18 U.S.C. § 3553(a)." The government did not learn anything new of significance concerning Aguirre in the several months prior to trial, or during trial. While CW-15 first spoke to prosecutors during this time, she did not reveal new information altering the understanding of Aguirre's conduct. The only new evidence that defense counsel learned of during this time was the YouTube videos. The government does not offer sentencing recommendations that it thinks are insufficient to comply with the purposes of § 3553(a). Those purposes do not change when the defendant opts for a trial. The government may withdraw an offer because it is required to deal with pretrial motions, or prepare for trial, or because witnesses must appear. In most cases, there may be legitimate reasons for the government's sentencing recommendation to increase if the defendant goes to trial, such as the conservation of judicial and prosecutorial resources, but compliance with § 3553(a) factors is not one of them. The sentence that the government was willing to recommend in September did not become insufficient to satisfy § 3553(a) in November. Aguirre's decision to go to trial does not justify a sentence recommendation that is 75% greater than what was previously thought sufficient. The government offered to seek approval for a plea to 16 years, with an adjustment for time-served on Aguirre's undischarged state sentence, concurrent with the balance on that sentence. This would have resulted in a sentence of approximately 11 ½ years beyond the completion of the state

sentence.  This is in contrast to the government now seeking a sentence of 20 years, with no adjustment for time-served, consecutive to the state sentence.  A difference of 8 ½ years.

"One of the fundamental principles of our jurisprudences is that a defendant cannot be punished for exercising a constitutional right and that vindictiveness is to play no role in the sentencing of defendants." *United States v. Mazzaferro*, 865. F.2d 450, 458 (1st Cir. 1989).  There is a point at which the disparity between a plea offer and a post-trial sentencing recommendation is too great to reflect legitimate factors, and instead must be recognized as a penalty on the defendant's reliance on his legal rights, which "is a due process violation of the most basic sort." *Id.* (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 2363 (1978)).  The difference between 11 ½ and 20 years is too severe to reflect judicial and prosecutorial economies.  Nor, particularly given the unique circumstances of this case, can this disparity be justified on the grounds of acceptance of responsibility.  The difference is too great to be understood as anything other than retaliatory.

Mr. Leoner-Aguirre respectfully requests that the Court find that a term of 15 years is sufficient and appropriate as a combined punishment for the instant offense and for the April 16th shooting that was part of this offense and which underlies the undischarged state sentence.  Accordingly, the defendant asks the Court to apply a downward adjustment of 48 months to a term of 180 months, and sentence him to 132 months, concurrent with the 7 months remaining on the state sentence.

Rafael Leoner-Aguirre
By his Attorney,

*Keith Halpern*
Keith Halpern
BBO # 545282
572 Washington Street, Suite 19
Wellesley, MA 02482

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 2, 2018.

/s/ *Keith Halpern*