## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**RAFAEL LEONER AGUIRRE** | **Criminal No. 15-10338-FDS** |

### SENTENCING MEMORANDUM OF THE UNITED STATES
### AND MOTION FOR UPWARD DEPARTURES OR VARIANCES

Rafael Leoner Aguirre a/k/a "Tremendo" bears more responsibility than any other individual for the reign of violence and mayhem unleashed by MS-13 in Chelsea in 2014-2015. The undisputed leader of the Enfermos Criminales Salvatrucha clique, Leoner Aguirre recruited high school students and other young adults into MS-13; he encouraged MS-13 members to kill, attack, and rob others; he stabbed, shot, and robbed people himself; and he organized a fledgling group of MS-13 hopefuls into a violent clique that continued his mission of violence in the year after his arrest.

If not for the fact that the statutory maximum limits Leoner Aguirre's Guideline Sentencing Range to 240 months, the government would be asking for an even higher sentence. Indeed, his Guideline Range would be *life in prison* if not for the statutory maximum, and there are no compelling mitigating factors to depart or vary downwards from the Guideline Range. As it stands, the Guideline Range is 240 months, and the factors outlined in 18 U.S.C. § 3553(a) strongly support the imposition of a Guideline sentence of ***240 months in custody***.

1

In the unlikely event that the Court arrives at a lower Guideline Sentencing Range, there are significant reasons to vary or depart upwards to achieve the appropriate sentence of ***240 months in custody*** to be followed by 3 years of supervised release.

## I.     THE GUIDELINE APPLICATION ISSUES

As always, the Court must begin with a calculation of the Guideline Sentencing Range.  In this case, Leoner Aguirre has raised a myriad of objections—all of which are unsupported by either the facts or the law.  The government addresses each category of objections in turn and provides support for why the Court should overrule or reject each objection.  The defendant's Guideline Sentencing Range is 240 months.

After addressing each of Leoner Aguirre's objections, the government raises its own objection to the manner in which Probation has applied—or declined to apply— a role enhancement for Leoner Aguirre.  Leoner Aguirre deserves a role enhancement for his attempted murders and other racketeering acts given his leadership role in the overall RICO conspiracy.  The defendant's Guideline Sentencing Range is 240 months even without the application of that enhancement to all his underlying racketeering activity, but as a matter of policy and precision, the government asks the Court to apply a four-level enhancement for role in the offense given the defendant's undisputed status as leader of the Enfermos clique.

### A.  Relevant Conduct is Determined by a Preponderance Standard.

The defendant's argument that "a beyond a reasonable doubt standard should be applied" to determine relevant conduct—*see* Defendant's Sentencing Memo., Dkt.

No. 2264 ("Def. Memo."), at pp. 1-2—must be rejected based on binding First Circuit authority. The defendant similarly advances this argument in multiple objections to the PSR, all of which should be similarly overruled. Defendant's core argument— that "the Court's use of a general verdict makes it impossible to know which predicate offenses were the basis of the verdict," Def. Memo. at 1—is irrelevant.

*First,* a sentencing court can use even uncharged or acquitted conduct to determine relevant conduct. *See, e.g.*, *United States v. Carrozza*, 4 F.3d 70, 80–81 (1st Cir. 1993) ("Relevant conduct increases a defendant's sentence, sometimes very significantly, despite the fact that it was not charged in an indictment and even despite the fact that a jury may have acquitted the defendant for that precise conduct.") (citations omitted); *United States v. Rumney,* 867 F.2d 714, 719 (1st Cir. 1989) ("[T]raditional sentencing factors need not be pleaded and proved at trial.").

*Second*, "sentencing factors, including the applicability of relevant conduct, need only be proven by a preponderance of the evidence, *not beyond a reasonable doubt.*" *Carrozza*, 4 F.3d at 81 (emphasis added). The First Circuit has rejected the exact objection raised by the defendant: "The fact that the government has not charged and proven beyond a reasonable doubt the conduct now asserted as relevant conduct does not prevent the increase in sentence resulting from the relevant conduct guideline. *We see no special reason to deviate from this principle when dealing with a RICO conviction.*" *Id.* (emphasis added).

### B. Leoner Aguirre is Responsible for Attempted Murders.

Probation correctly concludes in the PSR—and the evidence clearly establishes—that Leoner Aguirre is responsible for multiple attempted murders. *See* PSR at ¶¶ 35-40, 73-78 (summarizing Group 1: April 6, 2014 attempted murder involving machete attack); PSR at ¶¶ 41-47, 79-84 (summarizing Group 2: April 16, 2014 attempted murder involving shooting). Leoner Aguirre argues that "as to each, there is insufficient evidence to establish a probability of Aguirre's involvement in an attempted murder." Def. Memo. at pp. 2-3. Defendant's argument ignores the significant evidence elicited at trial.

