1              UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2

3

UNITED STATES OF AMERICA          )
4                                 )
vs.                               )  Criminal Action
5                                 )
RAFAEL LEONER-AGUIRRE,            )  No. 15-10338-FDS
6        Defendant                )
                                  )
7                                 )
                                  )
8

9

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11

                    JURY TRIAL DAY 10
12

13

14

        John Joseph Moakley United States Courthouse
15                   Courtroom No. 2
                    1 Courthouse Way
16                  Boston, MA 02210

17                  November 20, 2017
                     8:07 a.m.
18

19

20

21

22

                    Valerie A. O'Hara
23                 Official Court Reporter
        John Joseph Moakley United States Courthouse
24           1 Courthouse Way, Room 3204
                  Boston, MA 02210
25             E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

     United States Attorney's Office, by GLENN A. MacKINLAY, ASSISTANT UNITED STATES ATTORNEY, and KUNAL PASRICHA, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

     KEITH S. HALPERN, ESQ., 572 Washington Street, Suite 19, Wellesley, Massachusetts 02482.

PROCEEDINGS

THE CLERK:  All rise.  You may be seated.  Court is now back in session.

THE COURT:  Good morning, everyone.  We're starting a couple minutes later here because it takes so long to print out the current draft, which I've circulated to you.  Let me start by talking about things other than the jury instructions to make sure we're all on the same page.

We are going to, I think, read a stipulation to the jury; is that right?

MR. HALPERN:  Yes.  I actually prepared it so that if you want to do it to put it in as an exhibit.

MR. PASCRICHA:  We don't have an objection, your Honor, counsel can read it into the record.  He can submit it.  It's just a paragraph from a report.

THE COURT:  All right.  Reading is the norm, but I don't have an opinion one way or the other.  If you agree, it can go in writing, that's fine.

MR. PASCRICHA:  We had assumed he would just read it into the record.

MR. HALPERN:  It's a little convoluted, so I'd like to --

MR. PASCRICHA:  No objection.

THE COURT:  We'll mark it as an exhibit.  So, what exhibit number?

1          THE CLERK:  292.  All right.  That will be

2     Exhibit 292.

3          THE COURT:  Second, I need, I think, to instruct the

4     jury to disregard any evidence concerning the robbery of

5     Irwin Martinez on April 9th, 2014, including the testimony, the

6     video and all other related evidence.

7          MR. PASCRICHA:  That's fine, your Honor.

8          MR. HALPERN:  I drafted a motion for a mistrial.  I

9     feel like I need to talk to Mr. Aguirre about whether he wants

08:09AM 10     me to file that or not.

11          THE COURT:  All right.  That's fine.  I would expect

12     to deny it, but I'm certainly unhappy that I have to do this at

13     a minimum, but, in any event, that will be my working

14     assumption.

15          Third, length of the closings.  I think, Mr. Halpern,

16     you thought you might need closer to an hour.  Here's my plan.

17     I'm not going to cut anybody off if you're 45 minutes or an

18     hour.  I'll begin clearing my throat at some point if you go

19     beyond an hour, and if I really think it's going too long, I'm

08:10AM 20     going to ask you to wrap it up.

21          I have no problem you targeting 45 minutes and lasting

22     an hour.  If you target 45 minutes and wind up at two hours, we

23     have a problem, okay.  I'm not going to cut anyone off

24     mid-sentence.

25          Again, there will be a brief opportunity, on the order

1    of, you know, three or four minutes for true rebuttal by the

2    prosecution.  In terms of my jury charge, whether lunch

3    intervenes, whether I split my charge, which I could do, you

4    know, do the boilerplate first and the substantive later, if

5    that's the way it plays out, I'll wait and see, but one way or

6    the other, the jury will get the case today.

7            Anything else other than the instructions that we need

8    to talk about?  I think we're in agreement who the alternates

9    are.

08:11AM 10           MR. PASCRICHA:  Not from the government, your Honor.

11           MR. HALPERN:  There was one exhibit addition.  There

12   was -- so the shooting on April 16th, I had a disk with five

13   still shots, and they were introduced one-by-one.  I can't

14   believe I put this folder somewhere.  I don't know where I put

15   it.  They were introduced one-by-one and given -- do you

16   remember the number?

17           THE CLERK:  Yes, it's Exhibit 286, and it was

18   introduced into evidence as -- we introduced 286.1, 286.2,

19   286.3 and 286.4, but the disk contains five images.

08:12AM 20           MR. HALPERN:  What happened as I was doing this, I

21   kept putting up the image.  The jury saw them, I had asked him

22   some questions about them, when I got to the fifth image, I

23   showed it, I asked him about it, but I didn't say I'm offering

24   it.

25           THE COURT:  Well, if the image is on 286, if 286 is a

1    disk containing five images --

2              MR. HALPERN:  Yes.

3              THE COURT:  -- it is in evidence, and you can talk

4    about it in the closing.  In civil cases, lawyers constantly

5    introduce piles of evidence, leave them on the table and don't

6    show them to the jury and then mention them in their closing,

7    which has the jurors scratching their head like where did this

8    document come from.  In any event, it's in evidence.

9              All right.  Let's talk about the jury charge.  First,

08:13AM 10   I want to apologize to everyone and your families.  All of us

11   had to do some work over the weekend, which was basically, as

12   you know, a consequence of the government resting quicker than

13   anyone anticipated, which was good, but it required some effort

14   over the weekend, and I appreciate the fact that you all

15   responded yesterday, which was helpful to get me and my law

16   clerks thinking about it.

17             In no particular order, let me touch on some minor

18   things.  Mr. Pasricha's e-mail yesterday indicated that I had

19   forgot to delete the reference to the indictment going to the

08:14AM 20   jury.  That has been fixed and that some tinkering needed to be

21   done in reference to the unanimous verdict, which has been

22   done.

23             The conspiracy versus substantive crimes, as you know,

24   I have decided for -- well, I have decided that I am going to

25   use this example of a bank robbery to illustrate the difference

1   between conspiracy and substantive crimes because I think this

2   whole thing is so complicated, so convoluted that I think it

3   would help illustrate the point to the jury.

4           I have changed what is now page 25, I have somewhat

5   changed the hypothetical in response to the government's

6   concerns.  I don't think anyone reading this who has not been

7   to law school would think that uh-huh, there must be an overt

8   act requirement for bank robbery conspiracy as opposed to

9   racketeering conspiracy, but I've changed it so the hypo now,

08:15AM 10  the three people agreeing to rob a bank instead of one

11  supplying a gun, it says one thinks up the plan, so making

12  clear you could be a co-conspirator without personally doing

13  anything overt, but I think that it's a useful thing to do

14  despite the limitations of any analogy, and so that's how I've

15  decided to handle that.

16          The government also expressed concern about the

17  conjunctive, disjunctive description of what the indictment

18  charges, and that was correct, it will be rephrased, it should

19  have been rephrased, which I think it is at page 30 of the

08:16AM 20  current draft.

21          Let me jump ahead over the state court murder issues.

22  I've come to that last.  That's the most complicated and go to

23  the question of withdrawal and evidence of the defendant's

24  incarceration.

25          Here's my thinking on withdrawal.  On the one hand, I

1     think that there is not sufficient evidence to support a

2     withdrawal instruction in the sense that I don't think the law,

3     as I understand it, requires the defendant to show affirmative

4     acts, either to defeat or disavow the purposes of the

5     conspiracy, simply refraining from continuing to participate or

6     being prevented from continuing to participate is not enough,

7     notwithstanding this one case in I think the Second Circuit,

8     which suggests otherwise.  I don't think that's the law in the

9     First Circuit, and maybe that ought to be the end of the story.

08:17AM 10     The problem I have is this:  If we're putting on

11    evidence about the murder of Katerin Gomez when the defendant

12    is in prison, and there's no specific evidence tieing him to

13    that particular episode, and Mr. Halpern defends on the ground,

14    well, no, you know, he was in, putting aside the facts of the

15    actual shooting himself, he was in prison at the time, he was

16    incarcerated, and he had no role in it, what is the jury

17    supposed to make of that?

18    I don't want the jury to think, for example, that that

19    means, ah, he couldn't possibly be guilty of a conspiracy if he

08:18AM 20    was incarcerated during the murder of Katerin Gomez, that's not

21    right.  On the other hand, I can't state the law without

22    stating it completely and properly, and so all of that has led

23    me to this instruction so that they at least understand this is

24    what this means.

25    In other words, we didn't have to get into the murder

1   of Katerin Gomez necessarily.  We did.  Having done so, I think

2   I need to explain to them how that shooting and the defendant's

3   incarceration interact as a legal matter, which is what led me

4   to this instruction.

5        I've tweaked it slightly to add a sentence at the end

6   of the first paragraph on page 52:  "However, even if a

7   defendant later withdraws from the conspiracy, he or she is

8   still guilty of the crime of conspiracy," and, of course, the

9   only thing it cuts off is responsibility for the later acts of

08:19AM 10   co-conspirators, so I don't have a perfect solution here, but

11   that's my thinking.

12        I do think I need to instruct on the fact that he was

13   incarcerated because it's, you know, a potentially powerful

14   fact, and I have trimmed this just on page 51, I have trimmed

15   this back somewhat, so I tell them what they cannot do with it

16   but don't suggest to them what they could do with it.

17        So comments, objections, thoughts on those two

18   instructions?  Mr. Pasricha.

19        MR. PASCRICHA:  That works for the government, your

08:19AM 20   Honor, thank you.

21        THE COURT:  Mr. Halpern.

22        MR. HALPERN:  I'm not happy about the deletion of the

23   sentence of being able to take it into account in terms of --

24        THE COURT:  Of course, you can argue that, yes.

25   All right.  Let's talk about the substantive state law

1    instructions.  Again, the framework here is peculiar, at least

2    to me, because we have had, for example, a conviction for a

3    lesser included offense in state court.  Maybe that's not

4    technically relevant, but it seems to me in fairness somehow

5    ought to be, that, you know, if we're talking about what's

6    murder, then we ought to talk about what is not murder for what

7    it's worth.

8           I do think that it was appropriate to get rid of the

9    references to extreme atrocity and cruelty.  I note on page 44,

08:20AM 10   there's still one in there.  We're kind of doing this on the

11   fly, but all of that will come out.  Malice is quite confusing

12   under state law because it has two definitions.

13          MR. HALPERN:  Actually, more than that.

14          THE COURT:  Well, anyway, here's what I want to do on

15   this state law piece of it generally, decide what is in or out

16   and then follow the pattern instruction, period.  I feel

17   helpless.

18          MR. HALPERN:  Can I address?

19          THE COURT:  Yes.

08:21AM 20          MR. HALPERN:  That's what I asked you to do, and I'm

21   saying this, I don't mean it to sound, you know, smart ass in

22   any way.

23          THE COURT:  I can take it.

24          MR. HALPERN:  This instruction on assault with intent

25   to murder, it's wrong, it's flat out wrong.  You're referring

1    back to a prior malice instruction.  The prior malice

2    instruction related to murder.  There is no three-prong malice

3    requirement for either of these crimes, period.

4         THE COURT:  I think it's the malice -- this says the

5    malice absence of mitigation, right, is this where we get into

6    if there's mitigation?

7         MR. HALPERN:  Yes.

8         THE COURT:  So it's a different malice.

9         MR. HALPERN:  It's a different type of malice, and

08:22AM 10   there's no -- three-prong malice is unique to homicide, and

11   both -- you don't even get to the issue of mitigation on these

12   assault counts unless they find that he deliberately

13   subjectively intended to kill.  Grievance, harm isn't enough,

14   reasonable person should have known that there was a

15   substantial risk of death isn't enough, it's a strict specific

16   intent requirement.

17        MR. PASCRICHA:  Your Honor, I think it's just -- I

18   think the case law makes clear that's just another way to say

19   malice.  I think they do interchangeably use malice for, you

08:22AM 20   know, absence of mitigation, as your Honor noted.  We don't

21   have a strong preference, if it's easier to delete that third

22   element that the perpetrator acted with malice, that's fine.  I

23   do want to address the extreme atrocity and cruelty issue.

24        THE COURT:  Yes.

25        MR. PASCRICHA:  We strongly believe that instruction

1    is appropriate, and here's why.  The evidence here, part of the

2    reason your Honor is instructing them --

3         THE COURT:  I thought you said at the end of last week

4    that you were prepared to drop that extreme atrocity or

5    Mr. MacKinlay, rather?

6         MR. PASCRICHA:  I apologize if we did.  I wasn't here

7    Friday.  I guess at this point, we would ask if you're going

8    back in, in any event, to consider putting that in, and upon

9    reflection, the reason to do that is what your Honor is

08:23AM 10    instructing the jury is what categories count, what was the

11    plan.

12         This isn't about substantive offenses, what did they

13    want to do, what did they try to do, et cetera.  Here, where

14    you've got evidence from witnesses saying they're trying to cut

15    people's heads off with machetes, they were trying to gut

16    people down the middle.  What they were trying to do was murder

17    with extreme atrocity and cruelty.  In fact, the most

18    compelling form of murder, as shown by the evidence, in terms

19    of their plan was not just premeditated murder but extreme

08:24AM 20    cruelty and atrocity.

21         The tapes you heard from co-conspirators when they're

22    outside Clacker's house, they're talking about gutting him

23    trying to slice his neck open.  The plan really captures that

24    form of murder, so to the extent the goal of this is to show

25    what categories were they trying to do, we think it's essential

1      to give them that option because that's what the group was

2      trying to do.

3              THE COURT:  Mr. Halpern.

4              MR. HALPERN:  I think it's very clear under state law

5      that if people planned a murder and planned to torture somebody

6      but didn't do it, you could not be convicted of extreme

7      atrocity and cruelty.  Extreme atrocity and cruelty under state

8      law isn't a theoretical construct, it's real, it had to have

9      happened, so even if they did plan to do that in a way that

08:25AM 10   would qualify, and I agree that, you know, there's evidence of

11     people talking about acting in ways that would satisfy that

12     standard.

13              It's not enough under state law, you can't have a

14     conspiracy to commit extreme atrocity and cruelty, you have to

15     actually do it.

16              THE COURT:  You couldn't conspire, we're going to

17     kidnap my wife's boyfriend, and we're going to torture him,

18     that's the plan, and they have captured it all on tape, that's

19     not conspiracy?

08:25AM 20              MR. HALPERN:  I don't think so.  My -- I believe under

21     state law it's a crime that is based on what actually happened.

22     You have to be able to assess what happened to the victim and

23     how horrific it was.  I don't think you can do it based on a

24     plan.

25              THE COURT:  All right.  Here's my reaction to that

1   without the benefit of further legal research.  What the

2   government says sounds right to me.  Mr. Halpern, if you're

3   right, I won't put it back in.  We'll look for case law

4   supporting that.  If you have something, you have about an

5   hour, we'll do the best we can, and, again, I'm going to

6   default to the pattern.

7           MR. PASCRICHA:  That would include, your Honor, am I

8   correct, the parts of the pattern that talk about concepts,

9   such as the one concept being transferred intent, which I

08:26AM 10   believe your Honor in the current draft took from the pattern

11   and the second concept being, you known, duty to retreat or

12   self-defense, et cetera, would you be incorporating those

13   instructions from the pattern?

14           THE COURT:  That's the plan, yes.

15           MR. PASCRICHA:  Okay.  Thank you.

16           THE COURT:  All right.  What else about the homicide,

17   Mr. Halpern, you wanted voluntary manslaughter as well as

18   involuntary manslaughter?

19           MR. HALPERN:  I thought that on the Gomez homicide,

08:27AM 20   there's facts that would support it.

21           THE COURT:  Remind me what voluntary is as opposed to

22   involuntary?

23           MR. HALPERN:  So, essentially, it's the same scenario

24   as in the assault cases where you use mitigation to get to

25   assault to kill, you use mitigation in homicide to get from

1    second to manslaughter.  So you could have an intentional

2    shooting, but if it was done as a result of imperfect

3    self-defense or heat of the moment or sudden combat, it could

4    knock it down to manslaughter, even if it's intentional, so,

5    you know, I think the threat posed by these Eastside gang kids

6    could have even if he deliberately -- I mean, my argument is,

7    frankly, going to be for the most part that he didn't intend to

8    shoot anybody, but even if he did, if they thought that it was

9    as a result of the threat, then that mitigation could trigger

08:28AM 10    voluntary manslaughter.

11              THE COURT:  Mr. Pasricha.

12              MR. PASCRICHA:  Your Honor, if you're going to include

13    categories, I think that's probably an interpretation supported

14    by the law or by the facts, so we don't really object to adding

15    that if that's what counsel requests.

16              THE COURT:  Okay.  Again, then my working assumption

17    will be I'll add that in, and it's going to follow the pattern.

18    The state pattern instructions are like 100 pages long, okay,

19    but -- you wonder why I want to have lunch in the middle of my

08:29AM 20    instructions here.

21              MR. HALPERN:  So one of the things that I would

22    probably tell them, and then, you know, it raises an issue of

23    whether we want to add an instruction, suppose that there's no

24    specific intent that would satisfy either assault to murder or

25    assault to kill, it's still a crime.  It's ABDW, it's

1    potentially aggravated ABDW with serious injury, so I just want

2    to make it clear to them, look, it's still a crime, it's just

3    not a crime that counts.

4         THE COURT:  I guess the problem I have with that is we

5    could go all the way down to simple assault.  There's hardly

6    never any end to that, which is why I was trying to draw the

7    line at what's homicide and not homicide, you know, or

8    attempted homicide.

9         MR. HALPERN:  I don't feel like I need the

08:29AM 10  instruction, but I do certainly plan to tell them there is

11   another crime here, it's just not, you know, because they're

12   going to be thinking, well, wait a minute, if it's not that

13   assault and it's not that assault, does that mean it's nothing?

14   It's not nothing, it's a 20-year felony.

15        THE COURT:  Well, I'm not going to let you talk about

16   the length of the punishment.

17        MR. HALPERN:  Well, I won't say that.

18        THE COURT:  All right.  What else in these

19   instructions?  The government had said they wanted me to talk

08:30AM 20  about simple robbery as opposed to armed robbery.  The

21   indictment itself, if you look at page 18, paragraph 26, says,

22   you know, the pattern of racketeering activity consists of

23   multiple acts involving robbery, but then it says in violation

24   of Mass. General Laws, Chapter 265, Section 17, armed robbery,

25   Section 18, armed assault with intent to rob and in violation

1    of 274, Section 6, attempted robbery and Section 7, conspiracy

2    to rob.

3         So my take on that is that a simple robbery is not a

4    racketeering act, it has to be at least as charged in the

5    indictment.  It could be, I think, but it's not --

6         MR. PASCRICHA:  It was our understanding it is, your

7    Honor.

8         MR. MacKINLAY:  Unarmed robbery, your Honor, under

9    state law is the same punishment as armed robbery, ironically.

08:31AM 10    THE COURT:  Whatever the state law says, the question

11   is what does the indictment say?  In other words, you could

12   have charged labor racketeering, but it's not in there, and so

13   I'm not going to instruct the jury on labor racketeering.  The

14   indictment has to put them on notice what are the predicate

15   acts.

16        MR. PASCRICHA:  Fair enough, your Honor, thank you.

17        THE COURT:  What else about the charge?  And, again,

18   just to be clear, what I'm going to do is reflecting this

19   discussion, we're going to go back using the royal "we," of

08:32AM 20   course, my law clerks are going to do the laboring oar here,

21   pull the laboring oar and circle back, you know, at some point,

22   you know, in an hour, hour and 15 minutes and tell you what I

23   think is my final decision.

24        You will have one more chance to convince me I haven't

25   got it right because we have a couple of hours to get these

1    things printed out and ready for the jury.  They'll be nearly

2    final in about an hour.

3          Mr. Halpern.

4          MR. HALPERN:  A few things.  I think you had said

5    during the course the trial that you intended to give a

6    limiting instruction regarding medical records, but I don't

7    think you ever did.

8          THE COURT:  Well, it wasn't requested.  In other

9    words, this is the statement in the medical records, here's how

08:32AM 10   the attack happened, I put up my arm in self-defense, that

11   piece of it.

12         MR. HALPERN:  It wasn't requested because you said you

13   were going to do it.

14         THE COURT:  Well, it came in, I wasn't asked to, but I

15   can put that on my list of things to tell the jury, just to say

16   a caution.

17         MR. HALPERN:  I do have concerns about the kind of the

18   limitations of the cooperating witness instruction because I

19   don't think that they would perceive, for example,

08:33AM 20   Vicky Martinez for -- well, Vicky Martinez in particular as a

21   cooperating witness, and, nonetheless, the immigration benefits

22   that she's receiving are enormous and probably --

23         THE COURT:  Well, I've made a reference to immigration

24   matters, page 18.

25         MR. HALPERN:  Oh, okay.

            1         THE COURT:  Sorry.  I've added, The government may

            2    give or promise different types of benefits to such persons,

            3    including such things as assistance with immigration matters.