### 1. The April 6, 2014 Machete Attack was an Attempted Murder.

As to the April 6, 2014 attempted murder—which the defendant argues should be considered an aggravated assault and thus *ignored* for Guideline purposes—Probation correctly concluded after reviewing the evidence that "the defendant's conduct on April 6, 2014 is properly considered an attempted murder (as opposed to an aggravated assault)." *See* PSR at pp. 48-49 (listing Defendant's Objections and Probation's Response). "The defendant approached the victim, and without much conversation, immediately started striking the victim with a machete. The victim sustained multiple cuts while trying to protect himself from the attack, and as the victim tried to retreat, Leoner Aguirre continued yelling at and striking the victim, and ultimately struck the victim in the head." *Id.* Especially under a preponderance standard, *see* Section I above, the evidence establishes that the act of attacking a gang

rival and striking him multiple times with a machete—including slashing the victim's skull with a machete—should qualify as an attempted murder.

This finding is especially warranted given the other evidence the Court heard about the goals and missions of MS-13 in general, and Leoner Aguirre in particular. *See, e.g.*, PSR at ¶ 30 ("Leoner Aguirre also told [the members of the Enfermos] that there were too many members of the 18th Street gang in Chelsea, and that they needed to attack and kill as many 18th Street members as possible."). Given that trying to kill 18th Street members is a central tenet of MS-13 and killing rivals was a standing order given by Leoner Agurre, the defendant's argument that there were mitigating circumstances because the victim was wearing rival gang colors and "any young man from El Salvador living in Chelsea would have known which gang wore red Cortez," Def. Memo. at 6, is especially unavailing. The victim denied being a rival gang member, but even if he had not, Leoner Aguirre believing—righty or wrongly— that the victim was a rival gang member or wearing rival colors is an added reason to believe that Leoner Aguirre had the intent to kill. After all, killing rival gang members was the primary objective of MS-13, the Enfermos, and Leoner Aguirre.

At trial, CW-15 unequivocally testified about Leoner Aguirre believing that the victim was a rival gang member and shared her basis for knowing that critical piece of information about Leoner Aguirre's knowledge and intent:

> Q:   What occurred that day, that evening when you were going to get something to eat with Tremendo?
>
> A:   Two guys were coming, and Tremendo recognized them as being from the 18s, and he started saying things to them.

Q:     Who recognized him as being with the 18th?

A:     Tremendo.

Q:     Did he—do you know how he knew him to be with 18th Street?

A:     Yes.

Q:     How do you know that Tremendo knew it was 18th Street?

A:     Because Cilindro had already shown him photos of them.

Nov. 9, 2017 Trial Tr. of CW-15 at p. 13; *see also* pp. 14-17 (describing the attack and how Leoner Aguirre went home to wash off the blood from the machete).

Further, the Court also heard evidence about Leoner Aguirre sharing his subjective intent and belief regarding the victim with CW-2:

Q:     Did Tremendo say what happened to the person when Tremendo hit him [the victim] in the head?

A:     Yes, he [Tremendo] said he hit him [the victim] on the head and the guy started screaming for help, that he [the victim] was going to die, and he [Tremendo] went home.

Nov. 11, 2017 Trial Tr. of CW-2 at p. 42. Leoner Aguirre shared these thoughts with CW-2 when CW-2 was at Leoner Aguirre's house soon after returning home following this attack. CW-2's testimony about Leoner Aguirre's statements and demeanor following this attack further support the inclusion of this attack as part of Leoner Aguirre's racketeering activity, because Leoner Aguirre told CW-2 that the victim had supposedly made a rival gang sign at the defendant:

Q:     How did Tremendo seem when he was telling you that story?

A:     He was like offended.

Q:     Did he say what he was offended about?

6

A:      Because the 18 had had the courage to make the 18 hand sign at him.

Q:      And did he tell you why that upset him?

A:      Because when a rival makes the signs of his gang, you get angry, and what you want to do is kill him.

Nov. 11, 2017 Trial Tr. of CW-2 at p. 43.

The government also highlights the size of the large machete in black sheath introduced at trial as Exhibit 17, and how CW-2 testified that the machete used by Leoner Aguirre was even "a little bit longer than that." *Id.* at p. 41.  Using that large machete to strike a suspected gang rival multiple times, including slashing the victim's head open with a machete blow to the head, should not be considered anything less than attempted murder.