            4         MR. HALPERN:  Okay.

            5         THE COURT:  I'm actually specifically pointing to it.

            6    I could go on say, you know, cash housing, new names or

            7    whatever, but I think that's a fair inference.

            8         MR. HALPERN:  There's a couple of the RICO

            9    instructions that I just want to, page 10 of my supplemental,

08:34AM 10    that sentence really comes straight out of your decision.

           11         THE COURT:  Now you're citing poor authority here.

           12         MR. HALPERN:  You quoted from the First Circuit that

           13    there is a furtherance requirement, so I'd ask that that be put

           14    in.

           15         THE COURT:  You're saying in addition to an intent to

           16    agree, there has to be an intent to further the endeavor.  What

           17    does that mean in this context if there's no overt act

           18    requirement?

           19         MR. HALPERN:  I think you have to participate.  You

08:35AM 20    don't have to participate in the specific act, but you have to

           21    participate in the enterprise in a way that furthers a

           22    racketeering act, the possibility of a racketeering act

           23    occurring.

           24         I don't think it's just enough to be part of a group

           25    in which you've entered into an agreement with the

1    understanding that somebody else is going to do something.  You

2    have to agree to participate in some way.

3            THE COURT:  All right.  So, 10 people meet, the

4    government is capturing all this on a wire, and they all say,

5    all right, we're going to form an enterprise, and we're going

6    to affect interstate commerce, and we're going to commit

7    murders and armed robberies, and we're going to do at least two

8    of them, et cetera, et cetera, et cetera.  They all shake

9    hands, they prick their fingers, they burn the cards with their

08:36AM 10   blood on it and so forth, the government then takes everything

11   down, they have not committed the crime of conspiracy you're

12   saying because there's been no furtherance, no one has done

13   anything to further?

14           Let the record reflect the defendant is now coming

15   into the courtroom.

16           MR. HALPERN:  I think that's a tough hypothetical.  I

17   think -- my reading of it is that if you had a guy who entered

18   into that type of agreement and then did absolutely nothing,

19   not only nothing related to the specific racketeering acts that

08:36AM 20   they're talking about but nothing to further the activities of

21   the group at all, he just watched.  I don't think that's

22   enough.

23           I think you've got to at least plan to do something to

24   further the purpose of the enterprise, otherwise I don't

25   understand what that sentence means.  What does it mean -- it

1    doesn't say you have to further, it says you have to intend to

2    further, so in your analogy, I suppose the explanation would

3    be, well, the government arrested him, so he didn'tever

4    actually ever do anything to further, but he intended to, and

5    here's what he intended to.  I think you've got to intend to do

6    something other than just show up.

7            THE COURT:  Mr. Pasricha.

8            MR. PASCRICHA:  Your Honor, we'd object to that.  I

9    think it adds a layer of confusion.  I think part of your

10   instruction, and I forget what page it is, but part of the

11   things you're going to instruct them on is a conspiracy is

12   complete and the crimes occurred at the time the agreement is

13   reached.

14           Instructing them on that point, which is correct, and

15   then and if adding in this layer of but you've got to do

16   something in furtherance, I don't think it adds any clarity, I

17   don't think it's necessarily required by the law, and I think

18   it would add confusion more than anything else, so we'd object

19   to that requirement at least as requested.

08:38AM 20       And I think we'd further object just in terms of what

21   counsel can argue on this point.  Our concern would be if you

22   give some type of instruction like that, I don't think it would

23   be fair argument to stand up and then say, well, let's look at

24   each of these acts.  He didn't do anything in furtherance of

25   whatever X act, and, therefore, when the Judge tells you

1    there's this furtherance requirement, he didn't further this

2    particular murder, and so, you know, he's not guilty.  I think

3    it invites that kind of argument, which I think would be

4    improper.

5         THE COURT:  All right.  I'm not going to give the

6    requested instructions for better or for worse.  I think that's

7    language that is perhaps a little bit looser than it needs to

8    be, that is, the language from my decision and from the

9    appellate court, so I'm not going to give the decision.

08:39AM 10        Mr. Halpern.

11        MR. HALPERN:  Page 13, Number 11.

12        THE COURT:  I'm sorry, is this of your --

13        MR. HALPERN:  Yes, my supplemental.

14        THE COURT:  Your supplemental.

15        MR. HALPERN:  So I think that everything in these two

16   paragraphs comes out of the materials I've cited, and I think

17   most of it comes out of those two First Circuit decisions.  I

18   know you put in a sentence that characterizes some of this, but

19   I'd ask that this all go in.  It's right out of the case.  I

08:39AM 20   think it's an important explanation of the difference between

21   random events and continuing activity.

22        THE COURT:  All right.  This is in my current draft,

23   that's at page 35, and what we're talking about here is the

24   relatedness requirement and the threat of continued criminal

25   activity requirement.

1          You know, appellate decisions sometimes phrase things

2     in slightly different ways with the same concept.  I think that

3     is what is going on here.  I use the word "disconnected" twice

4     at page 35.  A series of disconnected crimes is not a pattern,

5     and nowhere is it continued racketeering activity, so I think

6     that the essence of the *Ramirez-Rivera* language is very clearly

7     captured in my instruction, page 35.

8               MR. HALPERN:  Thank you.  That's it.

9               THE COURT:  Anything further from the government?

08:40AM 10               MR. PASCRICHA:  Nothing further, your Honor.

11               THE COURT:  All right.  Why don't we reconvene in

12     about an hour.  I'll redistribute a new version of this, and

13     then we can talk about, you know, whether there's any

14     additional things that need to be done.  You are going to

15     confer with your client about whether you want to move for a

16     mistrial on the robbery issue.

17          Are you going to close for the government?

18               MR. PASCRICHA:  I believe Mr. MacKinlay will do the

19     closing, I'll do the rebuttal.

08:41AM 20               THE COURT:  Okay.  Let's see if we can't get that

21     screen pulled up.

22               THE CLERK:  All rise.  If I have this thing done

23     earlier, we'll bring it into the courtroom and you can look at

24     it.

25               MR. PASCRICHA:  Thank you, your Honor.

1          THE CLERK:  All rise.

2          (A recess was taken.)

3          THE CLERK:  All rise.  Thank you.  You may be seated.

4     Court is now back in session.

5          THE COURT:  All right.  I'm circulating to you the

6     redraft of the jury instructions, a couple quick points.  First

7     off, on the question of extreme atrocity or cruelty, one of the

8     peculiar -- first off, we didn't find any case along the lines

9     identified by Mr. Halpern, and because this involves a

09:52AM 10    conspiracy to commit murder by definition, if that's true, it's

11    premeditated, and so conceptually it's a little difficult to

12    see here how you would have a conspiracy to commit a murder

13    with extreme atrocity or cruelty that was also not a

14    premeditation murder.

15          In any event, I've decided to put it in and just

16    follow the pattern instructions for what it's worth, so it's

17    back in.  I think the business about malice that the defense

18    complained about is out.  We have included voluntary

19    manslaughter as well as involuntary manslaughter.  I think

09:53AM 20    those are the greatest hits.

21          I have the formal motion for a mistrial, which I will

22    deny, but I'll wait for the defendant to be in the courtroom

23    before I do that.  Just to be clear, because we have a couple

24    hours as a practical matter, well, maybe it depends on how long

25    your closings are, we are going to have to photocopy and staple

1    on the order of 25 or 30 of these things, so we can't wait till

2    literally at the last second, but if you're sitting at the

3    table and you see something, it is still correctible, you may

4    not convince me, but it is still correctible, and we're still

5    scrubbing it for typos as well if you see any of those, let me

6    know as well.  Mr. Halpern.  I'm sorry.

7           MR. HALPERN:  No, I was just cleaning up.

8           THE COURT:  Oh, Mr. Halpern, for what it's worth, and

9    I've left it in, if you look at page 39, the last sentence, the

09:54AM 10   original draft, and I've left it in, we're talking about

11   whether the defendant must personally commit or agree to commit

12   the two racketeering acts, however, the government must prove

13   that the defendant intended to further an endeavor that would

14   satisfy or actually did satisfy the requirement of a pattern of

15   racketeering activity.  It may be somewhat confusing, but I'm

16   leaving that in.

17          All right.  The defendant is back in the courtroom.

18   The defendant has moved for a mistrial based on the admission

19   of the Irwin Martinez evidence, which I've read.  I'm going to

09:55AM 20   deny that motion, but I am going to instruct the jury that they

21   are to disregard that evidence in its entirety and to give it

22   no consideration and to not speculate as to what other evidence

23   might have been or the reasons for me striking it.  That's how

24   I'll handle that.  Mr. Halpern.

25          MR. HALPERN:  I just request that exhibits that

```
  1    related to Martinez be maintained as part of the record.

  2            THE COURT:  Maintained as part of the record?

  3            MR. HALPERN:  Yes.

  4            THE COURT:  Yes, of course.  But just to be clear,

  5    because I'm going to strike them, let me make clear what I'm

  6    going to strike.  According to my records, I have 122 through

  7    126 inclusive.

  8            THE CLERK:  I have 121 also.

  9            THE COURT:  121 was the map.  Yes, I'm sorry, 121

 10    through 126 inclusive.

 11            THE CLERK:  Those exhibits have been removed from JERS

 12    as well as the hard copy.

 13            THE COURT:  They will not go to the jury either in

 14    hard copy or electronically.  They will be struck, but, of

 15    course, they will be kept as part of the record in the case.

 16            MR. HALPERN:  I don't know that I want to do this, but

 17    I'd be interested if it becomes an issue.  Would you have an

 18    issue if I referred to that evidence in the closing?

 19            THE COURT:  Yes.

 20            MR. HALPERN:  In the sense of --

 21            THE COURT:  It's not part of the case.  You asked me

 22    to strike it, and I've struck it.  It's out.  It's going to

 23    confuse them.

 24            MR. HALPERN:  I think the argument would be that they

 25    were shown evidence that they had no connection to MS-13.
```

1    THE COURT:  If you make that argument, I think

2 fairness would require the government to be able to respond why

3 they were shown that evidence, and I don't think that's fair.

4 I think we were still missing a couple jurors.

5    THE CLERK:  He actually gave me the thumb's up.

6    THE COURT:  Everybody is here.  Do you want to get

7 everybody lined up.  It's about four minutes to ten.  Are you

8 ready to go?

9    MR. MacKINLAY:  That's fine.

09:57AM 10    THE COURT:  Mr. Halpern, are you ready to go?

11    MR. HALPERN:  Yes.  We have to introduce that

12 stipulation.

13    THE COURT:  We have to do the stipulation, let me pull

14 my notes here, the instruction on Irwin Martinez.  I'm going to

15 give the cautionary instruction on the medical records, and

16 then we'll get into the closings.  Actually, why don't you

17 remain seated, Mr. MacKinlay, while the jury comes in.

18    THE CLERK:  All rise for the jury.

19    (JURORS ENTERED THE COURTROOM.)

10:00AM 20    THE COURT:  All right.  Ladies and gentlemen, welcome

21 back.  I appreciate your cooperation in starting a little bit

22 late.  It allowed us to do everything we needed to do to get

23 ready for today.

24    We have three items of business, the first is I think

25 that there is a stipulation that the defense wishes to

1   introduce.

2           MR. HALPERN:  Yes.

3           THE COURT:  Mr. Halpern.

4           MR. HALPERN:  The parties stipulate that in a

5   report --

6           THE COURT:  Can I just explain "stipulation" is a

7   legal word meaning an agreement, the parties agree that these

8   facts are true.  I'm sorry, go ahead.

9           MR. HALPERN:  "The parties stipulate that in a report

10:01AM 10   prepared on April 23, 2015, summarizing an April 21, 2015

11   interview of Christian Henriquez, with respect to Henriquez'

12   statements concerning a plan to murder him, a law enforcement

13   agent wrote, Henriquez believes that MS-13 Los Enfermos want to

14   murder him because they think he snitched on Little Crazy or

15   Tremendo."

16           "Approximately one month ago, Roca told him that he,

17   Roca, did not want to kill Henriquez because he knew that

18   Henriquez was innocent of being an informant.  Roca only wanted

19   to warn Henriquez that he was in danger of being killed.  Roca

10:02AM 20   told Henriquez that Big Crazy told him that Henriquez had

21   snitched on Little Crazy and Tremendo.  Roca said that Big

22   Crazy gave the order to kill Henriquez."

23           I'm offering this as Exhibit 292.

24           THE COURT:  All right.  It's admitted, Exhibit 292.

25           (Exhibit No. 292 received into evidence.)

1          THE COURT:  All right.  That's the first thing we need

2    to do.  The second thing is medical records from Mass. General

3    Hospital or the Mass. General system had been admitted as

4    Exhibit 117.  This concerns Christian Carillo who testified

5    that he had been attacked with a machete.  The medical records

6    include what Mr. Carillo told his healthcare providers what

7    happened, and I'm going to ask you, I'm going to instruct you

8    that you may consider that only for the purpose that that's

9    what he said to the doctors and nurses, this is what happened

10:03AM 10   to me but not as a description that you may consider as to what

11   happened.

12          In other words, the first question a nurse or doctor

13   often says is what happened, and the person responds, and it's

14   not sworn testimony as to exactly how things unfolded, it was

15   made for the purposes of medical treatment, and you can

16   consider it only for that purpose, and I think that's

17   Exhibit 117.  That's the second thing to do, that I wanted to

18   accomplish.

19          The third is the following:  There was testimony by

10:04AM 20   Irwin Martinez.  He testified in substance that he had been

21   robbed, he was outside sitting on the porch looking at his

22   phone and that he had been robbed on April 9th, 2014, and there

23   were some exhibits that came with that, Exhibits 121 through

24   126, a video and a map and so forth.

25          I'm striking all of that evidence from the record, so

1    you are to disregard it completely.  You should not speculate

2    as to why I'm striking it, what the evidence showed or didn't

3    show, and it should form no part of your consideration of this

4    case directly or indirectly.  Again, I'm striking it, and you

5    are to disregard it.  That's the testimony of Irwin Martinez

6    and Exhibits 121 through 126, which you will not have with you

7    in the jury room because I've struck them.  That brings us, I

8    think, to the closing arguments.

9         Again, the government is going to go first followed by

10   the defense followed by very brief opportunity for rebuttal

11   argument by the government and then my instructions to you,

12   which will be in writing, and I will read aloud.  I don't know

13   quite what breaks we're going to take and when because I don't

14   know how it's going to unfold, so we'll see how it goes.

15        All right.  Mr. MacKinlay, are you ready?

16        MR. MacKINLAY:  Yes, your Honor, thank you.

17                       CLOSING ARGUMENT

18        MR. MacKINLAY:  Tremendo brought a rain of error to

19   the City of Chelsea.  He joined MS-13 with a fundamental tenet,

20   a fundamental requirement of killing rivals.  The evidence that

21   you heard over the past several weeks demonstrates that he's

22   guilty of the charge of racketeering conspiracy.  Indeed, he

23   was guilty of the charge of racketeering conspiracy before the

24   wheels of his plane touched down in the State of Massachusetts.

25        What do I mean by that?  Well, remember the testimony

1     when he was in Michigan before he came here, and he was

2     organizing the gang.  He made plans, he made recruitment

3     videos, held meetings over the telephone.  Did the actions, did

4     the activities acted and through his words in a manner that

5     demonstrated that he was joining a conspiracy and all those

6     things that were to further the conspiracy?  He brought with

7     him, as you heard, reinforcements, in the form of people that

8     came with him on the plane, Bravo, Gallito, members of the gang

9     that came with him to help build up, to help activate, to help

10    develop, make it into the biggest gang in the country was the

11    testimony.

12         We put additional evidence before you besides just the

13    information from Vicky Martinez and others that occurred in

14    Michigan.  Why?  Why did we spend so much time parading

15    witnesses here and bringing evidence before you?  Conspiracy in

16    action, members of the jury, conspiracy in action.  We wanted

17    you to see what actions he was doing after the fact, and others

18    were doing at his behest in his gang that demonstrated his

19    intent to be a part of the MS-13 conspiracy.

20         That's why we brought you additional evidence,

21    evidence to prove to you that the agreement, and that's what

22    this is about, an agreement, an agreement by the defendant.

23    That's the crime.

24         I am not the Judge, obviously.  Judge Saylor will

25    instruct you on the law.  Anything that I say that differs from

1    what he's going to say, obviously, listen to him, but an

2    agreement is a shared understanding of the crime, simply put, a

3    shared understanding of the crime, simply put, simply stated,

4    an understanding.

5         What else do we have to prove?  What's a conspiracy?

6    Briefly stated, again, the Court will provide you much more

7    detailed instructions at the conclusion, but a conspiracy is

8    complete, and the crime is committed when the agreement occurs.

9    There's no requirement of demonstrating that the conspiracy was

10:09AM 10   actually successful or it was completed because it's the

11   agreement to join that constitutes the crime.

12        Now, again, briefly what conspiracy?  Conspiracy to do

13   what?  The defendant and the evidence will establish that the

14   defendant joined the MS-13 conspiracy that involved some member

15   of MS-13 committing two or more racketeering acts.

16        We don't even have to prove that he committed the

17   racketeering acts or that he even agreed to commit two

18   racketeering acts.  Agreement that some member, agreement to

19   join a conspiracy that some member would do that, and the Judge

10:10AM 20   will provide you a list of the racketeering acts we've alleged,

21   and you can rest assured that committing murder, conspiracy to

22   commit murder, robberies are some of those charges.

23        Before we move to some of the other areas in terms of

24   the more challenging issues that are presented in terms of the

25   law, I want to take at least three areas at the outset that I

1    think are pretty simply understood.  The evidence, likewise,

2    supports, the abundance of evidence, supports them in the same

3    manner as the elements that we just discussed.  The elements

4    are just what we need to prove in terms of establishing the

5    crime.

6         The first one is "enterprise."  What's the enterprise?

7    The enterprise, quite simply, is MS-13.  The enterprise is the

8    gang that you heard about from everybody from Claudia Saa at

9    the beginning of the case, Jeff Woods at the beginning of the

10   case, through and including Vicky Martinez and Clacker,

11   Christian Henriquez.

12        MS-13.  You remember the description provided by

13   Claudia Saa about the NFL.  Do you remember that, how the NFL

14   is like MS-13, and the East Coast Program and the West Coast

15   Program were like the conferences, AFC and NFC.  Within the

16   conferences are the teams, those are the cliques.  You remember

17   that.  Well, the enterprise is the NFL.  It's MS-13.  It's not

18   one of the teams, one of the cliques.  It's not merely ECS,

19   Enfermos clique in Chelsea, it's the whole of MS-13.

20        So what are the indicia of those types of MS-13, and

21   why is it the evidence establishes that MS-13 is the

22   enterprise?  You know the indicia, it was the colors they wore,

23   the structure they had.  There's a choice of weapons, being

24   machetes, the structure being a leader in El Salvador, an East

25   Coast leader in Virginia, and then all the cliques in

1       Massachusetts.  Do you remember that?

2              The scope of the enterprise is not just the local

3       group though, it's the entire scope of MS-13.  That's the

4       enterprise, the whole NFL.

5              Do you remember I showed you one of the recordings

6       that we had, the transcript that we played for you, and the

7       transcript was read to you.  We read the transcript.  I know

8       this was certainly early on in the trial.  Sugar, you may

9       recall, was the leader of the ECS clique in El Salvador.

10:13AM 10     What does he say in one of the recordings of the

11      meeting in Virginia, the transcript to which an excerpt you

12      have before you now.  "Let's all work together.  This is my

13      turf.  We all represent Mara Salvatrucha."  Isn't he telling

14      you what the enterprise is?  Isn't he telling you that it's the

15      whole of MS-13?

16             More locally in Massachusetts, you have evidence from

17      Clacker, Christian Henriquez, in which my Brother counsel

18      showed him a series of photographs, took him a pretty lengthy

19      period of time because he went through a whole stack of them,

10:13AM 20     marked them, and you have them as exhibits in the case, but

21      those are some of the people that are involved here in

22      Massachusetts, those that he identified in their actual

23      positions in their respective cliques.  You can see all the

24      various cliques and all the people that he identified that he

25      has personal knowledge are involved in MS-13 in Massachusetts,

1    a variety of cliques.

2           He gave some of their -- I believe he gave all of

3    their positions, a number of them homeboys.  You remember from

4    the structure discussions over and over again.  In fact, I

5    think even Sugar described in one of the calls, in the

6    transcripts of the recordings:  "Paro," "chequeo," "homeboy."

7    How you move up?  Violence.  How do you get to be a homeboy?

8    Killing.

9           A number of these people, they're identified by

10:14AM 10    Christian Henriquez are homeboys.  These are people that

11    defendant joined a conspiracy with.  In addition to the people

12    that were identified by Clacker, he also testified there was

13    over 100 MS-13 gang members in Massachusetts through a variety

14    of cliques.