The argument that Leoner Aguirre "did not attempt to slash Carillo's neck" and "he did not strike Carillo after Carillo went to the ground" is hardly compelling. Leoner Aguirre chased the victim on a busy public street at 1 p.m. in the afternoon and struck him multiple times with a machete at one of the major intersections in Chelsea near a learning center and a densely populated area:

CALLER:          Yeah, there's a guy in Central Avenue attack another guy with a machete in Chelsea.

DISPATCHER:      Where in Central Ave? Where?

CALLER:          At Central Avenue in Chelsea.

DISPATCHER:      I know.  What number?  That's a very big street. What number…

CALLER:          Outside… It's in front of the school and the learning center.

DISPATCHER:      Ok is the person there still? Is he bleeding? The guy?

CALLER:      Uh he was on the ground because the other guy hit him with a machete.

DISPATCHER:      Oh ok.

CALLER:      He was chasing him.

DISPATCHER:      Alright. Are they both there or did they leave?

CALLER:      Uh the guy was on the ground … the other one they running away.

Transcript of 911 Call.  *See also* Exhibits 115.6, 115.8, 115.12, and 115.13:






Leoner Aguirre does not get to avoid responsibility for an attempted murder because he ran away once the victim was on the ground bleeding instead of hanging around to slash the victim's neck or put the machete through the victim's skull a second time in the middle of the day in the middle of a busy intersection.

Nor is Leoner Aguirre's argument about the victim being armed worth much. The defendant cannot credibly argue that he chased after the victim and struck the victim with a machete multiple times because he feared the "weapon" in the victim's possession.  The victim took out a small boxcutter he was carrying from work to protect himself from the defendant's large machete, and the bladed part of that boxcutter was, at most, the size of a nickel.  *See* Exhibit 115.3:



The defendant's objections to the injury enhancement should also be rejected. Leoner Aguirre *fractured the victim's skull with a machete.  See* Exhibit 116.2:



The medical records from MGH state that the victim had a "scalp laceration" and a "small fracture" of the skull.  The injuries were described as "palpable skull deformity, left forehead fracture 6 cm laceration with bone exposure."  X-rays of his left elbow also revealed a "left ulna fracture" from the second machete strike.  The PSR correctly concludes that this was an attempted murder where the victim suffered life-threatening bodily injury.  *See* PSR at ¶¶ 73-74.

### 2.  The April 16, 2014 Shooting was an Attempted Murder.

The defendant's objections to the April 16, 2014 shooting being an attempted murder are similarly unavailing.  The defendant argues that this attack "should be found to be an assault with intent to kill, not intent to murder, and should not be considered in the offense level calculation."  Def. Memo. at p. 7.  The defendant argues that he "had two easy opportunities to kill" and "if Aguirre had intended to kill Portillo, he'd be dead."  Def. Memo. at pp. 7-8.  This argument also misses the mark.

As an initial matter, defendant misleadingly summarizes the evidence by stating that that the victim "testified that after he was shot and standing helpless in the street, Aguirre could have easily killed him if he'd wanted to."  Def. Memo. at p. 8 (citing to Testimony of Servellon at p. 116).  That is *not* what the victim testified.  The victim was asked on cross-examination about the victim's subjective mindset (which is irrelevant to defendant's intent), and the victim testified that he was so scared that *in his mind*, he thought the defendant was right behind him and could have killed him:

> Q.   When the bus did not stop, did it seem to you, *were you afraid you were going to get shot*?

A.    Yes, I was very scared.

Q.    It seemed at that moment that it would have been very easy for the guy with the gun to come towards you and shoot you again?

A.    *In my mind,* I thought he was right behind me.

Q.    He was what?

A.    *In my mind,* I thought he was right behind me.

Q.    Okay.  *In your mind,* you were thinking that if he wanted to kill you, it would have been very easy for him to do it?

MR. MACKINLAY: Objection.  THE COURT: I'll allow it. Overruled.

A.    Obviously, and I was already badly wounded.

Nov. 16, 2017 Transcript at p. 116 (emphasis added).

The defendant's mindset, not the victim's mindset, is what is important.  The evidence clearly showed that Leoner Aguirre chased after the victim and shot the victim in the back as the victim was running for his life and posing no threat to Leoner Aguirre whatsoever.  As the Court saw, the incident was captured on camera:



Exhibit 139.3 (showing Leoner Aguirre in white pants in the top left shooting at the fleeing victim). Leoner Aguirre's argument that "if he'd wanted to kill someone, he could have shot either of them in the back of the head," Def. Memo. at p. 7, ignores the fact that the evidence is *consistent with Leoner Aguirre attempting to shoot a fleeing victim in the back of the head.* *See* Exhibit 139.