15           How do those cliques act?  Like brothers.  It's like a

16    brotherhood.  They're all in it together, common purpose,

17    common goal, everybody kill the rivals, and what cliques have

18    been identified for you by other evidence?  They're listed

19    here.  There's eight of them.  Enfermos Criminales Salvatrucha

10:15AM 20    is just one of them.  All of the cliques are part of MS-13, all

21    of them are part of the conspiracy that the defendant joined.

22    All of them are available with people that could have

23    committed, were agreeing that were committing two or more acts

24    on behalf of MS-13.

25           Beyond the cliques statewide, you also know about ECS,

1    Enfermos Criminales with Tremendo at the top as the leader, but

2    the others, you've heard their names, you've seen them in

3    transcripts as well throughout the trial.  They're all members

4    of the clique as well, and they are all, according to the tapes

5    included, each one of them tied in as members through

6    cooperators' testimony and the testimony of Vicky Martinez, the

7    testimony of Christian Henriquez, documentary evidence.  Many

8    are recorded indicating and conducting the MS-13 activities.

9    This is still part of the enterprise, all the way down to the

10   group in ECS.  Make no mistake, that's not limited to that

11   group in terms of the enterprise.

12         This is, as you may recall, an MS-13 book that was

13   recovered during the search following Daniel Menjivar's arrest,

14   and it included inside of it certain notations that referenced

15   interesting information showing membership and showing the

16   involvement of the enterprise locally.

17         It shows the names.  Do you remember Christian

18   Henriquez went through the names, Cuervo, Primen was Villano

19   and so forth, Clacker, Roca, and there's two additional names

20   on the second half, the bottom half, which reflects money or

21   dues that were collected to be paid to support weapons locally

22   and to pay back to El Salvador, the dues that were owed back to

23   the clique.

24         But this document also clearly establishes that these

25   people are part of the enterprise all the way down to the

1   people that were in Chelsea, but, interestingly, the two

2   reinforcements, the two soldiers, Roca, Gallito and Bravo that

3   ended up coming along with him are also referenced there as

4   well.

5        The next issue that we can deal with I think fairly

6   simply is membership, and I would put it to you like this.  Was

7   there any evidence whatsoever that Tremendo was not involved as

8   an MS-13 gang member, that he was not the leader of the ECS

9   clique locally?  Of course not.

10:18AM 10        Over and over you heard it, in fact, you heard, you've

11   seen his tattoos, you've heard about them, you've seen about

12   the YouTubes that he produced, you heard them, violent-laden,

13   scary images.  He produced them.  He announced, he advertised

14   himself as being a leader of the gang, but there's more than

15   that.

16        Vicky Martinez also indicated that he's a member,

17   Clacker, and she indicated that he was the word, and you heard

18   what the word is, the first word or the word, "leader."  What

19   does the word mean?  The boss.  Not just Vicky Martinez saying

10:19AM 20   what the word is, you heard from Claudia Saa, and you heard

21   from Jeff Wood, that's who runs the clique, he was the word.

22   He was the boss of the clique according to Clacker as well, so

23   there can be no doubt that he was the leader and a member as

24   such of MS-13.

25        But in addition to being the leader and having the

1    title, tattoo, control that's associated with it, he gave out

2    orders, he told people what to do, he announced his presence

3    and his purpose, even at crime scenes.

4         We'll talk about these later, more specifically, "But

5    I am Tremendo from Enfermos Criminales."  That was the time

6    when he struck Christian Carillo in the head with the machete

7    moments before that.  That was the testimony of Vicky Martinez.

8         What did he say when he was shooting at

9    Javier Servellon?  Again, "La Mara," announcing his presence,

10:21AM 10  he's told you, "I'm MS-13," at the scenes of incidents, in

11   addition to having the tattoo, and in addition to his mother of

12   his child saying, in addition to one of his fellow gang members

13   saying it.

14        The third area that I want to move through, again,

15   relatively simply will be interstate commerce requirement.

16   Now, the Judge, again, will instruct on the law relative to

17   this, but I would suggest it's a minimal effect is required,

18   very minimal effect.

19        We did not rely on minimal effect.  In fact, we proved

10:21AM 20  that interstate commerce was affected by the affairs of the

21   enterprise in four ways, through four groups of evidence.  The

22   first was travel.  You remember Vicky Martinez.  She testified

23   how they rode on the top of a train in El Salvador to Texas

24   before being arrested, crossing the international line, the

25   border, that he was MS-13 beforehand, and eventually he was

1    being directed by the gang to come to Chelsea to set up shop,

2    right, to build up the clique because there was a lot of

3    presence here, because 18th Street was too strong here,

4    international travel by both of them, interstate travel.

5         How so?  Well, the defendant's own records indicate

6    that Tremendo along with Vicky and two other individuals was

7    reinforcement.  Gallito and Bravo also flew here at the same

8    time traveling across state lines, obviously, in an airplane.

9    We talked about it briefly earlier.

10:22AM 10        In addition to the travel of these individuals, which

11   in and of itself meets the requirement, there's also you

12   remember conversations with via the Internet.  I'm not sure it

13   was Skype or one of the other Internet, Facetime-Type devices

14   where they had conversations via the Internet realtime with

15   people outside the state, gang leaders in Virginia and overseas

16   in El Salvador.  Again, those conversations also meet the

17   interstate commerce requirement.

18        Third, telephone calls.  You heard testimony from

19   Vicky Martinez as well that there were phone calls where

10:23AM 20   meetings were conducted via the telephone, another way, both

21   internationally with Sugar and with Bunker, who were the

22   leaders in El Salvador, as well as in Virginia.  That's the

23   third way.

24        The fourth way is the firearms.  You heard from

25   Special Agent Mattheu Kelsch from the ATF, who examined these

1   three firearms that we marked previously as exhibits, and

2   indicated based on his training and experience that each was

3   manufactured outside of the State of Massachusetts.  More

4   specifically, the Beretta was made in Italy, and the other .22s

5   were made in Tennessee and New York, respectfully, and,

6   therefore, since they were being manufactured outside of

7   Massachusetts, they had to have crossed state lines before they

8   were recovered here at the crime scenes, at the destroyer house

9   for one of them in Revere, at the shooting scene of Dennis

10  Perdoma Rodrigues for the second one and in the backpack worn

11  by the defendant.  Again, each one is a firearm in the opinion

12  of the ATF agent, moreover, each traveled in interstate

13  commerce by being manufactured outside Massachusetts.

14          A little bit about government witnesses.  You heard

15  from Vicky Martinez.  I've referred to her a couple of times.

16  You heard from Clacker, Christian Henriquez.  Quite a long

17  testimony between the two of them.  But there's multiple ways,

18  at least four ways that I'm going to suggest, submit that you

19  can find based on your assessment of their testimony that

20  they're credible.

21          The first, did you notice that they corroborated each

22  other?  In other words, they said things, each one said

23  something, and the other one said something that was remarkably

24  similar.  That's how they corroborated each other.  For

25  example, didn't they both tell you, if you have a memory of

 1    their testimony, that controls, but think about it.  Didn't

 2    they both say that he, Tremendo, was coming to Massachusetts to

 3    set up the clique, to recruit more members, to activate the

 4    clique because there were more targets here, to ramp up the

 5    efforts, to build up MS-13?  Didn't they both say that?  Did

 6    you hear any evidence that they knew each other were

 7    corroborating and helping the government?  Nothing.

 8         Does it have a ring of truth to you when two people

 9    give the same account of an incident?  I would submit that you

10:26AM 10    could find that it does have a ring of truth.  They corroborate

11    each other.

12         Second way, courtroom demeanor.  Again, when we talk

13    to people every day, every day of your life, you bring your

14    common sense and your life experiences into play.  What do I

15    mean by that?  You size people up.  What do they look like, how

16    do they act?  Are they evasive?  Do they answer the question?

17    Do they try to add things in?  Do they try to keep things back?

18    Did you see any of that in the courtroom demeanor of

19    Vicky Martinez?  If you did, take it into account.

10:26AM 20         Did you see any of that in the testimony of

21    Christian Henriquez?  Again, I submit that you could find that

22    they were credible based upon the way they handled their

23    questions, their responsiveness to the questions and the way

24    that they conducted themselves here in the courtroom.

25         The third way, the circumstances.  Now, what do I mean

1    by that?  Christian Henriquez, did he start talking because of

2    a problem that he had, an arrest, anything of that nature?  No,

3    he started cooperating because they were going to kill him.  He

4    was told that he was going to be killed, he checked it out,

5    find out he believed it to be true and then became a part of

6    the government's case, not before.

7        The circumstances of his coming on board to testify

8    against the leader of this gang demonstrate, I would submit to

9    you, that you could find them to be a credible piece of

10:28AM 10   evidence to support his testimony.

11        Now, what's this about benefits he received?

12   Benefits.  Benefits?  Witness protection is a benefit?  No,

13   that's just to keep him alive, keep him safe.  Money expended.

14   What cost, at what cost the value and the cost of human lives

15   lost in the investigation and the cost of those people who were

16   attacked and suffered injuries, but, yes, the government spent

17   money to support and keep him safe.  But how much money went

18   into his pocket as income?  Nothing.  Nothing.  He had to move,

19   uproot his whole life and move away, never talk to his friends

10:28AM 20   again, move on, disappear.

21        What about Vicky Martinez?  What's the circumstances

22   of her testimony that came to life to be brought in here before

23   you?  Well, to be clear, I think the testimony you remember

24   will be she didn't ask for anything.  She didn't ask for

25   anything.  Her testimony was, no, I didn't ask for any

1    immigration benefits.  I didn't ask not to be prosecuted, I

2    didn't ask for anything, I decided to come here.

3         Again, she indicated she was afraid and she needed to

4    be subpoenaed or compelled to come here, but the circumstances

5    of her coming to light and coming to this court warrant

6    consideration by you in terms of assessing her credibility.

7         The final point of the corroboration, assessing the

8    credibility of these two people would be this:  What did the

9    gang itself think of this?  What did they view the people like

10:29AM 10   Vicky Martinez and Christian Henriquez?

11        Well, Sugar makes it pretty clear, he's worried about

12   the FBI getting involved with them, giving them money to loosen

13   their tongues, not to get them to lie, get them to talk because

14   they know what's going to happen if they talk.

15        Even the leader of the gang in El Salvador

16   acknowledges that people come in here and testify, they'd be in

17   a position to sink them.  Also, what about the local group?

18   What about the local clique?  How about Roca and Chucky?  What

19   did they say on a recorded meeting on April 21st?  Again, we

10:30AM 20   read this portion to you, and we also recorded it during the

21   opening, but he could wind up harming a great many people.

22   Chucky, he could sweep all of Chelsea, the whole structure,

23   he'll finish us all off.

24        Did they say because he's going to lie and make stuff

25   up about all this?  No.  He knows what happened here, and if we

1       don't kill him, he's going to tell someone like you guys about

2       it.   The gang itself in El Salvador, the gang itself here both

3       feared that this man would destroy the whole structure, the

4       whole enterprise locally of MS-13.

5              They pulled out all stops on him by putting a green

6       light on him.  What are the goals of MS-13?  Simply stated, the

7       goals of MS-13are to kill rival gang members.  You heard it

8       over and over again.  You heard it from Clacker.  It's always

9       the same, kill other people from the other gangs, 18th Street

10      and other rival gangs.

11             You heard it from Claudia Saa.  That's the ultimate

12      for them.  They wanted to use violence at every level because

13      they want to kill the rival gang members.  That's what they do.

14      Clacker said the same thing.  Vicky Martinez, Clacker both said

15      the same thing, that they wanted to identify and kill chavalas.

16      Over and over again, you heard the same theme.  That's one of

17      the goals, that's one of the fundamental parts of the gang,

18      kill the rivals, the gang and the conspiracy that he joined.

19             Jeffrey Wood indicated based on his investigation here

20      and his personal knowledge that the goals are to eliminate the

21      rivals, "disappear the rivals" I believe was used by one of the

22      witnesses.  I believe it was Clacker.

23             In the meetings, they discussed just that, they

24      discussed who the rivals are and how they're going to kill

25      them.  Now, if that sounds an awful lot like the conspiracy to

1    commit murder, it is.  We'll come back to that later, but along

2    the way, some of these things we're talking about are going to

3    meet -- what the Judge is going to instruct you on are acts

4    that constitute proper racketeering acts.  Conspiracy to commit

5    murder is clearly one of them.

6         At these meetings, they discussed that they shared

7    photographs.  They also identified through Facebook pictures,

8    you remember this, that's how they would know what to do, where

9    to go and find someone.  They would search through different

10   means to do that.

11        You remember hearing the multiple means of going out

12   and addressing the rivals.  Sometimes they staked them out, the

13   place where they might be.  Sometimes when they're on patrol,

14   "missions," I think maybe was the word that was used, put them

15   in the general area.  Other times, you heard about luring,

16   "catfishing" was the term used.  Do you remember that?  That

17   really horrible practice of tricking someone into thinking

18   they're meeting someone when, in fact, they are not and then

19   attacking them.  Three means that they used to conspire, attack

20   and kill rivals.

21        What about the murders?  Perfect time for me to circle

22   back and say, again, we're not required to prove that the

23   murders actually occurred, just there was an agreement to do

24   that.

25        Counsel raised in the opening statement, "Where are

1   the bodies?"  "Where are the bodies?"  You heard testimony

2   about six people in this aspect of the investigation that were

3   killed during MS-13 attacks.  Javier Ortiz, Wilson Martinez,

4   18th Street, Irvin De Paz, 18th Street, Christofer De La Cruz,

5   18th Street, Jose Aguilar Villaneuva, MS-13, and Katerin Gomez,

6   an innocent bystander for a shooting incident involving

7   Eastside gang.  That's where they are.  There's where the

8   victims are.  And there's the situations that got them where

9   they are.  In the case of Katerin Gomez, being at the wrong

10:35AM 10   place at the wrong time.

11          I do want to talk a little bit about the Katerin Gomez

12   murder because we provided a summary presentation.  One

13   witness, excuse me, I think we provided two witnesses.

14   Genevieve Gibbons, remember the state trooper who testified

15   that she went to the scene and what she did in the aftermath.

16   And then you heard, I believe, from Dontae Hart afterwards.

17          But you also heard from Clacker.  He said that Cuervo

18   was trying to shoot at the Eastside gang members and missed and

19   hit the woman in the window.  There was an argument out front,

10:35AM 20   she went to the window, she was struck by a rival bullet that

21   was aimed at the rival person.

22          She also, in addition to that, Clacker also said that

23   he knew that they were there to kill rivals that day.  With

24   this one, we don't need to rely on Clacker exclusively because

25   you have the iPhone of Cuervo and the message of Cuervo, an

1    excerpt of which is right here.

2        This was just a mere, again, seven or eight hours, I

3    think it was like 3:30 in the afternoon, that she was killed

4    just after midnight when she went to the window and the bullet

5    came through, you remember this, this was just Friday,

6    Thursday.

7        What did Cuervo tell you about the malice in his heart

8    on that day before he went out there?  He's looking for

9    homeboys, paying out and shooting with 13 bullets.  He's

10:36AM 10   hanging with his home boys, he's looking for the rivals, they

11   are greeting homeboys, making a presence felt in the area.

12   He's going there to look for the rivals from the Eastside gang.

13   He finds them.  He armed himself with a gun.  He loaded the

14   gun.  He went to that location, and he mistakenly fired the

15   gun?  Come on, come on.  You know better than that.

16       Dontae Hart says, yeah, they were rivals, Eastside

17   gang was rivals.  He saw Alex Rodriguez three feet away at the

18   time, approximately.  Remember, I stood somewhere around here.

19   I don't remember exactly where I stood, but do you remember he

10:37AM 20   gave an estimate how close the person was to Cuervo at the time

21   that he fired the shot, and he estimated around three feet.

22       But he said he's advancing, advancing, retreating,

23   running away, calling for help, nothing.  He's advancing,

24   Cuervo is, and you can see that on the video that he's

25   advancing.  When he comes up on the video and he raises his arm

1    afterwards and tries, at least points his weapon as they run

2    away.

3            That, members of the jury, is transferred intent

4    theory of first-degree murder that you're going to hear.  He

5    fired the gun at one person that he intended to kill

6    demonstrated by his malice in his heart of bringing a loaded

7    gun to that location, demonstrated by raising the weapon,

8    pointing it and firing it.  That's transferred intent.  He

9    intended to kill one person, the bullet missed and hit

10:38AM 10   Katerin Gomez and took her life.

11           What did the defendant's witness add to this?

12   Nothing.  Nothing.  Why?  The defense witness was on the wrong

13   premise.  He premised that your bullet goes where you point it.

14   I guess if you're an expert marksman, that might be the case,

15   but also use your common sense and life experiences in terms of

16   what you have seen and what you have learned.  Which direction

17   does the firearm kick when it's fired?  He shot at one person,

18   he killed another, that's transferred intent murder.  That's

19   what happened with Katerin Gomez.

10:38AM 20          What about the conspiracy to commit murders?  The plan

21   is to kill rivals.  The photos, the identifications that are

22   made through Facebook, patrolling, staking out, luring, all

23   those different means that they used to attack them.

24           You heard testimony from Clacker about that, the

25   testimony about how they routinely, how they went searching for

1    people, how they looked for people, and also how they -- part

2    of the whole plan of both membership in the gang and

3    advancement in the gang is to kill people.  It's to commit acts

4    of violence.  That's part of the fabric of MS-13, until it

5    turned around on Clacker though, right, the conspiracy to kill

6    him.

7            The testimony was the order came from above to kill

8    him.  The recording indicates that Violento spoke to Tremendo,

9    you're not going to talk about this like that, which one of you

10:39AM 10   was inside, inside, inside, right, incarcerated.  Gave

11   Tremendo -- "It was Tremendo?"  "Uh-huh."

12           Tremendo, you heard from the structure, who talked

13   about of the enterprise that the local leader had to get

14   approval to green light one of their members.  Do you remember

15   that?  The approval comes from El Salvador.  This is almost a

16   year after he's incarcerated.  His fellow gang members are

17   describing that he pulled the trigger to seek the authorization

18   and receive the authorization to have Clacker killed.  With

19   alarming detail, Roca, Chucky and Villano talked about that.

10:40AM 20          Now, I'm not go through and read all these sections of

21   the transcripts again, but you remember that, the technique,

22   the beheading of him so he won't talk, using the wires around

23   his neck, cutting his jugular like a hen so he bleeds out

24   quickly and quietly so he doesn't make any sound, where they

25   would shoot him, but they were afraid they'd be caught on

1    video, the neighbors would call the police and the police would

2    come.

3           Was there a conspiracy to kill Clacker?  Absolutely.

4    They hunted him, they circled his house, the GPS map that you

5    have in evidence demonstrates, which is on the bottom of the

6    cooperating witness' car, CW-1's car, shows the car circling

7    its prey, circling its prey, the prey, Christian Henriquez.  He

8    wasn't there though.  He was upstairs here.  He was upstairs

9    here April 28th, testifying in the grand jury.  He wasn't

10:41AM 10   around down in Chelsea where his own gang members are circling

11   his house waiting for the opportunity.

12          You remember the video.  You remember the video with

13   the machete and the pants.  "Be careful, you might get hurt."

14   You remember that.  Do you remember their faces on them?  Do

15   you believe was that a joke?  Was that something they were just

16   joking about?  Of course not.  They had their gang faces on.

17   They were ready to do what they needed to do to enforce the

18   rules.  That's the type of conspiracy that he joined.

19          What about the robberies?  Well, word came down from

10:42AM 20   El Salvador, we need more money, got to do more robberies, and

21   robberies, they did.  What did Vicky tell you?  Because if you

22   think about the robberies when we get to the end here, the

23   robberies will get you a racketeering act just on what Vicky

24   says about one night.  Think about that, one night.  Three

25   robberies, three different times, one night.

1          One was not a completed robbery.  The Judge will

2    instruct you on the sort of lesser charges, assault with intent

3    to rob.  That would be like if you stab someone and you don't

4    get your money because they don't have any or they get away

5    during the course of the robbery and assault the person.

6    Again, I, obviously, defer to the Court on the particulars of

7    that, but one night, multiple people involved.  How does she

8    know?  She's in the car.  She's in the car.

9          Is that one of the racketeering acts that he agreed to

10:43AM 10  do himself, although he didn't need to prove it, or that other

11   people that were with him that particular day also agreed to do

12   and did, in fact, do, even though we don't have to prove that.

13   Yes, it is, it's clearly established to the robberies, the

14   evidence of which you have.

15         And also, remember, Roca and Bravo were involved as

16   well, and Clacker indicated to that that other people were

17   involved in robbing both restaurant delivery people and other

18   robberies that he described that were conducted routinely to

19   get money to pay for what?  Weapons and to send back to

10:43AM 20  El Salvador.