The defendant's argument that "if Aguirre had intended to kill Portillo, he'd be dead," Def. Memo. at p. 8, also ignores the fact that Leoner Aguirre apparently *fired every bullet he had at the victim.* As the Court heard, Leoner Aguirre was captured immediately following this shooting and the gun was immediately recovered. There were *no other live rounds* left in the firearm.

And even if none of this was true and the incident occurred in an alternate universe where Leoner Aguirre had extra bullets to fire at a victim he had already wounded, Leoner Aguirre should still not escape responsibility for an attempted murder because he did not attempt more kill shots in broad daylight in the middle of a public street in a commercial area with numerous witnesses. *See* Exhibit 139.



Finally, the fact that a Suffolk County jury found Leoner Aguirre guilty of assault with intent to kill as opposed to assault with intent to murder is irrelevant. That was a different trial in front of a different jury with different evidence on different charges.   More importantly, as Probation articulately put it, that jury finding was about *criminal liability* under state law as opposed to *sentencing accountability* under federal law.  *See* PSR at pp. 51-52.  Probation correctly treats this incident as an attempted murder with life-threatening bodily injury, and the Court should adopt those findings.  *See* PSR at ¶¶ 79-80.

## C. Leoner Aguirre is Responsible for the Conspiracy to Murder CW-2.

Leoner Aguirre also objects to being held accountable for the conspiracy to murder CW-2.  The defendant's objections generally fall into three categories, none of which carries the day.

*First*, the defendant argues, "the government's assertion that Menjivar was involved in the plot to kill CW-2 is not supported by the evidence."  PSR at p. 53 (Objection to ¶ 50); *see also* Def. Memo. at pp. 8-10 (arguing that Menjivar was involved in a "ruse" to protect CW-2 as opposed to being part of the conspiracy to lure out and kill CW-2).  This is an argument that did not work for Menjivar, and it should not work for Leoner Aguirre.  The Court has already sentenced Menjivar, rejected the argument that Menjivar was part of a ruse, and held him responsible for the conspiracy to kill CW-2.  The government's assertions that Menjivar was involved in the plot to kill CW-2—and accordingly, Menjivar's statements about Leoner Aguirre being involved in the plot to kill CW-2 are credible—are supported by the evidence.

*Second*, the defendant argues, "at the time attempts were made to kill CW-2, Aguirre had been incarcerated for over a year." PSR at p. 53 (Objection to ¶ 52). This is similar to the argument the defendant attempted to advance at trial, essentially arguing that he had withdrawn from the conspiracy by virtue of his arrest. This argument is also without merit. As the Court noted at one point during trial—in response to an argument regarding withdrawal outside the presence of the jury—the facts of this case are not close to showing an affirmative withdrawal by the defendant.

*Third*, the defendant makes various objections about the evidence of his involvement coming from "totem pole hearsay statements of Menjivar." *See* PSR at p. 54 (Objection to ¶ 72); Def. Memo. at pp. 9-11. The objections about hearsay are also unavailing because the rules of evidence do not apply at sentencing, and in any event, the statements were nonetheless admissible as co-conspirator statements (which is why they were properly admitted at trial in the first instance).

Probation correctly holds the defendant responsible for the conspiracy to murder CW-2 and correctly gives the defendant a four-level enhancement for this grouping based on his leadership role in the criminal activity. *See* PSR at ¶¶ 91-96.

### D. Probation Correctly Concluded That Defendant's Guideline Range is 240 Months But Incorrectly Applied the Role Enhancement.

Based on Leoner Aguirre's relevant conduct, the initial calculation of his Guideline Range is well north of the 240-month statutory maximum. As a practical matter, additional enhancements do not increase the defendant's Guideline Range. However, given the importance of calculating the Guideline Range correctly, the government is compelled to object to the manner in which Probation has applied the

leadership enhancement in this case.   In short, Probation applies a four-level enhancement for role in the offense for the conspiracy to murder CW-2 grouping *and* for the robbery grouping, but *does not apply* a four-level enhancement for either of the two attempted murder groupings.  *See* PSR at ¶¶ 76, 82, 94, 100.  It is Probation's view that every single underlying activity must be committed with five or more participants (or be otherwise extensive) for a leader to get a leadership enhancement for that group.  The government disagrees with that analysis.