21         Are those robberies in furtherance of the gang's

22   activities?  Of course, they are.  That's where they get the

23   money.  That's how they funded.  Others, we'll talk about in a

24   minute, funded through other means, they funded it primarily,

25   primarily through robberies, and the evidence established that.

1    That evidence established that both he did them and other

2    people did them with him, so clearly they agreed, based upon

3    their conduct, of actually following through.

4         Others funded their activities by means of drug

5    trafficking.  You heard that one of the cliques that sold drugs

6    in order to get money to pay for weapons as well as to send

7    back to El Salvador.

8         You also heard that Villano sold marijuana, and he

9    used it according to the statement that he made recorded on

10:44AM 10   April 28th that that's how he supported himself by selling

11   drugs, and also it's very clear from Vicky Martinez that he not

12   only sold drugs, but he provided the money that he made to

13   Tremendo to use in the gang business.  Another checking the box

14   of the direct link to drug trafficking to support the direct

15   gang activities of the gang, the words of Villano himself.

16        I want to take a minute here and digress.  I need to

17   digress for a minute to this.  I need you to watch for

18   something that I expect may occur, what I'm going to call a

19   smoke show, smoke screen.  You know, look over here because

10:45AM 20   it's a cloudy issue.

21        What do I mean by that?  Self-defense, self-defense.

22   The Judge will instruct on the law again.  I keep reminding you

23   of that, but self-defense is a way to mitigate and a way to get

24   a lesser-type charge on the state court offenses of assault

25   with intent to kill or some other charge.

1          Let me give you a big fan for the smoke machine.  Do

2     you know the big fan that you're going to plug in and hit on

3     high?  It doesn't matter.  It doesn't matter.  Do you know why

4     it doesn't matter, because we don't need to prove the

5     underlying crime was actually committed, just the agreement, so

6     be thinking when you hear about the smoke, why do I need to be

7     concerned about this if they're not going to have to prove that

8     they committed the crime in the first place?

9          Self-defense, attempted murders.  Every reasonable

10:46AM 10     avenue of escape prior to resorting to deadly force.  Think

11     about that.  In the case before we get to self-defense, two

12     cases that we're going to talk about.  I want to talk about

13     Dennis Perdomo Rodriguez.  You remember Dennis Perdomo

14     Rodriguez.  That was the case where he was graphically cut, I

15     think the words were "eviscerated" and then shot by Roca and

16     Villano.  You remember that.

17          Roca says, "I was stabbing him, and the other guy was

18     shooting him in the chest.  We killed him.  Already dead.  We

19     thought he was already dead."  What does Villano say?  "Bang,

10:47AM 20     bang.  The son of a bitch's eyes were open.  I was shooting

21     him, and the gun was not firing anymore."

22          Consistent with what the ballistician said, perhaps

23     the weapon had a nail in it and wouldn't work very well.  He

24     was trying to take the life of Dennis Perdomo Rodriguez, as was

25     Roca, and what occurred?

1        Miraculously, Star Chung told you that she went to the

2   scene, a police officer, and she put his intestines back inside

3   of his person, again, I apologize for the graphicness, but it

4   is what happened, and he was transported to Mass. General.

5        You heard from Dr. Peter Fagenholz, and what did he

6   tell you?  He remembered him.  Almost three years ago.  Why?

7   "People don't usually survive those types of traumas," he said.

8   Cardiac arrest in the operating room, in the emergency

9   department.  What was the intention of him being in the

10:48AM 10   emergency department?  Cardiac arrest, no blood.  He bled out.

11   They brought him back.  Intent to kill him?  Are you serious?

12   Intent to kill him?  Absolutely they intended to kill him, both

13   Roca and Villano.

14        How about the shooting that Tremendo conducted?  What

15   do you need to remember about the shooting from Tremendo is

16   some things that are painfully obvious from the video, but some

17   things that I just want to go back and set up before that.

18        What did Vicky Martinez tell you about the shooting

19   that particular day?  He was upset over a prior attack, do you

10:49AM 20   remember, he was angry, and maybe it was about her being

21   followed, maybe it was about an incident that occurred the day

22   before, a few days before.

23        In any event, Tremendo's upset, and he was going out

24   to look for 18th Street gang members consistent with this

25   fundamental tenet of being a part of MS-13, and what did he say

        1    to her?  "Don't worry, we don't have to bother looking, they're
        2    here."  What does he do?  It's all captioned on video.  He gets
        3    out of the vehicle, and he walks down the street, circles back
        4    around, do you remember, and attacks these two individuals,
        5    Javier Servellon and Amal Capacillo.
        6          Servellon runs initially, and then he tells you in two
        7    different exchanges, 1, he was brave to go back to the scene to
        8    help his friend, 2, he was stupid to go back to help his
        9    friend.  In any event, he went back to help his friend, and
10:50AM 10    when he went back to help his friend, he took a chain out, and
       11    did he swing it?
       12          The video shows him going like this.  (Indicating)
       13    what happens after that though?  He starts running away.  Why?
       14    He tells you he saw the gun in his hand.  The gun was in his
       15    hand running away from the scene, and he gets shot at, not once
       16    but twice.
       17          In fact, he had no more bullets left in his gun when
       18    the gun was found in his backpack.  He armed himself to go out
       19    there and carry out a grudge, an attack on a fellow MS-13
10:50AM 20    member or an affront to his girlfriend.  Either way, he arms
       21    himself, he loads his gun, he goes to the location, he draws
       22    his gun, he aims his gun, he shoots his gun, his gun strikes
       23    the target, he shoots his gun again.  Self-defense?  I don't
       24    know.  I think it's ridiculous.
       25          What did he say though right before he fired the gun?

1    "The beast is going to take you like this."  What's the beast?

2    MS-13, the enterprise that he's a part of, that he joined to

3    commit such acts, he's trying to kill people like this.  The

4    bullet hit a vital organ, yes, it hit his bowels.  He had a

5    peritonitis infection.  It is a potential serious infection of

6    the abdominal cavity area, and he had a broken hip, and,

7    obviously, nearby other organs that could have been struck.  He

8    intended to kill him, he wanted him dead, and he said something

9    afterwards in the car to Vicky Martinez.  What did he say?  "I

10:51AM 10  don't know if he died.  I shot him.  I don't know if he died."

11        Why did he say that?  Why did he mention, why didn't

12   he just say I shot him?  That's not the goal of MS-13 to shoot

13   him, I'm just going to wound him, I'm going to shoot him in

14   self-defense, no, the goal of MS-13 is to kill him, so he's

15   wondering, I wondered if he died, I finished the job.

16        There's absolutely no evidence of self-defense in a

17   person running away from an incident to get shot between some

18   significant distance away as he ran to get onto the bus to get

19   away from this individual.

10:52AM 20        What did Javier Servellon tell you during the course

21   of the trial at the very conclusion?  For the first time, he

22   got to see something.  Do you remember?  The video.  Remember

23   he told you he hadn't seen the video before.  You saw the

24   video.  What did he say?  "See, it shows you I wasn't lying,"

25   his words.

1          The final incident I want to talk to you about is

2     Christian Carillo, the attack on him by the defendant.  You

3     have multiple sources of information and evidence that's before

4     you regarding the attack on Christian Carillo by the defendant

5     demonstrating his intent to join the gang.  They had the

6     appropriate mindset, the goal of killing people who are

7     perceived and are rival gang members.

8          What happened to Mr. Carillo?  He's going to soccer.

9     He meets up with a friend.  The friend may or may not be, it's

10:53AM 10     kind of conflicting, an associate of 18th Street.  He

11    apparently was wearing some red shoes, possibly a red hat.  In

12    any event, they ran into Tremendo, who was with his girlfriend,

13    Vicky.  It was in broad daylight.  They're coming from lunch.

14          What happens at that point?  According to

15    Vicky Martinez, again, your memory of the testimony controls,

16    but she says words to the effect of, "He said I'm Tremendo from

17    Enfermos Criminales."  Christian Carillo responded.  Tremendo

18    drew up the sword.  Do you remember he demonstrated how he did

19    it with the machete and brought it down, and Carillo was able

10:54AM 20    to block it, fractured his arm because he tried to plant it in

21    his face, just like the YouTube videos, tried to plant it in

22    his face.

23          What happened next?  He had the small box cart that

24    Christian Carillo had on his belt from working at McDonald's,

25    he used it to opening boxes was taken out.  After he was struck

1    once, what's the testimony of the witness?  Does that seem like

2    a fair fight?  Of course not.

3         No evidence at all of any injuries suffered by the

4    defendant, instead, the second blow, he struck right in the

5    head of Christian Carillo, and he fell to his knees, bled,

6    screaming in pain.

7         The defendant left the area with Vicky, right?  What

8    did he say to him right before?  "I'm Mara Salvatrucha."  Is it

9    in furtherance of the activities of the gang?  Of course, it

10:55AM 10    is.

11        That's not the only evidence that you have of that

12   attack though because Vicky Martinez was there as well, and she

13   testified about what happened from her perspective and also

14   described how after the fact back at the house, the apartment,

15   he washed the blood off the machete, a machete just like that

16   one.

17        The final thing I want to remind you, the testimony of

18   Christian Carillo, when he looked around the courtroom, he

19   looked at a person, look at his credibility.  Assess how he

10:56AM 20   testified.  Assess the fear that was palpable I submit you

21   could see in his face and in his mannerisms when he did that,

22   and he pointed to that man, the defendant.

23        I just have a few more minutes.  During your

24   deliberations, you're going to be asked to consider a list of

25   items that are crimes that the Judge will instruct you meet the

1    definition of a racketeering act that someone in the gang had

2    to have committed, MS-13 had to have committed two or more,

3    okay.

4         Do they include murder?  Does the evidence support it?

5    Yes, check the box.  Do they include robberies?  Does the

6    evidence support it?  Yes, check the box.  Do they include

7    conspiracy to commit murder?  Yes, it absolutely does, check

8    the box.  Does it include assaults with intent to rob?  Yes, it

9    does.  Does it include drug trafficking?  Yes, it does.

10:57AM 10        Any combination of those count.  You have to be

11   unanimous in your decision, but any combination of those count.

12   We provided you numerous opportunities and evidence to go

13   through your deliberations and find that each one of those

14   categories are met by the evidence.  Each one of them warrant a

15   finding of guilty collectively.  Racketeering conspiracy,

16   again, we need to prove he joined the conspiracy in which an

17   MS-13 member would commit two racketeering acts, qualifying

18   acts described by the Court.

19        When you return from your deliberations, I'm going to

10:58AM 20   ask you to return with a verdict, a verdict that is supported

21   by the evidence, a verdict that is true and just based upon the

22   evidence that you have before you, and I'm going to ask you to

23   find the defendant guilty of the only crime that he's charged

24   with here, racketeering conspiracy.

25        THE COURT:  All right.  Thank you.

1          Ladies and gentlemen, let me ask you, do you want a

2    break before the next argument?  I see some nods.  All right.

3    We'll take a short break.

4          THE CLERK:  All rise.

5          (JURORS EXITED THE COURTROOM.)

6          THE COURT:  One thing I wanted to put on the record, I

7    was not asked, and, therefore, neglected to make my final

8    *Petroziello* ruling, which I don't think makes a substantive

9    difference, but I do find that the statements that the

10:59AM 10    government identified in its supplemental submission on

11    *Petroziello* that were offered, not all of those were offered,

12    but the ones that were offered are admissible as co-conspirator

13    hearsay statements, and they have been tied in and connected as

14    required under the rule.  With that, we'll take a short break.

15          THE CLERK:  All rise.

16          (A recess was taken.)

17          THE CLERK:  All rise for the jury.

18          (JURORS ENTERED THE COURTROOM.)

19          THE CLERK:  Thank you.  You may be seated.  Court is

11:15AM 20    now back in session.

21          THE COURT:  Mr. Halpern, whenever you're ready.

22          MR. HALPERN:  Thank you.

23                          CLOSING ARGUMENT

24          MR. HALPERN:  Good morning, ladies and gentlemen.  I

25    appreciate your attention through these last couple of weeks.

1    I'm going to start kinds of backwards in terms of the way the

2    jury instructions are laid out.  Instead of talking about the

3    issues to agreement to form a RICO pattern, I'm going to talk

4    about the specific crimes first for two reasons.

5            The government, as has been explained to you, they

6    don't have to prove that any specific crime happened in order

7    to establish that there were racketeering acts that were agreed

8    to, but they can use those crimes to establish that

9    racketeering acts actually occurred because if the crime

11:16AM 10    happened and it was a racketeering offense, you know,

11    inherently there was some agreement to do it, so these acts are

12    important, Number 1, because I'm going to show you that

13    although crimes occurred in each case, they were not

14    racketeering offense crimes, so they can't be used as the

15    predicate offenses to justify a RICO count, but there's a

16    second reason that I want to talk about these first is that

17    it's really independent of what type of crime they were, and

18    that really deals with the circumstances under which these

19    crimes occurred because they were random, they were arbitrary,

11:16AM 20    they were not crimes that occurred in a pattern, they weren't

21    crimes that were predictable, they were crimes that happened

22    because something just happened that day that triggered those

23    events, and that's important when you get back to the initial

24    issues, which is what was the agreement?  Was there an

25    agreement, and if there was agreement, what exactly was agreed

1    to, and who agreed to it?

2         I want to start with the Katerin Gomez shooting, which

3    is six months after Mr. Aguirre is incarcerated, and there's

4    two issues that are critical that I want to explain.

5         Number 1, it's not murder.  It's a crime, it's

6    manslaughter but it's not murder, and I'll explain why, and the

7    second is it's wholly random.  It happened because they

8    happened to be followed.  It didn't happen because they were

9    out looking for people, it happened because a group of gang

11:18AM 10   kids went after them.

11         Now, whether or not it's murder requires you to look

12   at the elements of Massachusetts law that define murder, and I

13   expect the jury instructions that you're going to get are going

14   to give you a description of what it is that constitutes

15   murder, so for first-degree murder, and you've heard this

16   before, you have to have deliberate premeditation.  You have to

17   intend to kill the person, and you have to have time to think

18   about it and make a deliberate decision to do it.  That's

19   clearly not what happened here.

11:18AM 20        I think the evidence is -- it's not even an issue

21   where you would make this decision beyond a reasonable doubt.

22   I think if you were to say based on the evidence you heard,

23   what's more likely, that he intended deliberately to shoot

24   Alex Rodriguez or anybody else, or that this was an accident?

25   I think the evidence is overwhelming that it was an accident.

1    It wasn't premeditated.  He didn't think about it.  He reacted,

2    and I think the evidence strongly suggests he deliberately shot

3    over Rodriguez' head or the head of whoever Rodriguez was with.

4         Second-degree murder is if there's not enough time to

5    deliberately premeditate, the person didn't think about it,

6    they didn't take a moment and reflect, and there are three ways

7    in which the government can prove beyond a reasonable doubt

8    that second-degree murder occurred, and these are called the

9    three prongs of malice, you have to prove malice.

11:20AM 10     So the first prong is that the defendant actually

11   intended, subjectively, he thought about it, he intended to

12   kill the person.  He didn't think about it long enough, he

13   didn't deliberate about it long enough to constitute

14   first-degree murder, but he personally subjectively in his head

15   thought I'm going to kill that person.

16        The second way is that they intended to cause grievous

17   bodily harm that a reasonable person would know that could kill

18   him, all right.  So he may not have thought he was going to

19   kill him, but he did something to cause enormous bodily injury,

11:20AM 20   and the third, which is kind of the trickiest, is he intended

21   to do something that a reasonable person in his position would

22   have known created a strong and plain likelihood that death

23   would result.

24        So it's complicated for lawyers, let alone people who

25   have never heard of this before.  He doesn't have to

1   subjectively intend to kill, he has to subjectively intend to

2   do something that a reasonable person would know, not like

3   might kill somebody, not even likely would kill somebody but

4   that they would know that it was -- I mean, plain and strong

5   likelihood that death would result, so you need that for

6   second-degree murder.

7        And it's true that there is a concept of transferred

8   intent so that if a defendant intended to kill A and shot at A

9   and killed B, the intent can transfer, but that's not what

11:22AM 10   happened here.

11        You know, in every trial I find there are moments that

12   stick out for me.  I think a lot of times it's because there

13   are things that I don't anticipate, things that I just didn't

14   see coming, so in this case, one of those moments was the

15   contrast between Trooper Gibbons and Dontae Hart, the guy who

16   followed her.

17        So I hope you remember some of the problems I had

18   trying to cross-examine Trooper Gibbons, who put into her

19   testimony a line or two about -- not responsive to what I had

11:22AM 20   asked that Hector intended to shoot at Rodriguez.

21        The difficulty I had getting her to acknowledge that

22   these group of Eastside kids were following Ramires and his

23   friend rather than just happening to be walking in the same

24   direction.  It was difficult cross-examination because she had

25   an agenda.

1          And then you compare that to Mr. Hart, who comes in in

2     a jumpsuit who clearly wanted no part of this, and, I mean, did

3     everything that he said ring true to you?  Did he -- and he's

4     not my witness, he's their witness, and not only is he their

5     witness, but they found him, right?

6          She found him from that video, and you know, you know

7     that he had been interviewed and interviewed, he had been asked

8     about everything he saw, had been documented.  They knew what

9     he said.

11:23AM 10          Trooper Gibbons knew his story.  This wasn't the first

11     time she heard his story, but I didn't know his whole story,

12     and I don't know how many of you were looking at my face, but

13     when I asked him to describe what happened, and this didn't

14     come on direct, he wasn't asked about this on direct, and

15     Trooper Gibbons never mentioned it either, but I asked him, "So

16     when you see these guys for the first time, what do you see?"

17          And he says, "Well, I saw these Eastside kids walking

18     in one direction, and I saw those other two kids, and the one

19     in the light clothes walking in the opposite direction."

11:24AM 20          I'm like, "Huh?"  They were following them, and so I

21     asked a follow-up question, "Weren't they walking in the same

22     direction?"  He said, "No, they weren't walking in the same

23     direction, they were walking in opposite directions and then

24     the big group turned around and followed."

25          Now, I was surprised but she wasn't.  There's no way

1    she was surprised.  This was deliberate, all right, it was

2    deliberate that the government didn't present that evidence,

3    and the act of the gang in turning around and following these

4    guys was deliberate.  This wasn't an accident, so these guys

5    had ample reason to feel threatened.  There were 10 of them

6    that you saw in the video, but there were more that were off

7    the screen, she told you, and so did Mr. Hart that there was

8    another group that you don't see on the video.

9           So this was a good example of something I think you'll

11:25AM 10   see throughout this case, which was the way in which various

11   witnesses, both law enforcement witnesses and cooperating

12   witnesses, attempted to bend the truth to follow a script, to

13   follow the agenda that they got on the stand intending to put

14   in front of you.

15          Could you put up the picture for a minute.

16          Adam Hartley is a master's in forensic science,

17   bachelor's from Rochester Institute of Technology in technical

18   and scientific engineering, a technical engineer for Disney and

19   now working as a ballistic expert, and he told you that the

11:26AM 20   bullet went six to ten feet over the heads of these guys, and

21   if -- you may remember Mr. MacKinlay arguing that there was

22   some evidence that he was really standing closer to the

23   crosswalk, okay, and explained that if that were the case, the

24   bullet would have had to go even higher trajectory.  Thank you.

25          So, you saw a parade of witnesses from the government

1    with expertise in ballistics from ATF, from the State Police,

2    from the FBI.  If there was a legitimate argument that

3    Mr. Hartley was wrong and that the bullet did not go at least

4    six feet over the heads these guys, how hard do you think it

5    would be for the government to bring somebody in and say that's

6    not what happened here?  You know, I'll tell you a different

7    story and I'll explain why.

8         Instead, the only argument you heard suggesting that

9    Mr. Hartley was wrong concerned, you know, why didn't you

11:28AM 10    measure the angle of the bullet in the victim's head, why

11    didn't you take into account statements of witnesses, as though

12    that would have something to do with the science of what he was

13    trying to do.

14         There was one bullet fired, one.  If he intended to

15    kill somebody, why did he fire once?  Mr. Hart told you that

16    there was a point at which these guys were three feet apart.

17    If he wanted to kill, if Ramires wanted to kill Alex Rodriguez,

18    did he miss him from three feet away and somehow manage to

19    shoot way over his head?

11:28AM 20         I mean, the extent to which the government will go to

21    try to excuse things that don't fit their story, that the gun

22    kicked and he was aiming at Mr. Hart, and, I'm sorry, at

23    Alex Rodriguez and the gun kicked, and that's how the bullet

24    ends up in a second floor window.