The government's position on this issue is included as Government's Objection #1 on pages 42-43 of the PSR.  The government incorporates that discussion by reference, but highlights for the Court the following analysis from *United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009) (discussing how a role enhancement should be applied in RICO cases and holding that the role adjustment should be based on the defendant's role in the overall RICO enterprise, not any individual act):

> Finally, Ivezaj challenges his sentence on the ground that any aggravating role enhancement the district court applied should have been based on the conduct alleged in the underlying predicate acts, rather than on his role in the RICO enterprise as a whole.  We typically review a district court's factual findings in support of a role enhancement for clear error.  However, because Ivezaj's challenge requires us to make a legal determination about the applicability of the enhancement, we review the district court's determination de novo.
>
> U.S.S.G. § 2E1.1 addresses the base offense levels for RICO offenses, requiring a base offense level of 19 or the offense level applicable to the underlying racketeering activity. Application Note 1 to the Guideline provides that:
>
>> Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2). To determine whether subsection (a)(1) or (a)(2) results in the

> greater offense level, apply Chapter Three, Parts A, B, C, and D to both (a)(1) and (a)(2). Use whichever subsection results in the greater offense level.

U.S.S.G. § 2E1.1, cmt. n. 1. Because the Application Note treats each predicate act as "if [it were] contained in a separate count of conviction" for purposes of determining the offense level for the alleged racketeering activity, Ivezaj argues that the district court failed to consider his role in each charged act when applying the role enhancement.

> *We agree with the district court that a defendant's role adjustment is to be made on the basis of the defendant's role in the overall RICO enterprise.*

*Ivezaj*, 568 F.3d at 99–100 (emphasis added) (citations omitted); *see also United States v. Damico*, 99 F.3d 1431, 1437 (7th Cir. 1996) (finding same and concluding that "[The Application Note] only requires the underlying offenses to be treated separately "for the purposes of subsection (a)(2)"—that is, only for the purpose of establishing the base offense level applicable to the RICO conspiracy.  The note does not say that the separate treatment extends as well to application of the Chapter Three adjustments.").

The Second Circuit also discussed the common-sense reasons to apply the enhancement in this manner and why the plain language of the Guideline supports such an application:

> *[A]nalyzing a defendant's role in the overall RICO enterprise makes a good deal more sense than considering his role in each underlying predicate.*  In the case of a § 3B1.1(b) role enhancement, it makes little sense to allow a defendant who acts in a leadership capacity in a wide-ranging criminal enterprise to have his offense level adjusted on the basis of his participation in discrete racketeering acts.  For example, *a defendant who served as a leader or manager of an extensive RICO enterprise should not be able to avoid a role enhancement simply because certain predicate acts involved fewer than five participants or criminal activity that was not extensive.*  Second, we agree that t*he language of the Guidelines is clear that the requirement to look at each individual act*

> *in a RICO offense is only for the purpose of establishing the base level*
> *offense*, not for applying the Chapter Three adjustments.

*Ivezaj*, 568 F.3d at 99–100 (emphasis added).

The reasoning of *Ivezaj* is compelling: it would make little sense to allow the leader of an extensive RICO enterprise—in this case, the leader of a violent clique of MS-13—to avoid responsibility for being a leader just because a discreet violent act involved less than five participants. To use a hypothetical scenario: if the leader of the Mafia was charged with RICO conspiracy and evidence showed he had ordered three co-conspirators to commit three murders—thus resulting in three sentencing groupings for murder—he should not escape responsibility for being a leader simply because none of the three murders were committed by five or more people.

Leoner Aguirre was the undisputed leader of the Enfermos clique and everyone agrees he should get a leadership enhancement for certain offense conduct. He should not escape accountability for being a leader on the attempted murder groupings just because his attempted murders did not also include five people. Leoner Aguirre should receive a leadership enhancement across the board for his role in the overall racketeering conspiracy.

### E. The Appropriate Guideline Calculations.

The government urges the Court to recalculate the defendant's Guideline Range by giving him the role enhancement he deserves for his leadership role in the RICO conspiracy. There are two alternate ways to do this and both lead to the exact same result in this case (admittedly, the government is unsure of whether one

17

approach is more correct than the other, but the government respectfully submits that both methods are preferable to Probation's proposed approach):

### Option 1:  Apply the Role Enhancements First and Then Group

Under this approach, each group would get a four-level adjustment for role in the offense because the defendant was a leader for the entirety of the underlying racketeering activity, and the groups would then be combined.  As a result:

- Both Group 1 and Group 2 would also contain an adjustment for role in the offense, resulting in a four-level adjustment to paragraphs 76, 78, 82, and 84 of the PSR.