25         I mean, guns kick after the bullet is ejected.  If you

1   missed by six to ten feet because the gun kicks, I mean, you

2   couldn't shoot anybody, right.  I mean, you'd have shooting

3   ranges that were just holes in the ceiling, right.  This isn't

4   a result of a gun kicking, this is a result of Hector either

5   wanting to scare these guys off and hoping that if he fires

6   over their heads that they'll leave him alone, or he pulls the

7   gun out, they're already backing off.  He doesn't really need

8   to shoot the gun to get them to leave him alone because they

9   have seen the gun, and they're willing to leave him alone, and

11:30AM 10   he shoots a bullet over their heads because he's a hard ass,

11   and he wants to prove a point.

12        It doesn't matter why he did it, as long as he didn't

13   do it because he was intending to kill somebody, and I think

14   the evidence is clear that he wasn't trying to kill somebody,

15   nor was there a strong and plain likelihood that somebody would

16   get killed.

17        I mean, it's a horrible tragedy, but there's no way

18   anybody could have predicted that it was likely that a woman in

19   a second floor window would happen to get shot in the head, so

11:30AM 20   is it possible that that could happen?  Obviously, it happened,

21   but nobody could say, well, I mean, a reasonable person would

22   have known that it was very likely that if you shoot a bullet

23   six to ten feet over somebody's head on a street, somebody is

24   going to get killed, so it doesn't fit the definition of

25   malice.

1          What it does fit is the definition of manslaughter,

2     which involves recklessness, and I believe you'll get an

3     instruction on what constitutes manslaughter, and this

4     constituted manslaughter.  It wasn't self-defense, it was a

5     crime, it was a serious crime, but it wasn't murder, and it

6     wasn't attempted murder, it was manslaughter.  It was an

7     extremely reckless act that accidentally caused somebody's

8     death.

9          And even if you did think, and I don't believe there's

11:31AM 10     evidence to support this, but even if you did think that Hector

11     intended to shoot somebody, you still can get to manslaughter,

12     all right, because there's two types of manslaughter.  There's

13     involuntary manslaughter, which is what I'd argue the facts

14     support here, which is an accident, you didn't intend to shoot

15     anybody.

16          Voluntary manslaughter is when you did intend to shoot

17     at someone, but there were mitigating circumstances, and that

18     term will come up again when I talk about some of these other

19     crimes, so it's not pure self-defense, it's called imperfect

11:32AM 20     self-defense, you overreacted, you went further than you needed

21     to, or you reacted out of fear.

22          It could be in sudden combat, something, heat of

23     passion, there's something that provides some excuse for your

24     conduct.  It makes it less culpable, it's not murder, but it's

25     still a crime, and so there's two manslaughter options.  I

1    think the far more credible one here is that it was just an

2    accident by doing something stupid and risky but not murder,

3    not an intent to kill anybody and not an act that reasonably

4    foreseeably would kill somebody, and it also is incredibly

5    random.

6              I mean, you heard testimony that they were out on the

7    street looking to hurt people.  They hadn't hurt anybody in

8    years.  I mean, there's no evidence at all that prior to that

9    time those kids had ever shot anybody or attempted to shoot

11:33AM 10   anybody, so the notion that they're out looking to shoot

11   somebody is a little hard to buy given that nobody else had

12   gotten shot ever by these kids.

13             It's an arbitrary event that happens because they're

14   followed, and I think that goes when I come back later to the

15   issue of is there really a pattern of racketeering conduct, or

16   is this a series of just different crimes that becomes

17   important?

18             April 16th, the shooting by Mr. Aguirre.  There's no

19   issue of self-defense here.  The guy turned and was going away

11:34AM 20   when the gun was pulled.  That's not the issue.  You need to

21   look at the elements of the crimes, and here you're dealing

22   with what you might think would be called attempted murder, but

23   under Massachusetts law, it's called assault with intent to

24   murder and attempted manslaughter, which is called assault with

25   intent to kill.

1          For assault with intent to murder, the government has

2     to prove beyond a reasonable doubt that the defendant actually

3     subjectively intended to kill the person, right, not that he

4     intended to injure him, not that he intended to seriously

5     injure him, not that a reasonable person would have known that

6     there was a risk that somebody would have gotten killed, none

7     of that, they have to prove that he personally subjectively

8     intended to cause death, and I'd suggest to you there's no

9     evidence of that.

11:35AM 10          If he wanted to kill him, then at the beginning of

11     this fight, he's got a gun, the kid was within three, four,

12     five feet of him, he could have shot him right as he turned

13     around and he was behind him.  He didn't.  This fight goes on,

14     they run across the street.  They keep fighting for a while.

15          There's no gun, right, it's a fist fight, and it

16     remains a fist fight until the point when the victim ultimately

17     pulls out whatever it is, it's not a necklace, whether it's a

18     piece of a bicycle chain, whether it really is the sort of

19     chain that can connect a wallet, it's big enough that he's

11:36AM 20     holding it in his palm, and it's big enough that he's hitting

21     somebody, you know, over the head with it, and there's no gun

22     until that happens, right, and then after the shot, right,

23     Ramires tells you he's in the street, he's helpless.

24          The bus drives away.  He's thinking all this kid's got

25     to do is walk like 10 feet towards me, and I'm dead, and

1   Aguirre doesn't do it.  If he wanted to kill him, the guy would

2   be dead, so this was not an instance where you can say beyond a

3   reasonable doubt he intended to kill him.  I don't even know if

4   you can say it's likely that he intended to kill him because if

5   he had wanted to kill him, he could have killed him twice, once

6   at the beginning of this, and clearly once he shot him.

7        Now, if you don't find deliberate, subjective intent

8   to kill, your inquiry as to whether or not that's a

9   racketeering crime is over because that's what assault with

11:37AM 10   intent to murder requires.

11       Now, you still can, there's another step in which you

12   can find, okay, I do think he intended to kill him, and it's

13   still not a racketeering offense, and that's the difference

14   between assault with intent to murder and assault with intent

15   to kill, and that's where the mitigating factors come in.

16       So the mitigating factors can include and it will be

17   listed in the jury instructions but sort of heat of the moment,

18   sudden combat, overreacting in self-defense, the type of things

19   that are triggered by somebody trying to hit you in the head

11:37AM 20   with a metal chain, right, and so it's a crime, all right.

21       Somebody hits you in the head with a metal chain and

22   you pull out a gun, and he runs away, you don't get to shoot

23   him, all right.  He's gone.  All right.  It's a crime.  It's a

24   serious crime, but it's not assault with intent to murder, it's

25   assault with intent to kill if the reason that -- and, by the

1   way, the government's -- this is the government's burden of

2   proof, not mine.

3          They have to prove beyond a reasonable doubt that if

4   Aguirre intended to kill this kid, it had nothing to do with

5   the fact that he got smacked in the head with a chain.  It had

6   nothing to do with a fight, that he had an independent motive

7   to kill him.  It didn't happen that way.

8          I mean, I'd argue, Number 1, he didn't intend to kill

9   him at all, and, Number 2, if he did intend to kill him, this

11:38AM 10  would have never happened.  I mean, do you think this kid would

11  have gotten shot if that chain hadn't been brought out?

12  There's no indication that that would have happened.  If he

13  wanted to shoot somebody, he would have pulled out the gun to

14  begin with.

15         I don't have to prove that there was a mitigating

16  factor that caused him to shoot.  All right.  They have to

17  prove that the intention to kill was not caused by a mitigating

18  factor beyond a reasonable doubt.  Henriquez testified based on

19  what he saw that Aguirre pulled out the gun after he got hit

11:39AM 20  with the chain and got mad, and if you look at the video, it's

21  I think clear, and this is another random event, all right.

22         This is an event that's triggered because these two

23  guys are following the girls and the girls reported back and

24  these guys go after them, all right, but not to kill them,

25  which also raises questions about what exactly was this

agreement?  Because if the agreement, right, of MS-13, if the

deal, which you heard again and again and again is we kill the

rivals, any excuse we have, we kill the rivals.

Well, that doesn't seem to be what these kids agreed

to because again and again and again they didn't kill the

rivals when they had the opportunity to, and I'm going to argue

later it's a different agreement.

It wasn't an agreement to do -- whatever those, the

videos talk about, whatever the rap songs talk about, that's

11:40AM not what they did.  April 6th, you're going to see in evidence

Exhibit 117, the medical records of Carillo.  He was never

admitted to the hospital.

He was discharged from the emergency department in

about four and a half hours with a scalp wound that was a

little over two inches closed with sutures and staples.  He was

supposed to come back in a couple of weeks to get them removed.

He came back in a couple of months.

If you look at the records, you'll see that there are

inconsistent statements as to how exactly this incident

11:41AM happened.  Most of the statements say the opposite of the order

that he testified to in terms of now I'm getting confused as to

which came first but between whether he got hit in the arm

first or whether he got hit in the head first.

There's a good deal of inconsistency.  What is clear

is that he ends up on the ground, and he's helpless, all right,

1    and Aguirre walks away.

2          Now, you're back in some of the same questions that

3    you had to ask regarding April 16th.  If Aguirre wanted to kill

4    him, why didn't he because he sure had the opportunity?  The

5    injuries themselves don't indicate an intent to kill him.  If

6    he wanted to kill him, he could have slashed his neck.  The guy

7    was helpless on the ground.  He didn't, he walked away.

8          You heard multiple versions of how this fight started.

9    Carillo says that he didn't pull the box cutter first, that

11:42AM 10   Aguirre pulled the machete first.  Vicky Martinez says they

11   pulled it at the same time.  Clacker said that when he spoke to

12   Aguirre about it, Aguirre told him that the other guy pulled

13   out the box cutter first.

14         You've got good reason I think in this case to

15   question the credibility of Carillo because I kind of suspect

16   that McDonald's gives box cutters to the people who are working

17   there who need to open box cutters so they don't have to walk

18   back and forth to work with their box cutters, and I doubt

19   McDonald's wants their box cutters being taken back and forth

11:43AM 20   from the place of business, so I don't -- you may not find it

21   credible that Carillo has a box cutter solely so he can open

22   boxes at McDonald's.

23         So the first issue is was there an intention to kill?

24   And if you don't think there was beyond a reasonable doubt,

25   your job with respect to April 6th and whether that event

1    counts as a racketeering offense is over, but even if you do

2    think that there was an intent to kill, then you also have to

3    go back to the issue of whether there were mitigating

4    circumstances, and there's certainly testimony in this case

5    that there was, that Carillo pulled the knife first, that there

6    was a fight, that it happened in the context of the fight, but

7    I don't think you get there because I think that initially you

8    really stop at the point where you ask yourself, well, if he

9    wanted to kill him, why didn't he?

11:44AM 10    The plan to kill Clacker, there's no question there

11    was a plan, and the conversations in the car make it clear that

12    there was a plan, but I want you to look at, in particular, a

13    transcript from Exhibit 49, and this is the car conversation on

14    April 21st, and in particular at page 3 of this conversation,

15    so Roca is in the car with CW-1 and Chucky.

16    And all the evidence, the only evidence in this case

17    of Aguirre having anything to do with this plan to kill Clacker

18    is what Roca says in the car that day.  That's it, okay, and

19    look at the context in which this happens.  Roca has already

11:45AM 20    warned Clacker that there's a plan to kill him, but in the car,

21    moments before he refers to Tremendo, he lies.  He makes up a

22    story that the reason that Clacker is afraid and is hiding in

23    his house is because the cops told him that he's a target.

24    That's BS.

25    The reason Clacker is hiding in his house is because

1    Roca told him that there's a plan to kill him, and Roca is

2    keeping that a secret from the guys in the car.  Now, he

3    doesn't know that one of the other guys in the car also has a

4    secret, which is CW-1, right, the only guy in this car who

5    isn't playing a charade is Chucky.

6         It makes no sense that Roca would have told Clacker

7    that there was a plan to kill him, to somehow get Clacker to

8    trust him so that, what, so that Clacker would be an easier

9    target?  It's just not sensical, but what does make sense is

11:46AM 10    that Clacker has been warned by Roca, Clacker's hiding, and

11    Roca is just spinning out a story in the car, and part of that

12    story is that he had heard that Tremendo had something to do

13    with the plan to kill Clacker.

14         We have no idea how he heard this, whether he heard

15    it, how many different people this information had passed

16    through, and it contradicts other evidence, which is that this

17    plan was created by Big Crazy because Big Crazy thought that

18    Clacker had snitched on his brother, and that's the subject of

19    the stipulation that you have seen today, that's what Clacker

11:47AM 20    told the FBI and the prosecutors, and I read in I think

21    yesterday, that's what CW-1 says in the car that he had heard

22    Big Crazy say that he was going to kill Clacker.

23         There is no way that you can look at the evidence of

24    Roca one day, a few sentences in the context of a complete lie

25    within the car and say, yes, beyond a reasonable doubt

1    Tremendo, who had been in jail at that point for a year, had

2    something to do with killing Clacker.

3         Clacker didn't testify at his trial, right?  This is

4    happening at the very moment that Little Crazy has charges

5    against him for a stabbing, so in terms of, you know, some

6    cause-effect relationship, there's a timing connection between

7    what's going on with Little Crazy and the plan to kill Clacker.

8    There's no timing connection between him and the plan.

9         Dennis Perdoma Rodriguez, the stabbing and shooting.

11:48AM 10   There's no dispute over whether that was an assault with intent

11   to murder.  I mean, based on the evidence you heard, there's no

12   mitigating circumstances.  Even if it did start out as a fight,

13   by the time this kid gets shot, he's on the ground, the issue

14   is what's he have to do with it, and what was th.

15        Perdomo Rodriguez had been a target way before he was

16   even in Chelsea.  This is the guy that beat up Clacker a week

17   or two into school.  It's the guy who threatened him on the

18   first day of school.  It's the guy who tried to stab Clacker in

19   the back, and his buddy ends up stabbing Hector in the hand.

11:49AM 20        There were motives of many, many people, most

21   especially with Clacker to go after this kid that had nothing

22   to do with him.  There's no evidence that he knew who this kid

23   was.  There's no evidence that he had any conversation or

24   agreement to do anything relating to him, and to the extent

25   there was an agreement to try to retaliate against Perdomo

1    Rodriguez, that agreement existed way before Aguirre entered

2    the picture, right, and it's another random event.  They find

3    him on a bus, but did it constitute an attempted murder?  Yeah,

4    clearly it did, but not one that's attributable to him.

5         One exhibit I do want you to look at are the financial

6    records from Norfolk MCI that show the money going in and out

7    of his canteen.  He came in with about $300.  There are

8    occasional deposits of $25 to $40 by somebody named Susan, a

9    few deposits by mail for typically 40 bucks, no deposits from

11:50AM 10  Vicky Martinez.

11        In over two years, the total income is about $1350,

12   $58 a month, and much of it comes from the money he earns

13   working at the institution.  This is not consistent with the

14   story of MS-13 supports their leaders, they send money to the

15   canteens of the guys who were serving time.  He didn't get that

16   money, all right, which raises an issue as to, well, what

17   agreement was he in?  Was he in an agreement with MS-13, or was

18   he in an agreement with these six other kids in Chelsea?  The

19   robberies.

11:51AM 20        Henriquez testified that he never committed any

21   robbery with Aguirre.  He had heard about a robbery that

22   Aguirre did from Roca.  Vicky testified that she was in the car

23   when a number of robberies were done, and so you have to ask a

24   couple of questions, how credible is Vicky?  How credible was

25   Henriquez?  And were these robberies part of a consistent

1      pattern that had to do with MS-13, or was it him?  Right.

2           Was it him that had decided independently to go do

3      some robberies, just like Henriquez testified that he had

4      decided that he would freelance and do robberies independent of

5      the gang, and even if there is an agreement on his part to do

6      robberies, who's the agreement with?  And the distinction

7      between agreeing with these kids in Chelsea and doing robberies

8      relating to MS-13 because in connecting it back to MS-13, all

9      you've really got to go on are Henriquez and Vicky.

11:52AM 10           Now, the government says, well, you can trust them

11      because they say the same things, their stories are the same,

12      so they must be telling the truth.  Well, I kind of see the

13      opposite there.  It's exactly right, their stories are the

14      same, amazingly the same, to the word the same about how the

15      plan is always to kill the rivals.

16           I mean, they met with agents, they met with

17      prosecutors, they know what this trial is about from the

18      government's perspective.  This has been scripted.  They know

19      the script.  They know what they're supposed to say, and they

11:53AM 20      have an enormous amount at stake.

21           From Henriquez' perspective, payments have come out of

22      a quarter of million dollars, and, I'm sorry, but saying he

23      didn't get any of it, I don't understand what that means if

24      they're covering all of his living expenses and his rent and

25      his health insurance, but, frankly, more important than the

1    money are the immigration benefits, and it doesn't matter

2    whether Vicky asked for them or whether they said we're going

3    to help you.

4         The reality is these people are under tremendous

5    threat of deportation.  That's not like a myth, right, this is

6    real, and so for them to be told we can allow you to spend the

7    rest of your lives in the United States, it's a huge benefit.

8    She sat on top of a train for a month.  You don't think that

9    she would manipulate her testimony to help the government so

11:54AM 10   that she can stay in this country with her kids the rest of her

11   life?

12        Henriquez, there are many, many instances of issues

13   with his testimony that raise serious problems with

14   credibility, leaving out an entire year of when he was in

15   Chelsea.  I pressed him, and he eventually acknowledged that

16   there might have been upwards of 50 meetings between the clique

17   guys before Tremendo arrived, but I read grand jury testimony

18   in which he said there was one meeting, one in which Roca

19   talked about the clique and talked about Tremendo arriving.

11:55AM 20        The phone calls that he said came before Tremendo

21   arrived, lots of them, in which the group talked on a

22   conference call and in which he had independent calls

23   one-on-one with Aguirre, yet, right, testimony that on the

24   Tango call, they're introducing themselves to one another and

25   going around the room, who am I, what's my name, you know,

1    where am I from?

2           That's when we met him, right, that's what he

3    testified to, that's when we met him, so how did all these

4    other calls happen before he met him?  The graffiti store which

5    also was related to this Tango call, which is completely

6    absurd, and the fact that the government would present this as

7    though somehow it makes sense, how did people in gang

8    leadership in El Salvador find out that some kids in Chelsea

9    put up graffiti at the high school?

11:56AM 10          I mean, tell me that, right?  Tremendo, he didn't know

11   about it, nobody knew about it, so somebody picked up the phone

12   and called El Salvador, and said, oh, we got a problem in

13   Chelsea, we've got some kids who put up graffiti, and then the

14   El Salvador leaders tell Aguirre that you need to punish these

15   kids.

16          Inconsistent testimony as to whether Aguirre was in

17   the room when he counted this down, which is what he testified

18   to at the grand jury, or whether he did this countdown over

19   Tango.  Testimony that they were raising about $90 a week

11:56AM 20   between themselves so that they could send some money down to

21   El Salvador, and I said, well, it must have been at least a few

22   weeks before you found out that El Salvador was pissed off

23   because you hadn't sent enough money yet, right?  Yes, they

24   needed to give us time to get the money.

25          I said, "Did you hear more from Tremendo that

1    El Salvador was not happy about the money and they wanted

2    more?"  "Yes."

3              "How many times?"  "Five or six."

4              "Two or three weeks apart?"  "Yes."

5              "So this went on for months, right?"  I asked him,

6    "This went on for months?"  "Yes, it did."

7              He was in Chelsea for three weeks, all right, so there

8    is this willingness to say whatever it is he thinks is going to

9    move the story along in a way that helps his patrons, right,

11:57AM 10   who's paying for him, who's paying for his family, and who is

11   giving him a ticket to stay in this country.

12             It was more difficult for me to cross-examine

13   Vicky Martinez because I didn't have transcripts.  I didn't

14   have grand jury testimony to find inconsistencies, so this was

15   happening on the fly.  I think you have to stand back and say

16   how much can we accept here given the benefits that she's

17   receiving, given the immigration benefits?

18             You heard nothing about prior statements that she

19   made.  I don't know, despite all the resources the government

11:58AM 20   has, no evidence of any prior recorded statements from her, she

21   wasn't put in front of the grand jury.  All we know is what she

22   said here, that's it, and she had an enormous incentive to

23   tailor her testimony in a way that would further the

24   government's story.

25             In terms of evidence of corroboration, I'd ask you to

1    look at the efforts the government made to find evidence to

2    link this group in Chelsea to an international conspiracy.

3    Guns and machetes from homes that there's no evidence Aguirre

4    was ever in, that he ever knew about, or that he ever knew

5    anybody with any connection to.

6         The starter pistol and the machete and the knives from

7    the home of a drug dealer, based on a search warrant affidavit,

8    that doesn't even mention MS-13, had no connection at all to

9    anything other than the agent saying he knew, and, by the way,

11:59AM 10   the stuff that the agent said, there was probable cause to look

11   for relating to the shooting wasn't in the house, right, no

12   safe, no gun.

13        There was a day where Mr. Pasricha listed the names of

14   at least half a dozen MS-13 guys who had been arrested.  For

15   what?  There was no evidence of who they were, no evidence that

16   he knew who they were, no evidence that he had ever talked to

17   them, so, yeah, MS-13, and why not list guys who got arrested

18   in California?  Why not list guys who got arrested -- I mean,

19   it doesn't matter.  What's it got to do with him and his

12:00PM 20   agreement?