- The multiple count adjustment in paragraph 103 would read as follows:

| Group | Adjusted OL | Units |
|---|---|---|
| o   Group for April 6 Attempted Murder | 41 | 1.0 |
| o   Group for April 16 Attempted Murder | 41 | 1.0 |
| o   Group for Conspiracy to Murder CW-2 | 39 | 1.0 |
| o   Group for Robbery | 27 | 0.0 |
| | Total Units: | 3.0 |

- Greater of the Adjusted Offense Levels Above = 41
- Increase in Offense Level = 3
- Combined Adjusted Offense Level After Groupings = 44

- Total Offense Level = 44
- Typical Guideline Range = LIFE
- Final Guideline Range Based on Statutory Maximum = 240 months

### Option 2:  Apply Groupings First and then Apply Role Enhancement

Under this approach, each group would first be calculated based on the specific offense characteristics, and at the end, there would be a four-level adjustment after grouping because the defendant was a leader for the entirety of the underlying racketeering activity.  As a result:

- Group 1 and Group 2 would retain their adjusted offense levels and the role enhancements for Group 3 and Group 4 would be removed.

- The multiple count adjustment in paragraph 103 would read as follows:

| *Group* | *Adjusted OL* | *Units* |
|---|---|---|
| o Group for April 6 Attempted Murder | 37 | 1.0 |
| o Group for April 16 Attempted Murder | 37 | 1.0 |
| o Group for Conspiracy to Murder CW-2 | 35 | 1.0 |
| o Group for Robbery | 23 | 0.0 |
| | Total Units: | 3.0 |

- Greater of the Adjusted Offense Levels Above = 37
- Increase in Offense Level = 3
- Combined Adjusted Offense Level After Grouping = 40

- Four-level Adjustment for Role in Offense = +4

- Total Offense Level = 44
- Typical Guideline Range = LIFE
- Final Guideline Range Based on Statutory Maximum = 240 months

Under either approach, the defendant's offense level will be 44, which would typically result in the Guideline Range of Life.  In this case, the defendant's Guideline Range should be 240 months based on the statutory maximum.

## II.   <u>REQUEST FOR UPWARD DEPARTURES AND VARIANCES</u>

Every reasonable calculation results in a Guideline Range of 240 months. Even if the Court finds that Leoner Aguirre's racketeering activity did not involve *any* attempted murders and did not involve *any* robberies, his Guideline Range would be 240 months on the conspiracy to murder CW-2 alone.  (Base offense level 33, +4 for role in the offense, +2 for obstruction = adjusted offense level of 39 = guideline range higher than 240 months).

In the unlikely event the Court's calculation results in a Guideline Range less than 240 months, the government intends to seek an upward variance or upward departure so that it can recommend and the Court can sentence Leoner Aguirre to 240 months in prison. The government believes this scenario is unlikely, so instead of arguing each reason for upward variance or departure, the government simply incorporates by reference the submission from the government included by Probation in page 45 of the PSR ("Factors That May Warrant Departure") and page 46 of the PSR ("Factors That May Warrant Upward Variance or Sentence Outside the Guideline Range").

## III. **THE APPROPRIATE SENTENCE IS 240 MONTHS**

The nature and circumstances of Leoner Aguirre's conduct, his history and characteristics, and the need to promote respect for the law and afford adequate deterrence strongly support a sentence of ***240 months***, and anything less would be insufficient to comply with the purposes of 18 U.S.C. § 3553(a). There are no compelling mitigating factors supporting a downward variance and significant aggravating factors supporting an upward variance.

Prior to his arrival in Chelsea, Leoner Aguirre had already started to set the stage for the violence he would let loose by creating and sharing MS-13 recruitment and motivational videos on YouTube. The government played some of these videos at trial, which described in graphic detail the violence the defendant hoped to unleash, and provided invaluable insight into his goals and motivations. Those videos contain some of the most disturbing lyrics of any publicly available video. Worse, those videos were used to recruit impressionable high school children into MS-

13, including CW-2, who testified that he was at the high school cafeteria as a freshman when he first viewed one of Leoner Aguirre's MS-13 videos.

Once the defendant arrived in Massachusetts and organized the clique, which included taking direction from MS-13 leaders in El Salvador, he quickly made clear that the violent lyrics in his MS-13 recruitment videos were not puffery but prelude. Leoner Aguirre's own racketeering activity included his participation in multiple attempted murders, multiple robberies, and a conspiracy to kill a suspected cooperator.  Astonishingly, Leoner Aguirre managed to do all of that within one month of hitting the streets of Chelsea.