21        Transcript of Virginia, which you heard about again

22   this morning two years after he had been locked up, a

23   membership meeting in Virginia.  That's what they're asking you

24   to use to tie him to this international conspiracy.

25        The tragedy of Katerin Gomez, right, what does he have

1    to do with it?  Is there really evidence, solid evidence, that

2    this is a murder to begin with rather than some horribly tragic

3    accident that has absolutely nothing to do with him?  No phone

4    records of him talking to anybody in MS-13 ever, no jail

5    letters, no correspondence.

6            I want to turn now to the turn now to the RICO

7    conspiracy kind of big issues.  Enterprise.  What's the

8    enterprise?  Suppose there's seven kids in Chelsea and they

9    want to form a gang, okay, but their agreement is they're going

12:01PM 10    to go commit armed robberies, and they use a gun that crossed

11    state lines, okay, and they do the robberies, they do a lot of

12    robberies.  There's a pattern, it happens a lot, it's not

13    infrequent, and they use the money for gang purposes.

14            Is it a RICO conspiracy?  Probably is, okay, but what

15    is it?  It's an agreement between seven kids, all right.  Now,

16    suppose they dress up in MS-13 colors and they wear MS-13

17    clothes, and they play MS-13 songs, and they write MS-13 songs.

18    What is it?

19            It's an agreement between seven kids in Chelsea is

12:02PM 20    what it is because the rest of it isn't an agreement, all

21    right.  It doesn't matter how many pairs of blue Cortez they

22    have, and it doesn't matter what kind of lyrics they write.

23    The issue is what's the enterprise and what's the agreement?

24            Suppose they even decide to call themselves MS-13,

25    right?  Now is there an agreement with MS-13?  No.  If they had

1    been the Enfermos, they remained the Enfermos.  That's the

2    enterprise, right?  The ones who participate in the agreement

3    are the enterprise, and calling it something else without

4    evidence that it actually is something else doesn't change the

5    nature of the enterprise.  They didn't indict the Enfermos,

6    they didn't indict the clique in Chelsea, they indicted MS-13.

7            It may be a RICO conspiracy, all right, but they

8    indicted the wrong RICO conspiracy because the agreement, the

9    evidence of the agreement is not an MS-13 agreement, the

12:03PM 10   agreement is what these kids agreed to do with one another,

11   right?  You don't have evidence of an agreement with anybody

12   else.

13           The criminal group is the group you see in that same

14   picture again and again and again.  Those were the kids who

15   entered into this arrangement.  What was the pattern?  To

16   establish a racketeering crime, there has to be a pattern.  The

17   crimes have to be related.

18           I don't think you've heard evidence of a pattern of

19   racketeering crimes.  The crimes that they've connected him to

12:04PM 20   weren't racketeering offenses at all, none of them.  There's

21   not a single crime, other than the robberies, other than the

22   robberies, that would constitute a racketeering offense, all

23   right.

24           None of the crimes of violence were racketeering

25   offenses.  The robberies would be if there were enough of them,

1     Number 1, to create a racketeering pattern, and if the evidence

2     you had concerning them was credible, but there isn't evidence

3     of repetition.  You've got Vicky -- the government says, well,

4     there's evidence of a racketeering pattern because he went out

5     in a car with Vicky on one night, she says, and did three

6     robberies.  No, that's not a racketeering pattern.  That's one

7     night going out in a car and doing three robberies, which is a

8     crime, which can be prosecuted, but not this crime.

9         Lastly, what was the agreement?  Writing lyrics isn't

12:05PM 10    an agreement.  I asked Henriquez some questions to clarify what

11    exactly the agreement was that he entered into, so by expanding

12    your turf, the main thing you really wanted was to be able to

13    avoid getting beat up, yes.  And that's what they wanted.

14        They wanted to be able to walk around Chelsea without

15    getting beat up.  They wanted to help each other avoid getting

16    beat up, and they were willing to fight the rivals to do that,

17    and they did fight them.  That's not a racketeering offense.

18    Now, they may have talked about killing people, but they didn't

19    kill anybody.  They didn't try to kill anybody, and they didn't

12:06PM 20    agree to kill anybody.

21        I asked him, you agreed when you joined up and

22    increased the size of the group from three to four that you

23    were signing up to kill people, right?  Right.  So did that

24    really mean you were signing up to kill people when your group

25    got big enough to really pose a threat to the 100 or so 18th

1    Street kids?  Yes, of course.

2          Agreeing to get into fights and beat the hell out of

3    people is not a racketeering offense.  Agreeing to protect your

4    friends and ambushing your enemies is not a racketeering

5    offense unless you agree to kill them.  And agreeing to some

6    vague idea of killing your enemies at some unknown time in the

7    future when your gang grows, right, that doesn't pose a threat

8    of criminal activity, right?

9          I mean, it's like my -- if I tell my kid, you know,

12:07PM 10    I'm going to buy you a house when you graduate from medical

11    school, I mean, is it an agreement?  Yeah, if he got better

12    than Cs in biology, it mean mean something, but talking about

13    it doesn't make it real.

14          The agreement may have been, well, I hope one day

15    we're big enough and powerful enough and our turf has expanded

16    enough that we're going to be able to kill our rivals.  That's

17    a long way, it's a long way from agreeing to kill people.

18          The script here again and again and again repeated by

19    Henriquez and Vicky Martinez is this agreement to kill, but

12:07PM 20    there's no agreement, there's no evidence of an agreement that

21    Aguirre tried to kill anyone ever, right, and aside from the

22    attack on Pardomo Rodriguez, there's no evidence that anyone

23    connected to this group ever tried to kill anyone, and with

24    respect to Pardomo Rodriguez, there were reasons wholly

25    independent of this group and wholly independent of him for

1    what went on.

2         The agreement was not with MS-13, right, despite what

3    it's called, despite the music, despite all of it, the

4    agreement was with them.  This isn't about innocence.  I mean,

5    I said that in the opening statement, it's not what this is

6    about.  It's not about exonerating them, it's not about whether

7    crimes were committed.

8         Crimes were committed, it's about applying the right

9    laws to address the actual crimes that were committed, right.

12:09PM 10   You want to lodge murder charges against Hector Ramires for

11   killing Katerin Gomez, fine, all right, do it, but don't turn

12   it into something it isn't because it's not a RICO offense.

13   That's not how it happened, and that's not why it happened,

14   it's about focusing on what he actually did rather than on a

15   gang that everyone, everyone would like to get rid of.

16        Finding him not guilty is not an excuse, it's not an

17   exoneration at all, it's just an acknowledgement that this was

18   the wrong way to go about it because the crime charged here was

19   not the crime that actually happened.  Thank you.

12:10PM 20        THE COURT:  All right.  Thank you, Mr. Halpern.  All

21   right.  I think what makes sense, ladies and gentlemen, is for

22   us to take a short break, then to have the government's

23   rebuttal.  My instructions, unfortunately, are not short

24   because this is a little bit tangled, and I think what we'll

25   do, we'll have the government's response, we'll have the first

1    part of my instructions, and then we'll break for lunch, and

2    I'll give you the second part after lunch because it's a lot to

3    sit through, and I think you'll be able to absorb it better if

4    I break it into two pieces, but that will be the timetable, and

5    we'll take a break, and we'll come together as soon as we can.

6            THE CLERK:  All rise.

7            (JURORS EXITED THE COURTROOM.)

8            THE COURT:  I wanted to give the poor woman who was

9    coughing a break, which is why we didn't go straight into the

12:11PM 10   rebuttal.

11           Is there an issue with the jury verdict form which

12   I've gotten circulated?

13           MR. PASCRICHA:  The one comment we'd make, your Honor,

14   just change the introductory clause from, "As to Count Two" to

15   maybe, "As to the offense charged."  They may be confused by

16   those counts.

17           THE COURT:  Yes.

18           MR. PASCRICHA:  "As to the offense charged."

19           THE COURT:  Because we haven't mentioned Count Two, so

12:11PM 20   "As to the offense charged," we will change that.

21           MR. HALPERN:  Judge, have you obviously decided not to

22   list specific racketeering offenses?

23           THE COURT:  Correct, correct, simple general verdict,

24   guilty or not guilty.

25           THE CLERK:  All rise.

1          (A recess was taken.)

2          THE CLERK:  All rise for the jury.

3          (JURORS ENTERED THE COURTROOM.)

4          THE CLERK:  You may be seated.  Court is now back in

5   session.

6          THE COURT:  Okay.  Mr. Pasricha.

7          MR. PASCRICHA:  Thank you.  Good afternoon.  The crime

8   charged here is the crime submitted, it's conspiracy, which is

9   why it's entirely unclear to me why you heard 45 minutes about

12:26PM 10   murders and assault with intent to murder and mitigation.  He's

11   not charged with a murder, he's not charged with the murder of

12   Katerin Gomez, he's not charged with any attempted murder, he's

13   not charged with the attack on Dennis Perdomo Rodriguez,

14   Cristopher Carillo, Javier Servellon, anyone else, he's charged

15   with one thing, conspiracy.

16          The best part about this day for us is going to be not

17   the five minutes I'm going to talk, and I'm going to talk less

18   than five minutes, is that the Judge is going to follow me and

19   instruct you on exactly what the law is, and what you'll hear

12:27PM 20   is as long as he joined the conspiracy where people were trying

21   to kill others, it doesn't matter if he actually attempted to

22   do anything.

23          It doesn't matter if any of them actually attempted to

24   kill anyone, it's the agreement that's the crime.  I suspect

25   that the Judge is going to instruct you that the crime of

1   conspiracy is complete once the agreement is reached.  They

2   reached the agreement, that's it, that's the crime.  It doesn't

3   matter if they do anything after that to try to accomplish it.

4        Here, of course, they did, and that's why we showed

5   you some of that.  It's not just locker room talk, it's not

6   just bravado, it's not just rap songs, they're out trying to

7   kill people.  It goes to intent.  That's why we proved that to

8   you, that's why we showed you.

9        A few minor points.  The types of crimes.  You know,

12:28PM 10   there was this notion in closing, it wasn't premeditated.  It

11   wasn't?  They were talking for months.  They're on recordings.

12   Some of the recordings we showed you.  If you want, go back and

13   look at the YouTubes again.  One of them is from January, 2014.

14   Before he ever steps foot in here, he's talking about killing

15   people.

16        There was this notion about it wasn't predictable,

17   these were just random attacks.  It wasn't predictable?  You

18   join a group with the goal to kill people, tell others to go

19   kill people, go out marching in the streets of Chelsea armed

12:28PM 20   with machetes, it's not predictable that some people are going

21   to end up getting murdered, hurt and killed?

22        The number of crimes.  The Judge is going to instruct

23   you what pattern means, two or more related crimes.  When you

24   consider the evidence, think about what you know about MS-13.

25   Two or more crimes, did you come away thinking, do you know

 1   what, MS-13, these calls they are having with El Salvador,

 2   these meetings they're having, the instructions they're giving,

 3   what they really want to do was commit one crime, after they

 4   committed one robbery, that's it, mission accomplished, let's

 5   go home, let's disband all the cliques.  Of course, there was a

 6   pattern.

 7        You heard something about we didn't provide this

 8   evidence or that evidence.  I suspect the Judge will tell you

 9   that there's no obligation for law enforcement to follow every

12:29PM 10   conceivable avenue or every technique, and you'll hear about

11   that.

12        There was mention of the enterprise.  This was just

13   six kids in Chelsea, had nothing to do with MS-13.  The two

14   minutes during the break, I'll just quote from this had nothing

15   to do with MS-13, Tremendo ECS, January, 29th, 2014, before he

16   ever steps foot here to talk with six kids in Chelsea.  "You

17   made a mistake, son of a bitch, you made me lose my cool.  We

18   are the Salvatruchas that disarm you."

19        The little caption between the video, "The big

12:30PM 20   Mara Salvatrucha rules.  We, all, my homies, are flashing

21   MS-13.  MS-13 is the one that rules, killing and beating.  Your

22   best friend was just cut to pieces, that's what you get for

23   messing with MS-13."

24        It's not six kids in Chelsea.  Of course, he's a

25   member of MS-13.  He's a leader.  He's a palabrero.  He's got

1    tattoos, and you're going to hear the Judge instruct you on all

2    of that.

3         And, finally, this notion about, you know, conspiracy

4    to kill Clacker, and I think you heard counsel say there's no

5    question there was a plan to kill Clacker.  Great, we agree,

6    there's no question.  It doesn't matter who ordered the hit.

7    Was it Tremendo?  Yes, he's an MS-13 leader, great.  Was it Big

8    Crazy?  Great, he's also an MS-13 leader.  Was it because he

9    snitched on Little Crazy?  Great, a third MS-13 member from

12:30PM 10   another clique.

11        All of that proves the two rules you heard about

12   throughout.  They wanted to kill rivals, and they wanted to

13   kill snitches.  Little Crazy attacked the rivals trying to kill

14   them, and Big Crazy tried to kill the cooperator for telling

15   police about it or what he thought.

16        So just think about all of that.  At the end, he's

17   charged with one crime, conspiracy, and in this case, the

18   evidence leaves no reasonable doubt that MS-13 was a criminal

19   conspiracy.  He joined the MS-13 conspiracy.  When he joined

12:31PM 20   it, he knew that some member, not even him, some member of

21   MS-13 would commit two or more racketeering acts, and the Judge

22   will tell you when he goes through the instructions what that

23   means.

24        You can go category by category, if it makes it

25   easier.  Start with murder.  Does he have a plan to commit two

1    or more murders?  Yes.  Okay, great, your work is done.  You

2    all agree, there's unanimity, perfect, go to the next category.

3    Two or more attempted murders, yes, great, that's enough.  Drug

4    trafficking, okay, you all agree, that's enough.  Robbery,

5    okay, you agree, that's enough.

6           The Judge is going to instruct you that it can even be

7    some combination of those as long as you all agree.  Here,

8    there's no doubt.  Consider the evidence, as you must, follow

9    the law, as you must, find him guilty, as you must.  Thank you.

12:32PM 10        THE COURT:  Thank you, Mr. Pasricha.

11                        JURY INSTRUCTIONS

12           THE COURT:  All right.  Ladies and gentlemen, it's now

13   time for me to give you your instructions on the law that you

14   are to follow.  Ms. Pezzarossi is going to hand out to you a

15   copy of the instructions.  What I'm going to do is I'm going to

16   read partway through these, and then we're going to break for

17   lunch.  I'm going to split it into two pieces because they are

18   quite long, and I don't want you to start to fade as I get to

19   the instructions toward the end, which are important.

12:32PM 20        You'll recall I gave you some preliminary instructions

21   at the beginning of the case.  If there's anything inconsistent

22   between those instructions and these, these are the ones that

23   control.  I don't think there's anything inconsistent, but just

24   to be sure, these are the ones that control your deliberations,

25   and I permitted the lawyers to talk somewhat about the

1       applicable law in their arguments.

2              Again, if they said anything that's inconsistent,

3       these are the instructions that you are to follow in deciding

4       the case.  Each of you should have your own copy to read along

5       with me as I read them aloud to you.  You can take notes on

6       them.  I'll let you take them with you into the jury room when

7       the time comes to deliberate.  I'm not going to let you take

8       them at lunch because I won't have read them all, you'll have

9       to leave them on your chair when we break, but once you go to

12:33PM 10      deliberate, you can take them with you and read them and refer

11      to them.

12             So if you would turn with me, the first couple pages

13      are the caption and the title and the table of contents, and

14      then if you'll start following along with me at page 4.

15             It is your duty to find the facts from the evidence

16      admitted in this case.  To those facts, you must apply the law

17      as I give it to you.  The determination of the law is my duty

18      as the Judge.  It is your duty to apply the law exactly as I

19      give it to you, whether you agree with it or not.

12:34PM 20             In following my instructions, you must follow all of

21      them and not single out some and ignore others.  They are all

22      important.

23             You must not interpret these instructions, or anything

24      I may have said or done, as a suggestion by me as to what

25      verdict you should return.  That is a matter entirely for to

1     you decide.

2          Every person accused of a crime is presumed to be

3     innocent unless and until his guilt is proved beyond a

4     reasonable doubt.  The presumption is not a mere formality, it

5     is a fundamental principle of our system of justice.

6          The presumption of innocence means that the burden of

7     proof is always on the government to prove that the defendant

8     is guilty of the crimes with which he is charged beyond a

9     reasonable doubt.

12:34PM 10          This burden never shifts to the defendant.  It is

11    always the government's burden to prove each of the elements of

12    the crime charged beyond a reasonable doubt.  The defendant

13    does not have to prove that he is innocent, or present any

14    evidence, or call any witnesses.

15          The presumption of innocence alone may be sufficient

16    to raise a reasonable doubt and to require the acquittal of the

17    defendant.  You may not convict the defendant of any crime

18    charged against him if the government fails, or is unable, to

19    prove every element of that crime beyond a reasonable doubt.

12:35PM 20          You may not convict the defendant based on speculation

21    or conjecture.

22          You may not convict the defendant if you decide that

23    it is equally likely that he is guilty or not guilty.  If you

24    decide that the evidence would reasonably permit either of two

25    conclusions -- either that he is guilty as charged, or that he

1    is not guilty -- you must find the defendant not guilty.

2         You may not convict the defendant if you decide that

3    it is only probable or even strongly probable that he is

4    guilty.  A mere probability of guilt is not guilt beyond a

5    reasonable doubt.

6         The law does not require that the government prove

7    guilt beyond all possible doubt; proof beyond a reasonable

8    doubt is sufficient to convict.  There are very few things in

9    this world that we know with absolute certainty, and in

12:35PM 10   criminal cases, the law does not require proof that overcomes

11   every possible doubt.

12        Again, the defendant is presumed to be innocent, and

13   the government bears the burden of proving him guilty beyond a

14   reasonable doubt.  If, after fair and impartial consideration

15   of all the evidence, you have a reasonable doubt as to the

16   defendant's guilt, it is your duty to acquit him.  On the other

17   hand, if after fair and impartial consideration of all the

18   evidence, you are satisfied beyond a reasonable doubt as to his

19   guilt, you should vote to convict him.

12:36PM 20        Like all defendants, the defendant in this case has a

21   constitutional right not to testify.  No inference of guilt, or

22   of anything else, may be drawn from the fact that the defendant

23   did not testify.  That fact should not enter in any way in your

24   deliberations or your vote.  For any of you to do so would be

25   wrong; indeed, it would be a violation of your oath as a juror.

1        Your verdict must be based solely upon the evidence.

2   It would be improper for you to base your verdict on anything

3   that is not evidence.

4        Let me go off script here and again remind you I did

5   strike that evidence concerning the robbery of Mr. Martinez and

6   remind you that you may not consider that as part of your

7   deliberations.

8        Returning to the script, you may not base your verdict

9   on any personal feelings, prejudices, or sympathies you may

12:37PM 10   have about the defendant or about the nature of the crimes with

11   which he is charged.

12        You may not consider or be influenced by any possible

13   punishment that may be imposed on the defendant.

14        Again, your verdict must be based solely on the

15   evidence and according to the law.

16        The evidence in this case consists of the sworn

17   testimony of witnesses, both on direct and cross-examination;

18   the exhibits that have been received into evidence; and any

19   facts to which the parties have agreed or stipulated.  You

12:37PM 20   should consider all of the evidence, no matter what form it

21   takes, and no matter which party introduced it.

22        Whether the government has sustained its burden of

23   proof does not depend upon the number of witnesses it has

24   called, or upon the number of exhibits it has offered, but

25   instead upon the nature and quality of the evidence presented.

1            Certain things are not evidence.

2            Arguments and statements by lawyers are not evidence.

3       The lawyers are not witnesses.  What they say in their opening

4       statements, closing arguments, and at other times is intended

5       to help you interpret the evidence, but it is not evidence.  If

6       the facts, as you remember them from the evidence, differ from

7       the way the lawyers have stated them, your memory of the facts

8       should control.

9            Questions by lawyers standing alone are not evidence.

12:38PM 10      Again, the lawyers are not witnesses.  The question and the

11      answer taken together are the evidence.

12           Objections by lawyers are not evidence.  Lawyers have

13      a duty to their clients to object when they believe a question

14      or an exhibit is improper under the rules of evidence.  You

15      should not be influenced by any objection, or by my ruling on

16      it, and you should not speculate or guess about what the answer

17      might have been or what an exhibit might have said.

18           Anything that I have struck or instructed you to

19      disregard is not evidence.

12:38PM 20      The indictment is not evidence.

21           Anything you may have seen or heard when the Court was

22      not in session is not evidence.  You must decide the case sole

23      lit on the evidence received at trial.