The evidence the Court heard at trial speaks for itself and makes clear that the defendant not only committed violence, but he recruited, organized, motivated, directed, and let loose his clique to raise havoc in Chelsea.  The violence encouraged and motivated by Leoner Aguirre resulted in his clique members (1) Hector Ramires a/k/a "Cuervo" and (2) Brayan Galicia Barillas a/k/a "Chucky" being convicted for RICO conspiracy involving murder, and his clique members (3) David Lopez a/k/a "Cilindro" a/k/a "Villano," (4) Daniel Menjivar a/k/a "Roca," (5) Domingo Tizol a/k/a "Chapin," (6) Angel Pineda a/k/a "Bravo," and (7) Kevin Ayala a/k/a "Gallito" being convicted for RICO conspiracy involving attempted murder.

The defendant takes issue with the government's characterization of Leoner Aguirre as leading and organizing the fledgling Enfermos clique into a violent criminal enterprise.  *See* Def. Memo. at pp. 19-21.  However, the government's extensive, multi-year investigation *did not reveal evidence of a single racketeering act*

*involving violence by a single member of the Enfermos clique prior to Leoner Aguirre's arrival in Chelsea in Spring 2014.* Conversely, in the months following Leoner Aguirre's arrival, *every single member of the Enfermos clique was involved in a murder, attempted murder, or armed robbery.* That is a remarkable uptick in violence, all set in motion by Leoner Aguirre. *See, e.g.*, PSR at ¶¶ 31-32 (summarizing testimony from both CW-2 and CW-15 about Leoner Aguirre ordering Enfermos members to commit murders and robberies).

The need for the sentence to promote respect for the law, afford adequate deterrence, and reflect the seriousness of the offense argue strongly for a 240-month sentence. Deterrence requires, justice demands, and the public expects a considerable sentence for such a significant and troubling offense by someone who set in motion such a string of violence.

The Court should sentence Leoner Aguirre to the statutory maximum of 240 months, and the 18 U.S.C. § 3553(a) factors would warrant an even higher sentence if not for the statutory maximum.

## IV.   THE COURT SHOULD IMPOSE A 240 MONTH SENTENCE, NOT ADJUST FOR STATE SENTENCE, AND VARY UPWARD IF NEEDED.

The nature and circumstances of this case raise an unusual situation that may warrant an upward variance to ensure that Leoner Aguirre is sentenced to 240 months. The defendant has pointed to § 5G1.3, which allows for a downward adjustment to a sentence to account for an undischarged term of imprisonment. The defendant has been serving a state sentence for his April 16, 2014 shooting, which he will be completing shortly. The defendant argues that whatever sentence the Court

determines should be adjusted downwards by over 4 years to give him credit for that state sentence. The government strongly urges the Court not to do so in this case. Simply put, such an adjustment would result in a perverse outcome that would irrationally reward Leoner Aguirre for his second attempted murder.

The government posits the following: based on the nature and circumstances of the offense (including his attempted murder using a machete, his conspiracy to kill CW-2, his multiple armed robberies, his leadership role in arguably the most violent criminal gang in the country, etc.), Leoner Aguirre is deserving of a 240-month sentence even if he did not commit the April 16, 2014 shooting.

Assuming for present purposes that the Court agrees with that position, it seems counter-intuitive and wrong that if Leoner Aguirre did *not* commit the April 16, 2014 shooting, he would receive a 240-month federal sentence based on 18 U.S.C. § 3553(a) factors, but because he committed an additional attempted murder, his federal sentence should somehow be four years lower.[1]

---

[1]	Interestingly, the defendant objects to the April 16, 2014 shooting being considered an attempted murder that is therefore part of his relevant racketeering conduct. If the defendant gets his wish and that incident is not counted, that would remove even the discretion for the Court to depart or adjust downwards based on the state sentence for that shooting.

The government was tempted to just agree with the defendant to exclude the April 16, 2014 incident from his relevant conduct so that there would be no doubt that the defendant should not get a four-year discount on his federal sentence. The government would still have argued for 240 months even if that incident was not counted. As a matter of principle, however, that incident should be counted, and the defendant should be sentenced to 240 months.

This is not a novel sentencing argument raised by the government, and the government provided notice to the defendant months prior to trial that it would take this position at sentencing. The government and the defendant disagree on whether the Court has the authority to impose a 240-month sentence (statutory maximum) without adjusting downward or without making the sentence concurrent with the state sentence. Given that the Guidelines are advisory, the Court plainly has the authority to impose a 240 month sentence, and should do so here based on every single 3553(a) factor arguing strongly for a 240 month sentence.