24           Evidence may take the form of either "direct evidence"

25      or "circumstantial evidence."  "Direct evidence" is direct

1    proof of a fact, such as testimony from an eyewitness that the

2    witness saw something.  "Circumstantial evidence" is indirect

3    evidence; that is, proof of a fact (or facts) from which you

4    could draw a reasonable inference that another fact exists,

5    even though it has not been proved directly.

6          You are entitled to consider both direct and

7    circumstantial evidence.  The law permits you to give equal

8    weight to both.  It is for you to decide how much weight to

9    give to any particular piece of evidence, whether direct or

12:39PM 10   circumstantial.

11         Although you may consider only the evidence presented

12   in the case, you are not limited to the plain statements made

13   by witnesses or contained in the documents.  In other words,

14   you are not limited solely to what you saw and heard as the

15   witnesses testified.

16         You are also permitted to draw reasonable inferences

17   from the facts if you believe those inferences are justified in

18   light of common sense and personal experience.  An inference is

19   simply a deduction or a conclusion that may be drawn from the

12:40PM 20   facts that have been established.  Any inferences you draw must

21   be reasonable and based on the facts as you find them.

22   Inferences may not be based on speculation or conjecture.

23         A particular item of evidence is sometimes received

24   for a limited purpose only.  That is, it can be used by you

25   only for one particular purpose and not for any other purpose.

1    I have told you when that occurred and instructed you on the

2    purposes for which the item can and cannot be used.

3         Some of the evidence has been received in the form of

4    a stipulation.  A stipulation simply means that the government

5    and the defendant accept the truth of a particular proposition

6    or fact.

7         Because there is no disagreement, there is no need for

8    evidence as to that issue apart from the stipulation.  You may

9    accept the stipulation as a fact to be given whatever weight

10   you choose.

11        You do not have to accept the testimony of any witness

12   if you find that the witness is not credible.  You must decide

13   which witnesses to believe, considering all of the evidence and

14   drawing upon your common sense and personal experience.  You

15   may believe all of the testimony of a witness, or some of it,

16   or none of it.  You alone are the judges of the witnesses'

17   credibility.

18        In deciding whether to believe testimony of the

19   witnesses, you may want to take into consideration such factors

20   as their conduct and demeanor while testifying; any apparent

21   fairness or unfairness they may have displayed; any interest

22   they may have in the outcome of the case; any prejudice or bias

23   they may have shown; their opportunities for seeing and knowing

24   the things about which they have testified; the reasonableness

25   or unreasonableness of the events that they have related to you

1    in their testimony; and any other evidence that tends to

2    support or contradict their versions of the events.

3          If a witness testified falsely about any significant

4    matter, you may choose to distrust the testimony of that

5    witness in other respects.  You may reject all of the testimony

6    of that witness or give it such credibility as you may think it

7    deserves.

8          The testimony of a witness may be discredited or

9    impeached by showing that he or she previously made statements

10   that are inconsistent with his or her present testimony.  If a

11   witness made inconsistent statements about any significant

12   matter, you may choose to distrust the testimony of that

13   witness in other respects.  You may reject all of the testimony

14   of that witness or give it such credibility as you may think it

15   deserves.

16         Sometimes, of course, people make innocent mistakes,

17   particularly as to unimportant details.  Not every

18   contradiction or inconsistency is necessarily important.

19   Again, you alone are the judges of the witnesses' credibility.

20         You have heard the testimony of law enforcement

21   officers and other witnesses employed by the government.  You

22   may accept or reject that testimony.  The fact that a witness

23   may be employed as a law enforcement officer or by the

24   government does not mean that his or her testimony is

25   necessarily deserving of more or less consideration or greater

1       or less weight than that of any other witness.

2               Again, it is for you to decide whether to accept the

3       testimony of any witness and what weight, if any, to give to

4       that testimony.

5               You've heard the testimony of witnesses who have

6       entered into cooperation agreements with the government.

7               The law allows the government to enter into such

8       agreements, to make promises or potential rewards for

9       cooperation, and to call as witnesses people to whom such

12:43PM 10      promises have been given.  The government may give or promise

11      different types of benefits to such persons, including such

12      things as assistance with immigration matters.

13              However, a witness who participated in criminal

14      activity and who has entered into a cooperation agreement with

15      the government has an interest in the outcome of the case that

16      is different from that of an ordinary witness.  A cooperating

17      witness may, of course, testify truthfully in all respects.

18      But such a witness may also have a motive to tailor his or her

19      testimony to please the government.  You should, therefore,

12:44PM 20      examine the testimony of a cooperating witness with caution and

21      weigh it with greater care.

22              Again, it is for you to decide whether to accept the

23      testimony of any witness and what weight, if any, to give to

24      that testimony.

25              You've heard the testimony of witnesses who testified

1     under a promise of immunity.

2          "Immunity" means that a witness' testimony may not be

3     used against him or her in any later criminal proceeding.

4     However, if the witness testifies untruthfully, he or she could

5     be prosecuted for perjury or making a false statement, even

6     though he or she was testifying under a promise of immunity.

7          Some people in this position are entirely truthful

8     when testifying.  Still, you should consider the testimony of

9     an immunized witness with particular care and caution.  The

12:44PM 10   witness may have had reason to make up stories or exaggerate

11    what others did for his or her own purposes.  You must

12    determine whether the testimony of such a witness has been

13    affected by any interest in the outcome of case, any prejudice

14    for or against the defendant, or by any other benefits he or

15    she may have received from the government.

16         Again, it is for you to decide whether to accept the

17    testimony of any witness and what weight, if any, to give to

18    that testimony.

19         You have heard testimony that law enforcement

12:45PM 20   conducted certain testing procedures and followed certain

21    investigative techniques.  You may consider that testimony as

22    you would any other evidence and give it such weight as you

23    believe it may deserve under the circumstances.

24         You may make reasonable inferences from the fact that

25    certain tests were not conducted or that certain investigative

1    techniques were not used.  Any such inferences, however, should

2    not be based on speculation or conjecture about what the

3    results of such tests or techniques might have been.  There is

4    no legal requirement that the government use any specific tests

5    or techniques or all possible tests or techniques to prove its

6    case.

7              Certain charts have been shown to you in order to help

8    explain the facts disclosed by the books, records and other

9    documents that are in evidence in the case.  They are not

12:46PM 10   themselves evidence.  If they do not correctly reflect the

11   facts or figures shown by the evidence in the case, you should

12   not accept them.

13             You may, however, consider any summary that has been

14   received into evidence as you would any other piece of evidence

15   and give it the weight or importance, if any, that you feel it

16   deserves.

17             As I indicated at the beginning of the trial, you've

18   been permitted to take notes, but some cautions apply.  You

19   should bear in mind that not everything that is written down is

12:46PM 20   necessarily what was said.  When you return to the jury room to

21   discuss the case, do not assume simply because something

22   appears in somebody's notes that it necessarily took place in

23   court.  Notes are an aid to recollection, nothing more.  The

24   fact that something is written down does not mean that it is

25   necessarily accurate.

1          The numbers assigned to the exhibits are for

2     convenience and in order to ensure an orderly procedure.  You

3     should draw no inference from the fact that a particular

4     exhibit was assigned a particular number or that there may be

5     gaps in the number sequence.

6          All right.  That's where I'm going to pause.  From

7     this point forward, I'm going to talk about what the actual

8     crime that he's charged with is and what the government has to

9     prove, so let us break then for lunch.

12:47PM 10          Again, please leave your instructions on your chair,

11     if you would, and we'll pick up again when we return.  I'd like

12     to have this lunch be as close to 45 minutes as we can make it.

13     Sometimes it's hard to get all the moving pieces in order, but

14     in order to keep the case moving, your lunch should be up there

15     if you haven't nibbled on it already.

16          And I ask you one more time, you're all going to be

17     together, you are almost ready to deliberate, but please don't

18     talk about the case during lunch.  You can talk about the great

19     Patriots victory this weekend or anything else that comes to

12:47PM 20     mind, upcoming plans for Thanksgiving, just not about this

21     case, and then when we return at 1:30 or as close to 1:30 as we

22     can make it, I'll give you the remainder of the instructions.

23     Thank you.

24          THE CLERK:  All rise.

25          (JURORS EXITED THE COURTROOM.)

1        (A recess was taken.)

2        THE CLERK:  All rise for the jury.

3        (JURORS ENTERED THE COURTROOM.)

4        THE CLERK:  Thank you.  You may be seated.  Court is

5   now back in session.

6        THE COURT:  Ladies and gentlemen, welcome back.  If

7   you would turn with me to page 24, please, and I'll continue

8   with my instructions.

9        All right.  I'm now going to give you some

01:35PM 10   instructions on the nature of the crime charged in the

11   indictment and the elements that the government must prove

12   beyond a reasonable doubt.

13        The indictment contains one count against the

14   defendant.  He is charged with conspiracy to commit

15   racketeering.  Racketeering is a crime under federal law --

16   conspiracy to commit racketeering is also a crime under federal

17   law.  It is a separate crime from racketeering.

18        "Racketeering" means conducting the affairs of an

19   "enterprise" that affects "interstate commerce" through a

01:36PM 20   "pattern" of "racketeering activity."  Each of those terms has

21   a particular meaning, which I will explain to you.

22        Again, the defendant is charged with conspiracy to

23   commit racketeering.  I will begin by explaining the meaning of

24   a "conspiracy."

25        A "conspiracy" is an agreement to commit a crime.

1    Again, it's a separate crime from the crime that is the object

2    of the conspiracy -- what we sometimes called the "substantive"

3    crime.

4         I will give you a simple example to help illustrate

5    the difference between a crime and a conspiracy to commit that

6    crime.  It is a federal crime to commit bank robbery.  (This

7    case, of course, does not involve an alleged bank robbery.  I'm

8    using this only as an illustration.)  If a person robs a bank,

9    he has committed a bank robbery.  If three people agree to rob

01:37PM 10   a bank -- one thinks up the plan, one agrees to rob the bank,

11   and one agrees to drive the getaway car -- all three have

12   conspired to rob the bank.

13        Again, a "conspiracy" is an agreement to commit a

14   crime.  The agreement may be spoken or unspoken.  It does not

15   have to be a formal agreement or a plan in which everyone

16   involved sat down together and worked out all the details.  The

17   government, however, must prove beyond a reasonable doubt that

18   those who were involved shared a general understanding about

19   the crime.

01:37PM 20        Mere similarity of conduct among various people or the

21   fact that they may have associated with each other does not

22   necessarily establish the existence of a conspiracy, although

23   you may consider such factors in deciding whether a conspiracy

24   existed.  Mere association with other persons, even persons

25   involved in criminal activity, does not by itself establish the

1    existence of a conspiracy.

2           The object of a conspiracy must be one or more crimes.

3    To go back to my bank robbery example, the object of the

4    conspiracy among the three persons was to rob a bank, which is

5    itself a crime.

6           A conspiracy is complete, and the crime has occurred,

7    once the agreement has occurred.  The government does not have

8    to prove that the conspiracy succeeded or that its objects were

9    achieved.

01:38PM 10          In my bank robbery example, the three conspirators

11   committed the crime of conspiracy as soon as they agreed to rob

12   the bank.  Even if they had been arrested before the robbery

13   occurred, or if the robbery had been attempted but failed, they

14   would have nonetheless committed the crime of conspiracy to

15   commit bank robbery.  Even if one of the conspirators later

16   changed his mind and decided to break into a house that day

17   rather than rob a bank, they would have nonetheless committed

18   the crime of conspiracy to commit a bank robbery.  But if all

19   three people thought that the object was to commit a crime but

01:38PM 20   one of them thought it was a different type of crime -- for

21   example, if he thought it was an agreement to break into a

22   house -- that person would not have conspired with the others

23   to commit bank robbery.

24          I will now turn to the elements of the crime that the

25   government must prove in this case.  Again, the defendant is

1    charged with the crime of conspiracy to commit racketeering.

2         For you to find the defendant guilty of that crime,

3    you must be convinced that the government has proved each of

4    the following things beyond a reasonable doubt:

5         First, that there was a conspiracy to commit the crime

6    of racketeering -- that is, an agreement among two or more

7    persons to conduct the affairs of an enterprise affecting

8    interstate commerce through a pattern of racketeering activity.

9         Second, that the defendant knowingly and willfully

01:39PM 10    joined in that conspiracy;

11        And, third, that the defendant or another member of

12   the conspiracy agreed to commit at least two racketeering acts.

13        I will now explain the elements in detail.

14        The first element that the government must prove

15   beyond a reasonable doubt is that there was a conspiracy to

16   commit the crime of racketeering -- that is, that there was an

17   agreement among two or more persons to conduct the affairs of

18   an "enterprise" affecting "interstate commerce" through a

19   pattern of "racketeering activity."

01:40PM 20        I have already explained to you what a conspiracy is.

21        In a moment, I will explain the terms "enterprise,"

22   "interstate commerce," "pattern" and "racketeering activity."

23        Again, the government must prove the existence of an

24   agreement among two or more persons to commit the crime of

25   racketeering.

1          The government must prove the existence of the

2     agreement charged in the indictment and not some other

3     agreement.  The conspiracy charged in the indictment is a

4     conspiracy to conduct or participate in, directly or

5     indirectly, the affairs of the MS-13 enterprise through a

6     pattern of racketeering activity.

7          If you find beyond a reasonable doubt that a

8     conspiracy of some kind existed between the defendant and some

9     other person, that in and of itself is not sufficient to find

01:40PM 10   the defendant guilty.  The government is required to prove

11     beyond a reasonable doubt the existence of the conspiracy

12     specified in the indictment.

13          Again, the object of the conspiracy must be a crime.

14     Here, the indictment alleges that the object of the conspiracy

15     was the crime of racketeering -- specifically to conduct the

16     affairs of MS-13 through a pattern of racketeering activity.

17          An "enterprise" is a group of people who have

18     associated together for a common purpose of engaging in a

19     course of conduct over a period of time.  It may be a group of

01:41PM 20   individuals associated, in fact, although not a formal or a

21     legal entity.

22          The "enterprise," in addition to having a common

23     purpose, must have an ongoing organization, either formal or

24     informal, and it must have personnel who function as a

25     continuing unit.  The membership of the association may change

1    over time by adding or losing individuals during the course of

2    its existence.

3         Here, the indictment alleges that the enterprise was a

4    criminal organization known as La Mara Salvatrucha, or MS-13.

5         The "enterprise" must be one affecting "interstate

6    commerce."  Interstate commerce means the movement of goods,

7    services, money, and individuals between states.  It also

8    includes foreign commerce.  (That is, commerce between the

9    United States and a foreign nation.)  It includes, among other

01:42PM 10   things, the use of interstate or international mail, wire,

11   telephone or banking facilities to conduct the affairs of the

12   enterprise; the movement of persons across state or

13   international borders to conduct the affairs of the enterprise;

14   and the possession of firearms on behalf of the enterprise that

15   had been previously transported across state or international

16   borders.

17        The government must prove that the enterprise was

18   intended to engage in interstate commerce or affect interstate

19   commerce; however, the effect need not be substantial or

01:42PM 20   significant.  A minimal effect is sufficient.  The government

21   does not have to prove that the enterprise actually affected

22   interstate commerce, or that the defendant knew he was

23   affecting interstate commerce.

24        The "enterprise" must be one "affecting interstate

25   commerce" through a "pattern" of "racketeering activity."  I

1    will first define "racketeering activity," and then define

2    "pattern."

3             "Racketeering activity" consists of "racketeering

4    acts."  "Racketeering acts" are certain specific crimes defined

5    by federal law.  The racketeering acts alleged in the

6    indictment in this case are the following crimes:

7             murder,

8             assault with intent to commit murder,

9             armed assault with intent to murder;

01:43PM 10         conspiracy to commit murder,

11            armed robbery,

12            armed assault with intent to rob,

13            and criminal offenses involving trafficking in

14   narcotics.

15            In a moment, I will explain the elements of some of

16   these offenses in more detail.

17            A "pattern" of racketeering activity consists of two

18   or more racketeering acts that are related and pose a threat of

19   continued criminal activity.

01:43PM 20        To prove that the acts of racketeering are related,

21   the government must prove that the acts had a meaningful

22   connection to the enterprise, and that they had the same or

23   similar purposes, results, participants, victims, or methods of

24   commission, or that they are otherwise inter-related by

25   distinguishing characteristics and not merely isolated events.

1    The acts may be dissimilar or not related to each other as long

2    as they are related to the enterprise.  A series of

3    disconnected crimes does not constitute a pattern of

4    racketeering activity.

5         Examples of "related" racketeering acts are acts that

6    benefit the enterprise, that are authorized by the enterprise,

7    or that further or promote the purposes of the enterprise.

8         To prove that racketeering acts pose a threat of

9    "continued racketeering activity," the government must prove

01:44PM 10    that the acts are not a series of discontinued crimes but part

11    of a long-term association that exists for criminal purposes.

12         The second element that the government must prove

13    beyond a reasonable doubt is that the defendant knowingly and

14    willfully joined the conspiracy charged in the indictment.

15         The defendant acted "knowingly" if he acted with

16    knowledge and awareness of his actions and did not act out of

17    ignorance, mistake, neglect, or accident.

18         The defendant acted "willfully" if he acted

19    voluntarily and intentionally, and with the specific intent to

01:44PM 20    do something the law forbids -- that is, with a bad purpose

21    either to disobey or to disregard the law.

22         The government must prove that the defendant joined

23    the conspiracy with knowledge of its basic aims, an unlawful

24    purpose, and with the specific intention of furthering its

25    objectives.

1          The government does not have to prove that the

2     defendant knew the identities of each and every other member of

3     the conspiracy.  It does not have prove that the defendant was

4     aware or informed of all of the activities of the other

5     members, all of the details of the conspiracy, or its complete

6     scope.  However, it must prove that the defendant knew at least

7     some of the essential purposes or objectives of the conspiracy

8     and intended to aid in the accomplishment of its objects.

9          It is not enough for the government to prove, without

01:45PM 10    more, that the defendant simply knew of, or acquiesced in, the

11    conspiracy.  The fact that the defendant merely happened to

12    further the purposes or objectives of the conspiracy, without

13    more, is not sufficient.

14          Ordinarily, knowledge or intent may not be proved

15    directly because there is no way of directly scrutinizing the

16    workings of the human mind.  Knowledge and intent must be

17    proved indirectly.

18          In determining what the defendant knew or intended at

19    a particular time, you may consider any statements he may have

01:46PM 20    made; anything that he did, or failed to do, and any other fact

21    received in evidence that may reflect his knowledge or intent.

22          You may infer -- although you are not required to --

23    that a person intends the natural and probable consequences of

24    his acts and omissions when those acts are done knowingly.

25          The third element that the government must prove

1    beyond a reasonable doubt is that the defendant or another

2    member of the conspiracy agreed to commit at least two

3    racketeering acts.

4         The government must prove that the defendant agreed

5    that the objective of the enterprise would be to engage in a

6    pattern of racketeering activity.  In other words, the

7    government must prove that the defendant agreed to join the

8    conspiracy, and that the conspiracy involved or would have

9    involved the commission of two racketeering acts.  The

01:46PM 10   government is not required to prove either that the defendant

11   personally agreed to commit two racketeering acts or that he

12   actually committed two such acts.  However, the government must

13   prove that the defendant intended to further an endeavor that

14   would have satisfied, or actually did satisfy, the requirement

15   of a pattern of racketeering activity.

16        Again, the definition of "racketeering acts" is

17   limited to a specific list of crimes set by statute.

18   Furthermore, the indictment charges that the pattern of

19   racketeering activity engaged in by the enterprise, (that is,

01:47PM 20   by MS-13) consisted of certain specific types of crimes,

21   generally involving murder, armed robbery, and drug

22   trafficking.

23        There are many other crimes that do not qualify as

24   "racketeering acts."  In order to be convicted of conspiracy to

25   commit racketeering, the government must prove that the

1    defendant agreed that one or more members of the enterprise

2    would commit crimes that qualify as racketeering acts by law,

3    and that are specified in the indictment.

4         In order to decide that, you need to know the

5    definitions of those crimes.  Therefore, I will instruct you on

6    the elements of those crimes.

7         Again, the defendant is not charged with having

8    committed any of these crimes.  He is charged with conspiracy

9    to commit racketeering.  I am providing you with these

01:48PM 10  definitions so that you can determine whether the object of the

11   conspiracy was to conduct the affairs of an enterprise --

12   there's an extra word affairs in there, you can strike that

13   out -- whether the object of the conspiracy was to conduct the

14   affairs of an enterprise through a pattern of racketeering

15   activity.  I will also instruct you on the definitions of

16   certain related crimes that are not racketeering acts to try to

17   give you a reasonably clear picture of what the law requires.