The clearest discussion that the government could find of this unusual sentencing scenario is in *United States v. Winter*, 479 Fed. Appx. 28 (8th Cir. 2012). In that case, the defendant similarly pointed to USSG § 5G1.3 and similarly argued that the District Court was required to impose a concurrent sentence to an undischarged state court sentence for related offense conduct. The Eighth Circuit made clear that the Guidelines are advisory, the Court can consider USSG § 5G1.3 but use its discretion not to apply that adjustment, and can indeed even vary upwards notwithstanding USSG § 5G1.3 to sentence a defendant to the statutory maximum. That is exactly what the District Court did in that case in varying upward to impose a statutory maximum sentence based on § 3553(a) factors. *See id.* (affirming a sentence where the initial Guideline range was 57-71 months on a 120-month statutory maximum, and the defendant was eligible for a further adjustment and concurrent sentence under USSG § 5G1.3; the District Court acknowledged that

USSG provision, but not only did it use its discretion to ignore USSG § 5G1.3, but it used its discretion to vary upwards to the 120-month statutory maximum).

In this case, the Court's task—if the Court chooses to impose a 240-month sentence—is even easier. The defendant's Guideline range is already 240-months (and would have been *life* if not for the statutory maximum). The Court does not need to vary upward, but can simply note USSG § 5G1.3 and exercise its discretion not to adjust the sentence under that provision based on the 18 U.S.C. § 3553(a) factors.

Conversely, the Court can adjust the sentence downward to give the defendant credit for the prior state sentence, but the Court can then exercise its discretion to vary upward based on § 3553(a) factors to impose the requested 240 month sentence.

## V.   <u>DISCUSSION OF PLEA OVERTURES IS IMPROPER</u>

Finally, the government feels compelled to comment on the objectionable and factually inaccurate arguments advanced by the defendant in pages 22-24 of his sentencing memorandum. The defendant attempts to inform the Court of pre-trial plea overtures—which are irrelevant and which judges are supposed to be uninvolved in—and argues that the government is somehow punishing the defendant for exercising his trial right.[2] The government is doing no such thing.

*First*, there was no binding plea offer in this case from the government. The U.S. Attorney's Office has had a longstanding policy that no plea offer is binding

---

[2]   Defense counsel called the government prior to filing his sentencing memorandum to state that he intended to raise this argument. The government immediately informed the defendant that this argument was objectionable. The defendant's argument runs afoul of the spirit of Rule 11, which makes clear that "[t]he court must not participate in these discussions."

absent a written plea agreement executed by the Criminal Division Chief or his/her designee.  The defendant's argument that "the government offered to seek approval for a plea to 16 years" a few months prior to trial is irrelevant.

*Second*, the trial required testimony from, among others, (i) a witness who the defendant had ordered killed, (ii) the mother of his child, (iii) a victim that he had shot, (iv) and a victim that he had slashed with a machete.  The government may have been tempted to offer a greater than typical discount to avoid such a trial, but that does not mean that the government is punishing the defendant for exercising his trial right.

*Third*, the defendant advances a misleading and factually inaccurate argument that "the government did not learn anything new of significance concerning Aguirre in the several months prior to trial."  The government learned a significant amount of additional information about the history and characteristics of the defendant, and the nature and circumstances of his offense, in the months prior to trial.  Given that the defendant's offense conduct involves him authorizing the murder of a suspected cooperator, the government is not going to publicly disclose exactly what additional information about the defendant the government learned from what witnesses in the months leading up to trial.  Suffice to say that the government's view of the defendant changed for the worse in the lead-up to trial.

*Finally*, to the extent that the defendant felt it was relevant to inform the Court that the government once considered seeking approval for a 16-year sentence, the government notes that it rejected multiple plea overtures by the defendant in the

days leading up to trial.   On multiple occasions, the government informed the defendant that it would be seeking a 20-year sentence given the seriousness of the offense and the history and characteristics of the defendant.   That 20-year sentence is what the government seeks now, and that sentence is what the defendant deserves.

## Conclusion

For the reasons above, the Court should sentence the defendant to ***240 months in custody*** followed by 3 years of supervised release.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    /s/ Kunal Pasricha
Kunal Pasricha
Glenn A. MacKinlay
Christopher Pohl
Kelly B. Lawrence
Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, certify that the foregoing document was filed through the

Electronic Court Filing (ECF) system and will be sent electronically to the registered

participants as identified in the Notice of Electronic Filing.

/s/ Kunal Pasricha
KUNAL PASRICHA
Assistant United States Attorney

28