18        Because the defendant is charged with conspiracy, it

19   is not necessary for the government to prove that anyone

01:48PM 20  actually committed two or more racketeering acts.  Indeed, the

21   government does not have to prove that any racketeering act

22   occurred at all.  Thus, for example, as long as the defendant

23   agreed to join in an enterprise in which some members would

24   engage in murders, the government need not prove that the

25   murders ever happened, or that the defendant specifically

1    agreed that the enterprise would murder any specific person on

2    any specific day.

3          Again, the government is not required to prove that

4    any specific acts are racketeering acts, or that any such acts

5    occurred at all, however, the government must prove that the

6    defendant agreed to join in the enterprise engaged in

7    particular types of racketeering acts.  You must unanimously

8    agree on which type or types of racketeering activity that the

9    defendant agreed the enterprise would conduct -- for example,

01:49PM 10   at least two acts of murder, at least two acts of robbery, or

11   at least two acts of narcotics trafficking, or all of them, or

12   any combination of them.

13         All right.  The following crimes under Massachusetts

14   law constitute "racketeering acts" under federal law and as

15   charged in the indictment:

16         Murder.  Murder is the unlawful killing of a human

17   being.  Murder may be committed in the first degree or the

18   second degree.  Murder in the first degree can be with either

19   deliberate premeditation or with extreme atrocity or cruelty.

01:50PM 20   Murder in the first degree requires that a perpetrator caused

21   the victim's death, consciously or purposely intended to kill,

22   and committed the killing with deliberate premeditation, that

23   is, killed after a period of reflection.

24         Deliberate premeditation does not require any

25   particular length of time of reflection.  A decision to kill

1    may be formed over a period of days, hours, or even a few

2    seconds.

3           The question of whether a perpetrator intended to kill

4    refers to that perpetrator's objectives or purposes.  A

5    perpetrator must have had it in his or her mind to kill the

6    victim.  It involves concentrating or focusing the mind for

7    some perceptible period.  It is a conscious act, with the

8    determination of the mind to do the act.  It is contemplation

9    rather than reflection, and it must precede the act.  A

01:50PM 10   perpetrator must have possessed an actual, subjective intent to

11   kill.

12          If a perpetrator intends to kill a person and in

13   attempting to do so mistakenly kills another person, such as a

14   bystander, the perpetrator is treated under the law as if he or

15   she intended to kill the actual victim.  This is referred to as

16   transferred intent under the law.  For example, if I aim and

17   fire a gun at one person intending to kill him but instead

18   mistakenly kill another person, the law treats me as if I

19   intended to kill the actual victim.  My intent to kill is

01:51PM 20   transferred to the actual victim.

21          Murder in the first degree by extreme atrocity or

22   cruelty requires that a person caused the person's death, acted

23   with malice, and committed the killing with extreme atrocity or

24   cruelty.

25          A perpetrator acted with malice if he or she either

1    (a) intended to kill the victim, (b) intended to cause grievous

2    bodily harm to the victim, or (c) intended to do an act which,

3    in the circumstances known, a reasonable person would have

4    known created a plain and strong likelihood that death would

5    result.  Extreme atrocity means an act that is extremely wicked

6    or brutal, appalling, horrifying, or utterly revolting.

7         Murder in the second degree is different from first

8    degree murder in that it does not require proof of

9    premeditation or extreme atrocity or cruelty.  Murder in the

01:52PM 10   second degree requires only that a perpetrator caused the

11   victim's death and acted with malice.

12        The second crime is assault with intent to murder.

13   The crime of assault with intent to murder punishes the

14   attempted commission of a murder.  The elements of assault with

15   intent to murder are that the perpetrator assaulted another

16   person and that the perpetrator possessed a specific intent to

17   kill.

18        An assault is an attempted or threatened battery,

19   which is a harmful or offensive touching of another.  The

01:52PM 20   assault must be committed with a specific intent to kill the

21   victim, (which may be inferred from the perpetrator's conduct.)

22        Armed assault with intent to murder is the third

23   crime.  Armed assault with intent to murder is an aggravated

24   form of assault with intent to murder.  The elements of armed

25   assault with intent to murder are (1) that the perpetrator

1   assaulted another person, (2), that the perpetrator possessed a

2   specific intent to cause the death of the person assaulted,

3   and, (3), that at the time of the assault, the perpetrator was

4   armed with a dangerous weapon.  A dangerous weapon is any

5   instrument that by the nature of its construction or the manner

6   of its use is capable of causing grievous bodily injury or

7   death, or could be perceived by a reasonable person as capable

8   of causing such an injury.  The perpetrator need not display,

9   use, or otherwise make the victim aware of the dangerous weapon

01:53PM 10   to be guilty of armed assault with intent to murder.

11          The fourth crime is conspiracy to commit murder.  The

12   elements of conspiracy to commit murder are (1) an agreement or

13   plan between two or more persons, (2) to commit murder, where

14   (3) the perpetrator knowingly joined the conspiracy with the

15   intent that the murder be accomplished.  The essence of

16   criminal conspiracy is the knowing agreement to commit an

17   unlawful act.  Thus, the perpetrator need not have taken any

18   concrete steps to carry out the plan.  The perpetrator can be

19   convicted based on circumstantial evidence that he or she

01:54PM 20   intentionally joined the conspiracy with knowledge of the

21   agreement and its purpose.

22          The following crimes under Massachusetts law also

23   constitute "racketeering acts" under federal law and as charged

24   in the indictment.

25          The first crime is armed robbery.  The elements of

1    armed robbery are:  (1) a larceny from the victim's person;

2    (2) by force and violence or by assault and putting in fear;

3    and (3) that the perpetrator was armed with a dangerous weapon.

4    A larceny is the taking and carrying away of the personal

5    property of another against his will with the intent to steal.

6    There must be actual or threatened force to steal the victim's

7    property.  The degree of force employed is immaterial, as long

8    as there is a causal connection between the perpetrator use of

9    violence and intimidation and the larceny.  The perpetrator

01:55PM 10    need not display, use or otherwise make the victim aware of the

11    presence of the dangerous weapon to be guilty of armed robbery.

12         The second crime is armed assault with intent to rob.

13    The crime of armed assault with intent to rob punishes the

14    attempted commission of an armed robbery.  The elements of

15    armed assault with intent to rob are:  (1) an assault; (2) with

16    a specific intent to rob the person assaulted; and (3) that the

17    perpetrator was armed with a dangerous weapon at the time of

18    the assault.

19         The following federal -- it says crimes, but it's

01:55PM 20    really only one crime -- also constitute "racketeering acts"

21    under federal law, and as charged in the indictment.

22         A conspiracy to distribute control substances or to

23    possess with intent to distribute.  Actually, there are two

24    crimes, I apologize.  It is also a federal crime to conspire to

25    distribute control substances, including marijuana, or to

1   possess such substances with the intent to distribute.  The

2   elements of distribution or possession with intent to

3   contribute a controlled substance are:  (1) possession with

4   intent to distribute or distribution of a controlled substance

5   to another person; (2) knowledge that the substance was a

6   controlled substance; and (3) intentional action or conscious

7   object to transfer the controlled substance to another person.

8   It is not necessary that the perpetrator benefit in any way

9   from the transfer.

01:56PM 10        The following crimes under Massachusetts law, among

11   others, do not qualify as "racketeering acts."

12        The first is armed assault with intent to kill.  The

13   elements of armed assault with attempt to kill are the same as

14   the elements for armed assault with intent to murder with one

15   important difference.  A perpetrator is guilty of the lesser

16   crime of armed assault with intent to kill where he or she

17   (1) assaulted another person; (2) possessed a specific intent

18   to cause the death of the person assaulted; and (3) was armed

19   with a dangerous weapon at the time of the assault, but (4)

01:56PM 20   there was mitigation.

21        The term "mitigation" is used to describe situations

22   where the assault with intent to kill is unlawful but the

23   intention to kill arises from the frailty of human nature, as

24   in the instances of sudden passion induced by reasonable

25   provocation, sudden combat, or excessive force and

1    self-defense.  If there is evidence of mitigation, the

2    government must prove beyond a reasonable doubt that the

3    specific intent to kill was not the product of those mitigating

4    circumstances.

5            A perpetrator is not guilty of any crime if he acted

6    in proper self-defense.  The law does not permit retaliation or

7    revenge.  The proper exercise of self-defense arises from the

8    necessity of the moment and ends when the necessity ends.  A

9    person must retreat unless he cannot do so in safety.  A

01:57PM 10   perpetrator may only use sufficient force to prevent occurrence

11   or recurrence of the attack.  The question of what force is

12   needed in self-defense, however, should be considered with due

13   regard for human impulses and passions, and is not to be judged

14   too strictly.

15           Deadly force is force that is intended to or likely to

16   cause death or serious bodily harm.  Nondeadly force, by

17   contrast, is force that is not intended to or likely to cause

18   death or serious bodily harm.  A perpetrator should use or

19   attempt to use all proper and reasonable means under the

01:58PM 20   circumstances to avoid physical combat before resorting to the

21   use of deadly force.  If the perpetrator based on the

22   circumstances known to him or her at the time had reasonable

23   grounds to believe that he was in immediate danger of harm for

24   which he could save himself only by using nondeadly force and

25   had availed himself of all reasonable means to avoid physical

1    combat before resorting to nondeadly force, then the

2    perpetrator had the right to use the nondeadly force reasonably

3    necessary to avert the threatened harm, but he could no more

4    force than was reasonable and proper under the circumstances.

5    You must consider the proportionality of the force used to the

6    threat of immediate harm in assessing the reasonableness of

7    nondeadly force.

8         The right of self-defense ordinarily cannot be claimed

9    by a person who provokes or initiates an assault, and the right

01:59PM 10    of self-defense ordinarily cannot be claimed by a person who

11    was the first to use or threaten deadly force.

12         If a perpetrator was entitled to use the degree of

13    force he or she used in self-defense, he or she is not guilty

14    of armed assault with intent to murder or armed assault with

15    intent to kill.  If the perpetrator was entitled to use some

16    force in his or her self-defense but used excessive force under

17    the circumstances, there is mitigation, and the perpetrator is

18    guilty of armed assault with intent to kill but not armed

19    assault with intent to murder.  If the perpetrator was not

01:59PM 20    entitled to use any force in self-defense, there is no

21    mitigation, and he or she is guilty of armed assault with

22    intent to murder.

23         The next crime is voluntary manslaughter.  A

24    perpetrator is guilty of voluntary manslaughter if he or she

25    intentionally inflicted an injury or injuries on the victim

1    likely to cause death; (2) caused the victim's death; and (3)

2    did not act in proper self-defense or in the proper

3    self-defense of another.

4         I just explained self-defense in the context of armed

5    assault with intent to kill.  The same principles will apply to

6    voluntary manslaughter, and the third crime is involuntarily

7    manslaughter.

8         A perpetrator is guilty of involuntary manslaughter if

9    he or she caused the victim's death, Number 1; Number 2,

02:00PM 10    intended the conduct that caused the victim's death; 3, engaged

11    in conduct that was wanton and reckless; and, 4, did not act in

12    proper self-defense or in the proper defense of another.

13    Wanton and reckless conduct is intentional conduct that created

14    a high degree of likelihood that substantial harm will result

15    to another person.

16         The principal difference between murder and

17    involuntary manslaughter is the nature of the perpetrator's

18    intent.  To be guilty of murder, the perpetrator must have

19    acted with malice, that is, with the intent to kill, the intent

02:00PM 20    to cause grievous bodily harm to the victim, or the intent to

21    engage in conduct, which in the circumstances known, a

22    reasonable person would have known created a plain and strong

23    likelihood that death would result, however, if the

24    perpetrator's conduct was merely wanton and reckless, he or she

25    is guilty of the lesser crime of involuntary manslaughter.

1          All right.  And, again, going off script, that was the

2     description of certain crimes that do qualify as racketeering

3     acts and a small number of crimes that do not qualify as

4     racketeering acts.

5          All right.  Back to the instructions.  You've heard

6     evidence that the defendant has been incarcerated since

7     April 6th, 2014.  You may consider the fact of his

8     incarceration as part of the evidence in this case.  You may

9     not, however, consider that as evidence that the defendant has

02:01PM 10   a bad character or is somehow a bad person and is therefore

11    more likely to have committed the crime charged in the

12    indictment.  You have also heard testimony that there was a

13    prior court proceeding involving the defendant.  You should not

14    speculate as to the crime charged in that case, the jury's

15    verdict, or any sentence that may have been imposed.

16         A defendant who has joined a conspiracy continues to

17    violate the law through every moment of the conspiracy's

18    existence, and he becomes responsible for the acts of his

19    co-conspirators in pursuit of their common agreement.

02:02PM 20   Nevertheless, it is possible for a defendant who has joined to

21    a conspiracy to later withdraw from the conspiracy.  Once a

22    defendant has successfully withdrawn from a conspiracy, he is

23    no longer responsible for acts committed by his

24    co-conspirators.  However, even if a defendant later withdraws

25    from a conspiracy, he or she is still guilty of the crime of

1    conspiracy.

2         It is the defendant's burden to show that he has

3    withdrawn from the conspiracy, that is, once the government has

4    proved beyond a reasonable doubt that the defendant was part of

5    a conspiracy, it does not have to also prove beyond a

6    reasonable doubt that the defendant did not later withdraw from

7    the conspiracy.  Rather, the burden is on the defendant to show

8    that he did withdraw.

9         In order to withdraw from a conspiracy, a conspirator

02:02PM 10    must act affirmatively to either defeat or disavow the purposes

11    of the conspiracy.  Typically, that requires either a full

12    confession to authorities or a communication by the accused to

13    his co-conspirators that he has abandoned the enterprise and

14    its goals.  A defendant cannot withdraw simply by ceasing

15    activity in furtherance of the conspiracy or by being prevented

16    from continuing to participate in the conspiracy.

17         I come now to the last part of the instructions, the

18    rules for your deliberations.  When you retire, you will

19    discuss the case with the other jurors to reach agreement, if

02:03PM 20    you can do so.  You shall permit your foreperson to preside

21    over your deliberations, and your foreperson will speak for you

22    here in court.  Your verdict must be unanimous.  That is, all

23    of you must agree on the verdict.

24         Each of you must decide the case for yourself, but you

25    should do so only after having considered all the evidence,

1    discussing it fully with the other jurors, and listening to the

2    views of the other jurors.

3         Do not be afraid to change your opinion if you think

4    you are wrong, but do not come to a decision simply because

5    other jurors think it is right.

6         It is important that you reach a verdict if you can do

7    so consciously.  You should not hesitate to reconsider your

8    views from time to time and to change them if you are persuaded

9    that this is appropriate.

02:04PM 10         It is important that you attempt to return a verdict,

11    but, of course, only if each of you can do so after having made

12    your own consciousness determination.  Do not surrender an

13    honest conviction as to the weight and effect of the evidence

14    simply to reach a verdict.

15         I want to explain to you now what is called the

16    verdict form.  This is simply the written notice of the

17    decision you will reach in this case.  It's a single page.  It

18    has the caption of the case that says, "Verdict Form," and

19    there's a place for you to check guilty or not guilty and a

02:04PM 20    place for the person to sign it and date it.

21         After you have reached a unanimous agreement on your

22    verdict, your foreperson will fill in the form that has been

23    given to you, sign and date it, and advise the jury officer

24    outside your door that you are ready to return to the

25    courtroom.

1          After you have returned to the courtroom, your

2    foreperson will deliver the completed verdict form as directed

3    in open court.

4          If it becomes necessary during your deliberations to

5    communicate with me, you may send through the jury officer a

6    note signed by your foreperson or by one or more members of the

7    jury.  No member of the jury should ever communicate with me on

8    anything concerning the case except by a signed writing, and I

9    will communicate with any member of the jury on anything

02:05PM 10  concerning the case only in writing or orally here in open

11   court.

12         If you send out a question, I will consult with the

13   parties as promptly as possible before answering it, which may

14   take some time.  You may continue with your deliberations while

15   waiting for the answer to any question.  When you are

16   communicating with me, please do not tell me or anyone else how

17   the jury stands numerically or toward which decision the jury

18   is leaning.

19         All right.  Let me see counsel at sidebar.

20         (SIDEBAR CONFERENCE WAS HELD.)

21         THE COURT:  Ladies and gentlemen, let me make a couple

22   clarifications.  The first is I think twice I used the word, at

23   least twice I used the word "narcotics trafficking," and then

24   later I referred to marijuana.

25         We're only talking about marijuana here.  I should

1    have used the word "drug," because marijuana is not a narcotic,

2    and it might be confusing, but we're talking about marijuana,

3    which is a controlled substance under federal law.

4         Next, if you would turn with me to page 49, the last

5    sentence above the phrase "voluntary manslaughter," it says,

6    "If the perpetrator is not entitled to use any force in

7    self-defense, there is no mitigation, and he or she is guilty

8    of armed assault with intent to murder."

9         That means only there's no mitigation as to

02:10PM 10   self-defense.  There are other ways in which mitigation can

11   exist, for example, reasonable provocation, and so that

12   sentence applies only when the issue is self-defense as opposed

13   to some other form of mitigation, so I wanted to clarify that.

14        All right.  A couple follow-up matters, housekeeping

15   and otherwise.  The first is if you have any issues involving

16   your personal comfort, you don't need to -- we don't need to

17   convene in open court, if it's too hot or too cold, or you've

18   run out of soda, you don't need to send me a note, but anything

19   else, anything that doesn't involve your own comfort, we're

02:11PM 20   going to need a note, and we're going to have to reconvene in

21   court, Number 1.

22        Number 2, it's now ten minutes after two.  I'm about

23   to instruct you to retire and deliberate.  You can take as long

24   as you need to make this decision or as little time that as you

25   need.  It is entirely up to you.  We are here.  We'll be here

1    tomorrow.  If I haven't heard from you otherwise, I'm going to

2    check in at about five or ten minutes to five o'clock and see

3    where you are.  Sometimes jurors want a little more time to get

4    it done that day, sometimes they want to go home.  You're the

5    masters of your schedule at this point forward, and, again,

6    it's an important decision, and you're under no obligation to

7    make it at any particular time, and that includes tomorrow as

8    well.  We're taking Wednesday off, but you don't have to decide

9    this by Thanksgiving.  We're here after Thanksgiving as well,

02:12PM 10    so it's entirely up to you.

11          All right.  You will have the exhibits with you in the

12    jury room.  It's going to take a little while for us to collect

13    those.  You'll also have an electronic system that you can use

14    to look at the exhibits, and we will collect those as soon as

15    we can.

16          I'm going to appoint a foreperson of the jury.  The

17    role of the foreperson is simply this, to preside over the

18    discussion and make sure it's orderly and that everyone is

19    having a chance to speak and to make sure that the form is

02:12PM 20    filled out correctly.

21          You are a jury of equals.  The foreperson has no extra

22    vote and not entitled to any extra consideration or deference

23    by you except, again, to ensure that the discussion is orderly

24    and that the form is filled out correctly.

25          Ms. Pinciaro in seat 9 is in the nursing field, and

1   you probably know how to fill out a form, so I'm going to

2   appoint you to preside over your deliberations.

3        The next thing I have to do, and, unfortunately, I

4   have to do it by law.  I don't like doing it, but I have to.

5   We impaneled 16 people, and only 12 of you can deliberate and

6   vote.  We thought this case there was a good chance that it was

7   going to go well into December, even conceivably beyond if

8   things didn't go the way we expected, and so we had to impanel

9   some alternates, but I now have to take four of you off, and

02:13PM 10  that means the four of you can't deliberate or vote, and to

11  make matters worse, you don't get to go home because sometimes

12  we lose people during deliberations because they become ill or

13  something else happens during deliberations, so you'll be

14  segregated from the other jurors and not permitted yet to

15  leave, so my apologies, but I'm required to do it, and, the

16  four alternates are going to be the last four people that we

17  impaneled on the day of impanelment, and so that will be

18  Ms. Wilcox-Gonzalez in seat 3, Mr. Zimmerman in seat 12,

19  Ms. Cassidy in seat 16, and Mr. Murphy -- no, names wrong,

02:14PM 20  Mr. Askins in seat 12 and Mr. Zimmerman in seat 8.  Wilcox,

21  Gonzalez, Cassidy and Zimmerman, so I apologize to the four of

22  you.

23        With that, I instruct you to retire to the jury to

24  begin your deliberations.  We'll get the exhibits up to quickly

25  as quickly as we have them in order, and if I haven't heard

1  from you otherwise, I will check in with you at a few minutes

2  before five o'clock.

3             (Whereupon, the hearing was adjourned at

4  4:59 p.m.)

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript,

8    Pages 1 through 136 inclusive, was recorded by me

9    stenographically at the time and place aforesaid in Criminal

10   Action No. 15-10338-FDS, UNITED STATES vs. RAFAEL

11   LEONER-AGUIRRE and thereafter by me reduced to typewriting and

12   is a true and accurate record of the proceedings.

13           Dated this 19th day of July, 2018.

14                    s/s Valerie A. O'Hara

15           _____

16           VALERIE A. O'HARA

17           OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25